**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

**No. 24-1180 (consolidated with 24-1178)**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

THE ETHYLENE OXIDE STERILIZATION ASSOCIATION, INC.
*Petitioner*,

v.

ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

---

On Petition for Review of Final Agency Action of the
Environmental Protection Agency

---

**BRIEF OF PETITIONER**

---

Amanda Shafer Berman
Monty Cooper
Siyi Shen
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 688-3451
Fax: (202) 628-5116
aberman@crowell.com

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

## 1.    Parties in this Case

The Petitioner in 24-1180 is The Ethylene Oxide Sterilization Association, Inc. The Respondents in 24-1180 are U.S. Environmental Protection Agency ("EPA") and Michael S. Regan, Administrator, EPA.

The Petitioners in 24-1178 are California Communities Against Toxics, Clean Power Lake County, Comite Dialgo Ambiental, Rio Grande International Study Center, Sierra Club and Union of Concerned Scientists.   The Respondents in 24-1178 are U.S. Environmental Protection Agency ("EPA") and Michael S. Regan, Administrator, EPA.

## 2.    Intervenors in this Case

California Communities Against Toxics, Clean Power Lake County, Comite Dialgo Ambiental, Rio Grande International Study Center, Sierra Club and Union of Concerned Scientists were granted leave to intervene as Respondents in 24-1180.

The Ethylene Oxide Sterilization Association was granted leave to intervene as a Respondent in No. 24-1178.

## 3.    Amici curiae in this Case

As of this time, there are no amici curiae.

## 4. Related cases

These consolidated cases have not previously been before this Court or any other court.

/s/ Amanda Shafer Berman
Amanda Shafer Berman

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner the Ethylene Oxide Sterilization Association, Inc. ("EOSA") states the following:

EOSA is a nonprofit organization incorporated in the District of Columbia for the purpose of representing members of the ethylene oxide sterilizing industry to promote and enhance the safe use of ethylene oxide for sterilization purposes. EOSA has no parent company, subsidiary, or affiliates. No publicly held company has a 10% or greater ownership interest in EOSA.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS  AND
    RELATED CASES .......................................................... ii

CORPORATE DISCLOSURE STATEMENT ........................................ iv

GLOSSARY ................................................................. xii

INTRODUCTION ............................................................. 1

JURISDICTIONAL STATEMENT ................................................. 3

STATEMENT OF ISSUES ...................................................... 3

STATUTORY AND REGULATORY PROVISIONS ...................................... 4

STATEMENT OF THE CASE .................................................... 4

I.    Statutory background .............................................. 4

      A.    Congress enacts CAA section 7412. .......................... 4

      B.    Congress amends section 7412. .............................. 5

            1.    Amended section 7412(d) ............................. 7

            2.    Amended section 7412(f) ............................. 7

II.   Regulatory background ............................................. 9

      A.    EPA promulgates initial EtO standards ...................... 9

      B.    EPA declines to revise the EtO standards in
            2006 ....................................................... 9

      C.    EPA changes course in 2024 ................................ 10

            1.    The proposed emission standards. ................... 11

            2.    Comments on the proposed standards ................. 12

            3.    The final emission standards. ...................... 13

SUMMARY OF ARGUMENT ..................................................... 14

STANDING ................................................................ 16

STANDARD OF REVIEW.....................................................................17

ARGUMENT ........................................................................................18

I.   EPA lacks statutory authority to revise its EtO
     emission standards through another round of residual
     risk review. ...............................................................................18

     A.   The Rule is contrary to the text and structure of
          section 7412. ......................................................................18

     B.   EPA's new interpretation of section 7412(f)(2)
          allows it to bypass consideration of costs..........................24

     C.   EPA's new interpretation of section 7412 is
          contrary to the legislative history. ...................................26

II.  EPA violated the statute in several other ways. ........................28

     A.   EPA wrongly set standards based on EtO use, not
          emissions. ...........................................................................28

     B.   EPA unlawfully set residual risk standards for
          previously unregulated sources...........................................30

III. The Rule's stringent emissions standards are arbitrary
     and capricious............................................................................32

     A.   Many of the standards are not achievable...........................33

          1.   The SCV standard is arbitrary and
               capricious.....................................................................34

          2.   The ARV standard is arbitrary and
               capricious.....................................................................37

     B.   The standards cannot be achieved within the
          compliance period...............................................................39

     C.   EPA failed to rationally assess the Rule's costs. ...............43

     D.   EPA failed to respond to comments challenging
          its reliance on the 2016 IRIS value. ..................................49

IV.   EPA's CEMS requirements are arbitrary and
      capricious. ........................................................................51

     A.   Requiring sterilizers to switch from parametric
          monitoring to CEMS is irrational. ....................................52

     B.   The Proposed Rule did not provide fair notice that
          EPA might require CEMS *on each inlet*. ...........................55

CONCLUSION ........................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air All. Houston v. EPA,*
906 F.3d 1049 (D.D.C. 2018) ........................................................ 29, 43

*Bus. Roundtable v. SEC,*
647 F.3d 1144 (D.C. Cir. 2011) ..................................................... 45, 48

*Citizens to Save Spencer Cnty. v. EPA,*
600 F.2d 844 (D.C. Cir. 1979) .............................................................. 21

*City of Portland, Or. v. EPA,*
507 F.3d 706 (D.C. Cir. 2007) ...................................................... 49, 50

*Eagle Pharms., Inc. v. Azar,*
952 F.3d 323 (D.C. Cir. 2020) .............................................................. 17

*Env't Integrity Project v. EPA,*
425 F.3d 992 (D.C. Cir. 2005) .............................................................. 56

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006) ............................................................................... 20

*Int'l Union, United Mine Workers of Am. v. Mine Safety &
Health Admin.,*
407 F.3d 1250 (D.C. Cir. 2005) ........................................................... 56

*La. Env't Action Network v. EPA,*
955 F.3d 1088 (D.C. Cir. 2020) ...................................................... 7, 20

*Loper Bright Enters. v. Raimondo,*
144 S. Ct. 2244 (2024) .......................................................................... 17

*Michigan v. EPA,*
576 U.S. 743 (2015) ............................................................................... 44

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29 (1983) ..................................................................... 17, 47

*Nat. Res. Def. Council, Inc. v. EPA,*
 824 F.2d 1146 (D.C. Cir. 1987) ............................................... 5, 24

*Nat. Res. Def. Council v. EPA,*
 749 F.3d 1055 (D.C. Cir. 2014) .................................................. 22

*Nat'l Ass'n for Surface Finishing v. EPA,*
 795 F.3d 1 (D.C. Cir. 2015) .............................................. 7, 9, 20

*Nat'l Ass'n of Home Builders v. EPA,*
 682 F.3d 1032 (D.C. Cir. 2012) .................................................. 33

*Nat'l Lime Ass'n v. EPA,*
 233 F.3d 625 (D.C. Cir. 2000) ..................................................... 6

*Natural Resources Defense Council, Inc. v. Reilly,*
 976 F.2d 36 (D.C. Cir. 1992) ...................................................... 22

*Ohio v. EPA,*
 603 U.S. ----, 144 S. Ct. 2040 (2024) ...................... 30, 33, 36, 39, 51

*Sierra Club v. EPA,*
 292 F.3d 895 (D.C. Cir. 2002) .................................................... 16

*Sierra Club v. EPA,*
 551 F.3d 1019 (D.C. Cir. 2008) .................................................. 17

*United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.,* 517 U.S. 544 (1996) ......................................... 16

*Utility Air Regulatory Group v. EPA,*
 573 U.S. 302 (2014) ................................................................... 18

**Statutes**

5 U.S.C. § 706 .................................................................. 17

42 U.S.C. § 7401 *et seq.* ................................................... 4

42 U.S.C. § 7412 ............................................ 4, 5, 6, 11, 12, 14, 15, 18, 20,
.................................................................. 21, 24, 26, 27, 28

42 U.S.C. § 7412(a)(1) ....................................................... 30

42 U.S.C. § 7412(b) .......................................................... 22

42 U.S.C. § 7412(d) ........................................ 2, 3, 7, 9, 14, 15, 19, 25, 33

42 U.S.C. § 7412(d)(2) ........................................... 6, 25, 31, 43

42 U.S.C. § 7412(d)(2)–(3) ........................................... 29, 31

42 U.S.C. § 7412(d)(3) ............................................... 29, 31

42 U.S.C. § 7412(d)(6) ........................................ 7, 10, 19, 20

42 U.S.C. § 7412(e)(1)(E) ..................................................... 6

42 U.S.C. § 7412(f) ........................................ 3, 7, 10, 11, 20, 31

42 U.S.C. § 7412(f)(1) ............................................... 8, 19, 22

42 U.S.C. § 7412(f)(2) ....................................... 1, 2, 3, 8, 10, 12, 14, 15,
.................................................................. 24, 25, 28, 30, 31, 32, 39, 43

42 U.S.C. § 7412(f)(2)(A) ........................................ 8, 9, 19, 23, 31

42 U.S.C. § 7412(f)(2)(C) ........................................ 8, 19, 20, 23

42 U.S.C. § 7412(f)(3)–(4) ................................................... 43

42 U.S.C. § 7412(i)(4) ........................................................ 42

42 U.S.C. § 7601(a)(1) ........................................................ 21

42 U.S.C. § 7607(b)(1) ......................................................... 3

Pub. L. No. 91-604, § 4(a), 84 Stat. 1676 (1970) ........................................ 4

Pub. L. No. 101-549, § 301, 104 Stat. 2399 (1990)
.................................................................................. 6, 10, 21, 22

**Regulations**

40 C.F.R. § 63.361 .................................................................. 31

**Other Authorities**

136 Cong. Rec. S16,895 (Oct. 27, 1990) ............................................. 9, 27

40 Fed. Reg. 59,532 (Dec. 24, 1975) ................................................. 5

59 Fed. Reg. 10,591 (Mar. 7, 1994) .................................................. 29

66 Fed. Reg. 55,577-02 (Nov. 2, 2001) ............................................... 9

71 Fed. Reg. 17,712 (Apr. 7, 2006) ............................................ 10, 11, 21

88 Fed. Reg. 22,790 (Apr. 13, 2023) ........ 11, 13, 30, 32, 35, 38, 39, 46, 49

89 Fed. Reg. 24,090 (Apr. 5, 2024) ................ 1, 10, 11, 12, 13, 14, 21, 25,
.......................................................... 28, 30, 31, 32, 34, 35, 36, 37, 39,
.............................................................. 41, 42, 43, 44, 46, 47, 51, 52, 53, 54, 55

H.R. Rep. No. 101-490 (1990) ................................................... 5, 26

John P. Dwyer, *The Pathology of Symbolic Legislation*, 17
ECOL. L.Q. 233 (1990) .......................................................... 5

*Residual Risk Report to Congress*, EPA-453/R-99-001 (1999) ................. 8

S. Rep. No. 101-228 (Dec. 20, 1989) ........................................... 6, 7

# GLOSSARY

ARV        Aeration Room Vent

CEMS      Continuous Emission Monitoring System

EOSA      The Ethylene Oxide Sterilization Association

EPA        The U.S. Environmental Protection Agency

EtO        Ethylene Oxide

FDA        U.S. Food and Drug Administration

IRIS       Integrated Risk Information System

SCV       Sterilization Chamber Vent

## INTRODUCTION

The Ethylene Oxide Sterilization Association, Inc. ("EOSA") challenges EPA's "Sterilizer Rule," 89 Fed. Reg. 24,090 (Apr. 5, 2024). The Rule imposes stringent emission controls for sources of ethylene oxide (EtO), an essential component of the medical device sterilization process. *Id.* at 24,092 ("For many medical devices, sterilization with ethylene oxide may be the only method that effectively sterilizes and does not damage the device[.]").

The Rule will not only have adverse impacts on sterilization facilities, but also on healthcare providers and patients. The stringent standards imposed—some requiring control of EtO emissions up to 99.99%—will require sterilizers to redesign their facilities; put some sterilizers out of business; and disrupt the medical device supply chain.

The Rule's harms are the result of an unlawful process and a series of arbitrary and capricious agency choices. To set many of the Rule's most stringent standards, EPA relied on a Clean Air Act ("CAA") provision, 42 U.S.C. § 7412(f)(2), that Congress intended to be used only *once* to conduct a *second* round of "risk review," instead of relying on EPA's established authority to revise hazardous air pollutant standards

pursuant to periodic "technology review" under 42 U.S.C. § 7412(d). EPA's claim to such broad authority is contrary to the statutory text and scheme, as well as the legislative history. The Rule must be vacated for this reason alone.

The Rule's standards are unlawful, arbitrary, and capricious for many other reasons. EPA set standards based on EtO *use*, not EtO emissions, in violation of the statute. EPA also set first-ever EtO standards for some sources under section 7412(f)(2) when the statute requires that standards first be set under section 7412(d). The extremely stringent standards are based on limited test data that EPA admitted does not reflect normal operations. They require control of emissions beyond what equipment manufacturers can guarantee—and sooner than source owners can re-design their facilities and install new equipment.

EPA also failed to rationally assess the Rule's costs, as well as to respond to comments challenging its reliance on the flawed 2016 "IRIS" risk value for EtO. And EPA irrationally demands that sterilizers install continuous emission monitoring systems ("CEMS") on every inlet, imposing a monitoring regime that is costly, technically infeasible, and that commenters did not have a chance to address.

In short, the Rule is a house built on a sinking statutory foundation, riddled with structural and design flaws. It should be vacated.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1).

## STATEMENT OF ISSUES

(1)    Did EPA have authority to conduct a second round of risk review for EtO emissions from sterilizers under CAA section 7412(f)(2) when that provision provides only for a *one-time* risk review eight years after standards are first promulgated, and section 7412(d) directs EPA to review standards periodically based on *technological* developments, requiring EPA to consider costs when doing so?

(2) Did EPA violate the statute by setting standards based on EtO use, not emissions, and setting risk-based standards under section 7412(f) for sources never previously regulated under section 7412(d)?

(3) Are EPA's stringent standards requiring sources to control EtO emissions up to 99.99% arbitrary and capricious because:

(a) they are based on performance test data that does not reflect normal operating conditions and require emissions control beyond what manufacturers of control equipment can guarantee;

(b) the standards cannot be achieved within the two-year compliance timeframe that applies to many of them;

(c) EPA did not rationally assess the costs to sterilizers, health care providers, and patients, and weigh them against the minimal health benefits EPA claims the Rule will have; and

(d) EPA failed to respond to comments challenging its reliance on the questionable 2016 IRIS value for EtO?

(4) Did EPA arbitrarily require sources to switch from parametric monitoring to CEMS, and fail to provide notice that sources would have to apply CEMS *at all inlets*?

## STATUTORY AND REGULATORY PROVISIONS

Key provisions are in the Addendum.

## STATEMENT OF THE CASE

### I. Statutory background

### A. Congress enacts CAA section 7412.

In 1970, Congress amended the CAA to enact section 7412, which directs EPA to identify and regulate hazardous air pollutants. Pub. L. No. 91-604, § 4(a), 84 Stat. 1676, 1678–80 (codified as amended at 42 U.S.C. § 7401 *et seq*.). Over the next twenty years, EPA managed to establish standards for only seven hazardous air pollutants. As described

in a 1983 Committee hearing: "No decision—is the history of this program." H.R. Rep. No. 101-490, at 151 (1990).

A significant cause of EPA's slow progress was that section 7412 required EPA to set standards based on public health risk *regardless of cost*. In implementing the statute, EPA came to recognize that ignoring costs and technical feasibility would make the setting of standards impracticable. *E.g.*, Proposed Standard for Vinyl Chloride, 40 Fed. Reg. 59,532, 59,534 (Dec. 24, 1975) ("Complete prohibition of all emissions could require closure of an entire industry."). EPA thus adopted a policy of considering cost, *see id.*, even though such an approach was later found to be contrary to the version of section 7412 in place at the time. *See Nat. Res. Def. Council, Inc. v. EPA*, 824 F.2d 1146, 1164–65 (D.C. Cir. 1987) (en banc) ("*NRDC*"). This, in turn, led EPA to request that Congress revise section 7412 and authorize consideration of costs. *See* John P. Dwyer, *The Pathology of Symbolic Legislation*, 17 ECOL. L.Q. 233, 292-93 (1990).

B.     **Congress amends section 7412.**

Congress amended the CAA in 1990, with provisions that "force[d] regulatory action to overcome the inertia that has plagued the health-

based, standard-setting process[.]" S. Rep. No. 101-228, at 156 (Dec. 20, 1989); *see* CAA Amendments of 1990, Pub. L. No. 101-549, § 301, 104 Stat. 2399, 2531–74 (1990). Congress established its own list of nearly 200 "pollutants to be regulated" by EPA, including ethylene oxide, along with "regulation deadlines, and minimum stringency requirements[.]" *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 634 (D.C. Cir. 2000).

As amended, section 7412 directs a sequential process for EPA to regulate hazardous air pollutants. That process begins with the initial promulgation of standards according to a set schedule. *See* 42 U.S.C. § 7412(e)(1)(E) (requiring standards to be "promulgated not later than 10 years after November 15, 1990"). That mandate was made practicable, however, by requiring that standards be set according to "application of measures, processes, methods, systems or techniques" rather than solely the risk to human health, and also requires "taking into consideration the cost of achieving such emission reduction[.]" *Id.* § 7412(d)(2).

That initial promulgation is followed by periodic review and potential revision under "two distinct, parallel analyses: a recurring 'technology review' under section [74]12(d)(6) and a *one-time* 'risk review'

under section [74]12(f)(2)." *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 5 (D.C. Cir. 2015) (emphasis added).

### 1.    Amended section 7412(d).

As amended, section 7412(d) requires EPA to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies)," its emissions standards "no less often than every 8 years." 42 U.S.C. § 7412(d)(6). "That [technology] review ensures that, over time, EPA maintains source standards compliant with the law and on pace with emerging developments[.]" *La. Env't Action Network v. EPA*, 955 F.3d 1088, 1093 (D.C. Cir. 2020). The technology review requires that EPA assess "the cost and feasibility of developments and corresponding emissions savings." *Surface Finishing*, 795 F.3d at 5.

### 2.    Amended section 7412(f).

Congress recognized, however, that setting standards strictly based on available technologies would not guarantee public safety, and so required EPA to conduct a "residual risk review" after implementing its "technology review" standards to consider any remaining risks to public health. *See* S. Rep. No. 101-228, at 177. But Congress was unable to agree on what level of risk is acceptable, and deferred that determination by requiring EPA to issue a report addressing health risks from regulated

sources after application of technology standards, on which Congress could then act. 42 U.S.C. § 7412(f)(1). EPA's report must address the residual risk program more broadly (*e.g.*, methods for calculating risk) as well as fact-specific conclusions regarding specific risks. *Id.* EPA prepared this report for Congress in 1999, but did not recommend legislation. *Residual Risk Report to Congress*, EPA-453/R-99-001 (1999). Congress accordingly took no action.

Because Congress did not act on EPA's report, the section 7412(f)(2) residual risk program was triggered. That provision states:

> If Congress does not act on any recommendation …, the Administrator shall, *within 8 years after promulgation of standards* for each category or subcategory of sources pursuant to subsection (d), promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health[.]

42 U.S.C. § 7412(f)(2)(A) (emphasis added). If EPA decides action under this provision is required, it "shall promulgate the standards 8 years after promulgation of the standards under subsection (d) for each source category or subcategory concerned." *Id.* § 7412(f)(2)(C).

This "residual risk review" is not based on control technologies and cost considerations, but rather on any "lingering public health risk that

the initial standard did not eliminate." *Surface Finishing*, 795 F.3d at 5.

Indeed, the statutory text directs review "in accordance with this section

(as in effect before November 15, 1990)[.]" 42 U.S.C. § 7412(f)(2)(A); *see*

*also* 136 Cong. Rec. S16,895, S16,932 (Oct. 27, 1990) ("We simply return

to current law in the [residual risk] phase and ask EPA to set standards

which provide an ample margin of safety to protect public health. That is

the current law standard. It is also the reason that very little has been

done to regulate toxic air pollutants[.]").

## II.     Regulatory background

### A.     EPA promulgates initial EtO standards.

In 1994, EPA issued a rule promulgating its first EtO emissions

standards for sterilization facilities under section 7412(d). 94 Fed. Reg.

29,823 (Dec. 6, 1994).

Prior to conducting its subsequent one-time residual risk review

and next round of technology review, EPA issued two sets of minor

amendments establishing fact-specific exemptions not at issue here. *E.g.*,

66 Fed. Reg. 55,577-02 (Nov. 2, 2001).

### B.     EPA declines to revise the EtO standards in 2006.

EPA was required, within 8 years of promulgating the first EtO

standards in 1994, to conduct the first periodic technology review under

section 7412(d)(6) and a one-time residual risk review under section 7412(f)(2). EPA did so belatedly in 2006, but found: "no additional control requirements are warranted." 71 Fed. Reg. 17,712 (Apr. 7, 2006). EPA noted, however, that "we have the authority to revise these standards, taking into account 'developments in practices, processes, and control technologies.'" *Id.* at 17,713 (discussing technology review authority). In response to a comment that the residual risk review should also account for possible increased risk because "there is no mechanism to revisit section 7412(f) assessments," EPA disagreed, claiming: "We have the authority to revisit (and revise, if necessary) any rulemaking", citing CAA section 301 (42 U.S.C. § 7601). *Id.* at 17,715.

### C.    EPA changes course in 2024.

Nearly two decades later, EPA conducted its next technology review—but also undertook a *second* residual risk review using the 2016 IRIS risk value for EtO.

In the Rule, EPA acknowledged: "CAA section [74]12(f)(2) requires only a one-time risk review, which is to be conducted within eight years of the date the initial standards are promulgated[.]" 89 Fed. Reg. at 24,094. But EPA contended that the statute "does not limit our discretion

or authority to conduct another risk review[.]" *Id.* As authority, EPA cited its own prior assertion that "[w]e have the authority to revisit … any rulemaking[.]" *Id.* (quoting 71 Fed. Reg. at 17,715).

Notably, nearly half of the EtO emission standards promulgated in the Rule—including some of the most stringent—were established pursuant to the section 7412(f) risk review. *See id.* at 24,093.

### 1. The proposed emission standards.

In April 2023, EPA proposed revising the EtO emission standards for commercial sterilization facilities by both amending existing standards and establishing additional standards. 88 Fed. Reg. 22,790 (Apr. 13, 2023). EPA proposed to exercise authority under both subsections (d) and (f) of section 7412. *Id.* at 22,793.

The Proposed Rule included emissions standards for the following individual sources within sterilization facilities: sterilization chamber vents (SCVs), aeration room vents (ARVs), chamber exhaust vents (CEVs), and "group rooms."[1] *Id.* at 22,831–Table 23. EPA proposed

---

[1] 89 Fed. Reg. at 24,099 ("Group 1 room air emissions are defined as emissions from indoor EtO storage, EtO dispensing, vacuum pump operations, and pre-aeration handling of sterilized material. Group 2 (Continued…)

different standards for each of these emissions sources, citing either subsection (d) or (f) of section 7412, and based on whether the source is "new" or "existing" and the amount of EtO used by the source. *Id.*

To demonstrate compliance, EPA proposed to require sterilizers to install EtO CEMs. *Id.* at 24,094.

## 2. Comments on the proposed standards.

Commenters challenged aspects of the Proposed Rule, including (1) EPA's authority to set new standards under section 7412(f)(2) (*e.g.*, Sterigenics Comments 54_[JAXX]; ACC Comments 2_[JAXX]); (2) EPA's decision to set standards based on performance data that are not representative of normal conditions (*e.g.*, Sterigenics Technical Comments (Attach. 2) 8_[JAXX]); and (3) removal of an alternative mass-based standard for ARVs (EOSA Comments 18–19_[JAXX]).

Commenters also opposed EPA's proposal to require CEMS rather than parametric monitoring. *E.g.*, EOSA Comments 41_[JAXX].

---

room air emissions are defined as emissions from post-aeration handling of sterilized material.").

(Continued…)

### 3. The final emission standards.

In the Rule, EPA increased the standard for SCVs using at least 30 tons per year ("tpy") of EtO from the prior applicable 99% DRE (destruction and removal efficiency) standard to a 99.99% DRE standard.[2] *See* 89 Fed. Reg. at 24,093–Table 1. Likewise, for ARVs, the Rule increased the DRE requirement from 99% to 99.9% for ARVs using at least 30 tpy, while declining commenters' request for an alternative standard if facilities are not able to meet the DRE requirement. *Id.*; *see* 89 Fed. Reg. at 24,100.

For area source facilities where EtO use was at least 400 tpy, EPA set a CEV emission standard of 99.9% DRE, 89 Fed. Reg. at 24,093, a change in form from the Proposed Rule's mass-per-hour limit (88 Fed. Reg. at 22,831–Table 23), but equally unachievable. For Group 1 room air emissions, EPA finalized a 98% DRE standard at area source facilities where EtO use is at least 40 tpy, and EPA finalized a 98% DRE standard for Group 2 room air emissions at area source facilities where EtO use is

---

[2] A DRE measures the percentage of emissions reduced by a control device, in contrast to a mass-per-hour standard, which imposes a static cap on the amount of ethylene oxide emitted. *See* Sterigenics Comments 31, n.2_[JAXX].

at least 20 tpy. 89 Fed. Reg. at 24,093. These standards are also a change in form from the proposed mass-per-hour limit.

EPA also finalized provisions that required source owners and operators to demonstrate compliance through the use of EtO CEMS—and it added a new, two-part compliance scheme, ostensibly giving facilities a "choice" of whether to use CEMS at outlets to demonstrate compliance with the most stringent standard applicable, or to instead install CEMS *at every emissions inlet* within the facility. *See id.* at 24,136, 24,187.

## SUMMARY OF ARGUMENT

I.     EPA unlawfully conducted a second round of residual risk review under CAA section 7412(f)(2), contrary to the text, scheme, and history of section 7412.

The statute only calls for one round of risk review, eight years after EPA first sets standards for a source category under section 7412(d). Then, EPA is to conduct periodic technology reviews under that provision, considering costs and feasibility. This scheme does not allow EPA to conduct a new round of risk review when it chooses—and thereby avoid section 7412(d)'s mandate to consider costs when determining whether to revise standards.

EPA's re-interpretation of section 7412 also cannot be squared with the legislative history; Congress amended section 7412 in 1990 specifically to require recurring technology review with consideration of cost, instead of recurring risk review without that consideration.

II.     The Rule's emission standards are also unlawful because EPA set those standards based on EtO usage, rather than emissions.

EPA also unlawfully set first-time standards for sources under section 7412(f)(2), when the statute plainly directs that standards must first be set under section 7412(d).

III.    The Rule's stringent emission standards are arbitrary and capricious, including because: (A) they are based on performance tests that EPA admits don't reflect standard operating conditions and require control of emissions to a degree that equipment manufacturers cannot guarantee; (B) the standards cannot be achieved in the time provided for compliance; (C) EPA failed to reasonably consider the Rule's costs— including to the medical device supply chain—and balance them against the claimed benefits; and (D) EPA entirely failed to respond to comments challenging its reliance on the flawed 2016 IRIS value for ethylene oxide.

IV. EPA's requirement that sources demonstrate compliance using CEMS, rather than parametric monitoring, is unsupported and illogical. And EPA's two-part compliance demonstration scheme was not part of the agency's proposal, so commenters had no opportunity to explain that it provided no real choice and that installing CEMS on each inlet is unduly costly and impracticable.

## STANDING

EOSA's member companies (several of which separately commented on the Proposed Rule[3]) are directly regulated by the Rule, thus making their standing "self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002).

EOSA, in turn, has associational standing to sue on behalf of its members because the interests EOSA seeks to protect are germane to its purpose and member participation is not required. *See United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553–54 (1996). EOSA thus has standing to challenge the Final Rule.

---

[3] *E.g.*, Comments of Sterigenics U.S., LLC on Proposed Rule (June 27, 2023), EPA-HQ-OAR-2019-0178-0632 ("Sterigenics Comments").

## STANDARD OF REVIEW

"[C]ourts, not agencies" must "decide '*all* relevant questions of law' arising on review of agency action[.]" *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (quoting 5 U.S.C. § 706)). Courts thus must "independently" determine the "single, best meaning" of the statute. *Id.* at 2266.

"In addressing a question of statutory interpretation, [courts] begin with the text." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (citation omitted). Next, courts look to structure and purpose to "interpret the statute as a symmetrical and coherent regulatory scheme[.]" *Id.* at 332 (citation omitted). "[E]xhaust[ing] the traditional tools of statutory construction" includes "examining the statute's legislative history to shed new light on congressional intent." *Id.* at 338 (quoting *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008)).

Agency action is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or is not in accordance with the law. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52 (1983).

# ARGUMENT

## I. EPA lacks statutory authority to revise its EtO emission standards through another round of residual risk review.

EPA's decision to conduct a second residual risk review flouts the statutory text and scheme, which directs EPA to perform two discrete and parallel review processes: a periodic technology review every eight years, and a one-time residual risk review. The text, structure, and history of CAA section 7412 make clear that EPA has no authority to expand the risk review into a distorted mirror of the technology review, which would create a loophole to section 7412(d)'s requirement that the agency must consider costs in setting standards. EPA's sudden discovery of "newfound authority" to conduct multiple rounds of risk review in a "long-extant statute," *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324, 328 (2014), should be viewed with deep skepticism.

### A. The Rule is contrary to the text and structure of section 7412.

The text of section 7412 makes clear that the one-time residual risk review is a distinct process that does *not* duplicate the recurring technology review.

Congress expressly mandated that technology review be recurring; EPA must "review, and revise as necessary (taking into account

18

developments in practices, processes, and control technologies),” its emissions standards “no less often than every 8 years.” 42 U.S.C. § 7412(d)(6). In contrast, the residual risk review is a one-time event contingent on a specific sequence of prerequisites.

*First*, EPA had to submit to Congress a report on how to address the remaining human health risk “[n]ot later than 6 years after November 15, 1990[.]” *Id.* § 7412(f)(1). *Next*, if Congress fails to act on that report, EPA “shall, within 8 years after promulgation of standards” under section 7412(d), establish residual risk standards if needed “to provide an ample margin of safety to protect public health[.]” *Id.* § 7412(f)(2)(A). The statute further clarifies that, if EPA decides to promulgate emissions standards under 7412(f)(2), EPA “shall promulgate *the* standards 8 years after promulgation of the standards under subsection (d) for each source category or subcategory concerned.” *Id.* § 7412(f)(2)(C) (emphasis added). [4] In contrast, section 7412(d)

_____

[4] The last sentence of this provision similarly highlights the singular nature of residual risk standards, requiring that, for certain hazardous pollutants that EPA is required to address within two years of 1990, “the Administrator shall have 9 years after promulgation of *the standards* under subsection (d) to make the determination [of whether residual risk standards are necessary] and, if required, to promulgate (Continued…)

requires that review of technology-based standards is to occur "*no less often than every 8 years.*" *Id.* § 7412(d)(6) (emphasis added).

Thus, by its plain terms, section 7412 sets up two review processes on discrete and specific timelines: (1) a periodic, recurring technology review under section 7412(d)(6), and (2) a *conditional, one-time* residual risk review under section 7412(f). Congress's choice to explicitly make EPA's technology review recurring, but exclude such language from the residual risk review, is an intentional limitation of the latter to a single, contingent instance in time. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ("[A] negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute.").

This Court has similarly characterized section 7412's "two distinct" review processes, describing risk review as a "one-time" event and technology review as "recurring." *Surface Finishing*, 795 F.3d at 5; *La. Env't Action Network*, 955 F.3d at 1093 ("section [74]12(d)(6)[] requires EPA, on an ongoing periodic basis, to revisit and update emission

---

*the standards* under this paragraph." 42 U.S.C. § 7412(f)(2)(C) (emphasis added).

standards," and "EPA under section [74]12(f)(2) must conduct a *one-time review*") (emphases added). Even EPA acknowledges: "section [74]12(f)(2) requires only a one-time risk review[.]" 89 Fed. Reg. at 24,094.

Where EPA goes wrong, however, is by asserting that, after completing its one-time review, the CAA "does not limit our discretion or authority to conduct another risk review should we consider that such review is warranted." *Id.* To support that novel proposition, EPA cites its own assertion in 2006 that "[w]e have the authority to revisit (and revise, if necessary) any rulemaking[.]" *Id.* (quoting 71 Fed. Reg. at 17,715). That 2006 assertion, in turn, cited CAA section 301. 71 Fed. Reg. at 17,715.

CAA section 301 gives EPA the general authority "to prescribe such regulations as are necessary to carry out [its] functions[.]" 42 U.S.C. § 7601(a)(1). But "[s]uch a provision does not provide the Administrator with Carte blanche authority to promulgate any rules, on any matter relating to the Clean Air Act, in any manner that the Administrator wishes." *Citizens to Save Spencer Cnty. v. EPA*, 600 F.2d 844, 873 (D.C. Cir. 1979). Moreover, that general authority says nothing about the specific timelines mandated by Congress in section 7412; "EPA's [section 301] authority to issue ancillary regulations is not open-ended,

particularly when there is statutory language on point." *Nat. Res. Def. Council v. EPA*, 749 F.3d 1055, 1063 (D.C. Cir. 2014).

*Natural Resources Defense Council, Inc. v. Reilly*, 976 F.2d 36 (D.C. Cir. 1992), illustrates this point. EPA had established emissions standards for radionuclides under CAA section 7412(b), which were revised several times. *Id.* at 38. EPA then stayed implementation of the final standards for three months. *Id.* at 39. After that stay expired, EPA stayed the standards another three times. *Id.* According to EPA, the stays were authorized by its section 301 general rulemaking authority. *Id.* This Court rejected that argument because: "[T]he [CAA] mandated a highly circumscribed schedule for the promulgation of regulations" and, "[i]n the face of such a clear statutory command, we cannot conclude that section 301 provided the EPA with the authority to stay regulations that were subject to the deadlines established by section [74]12(b)." *Id.* at 41.

Here, too, the deadlines for risk review represent a clear statutory command. Congress set a one-time deadline for EPA to investigate residual risk and submit a report to Congress by 1996. *See* 42 U.S.C. § 7412(f)(1). The residual risk program is not activated until another specific event: Congress's failure to address residual risk through

legislation. *See id.* § 7412(f)(2)(A). It was only when Congress failed to act based on EPA's 1999 report, that it *then* fell upon EPA to address that risk in Congress's stead, by determining (within eight years of the initial standards) whether to promulgate further standards to address residual risk. *Id.* And there has been no subsequent report to Congress on which basis EPA might try to justify a second round of risk review.

Further, EPA's new interpretation of its statutory authority as allowing infinite additional risk review at any time ignores Congress's direction that EPA assess whether risk remains "8 years *after*" it first sets technology-based standards "for each source category or subcategory concerned." *Id.* § 7412(f)(2)(C) (emphasis added). The statutory language speaks to a singular event, to be undertaken by a time certain—not a continuing, discretionary act by EPA. And EPA recognized that in this very rulemaking: "[T]he first review after a NESHAP is promulgated is a residual risk and technology review and the subsequent reviews are just technology reviews."[5]

---

[5] Final RIA: Ethylene Oxide Commercial Sterilization and Fumigation Operations at 1-4_[JAXX].

Here, EPA's technology review was a decade late; after its review in 2006, the agency should have conducted another round of technology review in 2014. Had EPA done so, then it would have been better placed to assess, in 2022, what risk remained—if any—after implementation of updated technology standards (assuming for the moment that the statute allows any additional risk review). Instead, EPA seems to have undertaken risk review here to make up for years of inaction.

In any event, nothing in section 301's general rulemaking authority allows EPA to create an alternate timeline and process outside the series of contingent events described in section 7412.

### B. EPA's new interpretation of section 7412(f)(2) allows it to bypass consideration of costs.

The consequence of EPA's *ultra vires* action becomes apparent when examining EPA's assessment of costs (or not) in the Rule.

The residual risk review of section 7412(f)(2) does not explicitly require EPA to consider cost.[6] *See NRDC*, 824 F.2d at 1165. In contrast,

_____

[6] EPA did analyze some costs associated with the Rule (*e.g.*, engineering costs) as well other economic impacts. Final RIA at 3-1–3-15, 5-1–5-18_[JAXX]. But it failed to quantify the claimed benefits. *Id.* at 6–1. And EPA did not even attempt to quantify costs associated with shortages of safe medical devices. Sterigenics Comments 11_[JAXX].

section 7412(d) requires EPA to "tak[e] into consideration the cost of achieving such emission reduction" when conducting a technology review. 42 U.S.C. § 7412(d)(2). Thus, in the Rule, EPA considered cost when setting standards under the section 7412(d), *see* 89 Fed. Reg. at 24,125–29, but did not assess the reasonableness of the specific costs associated with standards set under the residual risk review provision (section 7412(f)(2)). *See id.* at 24,116–25.

EPA's unprecedented decision to conduct a second residual risk review for EtO concurrently with its technology review allowed it to bypass considerations of cost that, by any logical assessment, would have doomed many of its standards. As is evident from the table listing all of the Rule's standards, some of the most stringent standards—*e.g.*, the 99.99% reduction for existing and new SCV sources with at least 30 tons per year of EtO use—are set under section 7412(f)(2), *without* consideration of cost. 89 Fed. Reg. at 24,093—Table 1. This illustrates the loophole EPA's new interpretation of the statute has created, allowing it to choose when, and when not, to adhere to Congress's mandate to consider costs.

Congress did not intend such a result. The two review processes enacted in 1990 are distinct; one recurring with cost considerations, and another as a one-time safety net to address public health considerations *if* Congress failed to act on EPA's recommendations for legislation regarding remaining risk. It would be absurd if Congress created these two discrete processes—with different timelines—with the intention that EPA could simply disregard the distinctions between them.

## C.  EPA's new interpretation of section 7412 is contrary to the legislative history.

The legislative history of section 7412 also shows that Congress did not intend EPA to employ residual risk review more than once.

As originally enacted, section 7412 was impracticable because it did not authorize EPA to consider cost when setting emissions standards. For the next twenty years, section 7412 led to "a lot of action, but nothing final." H.R. Rep. No. 101-490, at 151. The 1990 amendments transformed a stymied regulatory process by directing EPA to promulgate standards considering cost and feasibility—and then review those standards every eight years to keep them in line with technological developments. The residual risk review, on the other hand, was simply a fall-back program incorporating preexisting language, intended to function as a secondary

safety net to the first set of standards promulgated under the technology review process. *See* 136 Cong. Rec. at S16,932, S16,979.

This history illuminates EPA's error for several reasons.

*First*, it demonstrates that the residual risk review was intended only to be a one-time, gap-filler option for EPA, contingent on Congressional inaction after EPA's submission of its one-time risk report.

*Second*, the residual risk review was a fallback option incorporating the language of former section 7412—which resulted in twenty years of near inaction and prompted Congress's intervention. Congress granted EPA the one-time authority to act *if* Congress failed to act on an EPA recommendation for additional *legislation* to address remaining risk. Congress would not have gone through the trouble of adding the recurring technological review if it intended that EPA would perform recurring risk reviews. EPA's contrary interpretation of that provision effectively renders the statute the same as prior to the 1990 amendments—with the same core flaws. To the extent EPA might argue that the statutory scheme leaves the agency with no route to reassess risk, it is for Congress to amend it, not EPA.

*Finally*, because technological feasibility and costs were key statutory components added by the 1990 amendments, Congress could not have intended to allow EPA to employ the fallback risk review provision to bypass those considerations.

The Rule is thus plainly contrary to the history of section 7412—in addition to the statutory text and scheme. All pieces of the statutory puzzle indicate that the residual risk review described in section 7412(f)(2) is a one-time event. EPA's second round of risk review for EtO was thus unlawful, and the Rule should be vacated for that reason alone.

## II. EPA violated the statute in several other ways.

### A. EPA wrongly set standards based on EtO use, not emissions.

EPA used a combination of different authorities under section 7412 to set standards for both existing and new affected sources. A common thread in all, however, is that EPA based the level of stringency on EtO use at a source (as expressed in tpy) and not on the amount of *emissions* from such affected sources. *See* 89 Fed. Reg. at 24,093—Table 1. This contravenes the Act, which requires EPA to set maximum achievable control technology ("MACT") standards based on the "maximum degree of *reduction in emissions*," reflecting no less than "the *average emission*

*limitation achieved* by the best performing 12 percent of the existing sources (for which [EPA] has *emissions information*)[.]" 42 U.S.C. § 7412(d)(2)–(3) (emphasis added).

Commenters pointed out this problem, explaining that EPA failed to justify the "form" of its standards. Sterigenics Comments 52–53_[JAXX–XX]. EPA did not respond; it simply confirmed that it had "established standards which are dependent on *the EtO use* at a facility, therefore the standards reflect the *potential to emit* and the *potential risk* at each facility." RTC 54_[JAXX] (emphasis added). But section 7412(d)(3) does not authorize EPA to engage in predictive analysis based on potential risk; it was enacted so that MACT standards would be based on *emission levels actually achieved* by the application of technology.

EPA's approach is based on an erroneous, decades-old presumption that *all* EtO used for sterilization is eventually emitted. *See* 59 Fed. Reg. 10,591, 10,592 (Mar. 7, 1994). But this presumption is not applicable to all sources regulated by the Rule, much less sources that have applied extensive emission control technology. EPA's presumption also improperly defines sources as "major" or "area" based on their EtO use, contrary to the statutory definition of major sources as those with the

"potential to *emit*" more than 10 tpy. *See* 42 U.S.C. § 7412(a)(1) (emphasis added); *see also* 89 Fed. Reg. 24,093 at n.10 (similarly asserting that all sources using more than 10 tpy EtO are area sources). EPA has thus violated both the statutory directive to regulate based on emission, not use, and its definitions of regulated source categories.

EPA also wrongly applied the same use-focused approach to set residual risk standards under section 7412(f)(2). 89 Fed. Reg. at 24,093— Table 1. It is hard to understand why, since EPA gathered emissions data from sources as well as information on the performance of control systems. 88 Fed. Reg. at 22,800–02. But EPA did not use this data to characterize sources based on relative risk; it simply retained EtO use as *the* determining factor in how stringent a section 7412(f)(2) standard applied. And EPA did not respond to comments on this important issue, making the standards both unlawful and arbitrary and capricious. *See Ohio v. EPA*, 603 U.S. ----, 144 S. Ct. 2040, 2054, 2056 (2024).

## B.  EPA unlawfully set residual risk standards for previously unregulated sources.

In the Rule, EPA regulates room air emissions (Group 1 and Group 2 sources) for the first time ever, relying *solely* on section 7412(f)(2). 89 Fed. Reg. at 24,093–94—Table 1. Where EPA has not before promulgated

a MACT standard under section 7412(d)(2)–(3), EPA lacks statutory authority to promulgate a residual risk standard. Congress was clear that section 7412(f) risk standards may only be promulgated "within 8 years *after promulgation of standards* for each category … of sources pursuant to subsection (d)[.]" 42 U.S.C. § 7412(f)(2)(A) (emphasis added).

EPA has not previously promulgated *any* MACT standards for Group 1 and Group 2 emissions at area sources using 40 tpy of EtO or 20 tpy of EtO respectively—nor has EPA previously promulgated Group 1 or Group 2 MACT standards for any other source. For the first time, EPA is both defining both groups,[7] and then immediately imposing residual risk standards to provide "an ample margin of safety" based on the claimed inadequacy of technology-based standards EPA never established. EPA admits that it didn't even *consider* what emission controls had been installed for such sources, but instead determined residual risk standards based on "uncontrolled emissions." 89 Fed. Reg. at 24,117. This is contrary to the step-wise process established in sections 7412(d)(2), (3), and (f)(2), which calls for the issuance of technology-based standards, followed by a residual risk review.

---

[7] 89 Fed. Reg. at 24,099; 40 C.F.R. § 63.361.

While EPA states that it *considered* control options for Group 2 sources pursuant to sections 7412(d)(2), (3), and (5), 89 Fed. Reg. at 24,117, this is insufficient given the statutory text, scheme, and legislative history showing that Congress intended a sequential process of (1) setting MACT standards before (2) evaluating any remaining risks. *See* Arg. § I, *supra*. Thus, EPA's section 7412(f)(2) standard for Group 1 and 2 sources are unlawful as well.

## III. The Rule's stringent emissions standards are arbitrary and capricious.

The Rule includes both strict emissions standards for previously regulated emission sources and strict new standards for previously unregulated sources. *See* 89 Fed. Reg. at 24,093–Table 1. But EPA built this house on a weak foundation: performance test data that is not representative of normal operations. EPA admitted as much in the Proposed Rule, stating that the "current performance testing procedures … do not reflect normal operations", and that it was accordingly proposing new testing procedures. 88 Fed. Reg. at 22,844. Yet, in the Rule, EPA relied on test data that did not reflect actual operating conditions to set standards and that will be impossible for sterilizers to consistently achieve. And EPA essentially admits that sterilizers are

unlikely to be able to comply in the time allotted, which further demonstrates the arbitrary and unsupported nature of the extremely stringent standards the agency has set.

EPA also failed to reasonably consider the costs of its strict new EtO standards and justify them in light of the modest health benefits EPA claims the Rule will have. EPA must do that as a matter of statutory mandate for standards set under section 7412(d). And where—as here— EPA has purported to assess a rule's costs and benefits, it must do so thoroughly and rationally. *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039–40 (D.C. Cir. 2012) ("[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable.").

Finally, EPA unreasonably failed to respond to comments addressing a key issue underlying the entire Rule: EPA's reliance on the flawed 2016 IRIS value for ethylene oxide. That, too, makes the Rule arbitrary and capricious. *See Ohio*, 144 S. Ct. at 2056.

## A. Many of the standards are not achievable.

EPA has imposed stringent standards that will be extremely difficult, if not impossible, for many sterilizers to meet, including: (1)

SCVs (using at least 30 tpy of EtO) must meet a 99.99% DRE; and (2) ARVs (at least 10 tpy) must meet DREs ranging from 99.6–99.9%. 89 Fed. Reg. at 24,093–Table 1. Further, if sterilizers cannot meet the DRE, they cannot choose an alternative concentration standard—a major change from the prior regulations. *Id.* at 24,120.

These stringent standards are arbitrary and capricious. They could also endanger our nation's health care system and its ability to respond to infectious diseases.

### 1. The SCV standard is arbitrary and capricious.

For SCVs, EPA set a 99.99% DRE based on existing performance test data. That standard is impossible to meet, which is because it is based on performance test data that even EPA admits does not represent normal facility operating conditions.

In fact, existing performance-test data are based on the "worst-case scenario" of EtO emissions at a facility. They capture the first evacuation of a cycle over a short-period of time, which results in very high EtO concentrations at the inlet to a pollution-control device. *See* Sterigenics Technical Comments (Attach. 2) 8_[JAXX]. A testing requirement reflecting normal operations (not worst-case scenarios) would extend

34

testing to include a longer period that would capture more chamber exhaust stages, including times when no or very low concentrations are exhausting to a pollution-control device. *Id.*; 88 Fed. Reg. at 22,844. The amount of EtO concentration going into an emission source is important because, the higher the EtO concentrations going into a control device, the more easily the device can achieve a more stringent DRE percentage-based standard. *See* EOSA Comment 19_[JAXX]. Thus, a standard based on "normal operations" test data versus "worst-case scenario" test data would result in more accurate assessment of the emission control levels achieved by the technology.

EPA clearly understood that existing test procedures were inadequate. It explained in the Proposed Rule:

> [C]urrent performance testing procedures … do not reflect normal operations …. A more encompassing performance test procedure … that includes normal operation of the sterilizer chamber … would provide a more representative control level actually achieved by the control system. A longer test run period would provide a better indication of the emission reduction achieved[.]

88 Fed. Reg. at 22,844.

Given this knowledge, EPA should have declined to rely on the existing performance test data to set standards. Instead, it doubled down

and relied on data from just two existing performance tests (including an old, 25-year-old test) to set a 99.99% DRE standard for SCVs using at least 30 tpy EtO. 89 Fed. Reg. at 24,124.

Notably, this 99.99% DRE for large SCVs is more stringent than the manufacturer guarantee for SCV pollution-control devices, which is 99.90%. Sterigenics Technical Comments 8_[JAXX]. Manufacturer guarantees are important because they are used by sterilizers to prove to regulators that their equipment can meet the government's regulations. Because 99.99% DRE is beyond the manufacturer guarantee, sterilizers run the risk of installing abatement equipment that cannot consistently meet the standard, putting them at a continual risk of violation.

Commenters pointed out these problems. *See* Sterigenics Technical Comments (Attach. 2) 8_[JAXX]); EOSA Comments 29-30_[JAXX]); Sterigenics Comments 30–31_[JAXX–XX]. EPA, however, failed to adequately address these concerns, thus rendering the SCV standard arbitrary and capricious. *See Ohio*, 144 S. Ct. at 2053-54 (rule was likely arbitrary or capricious where EPA offered no response to commenters' concerns and "failed to supply a satisfactory explanation for its action") (internal quotation marks and citation omitted).

## 2. The ARV standard is arbitrary and capricious.

As with SCVs, EPA wrongly relied on performance test data that is not representative of normal operations to establish DREs ranging from 99.6–99.9% for ARVs using at least 10 tpy of ethylene oxide. *See* 89 Fed. Reg. at 24,120. But for ARVs, EPA added another compliance constraint: it decided not to allow sterilizers to choose a measurable alternative concentration standard. EOSA Comments 18_[JAXX]. In doing so, EPA failed to give a reasoned explanation for this change in approach from the past EtO standards, and failed to address issues raised by commenters about demonstrating compliance solely through a DRE standard.

*First*, commenters explained that emissions monitoring equipment may be unable to demonstrate compliance with a DRE-percentage-based standard if EtO concentrations are low. *Id.* Outlet concentrations of EtO (after passing through a control device) could be at levels that are below the level of detection (30 ppb) for emissions monitoring equipment, preventing an affected source from demonstrating compliance even if an ARV was meeting the required 99.6% DRE. *Id.* at 19_[JAXX]. EPA unreasonably failed to consider these limitations in even the best technology available for monitoring emissions—and that without an

alternative emission standard for ARVs, such as an alternative outlet concentration per the previous rule, some sterilizers may not be able to demonstrate compliance even where they are not releasing any significant EtO emissions. *Id.*

*Second*, EPA failed to adequately explain its decision to remove the alternative standard. In the Proposed Rule, EPA said it was making this change because it believed that the 1 ppmv alternative standard was not equivalent to a 99% DRE (the prior applicable DRE). EPA reached this conclusion based on its review of facilities where EtO use was at least 10 tpy, but included both low and high inlet concentrations of EtO. *See* 88 Fed. Reg. at 22,811. EPA calculated the average value of the ARV outlet EtO concentrations across those facilities, which EPA claimed resulted in 0.5 ppmv. *Id.*

But 1 ppmv *is* equal to or better than a 99% DRE if the inlet concentration is at least 100 ppmv. EOSA Comments 19_[JAXX]; Sterigenics Technical Comments (Attach. 2) 9_[JAXX]. The higher the inlet concentration is at a facility, the higher the corresponding ppmv at outlets will be to achieve the same DRE. EOSA Comments 19_[JAXX].

EPA failed to consider the impact that lower inlet concentrations might have on a resulting ppmv measurement. *Id.*

Unfortunately, EPA ignored these comments. Instead of responding, EPA simply referred back to its explanation in the Proposed Rule for removing the alternative. *See* 89 Fed. Reg. at 24,104 ("We proposed removing the less stringent 1 ppmv concentration alternative for these sources because it is not equivalent[.]"). This non-response renders the ARV standard arbitrary and capricious. *See Ohio*, 144 S. Ct. at 2054 (rule was likely arbitrary and capricious where EPA offered no response to commenters' concerns and "failed to supply a satisfactory explanation for its action") (internal quotation and citation omitted).

## B. The standards cannot be achieved within the compliance period.

In response to EPA's proposed 18-month deadline for meeting the extremely stringent standards it set under CAA section 7412(f)(2), commenters explained that "the estimated minimum implementation timeframe [under section 7412(f)(2) standards] needed to avoid the most severe medical device shortages is *three to four years at a minimum*, and likely much longer." EOSA Comments 59_[JAXX] (emphasis added). This is because imposing the control technologies needed for facilities to even

attempt to achieve EPA's stringent standards would require "major facility modifications and major equipment installations (representing significant rebuild of large portions of facilities in many cases) in facilities that are heavily regulated by multiple agencies on the Federal, State, and Local levels [requiring] many years to complete." *Id.* Further, the availability of the equipment, materials, and contractor services necessary to modify control systems is limited—and after installation, the systems must be tested and calibrated to ensure that they perform as anticipated. *See* Sterigenics Comments 28_[JAXX]; AdvaMed Comments 9–10_[JAXX]. The FDA echoed commenters' concerns about the impossibility of timely compliance during interagency review, cautioning: "EPA needs to do a complete consideration of the capacity reductions required to implement this rule on their timeline[.]"[8]

In response, EPA extended the compliance deadline from 18 months to two years. While an improvement, that remains insufficient for the reasons commenters explained.

---

[8] EPA-HQ-OAR-2019-0178-0493 (12866 Interagency Review Documentation - File Set 1 of 2, Attach. 36 at 2–8 (Margin Comment [A8]))_[JAXX].

EPA admits as much. EPA made no finding that facilities would likely be able to install new control equipment (obtaining all permits and making the major structural changes needed) within two years. Rather, EPA states: "If facilities commence work … immediately after this rule becomes effective, *we believe* that sources will be able to comply … within the two year compliance window set by § [74]12(f)(4), without substantial interruption in operations." 89 Fed. Reg. at 24,102 (emphasis added). This is no more than wishful thinking, unsupported by any substantive explanation of *how* facilities will accelerate the design, construction, installation, and permitting timelines to meet the deadline.

EPA also failed to address comments that the short compliance deadline is likely to cause shortages of life-critical medical devices. EOSA explained: "[M]any medical procedures will not be possible because a very wide variety of sterilized devices, including those needed for life-saving and other critical medical procedures, will simply not be available." EOSA Comments 59–60_[JAXX–XX]. EPA theorizes that "increased coordination" might be able to "ensure that the supply of medical devices is not adversely impacted." Proposed RIA 5-19_[JAXX]. But the extreme

challenges created by the severely inadequate compliance timeframe cannot be magically solved by "increased coordination."

As one commenter explained, "current facilities are ... operating very close to their maximum capacity level. There does not exist additional capacity for other contract sterilizers to absorb the deficit if ... facilities were forced to limit capacity" AdvaMed Comments, Attach. 1, at 7_[JAXX]. Further, "many products are qualified at only one facility or one chamber, making it unlikely that the product could be sterilized at any other location." AdvaMed Comments 9_[JAXX]. Again, EPA has no response—except to note that, "if more time is needed … '[t]he President *may* exempt any stationary source from compliance with any standard or limitation … for a period of not more than 2 years [each time].'" 89 Fed. Reg. at 24,103 (emphasis added). But there is no prescribed process or known way for sterilizers to seek such relief from the President. And the President must make a finding that the technology to meet the standard is not available and an exemption "is in the national security interests of the United States[.]" 42 U.S.C. § 7412(i)(4). This highly unlikely possibility is thus cold comfort to sterilizers staring down the barrel of potential EPA enforcement actions for failure to timely comply.

EPA took the view that it could offer no more than two years because that is the limited waiver available for risk-based standards under section 7412(f)(3)–(4). But the fact that EPA's extremely stringent standards cannot be met within the statutory time frame without serious disruption of the medical supply chain—as the FDA opined and EPA essentially admits—serves to demonstrate their arbitrary and capricious nature. *See Air All. Houston v. EPA*, 906 F.3d 1049, 1067 (D.D.C. 2018) (compliance timeframe must be "justified" and "practicable").

### C. EPA failed to rationally assess the Rule's costs.

As discussed above (Arg. § I), while CAA section 7412(f)(2) does not explicitly require EPA to consider costs when conducting a residual risk review, section 7412(d)(2) does require EPA to assess costs, as well as "any non-air quality health and environmental impacts," when setting technology-based standards. 42 U.S.C. § 7412(d)(2).

Here, the Rule sets standards under both subsections (d) and (f). 89 Fed. Reg. at 24,093–Table 1. Perhaps for this reason, EPA purported to assess the costs of the *entire* Rule, *id.* at 24,137, as well as its claimed benefits, *id.* at 24,139. This makes sense; "reasonable regulation ordinarily requires paying attention to the advantages *and* the

disadvantages of agency decisions." *Michigan v. EPA*, 576 U.S. 743, 753 (2015). But EPA's costs assessment is flawed and incomplete. EPA minimizes and underestimates the costs the Rule will impose on sterilizers—and discounts the possibility of harm to the medical supply chain and the healthcare providers and patients who depend on it. During interagency review, FDA submitted comments that the EtO rulemaking could "inadvertently contribute to significant medical device supply chain disruptions." Sterigenics Comments 22_[JAXX]. Yet EPA examined this issue only superficially, claiming without support that the final rule responded to "key issues raised by commenters" and would "minimize the possibility of shortages." Final RIA 1-16, 1-18 [JAXX-XX].

The Rule's costs to sterilizers are extremely high—beyond what many facilities can bear. EPA estimates the Rule's total *annual* costs to regulated facilities will be approximately $88 million. 89 Fed. Reg. at 24,137. But this is only the tip of the cost iceberg. Sterilizers will have to pay substantial capital costs to retrofit their facilities to meet the new standards, which EPA dramatically underestimates.

For example, for Group 1 and 2 room emissions, facilities must contain all emissions within a permanent total enclosure (PTE) and then

continuously reduce EtO emissions by 80%–98%. *See id.* at 24,093–Table 1. To comply, sterilizers will have to redesign their facilities and make major equipment modifications, which could be up to 100 times greater than EPA's estimates. AdvaMed Comments 21_[JAXX]. EPA's failure to adequately account for these significant retrofit costs is arbitrary. *See Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148–49 (D.C. Cir. 2011) (finding rule arbitrary and capricious where agency "failed adequately to quantify [ ] certain costs").

Even setting aside initial capital costs, many of the country's sterilizers will need to spend *over 20% of their revenue* on compliance annually. *See* Small Bus. Ass'n ("SBA") Comments at 12_[JAXX]. This will cause many sterilizers to exit the market, which could result in a shortage of medical-device equipment. SBA Comments at 6_[JAXX]. This shortage will be especially impactful for specialized devices like catheters; if even one sterilizer facility were to reduce output or exit the market, the supply of catheters would be greatly reduced nationwide. AdvaMed Comments, Attach. 1, at 11_[JAXX]. EPA fails to address, much less quantify, these harms to medical providers and patients, which

could quickly outweigh the Rule's claimed health benefits—which EPA did not even attempt to monetize.[9]

Even without monetizing them, it is clear that the Rule's costs are dramatically disproportionate to its minimal claimed health benefits. EPA estimates that the Rule will result in a reduction in annual cancer risk equivalent to *less than one case nationwide. See* 89 Fed. Reg. at 24,095–Table 3; 88 Fed. Reg. at 22,794–Table 2. Meanwhile, interagency reviewers estimated that the Proposed Rule's costs range up to *$110 million* per-cancer-case-prevented.[10] And that doesn't account for the fact that the total annual costs are greater in the Rule than in the Proposed Rule. *Compare* 89 Fed. Reg. at 24,137 *with* 88 Fed. Reg. at 22,853.

Most importantly, EPA has not balanced the small, theoretical reduction in annual cancer risk (less than one case) it projects against the serious risk to the entire medical device supply chain imposed by the Rule. If illnesses, infections, or even one death were to result from

---

[9] *See* Final RIA, Table 1-2 at 1-18_[JAXX].

[10] *See* 12866 Interagency Review Documentation - File Set 2 of 2, Attach. 7 at 6_[JAXX]; *see also id.*, Attach. 2 at 1–2_[JAXX, XX] (opining that these costs are "unreasonable" and "given the concerns about the medical supply chain, hard to justify against likely unintended consequences").

decreased access to sterilized medical devices, that would completely undermine EPA's qualitative analysis of health benefits. The closest EPA comes to addressing this issue is to blithely assert that, because the industry is planning for the new standards, EPA doesn't "anticipate" that there will be adverse medical supply chain effects. 89 Fed. Reg. at 24,092. But this is no more than wishful thinking. EPA's failure to meaningfully address an "important aspect" of the issue before it renders the Rule arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

EPA also failed to quantify the increased costs for medical providers to obtain sterilized products. MDMA Comments 10_[JAXX]. This led EPA to downplay the Rule's costs, asserting that any price impact on medical-device suppliers and ultimately healthcare consumers would be "small." *See* Final RIA 5-15_[JAXX-XX]. But "small" price increases can lead to significant reductions in the availability of sterilized devices. For example, one commenter estimated that the Rule will result in sterilizers reducing capacity from 19% to 51% after the compliance period. MDMA Comments 16_[JAXX]. This loss in capacity will result in annualized costs between $1.7 billion and $2.5 billion, which will be passed to healthcare consumers. *Id.* at 16–17. Ultimately, insurance providers will

have to pay for many of these increased costs, likely leading them to drop coverage for certain procedures or devices—and some devices may not be available regardless of the cost. *Id.* The end result will be both increased costs and less healthcare. Again, EPA did not adequately consider these impacts on end-users of sterilized medical devices—and how quickly they could outweigh the Rule's modest claimed benefits.

Given these impacts, medical industry commenters asked EPA to conduct a more thorough analysis, including to address how increased medical device costs might lead to decreased use of essential healthcare services. *E.g.*, MDMA Comments 17_[JAXX]. EPA conducted no such analysis. Instead, EPA simply repeated *verbatim* its unsupported assertion from the Proposed Rule that there will be only small price increases for consumers and patients. *Compare* Proposed RIA 5-26_[JAXX-XX] *with* Final RIA 5-16_[JAXX-XX]. That is not a valid response to significant comments, or a reasoned approach to cost/benefit analysis. *See Bus. Roundtable*, 647 F.3d at 1148–49 (rule was arbitrary and capricious where it "inconsistently and opportunistically framed the costs and benefits").

Thus, EPA's analysis of the Rule's costs was both incomplete and arbitrary—yet another reason the Rule should be vacated. *See City of Portland, Or. v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (Court will not "tolerate rules based on arbitrary and capricious cost-benefit analyses").

### D. EPA failed to respond to comments challenging its reliance on the 2016 IRIS value.

Among the many issues on which EPA failed to respond to comments, one deserves special mention: EPA's reliance on the 2016 EtO IRIS value.

EPA made clear that the motivating factor for its second round of risk review was the 2016 IRIS value. *See* 88 Fed. Reg. at 22,792–93, 22,850. EPA nonetheless did not seek comment on that core aspect of the proposal. But because the IRIS value is a "predicate to EPA's decision … [EPA] is required to accept comments on the use of the value in this regulatory context." ACC Comments 9_[JAXX]; *see City of Portland*, 507 F.3d at 715 (agency must respond to "[s]ignificant comments" that "raise points relevant to the agency's decision") (internal quotation omitted).

Recognizing how critical the 2016 EtO IRIS value is to EPA's process, commenters explained that (1) that value is flawed, and (2) EPA must consider background and endogenous EtO levels in determining

risk and setting risk-based standards. *E.g.*, EOSA Comments 28–29, 50–51_[JAXX–XX, XX–XX]. Commenters detailed many reasons why the 2016 IRIS value is flawed, including that (1) it vastly overestimates cancer mortalities; (2) it is inconsistent with underlying data and other evidence; and (3) the suggested mode of action is biologically implausible.

*See id.*; ACC Comments 8–10_[JAXX–XX]; Sterigenics Comments 10–11_[JAXX–XX], 19–28_[JAXX–XX]. EOSA further explained:

> [B]ackground/ambient EtO concentrations are, according to the flawed 2016 EtO IRIS assessment, at levels that cause cancer risk well above EPA's 1 in 10,000 acceptable risk threshold, often by an order of magnitude or more. This … *defies logic and points to serious flaws with the EtO IRIS value* – and also puts cancer risk from EtO *in ambient air* that is many times higher than the risk that EPA has calculated for emissions from sterilization facilities.

EOSA Comments 50–51_[JAXX–XX] (emphasis added). Commenters also pointed out that a federal agency had "concluded that EtO sterilization facility workers had 'no overall elevated risk for any cancer or other diseases as compared to the general population,'" which is directly at odds with the 2016 IRIS assessment's prediction of a 1-in-10 cancer risk for such workers. Sterigenics Comments (Attach. 1) 10, 24_[JA XX, XX].

In the Rule, EPA offered no response to these and other concrete, data-based challenges to EPA's reliance on the 2016 IRIS. This failure to respond to comments on a significant issue again makes the Rule arbitrary and capricious. *Ohio*, 144 S. Ct. at 2054, 2056.

## IV. EPA's CEMS requirements are arbitrary and capricious.

EPA demands that facilities using at least 100 lb/year of EtO install CEMS to demonstrate compliance. 89 Fed. Reg. at 24,132, 90. This is arbitrary and capricious because while replacing parametric monitoring with CEMS is extremely costly, complicated, and burdensome, the actual emission reduction benefits are minimal. EPA's additional requirements that sterilizers monitor via CEMS at fifteen-minutes intervals, and demonstrate 90% data availability, are also irrational and unsupported.

Further, EPA failed to allow commenters to weigh in on the two-part CEMS scheme the agency finalized, which requires application of CEMS *at each emissions inlet* if sterilizers cannot meet the most stringent standard applicable to sources that share an outlet. The Rule is thus not a logical outgrowth of the Proposed Rule, and is arbitrary and capricious here too.

## A.   Requiring sterilizers to switch from parametric monitoring to CEMS is irrational.

Using CEMS to demonstrate compliance is expensive and complicated. EPA does not dispute that the recurring annual costs would be about $75,000 per facility. AdvaMed Comments at 56_[JAXX]. And each facility would have to suspend some or all of its sterilization operations to run test cycles for CEMS. *See id.*

On the other hand, there is little perceptible benefit. EPA admits that parametric monitoring is "effective in reducing EtO emissions." 89 Fed. Reg. at 24,132. EPA asserts that it seeks to reduce chronic EtO exposure; *i.e.*, "lifetime cancer risks." *Id.* at 24,091. But though "[c]ontinuous, instantaneous monitoring may be useful to address acute exposure concerns," it does not offer additional benefits for addressing potential harms caused by chronic exposure. AdvaMed Comments 56_[JAXX].

Moreover, the Rule requires CEMS data to be monitored and recorded at least every 15 minutes, rather than hourly. 89 Fed. Reg. at 24,179. This requirement has no meaningful emissions benefits and raises significant technical challenges. When CEMS is time-shared (*i.e.*, when one CEMS is used to monitor multiple locations or processes), it

would be very difficult to monitor on a fifteen-minute cycle because certain measurement technologies require "longer [periods of] time[] to cycle between locations[.]" EOSA Comments 44_[JAXX]. On the flip side, extending the sampling interval from 15 minutes to one hour would not compromise the accuracy or reliability of the emissions data, while "reduc[ing] the cost of CEMS equipment[.]" *Id.*

Continuous EtO monitoring is also not reflective of industry processes. Because the sterilization process is done in batches, EtO is not emitted at a constant rate over a 24-hour period; thus, a longer monitoring interval would be more in line with normal operations and provide a better picture of overall emissions. *See* AdvaMed Comments 56_[JAXX]. Again, EPA has no answer to this mismatch.

To try to overcome concerns about technical feasibility, EPA imposed a requirement of 90% minimum data availability; *i.e.*, "EtO emissions data must be collected over at least ninety percent of the process operating time[.]" 89 Fed. Reg. at 24,133. But that offers limited protection for monitoring system malfunctions, "which are common." Becton, Dickinson and Co. ("BD") Comments at 8–9_[JAXX]. EPA recognizes that "EtO CEMS are a newer technology" "that may pose

challenges[.]" 89 Fed. Reg. at 24,133. But EPA nevertheless arbitrarily limits the tolerance for "data unavailability [at] ten percent of process operating time," requires facilities to "record EtO CEMS values during all periods of operation," and strictly counts "periods of out-of-control monitor operation or when the EtO CEMS is unable to provide quality-assured data … as periods of data unavailability." *Id.*

Counting periods of out-of-control *monitoring* malfunctions as periods of data unavailability puts facilities at risk of penalties without any substantive emission reduction benefits:

> Unlike control system malfunctions, monitoring system malfunctions do not cause excess emissions events. … There is no technical reason to require shutdown of production during these periods.

BD Comments 8–9_[JAXX]. EPA did not respond to this simple, logical point, rendering its application of CEMS monitoring requirements arbitrary and capricious in both the general and the specific.

Finally, the Rule's requirements for backup CEMS are irrational. EPA does not mandate that facilities employ backup CEMS—but, if they do, the agency imposes a host of additional requirements, illogically discouraging sterilizers from employing them. *See* 89 Fed. Reg. at 24,198.

And EPA does not assess the costs associated with those requirements, again rendering its assessment of the Rule's costs deficient.

## B. The Proposed Rule did not provide fair notice that EPA might require CEMS *on each inlet.*

The Rule identifies two ways facilities can demonstrate compliance through CEMS:

- Option 1: Determine the mass of EtO entering the control device at a point *after the emission streams are combined*, and apply *the most stringent emission reduction standard* that the component streams are subject to.

- Option 2: Determine the mass of EtO entering the control device *at points before the emission streams are combined*, and apply the emission reduction standards that the component streams are subject to.

89 Fed. Reg. at 24,136 (emphasis added).

Option 1 (*i.e.*, applying CEMS at *outlets*) was described in the Proposed Rule—but is not achievable as finalized because it requires *the entire emission stream* to meet the most stringent standard applicable to the component sources. EPA increased the stringency of key standards between the proposed and final rules, ultimately requiring that some sources within sterilization facilities control EtO emissions up to 99.99%.

Therefore, facilities will be forced to undertake Option 2, which requires reporting of "daily sum of [CEMS data] *for each inlet*[.]" 89 Fed.

Reg. at 24,136, 24,187 (emphasis added). EPA did not propose this requirement, and thus commenters had no chance to explain why this is problematic, including because it requires a substantial additional number of CEMS to be purchased and installed.

EPA's failure to provide notice of this "choice" between CEMS approaches and give commenters an opportunity to explain to EPA why it is really no choice at all violates the APA's notice-and-comment requirements. *See Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (a final regulation that "finds no roots in the agency's proposal because something is not a logical outgrowth of nothing," and "interested parties would have had to divine the agency's unspoken thoughts" fails) (internal quotation and citations omitted). This Court has routinely applied the "logical outgrowth" doctrine to strike down regulatory requirements that commenters had no chance to address. *See id.* at 996–97; *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1261 (D.C. Cir. 2005) (vacating rule because agency "did not afford ... notice of its intent to adopt, much less an opportunity to comment on, [] a cap" on air velocity).

The Court should do so again here, vacating the CEMS monitoring requirements—as well as the whole Rule, which is based on an unlawful statutory foundation and arbitrary and capricious in its selection of stringent, overly costly EtO emission standards that are not achievable.

## CONCLUSION

For all these reasons, the Rule should be vacated.

Respectfully submitted,

s/ Amanda Shafer Berman
Amanda Shafer Berman
Monty Cooper
Siyi Shen
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 688-3451
Fax: (202) 628-5116

# CERTIFICATE OF COMPLIANCE

This brief complies with the Court's September 4, 2024 Order setting a combined word limit of 22,000 for both industry and environmental Petitioners because, excluding the portions exempted by Rule 32(f), this brief contains <u>10,963</u> words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

<u>*/s/ Amanda Shafer Berman*</u>
Amanda Shafer Berman


Dated: October 18, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2024, I have caused the foregoing to be filed electronically with the Clerk of the United States Court of Appeals for the District of Columbia Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/*Amanda Shafer Berman*
Amanda Shafer Berman

# **ADDENDUM**

## TABLE OF CONTENTS

## FEDERAL STATUTES

| Description | Addendum Page |
|---|---|
| 42 U.S.C. § 7412(a) | 1 |
| 42 U.S.C. § 7412(d) | 3 |
| 42 U.S.C. § 7412(f) | 5 |
| 42 U.S.C. § 7412(i) | 7 |

such regulations are proposed that, at a minimum, require any source subject to such revised standards to emit sulfur dioxide at a rate not greater than would have resulted from compliance by such source with the applicable standards of performance under this section [amending sections 7411 and 7479 of this title] prior to such revision.

''(c) APPLICABILITY.—The provisions of subsections (a) [amending this section] and (b) apply only so long as the provisions of section 403(e) of the Clean Air Act [42 U.S.C. 7651b(e)] remain in effect.''

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

**Executive Documents**

TRANSFER OF FUNCTIONS

Enforcement functions of Administrator or other official in Environmental Protection Agency related to compliance with new source performance standards under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for the Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, eff. July 1, 1979, §§102(a), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

POWER SECTOR CARBON POLLUTION STANDARDS

Memorandum of President of the United States, June 25, 2013, 78 F.R. 39535, which related to carbon pollution standards for power plants, was revoked by Ex. Ord. No. 13783, §3(a)(ii), Mar. 28, 2017, 82 F.R. 16094, formerly set out as a note under section 13201 of this title.

## § 7412. Hazardous air pollutants

### (a) Definitions

For purposes of this section, except subsection (r)—

**(1) Major source**

The term ''major source'' means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. The Administrator may establish a lesser quantity, or in the case of radionuclides different criteria, for a major source than that specified in the previous sentence, on the basis of the potency of the air pollutant, persistence, potential for bioaccumulation, other characteristics of the air pollutant, or other relevant factors.

**(2) Area source**

The term ''area source'' means any stationary source of hazardous air pollutants that is not a major source. For purposes of this section, the term ''area source'' shall not include motor vehicles or nonroad vehicles subject to regulation under subchapter II.

**(3) Stationary source**

The term ''stationary source'' shall have the same meaning as such term has under section 7411(a) of this title.

**(4) New source**

The term ''new source'' means a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source.

**(5) Modification**

The term ''modification'' means any physical change in, or change in the method of operation of, a major source which increases the actual emissions of any hazardous air pollutant emitted by such source by more than a de minimis amount or which results in the emission of any hazardous air pollutant not previously emitted by more than a de minimis amount.

**(6) Hazardous air pollutant**

The term ''hazardous air pollutant'' means any air pollutant listed pursuant to subsection (b).

**(7) Adverse environmental effect**

The term ''adverse environmental effect'' means any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas.

**(8) Electric utility steam generating unit**

The term ''electric utility steam generating unit'' means any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale. A unit that cogenerates steam and electricity and supplies more than one-third of its potential electric output capacity and more than 25

megawatts electrical output to any utility power distribution system for sale shall be considered an electric utility steam generating unit.

**(9) Owner or operator**

The term ''owner or operator'' means any person who owns, leases, operates, controls, or supervises a stationary source.

**(10) Existing source**

The term ''existing source'' means any stationary source other than a new source.

**(11) Carcinogenic effect**

Unless revised, the term ''carcinogenic effect'' shall have the meaning provided by the Administrator under Guidelines for Carcinogenic Risk Assessment as of the date of enactment.[1] Any revisions in the existing Guidelines shall be subject to notice and opportunity for comment.

**(b) List of pollutants**

**(1) Initial list**

The Congress establishes for purposes of this section a list of hazardous air pollutants as follows:

| CAS number | Chemical name |
|---|---|
| 75070 | Acetaldehyde |
| 60355 | Acetamide |
| 75058 | Acetonitrile |
| 98862 | Acetophenone |
| 53963 | 2-Acetylaminofluorene |
| 107028 | Acrolein |
| 79061 | Acrylamide |
| 79107 | Acrylic acid |
| 107131 | Acrylonitrile |
| 107051 | Allyl chloride |
| 92671 | 4-Aminobiphenyl |
| 62533 | Aniline |
| 90040 | o-Anisidine |
| 1332214 | Asbestos |
| 71432 | Benzene (including benzene from gasoline) |
| 92875 | Benzidine |
| 98077 | Benzotrichloride |
| 100447 | Benzyl chloride |
| 92524 | Biphenyl |
| 117817 | Bis(2-ethylhexyl)phthalate (DEHP) |
| 542881 | Bis(chloromethyl)ether |
| 75252 | Bromoform |
| 106990 | 1,3-Butadiene |
| 156627 | Calcium cyanamide |
| 105602 | Caprolactam |
| 133062 | Captan |
| 63252 | Carbaryl |
| 75150 | Carbon disulfide |
| 56235 | Carbon tetrachloride |
| 463581 | Carbonyl sulfide |
| 120809 | Catechol |
| 133904 | Chloramben |
| 57749 | Chlordane |
| 7782505 | Chlorine |
| 79118 | Chloroacetic acid |
| 532274 | 2-Chloroacetophenone |
| 108907 | Chlorobenzene |
| 510156 | Chlorobenzilate |
| 67663 | Chloroform |
| 107302 | Chloromethyl methyl ether |
| 126998 | Chloroprene |
| 1319773 | Cresols/Cresylic acid (isomers and mixture) |
| 95487 | o-Cresol |

| CAS number | Chemical name |
|---|---|
| 108394 | m-Cresol |
| 106445 | p-Cresol |
| 98828 | Cumene |
| 94757 | 2,4-D, salts and esters |
| 3547044 | DDE |
| 334883 | Diazomethane |
| 132649 | Dibenzofurans |
| 96128 | 1,2-Dibromo-3-chloropropane |
| 84742 | Dibutylphthalate |
| 106467 | 1,4-Dichlorobenzene(p) |
| 91941 | 3,3-Dichlorobenzidene |
| 111444 | Dichloroethyl ether (Bis(2-chloroethyl)ether) |
| 542756 | 1,3-Dichloropropene |
| 62737 | Dichlorvos |
| 111422 | Diethanolamine |
| 121697 | N,N-Diethyl aniline (N,N-Dimethylaniline) |
| 64675 | Diethyl sulfate |
| 119904 | 3,3-Dimethoxybenzidine |
| 60117 | Dimethyl aminoazobenzene |
| 119937 | 3,3'-Dimethyl benzidine |
| 79447 | Dimethyl carbamoyl chloride |
| 68122 | Dimethyl formamide |
| 57147 | 1,1-Dimethyl hydrazine |
| 131113 | Dimethyl phthalate |
| 77781 | Dimethyl sulfate |
| 534521 | 4,6-Dinitro-o-cresol, and salts |
| 51285 | 2,4-Dinitrophenol |
| 121142 | 2,4-Dinitrotoluene |
| 123911 | 1,4-Dioxane (1,4-Diethyleneoxide) |
| 122667 | 1,2-Diphenylhydrazine |
| 106898 | Epichlorohydrin (1-Chloro-2,3-epoxypropane) |
| 106887 | 1,2-Epoxybutane |
| 140885 | Ethyl acrylate |
| 100414 | Ethyl benzene |
| 51796 | Ethyl carbamate (Urethane) |
| 75003 | Ethyl chloride (Chloroethane) |
| 106934 | Ethylene dibromide (Dibromoethane) |
| 107062 | Ethylene dichloride (1,2-Dichloroethane) |
| 107211 | Ethylene glycol |
| 151564 | Ethylene imine (Aziridine) |
| 75218 | Ethylene oxide |
| 96457 | Ethylene thiourea |
| 75343 | Ethylidene dichloride (1,1-Dichloroethane) |
| 50000 | Formaldehyde |
| 76448 | Heptachlor |
| 118741 | Hexachlorobenzene |
| 87683 | Hexachlorobutadiene |
| 77474 | Hexachlorocyclopentadiene |
| 67721 | Hexachloroethane |
| 822060 | Hexamethylene-1,6-diisocyanate |
| 680319 | Hexamethylphosphoramide |
| 110543 | Hexane |
| 302012 | Hydrazine |
| 7647010 | Hydrochloric acid |
| 7664393 | Hydrogen fluoride (Hydrofluoric acid) |
| 123319 | Hydroquinone |
| 78591 | Isophorone |
| 58899 | Lindane (all isomers) |
| 108316 | Maleic anhydride |
| 67561 | Methanol |
| 72435 | Methoxychlor |
| 74839 | Methyl bromide (Bromomethane) |
| 74873 | Methyl chloride (Chloromethane) |
| 71556 | Methyl chloroform (1,1,1-Trichloroethane) |
| 78933 | Methyl ethyl ketone (2-Butanone) |
| 60344 | Methyl hydrazine |
| 74884 | Methyl iodide (Iodomethane) |
| 108101 | Methyl isobutyl ketone (Hexone) |
| 624839 | Methyl isocyanate |
| 80626 | Methyl methacrylate |
| 1634044 | Methyl tert butyl ether |
| 101144 | 4,4-Methylene bis(2-chloroaniline) |
| 75092 | Methylene chloride (Dichloromethane) |
| 101688 | Methylene diphenyl diisocyanate (MDI) |
| 101779 | 4,4'-Methylenedianiline |
| 91203 | Naphthalene |
| 98953 | Nitrobenzene |

---

[1] See References in Text note below.

ADD-2

tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin, the Administrator shall, not later than 5 years after November 15, 1990, list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4). Such standards shall be promulgated not later than 10 years after November 15, 1990. This paragraph shall not be construed to require the Administrator to promulgate standards for such pollutants emitted by electric utility steam generating units.

**(7) Research facilities**

The Administrator shall establish a separate category covering research or laboratory facilities, as necessary to assure the equitable treatment of such facilities. For purposes of this section, ''research or laboratory facility'' means any stationary source whose primary purpose is to conduct research and development into new processes and products, where such source is operated under the close supervision of technically trained personnel and is not engaged in the manufacture of products for commercial sale in commerce, except in a de minimis manner.

**(8) Boat manufacturing**

When establishing emissions standards for styrene, the Administrator shall list boat manufacturing as a separate subcategory unless the Administrator finds that such listing would be inconsistent with the goals and requirements of this chapter.

**(9) Deletions from the list**

(A) Where the sole reason for the inclusion of a source category on the list required under this subsection is the emission of a unique chemical substance, the Administrator shall delete the source category from the list if it is appropriate because of action taken under either subparagraphs (C) or (D) of subsection (b)(3).

(B) The Administrator may delete any source category from the list under this subsection, on petition of any person or on the Administrator's own motion, whenever the Administrator makes the following determination or determinations, as applicable:

(i) In the case of hazardous air pollutants emitted by sources in the category that may result in cancer in humans, a determination that no source in the category (or group of sources in the case of area sources) emits such hazardous air pollutants in quantities which may cause a lifetime risk of cancer greater than one in one million to the individual in the population who is most exposed to emissions of such pollutants from the source (or group of sources in the case of area sources).

(ii) In the case of hazardous air pollutants that may result in adverse health effects in humans other than cancer or adverse environmental effects, a determination that emissions from no source in the category or subcategory concerned (or group of sources in the case of area sources) exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect) will result from emissions from any source (or from a group of sources in the case of area sources).

The Administrator shall grant or deny a petition under this paragraph within 1 year after the petition is filed.

**(d) Emission standards**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation pursuant to subsection (c) in accordance with the schedules provided in subsections (c) and (e). The Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards except that, there shall be no delay in the compliance date for any standard applicable to any source under subsection (i) as the result of the authority provided by this sentence.

**(2) Standards and methods**

Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which—

(A) reduce the volume of, or eliminate emissions of, such pollutants through process changes, substitution of materials or other modifications,

(B) enclose systems or processes to eliminate emissions,

(C) collect, capture or treat such pollutants when released from a process, stack, storage or fugitive emissions point,

(D) are design, equipment, work practice, or operational standards (including requirements for operator training or certification) as provided in subsection (h), or

(E) are a combination of the above.

None of the measures described in subparagraphs (A) through (D) shall, consistent with the provisions of section 7414(c) of this title, in any way compromise any United States patent or United States trademark right, or any confidential business information, or any trade secret or any other intellectual property right.

**(3) New and existing sources**

The maximum degree of reduction in emissions that is deemed achievable for new sources in a category or subcategory shall not

be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator. Emission standards promulgated under this subsection for existing sources in a category or subcategory may be less stringent than standards for new sources in the same category or subcategory but shall not be less stringent, and may be more stringent than—

(A) the average emission limitation achieved by the best performing 12 percent of the existing sources (for which the Administrator has emissions information), excluding those sources that have, within 18 months before the emission standard is proposed or within 30 months before such standard is promulgated, whichever is later, first achieved a level of emission rate or emission reduction which complies, or would comply if the source is not subject to such standard, with the lowest achievable emission rate (as defined by section 7501 of this title) applicable to the source category and prevailing at the time, in the category or subcategory for categories and subcategories with 30 or more sources, or

(B) the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information) in the category or subcategory for categories or subcategories with fewer than 30 sources.

**(4) Health threshold**

With respect to pollutants for which a health threshold has been established, the Administrator may consider such threshold level, with an ample margin of safety, when establishing emission standards under this subsection.

**(5) Alternative standard for area sources**

With respect only to categories and subcategories of area sources listed pursuant to subsection (c), the Administrator may, in lieu of the authorities provided in paragraph (2) and subsection (f), elect to promulgate standards or requirements applicable to sources in such categories or subcategories which provide for the use of generally available control technologies or management practices by such sources to reduce emissions of hazardous air pollutants.

**(6) Review and revision**

The Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

**(7) Other requirements preserved**

No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D, or other authority of this chapter or a standard issued under State authority.

**(8) Coke ovens**

(A) Not later than December 31, 1992, the Administrator shall promulgate regulations establishing emission standards under paragraphs (2) and (3) of this subsection for coke oven batteries. In establishing such standards, the Administrator shall evaluate—

(i) the use of sodium silicate (or equivalent) luting compounds to prevent door leaks, and other operating practices and technologies for their effectiveness in reducing coke oven emissions, and their suitability for use on new and existing coke oven batteries, taking into account costs and reasonable commercial door warranties; and

(ii) as a basis for emission standards under this subsection for new coke oven batteries that begin construction after the date of proposal of such standards, the Jewell design Thompson non-recovery coke oven batteries and other non-recovery coke oven technologies, and other appropriate emission control and coke production technologies, as to their effectiveness in reducing coke oven emissions and their capability for production of steel quality coke.

Such regulations shall require at a minimum that coke oven batteries will not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing oven doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries shall be December 31, 1995.

(B) The Administrator shall promulgate work practice regulations under this subsection for coke oven batteries requiring, as appropriate—

(i) the use of sodium silicate (or equivalent) luting compounds, if the Administrator determines that use of sodium silicate is an effective means of emissions control and is achievable, taking into account costs and reasonable commercial warranties for doors and related equipment; and

(ii) door and jam cleaning practices.

Notwithstanding subsection (i), the compliance date for such work practice regulations for coke oven batteries shall be not later than the date 3 years after November 15, 1990.

(C) For coke oven batteries electing to qualify for an extension of the compliance date for standards promulgated under subsection (f) in accordance with subsection (i)(8), the emission standards under this subsection for coke oven batteries shall require that coke oven batteries not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries seeking an extension shall be not later than the date 3 years after November 15, 1990.

ADD-4

**(9) Sources licensed by the Nuclear Regulatory Commission**

No standard for radionuclide emissions from any category or subcategory of facilities licensed by the Nuclear Regulatory Commission (or an Agreement State) is required to be promulgated under this section if the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission pursuant to the Atomic Energy Act [42 U.S.C. 2011 et seq.] for such category or subcategory provides an ample margin of safety to protect the public health. Nothing in this subsection shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce any standard or limitation respecting emissions of radionuclides which is more stringent than the standard or limitation in effect under section 7411 of this title or this section.

**(10) Effective date**

Emission standards or other regulations promulgated under this subsection shall be effective upon promulgation.

**(e) Schedule for standards and review**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for categories and subcategories of sources initially listed for regulation pursuant to subsection (c)(1) as expeditiously as practicable, assuring that—

(A) emission standards for not less than 40 categories and subcategories (not counting coke oven batteries) shall be promulgated not later than 2 years after November 15, 1990;

(B) emission standards for coke oven batteries shall be promulgated not later than December 31, 1992;

(C) emission standards for 25 per centum of the listed categories and subcategories shall be promulgated not later than 4 years after November 15, 1990;

(D) emission standards for an additional 25 per centum of the listed categories and subcategories shall be promulgated not later than 7 years after November 15, 1990; and

(E) emission standards for all categories and subcategories shall be promulgated not later than 10 years after November 15, 1990.

**(2) Priorities**

In determining priorities for promulgating standards under subsection (d), the Administrator shall consider—

(A) the known or anticipated adverse effects of such pollutants on public health and the environment;

(B) the quantity and location of emissions or reasonably anticipated emissions of hazardous air pollutants that each category or subcategory will emit; and

(C) the efficiency of grouping categories or subcategories according to the pollutants emitted, or the processes or technologies used.

**(3) Published schedule**

Not later than 24 months after November 15, 1990, and after opportunity for comment, the Administrator shall publish a schedule establishing a date for the promulgation of emission standards for each category and subcategory of sources listed pursuant to subsection (c)(1) and (3) which shall be consistent with the requirements of paragraphs (1) and (2). The determination of priorities for the promulgation of standards pursuant to this paragraph is not a rulemaking and shall not be subject to judicial review, except that, failure to promulgate any standard pursuant to the schedule established by this paragraph shall be subject to review under section 7604 of this title.

**(4) Judicial review**

Notwithstanding section 7607 of this title, no action of the Administrator adding a pollutant to the list under subsection (b) or listing a source category or subcategory under subsection (c) shall be a final agency action subject to judicial review, except that any such action may be reviewed under such section 7607 of this title when the Administrator issues emission standards for such pollutant or category.

**(5) Publicly owned treatment works**

The Administrator shall promulgate standards pursuant to subsection (d) applicable to publicly owned treatment works (as defined in title II of the Federal Water Pollution Control Act [33 U.S.C. 1281 et seq.]) not later than 5 years after November 15, 1990.

**(f) Standard to protect health and environment**

**(1) Report**

Not later than 6 years after November 15, 1990, the Administrator shall investigate and report, after consultation with the Surgeon General and after opportunity for public comment, to Congress on—

(A) methods of calculating the risk to public health remaining, or likely to remain, from sources subject to regulation under this section after the application of standards under subsection (d);

(B) the public health significance of such estimated remaining risk and the technologically and commercially available methods and costs of reducing such risks;

(C) the actual health effects with respect to persons living in the vicinity of sources, any available epidemiological or other health studies, risks presented by background concentrations of hazardous air pollutants, any uncertainties in risk assessment methodology or other health assessment technique, and any negative health or environmental consequences to the community of efforts to reduce such risks; and

(D) recommendations as to legislation regarding such remaining risk.

**(2) Emission standards**

(A) If Congress does not act on any recommendation submitted under paragraph (1), the Administrator shall, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d), promulgate standards for such category or subcategory if promulgation of such

standards is required in order to provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990), unless the Administrator determines that a more stringent standard is necessary to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. If standards promulgated pursuant to subsection (d) and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, the Administrator shall promulgate standards under this subsection for such source category.

(B) Nothing in subparagraph (A) or in any other provision of this section shall be construed as affecting, or applying to the Administrator's interpretation of this section, as in effect before November 15, 1990, and set forth in the Federal Register of September 14, 1989 (54 Federal Register 38044).

(C) The Administrator shall determine whether or not to promulgate such standards and, if the Administrator decides to promulgate such standards, shall promulgate the standards 8 years after promulgation of the standards under subsection (d) for each source category or subcategory concerned. In the case of categories or subcategories for which standards under subsection (d) are required to be promulgated within 2 years after November 15, 1990, the Administrator shall have 9 years after promulgation of the standards under subsection (d) to make the determination under the preceding sentence and, if required, to promulgate the standards under this paragraph.

**(3) Effective date**

Any emission standard established pursuant to this subsection shall become effective upon promulgation.

**(4) Prohibition**

No air pollutant to which a standard under this subsection applies may be emitted from any stationary source in violation of such standard, except that in the case of an existing source—

(A) such standard shall not apply until 90 days after its effective date, and

(B) the Administrator may grant a waiver permitting such source a period of up to 2 years after the effective date of a standard to comply with the standard if the Administrator finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment.

**(5) Area sources**

The Administrator shall not be required to conduct any review under this subsection or promulgate emission limitations under this subsection for any category or subcategory of area sources that is listed pursuant to subsection (c)(3) and for which an emission standard is promulgated pursuant to subsection (d)(5).

**(6) Unique chemical substances**

In establishing standards for the control of unique chemical substances of listed pollutants without CAS numbers under this subsection, the Administrator shall establish such standards with respect to the health and environmental effects of the substances actually emitted by sources and direct transformation byproducts of such emissions in the categories and subcategories.

**(g) Modifications**

**(1) Offsets**

(A) A physical change in, or change in the method of operation of, a major source which results in a greater than de minimis increase in actual emissions of a hazardous air pollutant shall not be considered a modification, if such increase in the quantity of actual emissions of any hazardous air pollutant from such source will be offset by an equal or greater decrease in the quantity of emissions of another hazardous air pollutant (or pollutants) from such source which is deemed more hazardous, pursuant to guidance issued by the Administrator under subparagraph (B). The owner or operator of such source shall submit a showing to the Administrator (or the State) that such increase has been offset under the preceding sentence.

(B) The Administrator shall, after notice and opportunity for comment and not later than 18 months after November 15, 1990, publish guidance with respect to implementation of this subsection. Such guidance shall include an identification, to the extent practicable, of the relative hazard to human health resulting from emissions to the ambient air of each of the pollutants listed under subsection (b) sufficient to facilitate the offset showing authorized by subparagraph (A). Such guidance shall not authorize offsets between pollutants where the increased pollutant (or more than one pollutant in a stream of pollutants) causes adverse effects to human health for which no safety threshold for exposure can be determined unless there are corresponding decreases in such types of pollutant(s).

**(2) Construction, reconstruction and modifications**

(A) After the effective date of a permit program under subchapter V in any State, no person may modify a major source of hazardous air pollutants in such State, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for existing sources will be met. Such determination shall be made on a case-by-case basis where no applicable emissions limitations have been established by the Administrator.

(B) After the effective date of a permit program under subchapter V in any State, no person may construct or reconstruct any major source of hazardous air pollutants, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met. Such determination shall be made on a case-by-case basis where no applicable emission limitations have been established by the Administrator.

**(3) Procedures for modifications**

The Administrator (or the State) shall establish reasonable procedures for assuring that the requirements applying to modifications under this section are reflected in the permit.

**(h) Work practice standards and other requirements**

**(1) In general**

For purposes of this section, if it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, the Administrator may, in lieu thereof, promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in the Administrator's judgment is consistent with the provisions of subsection (d) or (f). In the event the Administrator promulgates a design or equipment standard under this subsection, the Administrator shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(2) Definition**

For the purpose of this subsection, the phrase "not feasible to prescribe or enforce an emission standard" means any situation in which the Administrator determines that—

(A) a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State or local law, or

(B) the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations.

**(3) Alternative standard**

If after notice and opportunity for comment, the owner or operator of any source establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

**(4) Numerical standard required**

Any standard promulgated under paragraph (1) shall be promulgated in terms of an emission standard whenever it is feasible to promulgate and enforce a standard in such terms.

**(i) Schedule for compliance**

**(1) Preconstruction and operating requirements**

After the effective date of any emission standard, limitation, or regulation under subsection (d), (f) or (h), no person may construct any new major source or reconstruct any existing major source subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V) determines that such source, if properly constructed, reconstructed and operated, will comply with the standard, regulation or limitation.

**(2) Special rule**

Notwithstanding the requirements of paragraph (1), a new source which commences construction or reconstruction after a standard, limitation or regulation applicable to such source is proposed and before such standard, limitation or regulation is promulgated shall not be required to comply with such promulgated standard until the date 3 years after the date of promulgation if—

(A) the promulgated standard, limitation or regulation is more stringent than the standard, limitation or regulation proposed; and

(B) the source complies with the standard, limitation, or regulation as proposed during the 3-year period immediately after promulgation.

**(3) Compliance schedule for existing sources**

(A) After the effective date of any emissions standard, limitation or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation or regulation except, in the case of an existing source, the Administrator shall establish a compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard, except as provided in subparagraph (B) and paragraphs (4) through (8).

(B) The Administrator (or a State with a program approved under subchapter V) may issue a permit that grants an extension permitting an existing source up to 1 additional year to comply with standards under subsection (d) if such additional period is necessary for the installation of controls. An additional extension of up to 3 years may be added for mining waste operations, if the 4-year compliance time is insufficient to dry and cover mining waste in order to reduce emissions of any pollutant listed under subsection (b).

**(4) Presidential exemption**

The President may exempt any stationary source from compliance with any standard or limitation under this section for a period of not more than 2 years if the President deter-

mines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years. The President shall report to Congress with respect to each exemption (or extension thereof) made under this paragraph.

**(5) Early reduction**

(A) The Administrator (or a State acting pursuant to a permit program approved under subchapter V) shall issue a permit allowing an existing source, for which the owner or operator demonstrates that the source has achieved a reduction of 90 per centum or more in emissions of hazardous air pollutants (95 per centum in the case of hazardous air pollutants which are particulates) from the source, to meet an alternative emission limitation reflecting such reduction in lieu of an emission limitation promulgated under subsection (d) for a period of 6 years from the compliance date for the otherwise applicable standard, provided that such reduction is achieved before the otherwise applicable standard under subsection (d) is first proposed. Nothing in this paragraph shall preclude a State from requiring reductions in excess of those specified in this subparagraph as a condition of granting the extension authorized by the previous sentence.

(B) An existing source which achieves the reduction referred to in subparagraph (A) after the proposal of an applicable standard but before January 1, 1994, may qualify under subparagraph (A), if the source makes an enforceable commitment to achieve such reduction before the proposal of the standard. Such commitment shall be enforceable to the same extent as a regulation under this section.

(C) The reduction shall be determined with respect to verifiable and actual emissions in a base year not earlier than calendar year 1987, provided that, there is no evidence that emissions in the base year are artificially or substantially greater than emissions in other years prior to implementation of emissions reduction measures. The Administrator may allow a source to use a baseline year of 1985 or 1986 provided that the source can demonstrate to the satisfaction of the Administrator that emissions data for the source reflects verifiable data based on information for such source, received by the Administrator prior to November 15, 1990, pursuant to an information request issued under section 7414 of this title.

(D) For each source granted an alternative emission limitation under this paragraph there shall be established by a permit issued pursuant to subchapter V an enforceable emission limitation for hazardous air pollutants reflecting the reduction which qualifies the source for an alternative emission limitation under this paragraph. An alternative emission limitation under this paragraph shall not be available with respect to standards or requirements promulgated pursuant to subsection (f) and the Administrator shall, for the purpose of determining whether a standard under sub-

section (f) is necessary, review emissions from sources granted an alternative emission limitation under this paragraph at the same time that other sources in the category or subcategory are reviewed.

(E) With respect to pollutants for which high risks of adverse public health effects may be associated with exposure to small quantities including, but not limited to, chlorinated dioxins and furans, the Administrator shall by regulation limit the use of offsetting reductions in emissions of other hazardous air pollutants from the source as counting toward the 90 per centum reduction in such high-risk pollutants qualifying for an alternative emissions limitation under this paragraph.

**(6) Other reductions**

Notwithstanding the requirements of this section, no existing source that has installed—

(A) best available control technology (as defined in section 7479(3) of this title), or

(B) technology required to meet a lowest achievable emission rate (as defined in section 7501 of this title),

prior to the promulgation of a standard under this section applicable to such source and the same pollutant (or stream of pollutants) controlled pursuant to an action described in subparagraph (A) or (B) shall be required to comply with such standard under this section until the date 5 years after the date on which such installation or reduction has been achieved, as determined by the Administrator. The Administrator may issue such rules and guidance as are necessary to implement this paragraph.

**(7) Extension for new sources**

A source for which construction or reconstruction is commenced after the date an emission standard applicable to such source is proposed pursuant to subsection (d) but before the date an emission standard applicable to such source is proposed pursuant to subsection (f) shall not be required to comply with the emission standard under subsection (f) until the date 10 years after the date construction or reconstruction is commenced.

**(8) Coke ovens**

(A) Any coke oven battery that complies with the emission limitations established under subsection (d)(8)(C), subparagraph (B), and subparagraph (C), and complies with the provisions of subparagraph (E), shall not be required to achieve emission limitations promulgated under subsection (f) until January 1, 2020.

(B)(i) Not later than December 31, 1992, the Administrator shall promulgate emission limitations for coke oven emissions from coke oven batteries. Notwithstanding paragraph (3) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 1998. Such emission limitations shall reflect the lowest achievable emission rate as defined in section 7501 of this title for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than—

(I) 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

(II) 1 per centum leaking lids;

(III) 4 per centum leaking offtakes; and

(IV) 16 seconds visible emissions per charge,

with an exclusion for emissions during the period after the closing of self-sealing oven doors (or the total mass emissions equivalent). The rulemaking in which such emission limitations are promulgated shall also establish an appropriate measurement methodology for determining compliance with such emission limitations, and shall establish such emission limitations in terms of an equivalent level of mass emissions reduction from a coke oven battery, unless the Administrator finds that such a mass emissions standard would not be practicable or enforceable. Such measurement methodology, to the extent it measures leaking doors, shall take into consideration alternative test methods that reflect the best technology and practices actually applied in the affected industries, and shall assure that the final test methods are consistent with the performance of such best technology and practices.

(ii) If the Administrator fails to promulgate such emission limitations under this subparagraph prior to the effective date of such emission limitations, the emission limitations applicable to coke oven batteries under this subparagraph shall be—

(I) 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

(II) 1 per centum leaking lids;

(III) 4 per centum leaking offtakes; and

(IV) 16 seconds visible emissions per charge,

or the total mass emissions equivalent (if the total mass emissions equivalent is determined to be practicable and enforceable), with no exclusion for emissions during the period after the closing of self-sealing oven doors.

(C) Not later than January 1, 2007, the Administrator shall review the emission limitations promulgated under subparagraph (B) and revise, as necessary, such emission limitations to reflect the lowest achievable emission rate as defined in section 7501 of this title at the time for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than the emission limitation promulgated under subparagraph (B). Notwithstanding paragraph (2) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 2010.

(D) At any time prior to January 1, 1998, the owner or operator of any coke oven battery may elect to comply with emission limitations promulgated under subsection (f) by the date such emission limitations would otherwise apply to such coke oven battery, in lieu of the emission limitations and the compliance dates provided under subparagraphs (B) and (C) of this paragraph. Any such owner or operator shall be legally bound to comply with such emission limitations promulgated under sub-

section (f) with respect to such coke oven battery as of January 1, 2003. If no such emission limitations have been promulgated for such coke oven battery, the Administrator shall promulgate such emission limitations in accordance with subsection (f) for such coke oven battery.

(E) Coke oven batteries qualifying for an extension under subparagraph (A) shall make available not later than January 1, 2000, to the surrounding communities the results of any risk assessment performed by the Administrator to determine the appropriate level of any emission standard established by the Administrator pursuant to subsection (f).

(F) Notwithstanding the provisions of this section, reconstruction of any source of coke oven emissions qualifying for an extension under this paragraph shall not subject such source to emission limitations under subsection (f) more stringent than those established under subparagraphs (B) and (C) until January 1, 2020. For the purposes of this subparagraph, the term "reconstruction" includes the replacement of existing coke oven battery capacity with new coke oven batteries of comparable or lower capacity and lower potential emissions.

**(j) Equivalent emission limitation by permit**

**(1) Effective date**

The requirements of this subsection shall apply in each State beginning on the effective date of a permit program established pursuant to subchapter V in such State, but not prior to the date 42 months after November 15, 1990.

**(2) Failure to promulgate a standard**

In the event that the Administrator fails to promulgate a standard for a category or subcategory of major sources by the date established pursuant to subsection (e)(1) and (3), and beginning 18 months after such date (but not prior to the effective date of a permit program under subchapter V), the owner or operator of any major source in such category or subcategory shall submit a permit application under paragraph (3) and such owner or operator shall also comply with paragraphs (5) and (6).

**(3) Applications**

By the date established by paragraph (2), the owner or operator of a major source subject to this subsection shall file an application for a permit. If the owner or operator of a source has submitted a timely and complete application for a permit required by this subsection, any failure to have a permit shall not be a violation of paragraph (2), unless the delay in final action is due to the failure of the applicant to timely submit information required or requested to process the application. The Administrator shall not later than 18 months after November 15, 1990, and after notice and opportunity for comment, establish requirements for applications under this subsection including a standard application form and criteria for determining in a timely manner the completeness of applications.

**(4) Review and approval**

Permit applications submitted under this subsection shall be reviewed and approved or