ORAL ARGUMENT NOT YET SCHEDULED
No. 24-1178 (Consolidated with 24-1180)

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CALIFORNIA COMMUNITIES AGAINST TOXICS, CLEAN POWER LAKE
COUNTY, COMITÉ DIÁLOGO AMBIENTAL, RIO GRANDE
INTERNATIONAL STUDY CENTER, SIERRA CLUB, and
UNION OF CONCERNED SCIENTISTS
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
and MICHAEL S. REGAN, Administrator,
United States Environmental Protection Agency,
*Respondents*.

PETITION FOR REVIEW OF FINAL ADMINISTRATIVE ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

**PROOF OPENING BRIEF OF CALIFORNIA COMMUNITIES AGAINST
TOXICS, CLEAN POWER LAKE COUNTY, COMITÉ DIÁLOGO
AMBIENTAL, RIO GRANDE INTERNATIONAL STUDY CENTER,
SIERRA CLUB, AND UNION OF CONCERNED SCIENTISTS**

Marvin C. Brown IV
Lillian Zhou
Seth L. Johnson
Earthjustice
1001 G Street, NW
Suite 1000
Washington, DC 20001
(202) 667-4500

**DATED: October 18, 2024**

mcbrown@earthjustice.org
lzhou@earthjustice.org
sjohnson@earthjustice.org

*Counsel for California Communities
Against Toxics, Clean Power Lake
County, Comité Diálogo Ambiental,
Rio Grande International Study
Center, Sierra Club, and Union of
Concerned Scientists*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners California Communities Against Toxics, Clean Power Lake County, Comité Diálogo Ambiental, Rio Grande International Study Center, Sierra Club, and Union of Concerned Scientists ("Petitioners") state as follows:

## A. Parties and *Amici*

### i. Parties, Intervenors, and *Amici* Who Appeared in the District Court

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

### ii. Parties to This Case

Petitioners:

- No. 24-1178: California Communities Against Toxics, Clean Power Lake County, Comité Diálogo Ambiental, Rio Grande International Study Center, Sierra Club, and Union of Concerned Scientists.

- No. 24-1180: Ethylene Oxide Sterilization Association.

Respondents: U.S. Environmental Protection Agency ("EPA") and Michael S. Regan, in his official capacity as Administrator of the EPA.

Intervenors-Respondents:

- No. 24-1178: Ethylene Oxide Sterilization Association.

- No. 24-1180: California Communities Against Toxics, Clean Power

Lake County, Comité Diálogo Ambiental, Rio Grande International Study Center, Sierra Club, and Union of Concerned Scientists.

### iii. *Amici* in This Case

The *per curiam* order on September 4, 2024, Doc. No. 2073052, permitted American Petroleum Institute to participate as *amicus curiae*.

### iv. Circuit Rule 26.1 Disclosures

See Petitioners' disclosure statement filed herewith.

## B. Rulings Under Review

Petitioners seek review of the final agency action taken by EPA titled "National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review," 89 Fed. Reg. 24,090 (Apr. 5, 2024).

## C. Related Cases

There are no related cases other than the consolidated case.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure Rule 26.1 and D.C. Circuit Rule 26.1, Petitioners hereby declare as follows:

1.     Petitioner California Communities Against Toxics is a nongovernmental corporation organized and existing under the laws of the State of California. California Communities Against Toxics does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in California Communities Against Toxics. California Communities Against Toxics is an environmental justice network of member groups that advocates for environmental justice and protection from toxic air pollution in California and nationally. Through public education, advocacy, and community organizing, it aims to reduce individuals' exposure to pollution, to expand knowledge about the effects of toxic chemicals on human health and the environment, and to protect the most vulnerable people from harm.

2.     Petitioner Clean Power Lake County is a nonprofit organization headquartered in Highland Park, Illinois. Clean Power Lake County does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in the organization. Clean Power Lake County is a community-driven coalition committed to local action to secure environmental, economic, and racial justice. Clean Power Lake County's mission is to ensure

clean air, clean water, and healthy soil for every Lake County community member and to achieve the self-determination of those disproportionately impacted by environmental pollution.

3. Petitioner Comité Diálogo Ambiental ("Diálogo"), is a community environmental group composed of residents of the Municipality of Salinas and the Guayama Region and organized as a nonprofit corporation under the laws of the Commonwealth of Puerto Rico since 1997. Comité Diálogo Ambiental does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in Comité Diálogo Ambiental. Diálogo's purposes include promoting the general welfare of the communities it serves through education and capacity building of residents to encourage conditions under which human beings and the environment can exist in harmony to fulfill economic, social and other needs of present and future generations.

4. Petitioner Rio Grande International Study Center ("RGISC," pronounced "risk") is a chartered nonprofit organization headquartered in Laredo, Texas, and founded in January 1994. RGISC does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in RGISC. RGISC is a frontline environmental advocacy group dedicated to using science, data, people power, and creative actions to preserve and protect, among other things, the people of the Rio Grande-Rio Bravo watershed.

RGISC pushes for a positive vision of our South Texas border region via research, public awareness campaigns, grassroots building, signature community events, and advocacy for local ordinances and policy making.

5.      Petitioner Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit membership organization. Sierra Club does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in Sierra Club. Sierra Club is dedicated to the protection of public health and the environment.

6.      Petitioner Union of Concerned Scientists ("UCS") is a national nonprofit organization founded in 1969 by scientists at the Massachusetts Institute of Technology. USC does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in USC. USC's mission is to achieve a healthier planet and a safer world by fostering independent, science-based solutions that improve people's lives.

DATED: October 18, 2024

/s/ Marvin C. Brown IV
Marvin C. Brown IV
Lillian Zhou
Seth L. Johnson
Earthjustice
1001 G Street, NW
Suite 1000
Washington, DC 20001
(202) 667-4500
mcbrown@earthjustice.org
lzhou@earthjustice.org

sjohnson@earthjustice.org

*Counsel for California Communities
Against Toxics, Clean Power Lake
County, Comité Diálogo Ambiental,
Rio Grande International Study
Center, Sierra Club, and Union of
Concerned Scientists*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES............. iii

RULE 26.1 DISCLOSURE STATEMENT ............................................. v

TABLE OF AUTHORITIES ................................................. xi

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ................................ xvii

PRELIMINARY STATEMENT...................................................1

JURISDICTIONAL STATEMENT .......................................1

STATUTES AND REGULATIONS ....................................2

STATEMENT OF ISSUES .................................................2

STATEMENT OF THE CASE....................................................2

    I.   Introduction ...................................................2

    II.   The Dangers of Breathing In Ethylene Oxide............................5

    III. EPA's Statutory Duty to Effectively Regulate Air Toxics to Protect Public Health ...................................................7

        A. Emission Standards for Hazardous Air Pollutants.................7

        B. Title V Operating Permits........................................12

    IV. EPA's Commercial Sterilizer Regulations...................................14

SUMMARY OF ARGUMENT............................................21

STANDING.....................................................................22

STANDARD OF REVIEW .................................................23

ARGUMENT ...................................................................24

    I.   EPA Violated the Clean Air Act and Acted Arbitrarily by Failing to Follow the Compliance Provisions for 112(f)(2) Emission Standards. .................24

    II.  EPA's Decision Not to Require Title V Permits Was Arbitrary and Capricious. .........................................................29

        A. EPA arbitrarily changed its position without adequately explaining its change in reasoning....................................................30

1. EPA arbitrarily changed its position on the value of the Title V permit process in increasing compliance at sterilizer facilities. ........................ 31

2. EPA arbitrarily changed its position on the complexity of the sterilizer rule......................................................................................................... 34

B. EPA's finding that Title V compliance would be overly burdensome runs counter to the record evidence. .................................................................37

CONCLUSION .........................................................................................................39

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT................. 41

# TABLE OF AUTHORITIES

<u>C</u><span>ASES</span>                                                                                          <u>P</u><span>AGE(S)</span>

*Allegheny Power v. FERC*,
   437 F.3d 1215 (D.C. Cir. 2006) ...........................................................................31

\*Ass'n of Battery Recyclers v. EPA,
   716 F.3d 667 (D.C. Cir. 2013) ...........................................................11, 22, 24, 28

*Burlington Truck Lines v. United States*,
   371 U.S. 156 (1962) ............................................................................................34

*California Communities Against Toxics v. EPA*,
   No. 1:22-CV-03724, 2022 WL 17717384 (D.D.C., Dec. 14, 2022) ...................17

*Cement Kiln Recycling Coal. v. EPA*,
   255 F.3d 855 (D.C. Cir. 2001) ..........................................................................7, 8

*City of Waukesha v. EPA*,
   320 F.3d 228 (D.C. Cir. 2003) ...........................................................................23

*Com. of Va. v. Browner*,
   80 F.3d 869 (4th Cir. 1996) ................................................................................13

*Ethyl Corp. v. EPA*,
   306 F.3d 1144 (D.C. Cir. 2002) .........................................................................23

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ............................................................................................33

*FEC v. Akins*,
   524 U.S. 11 (1998) ..............................................................................................23

\*Authorities upon which we chiefly rely are marked with asterisks.

*Fin. Plan. Ass'n v. SEC*,
   482 F.3d 481 (D.C. Cir. 2007) ............................................................25

*Friends of Animals v. Jewell*,
   824 F.3d 1033 (D.C. Cir. 2016) ..........................................................23

*Friends of the Earth v. Laidlaw Env't Servs*,
   528 U.S. 167 (2000) ............................................................................22

*Huntsman Petrochemical LLC v. EPA*,
   114 F.4th 727 (D.C. Cir. 2024) .............................................................5

*In re England*,
   375 F.3d 1169 (D.C. Cir. 2004) ..........................................................29

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ........................................................................23

*Monsanto Co. v. EPA*,
   19 F.3d 1201 (7th Cir. 1994).................................................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................ 24, 38, 39

*Nat'l Lime Ass'n v. EPA*,
   233 F.3d 625 (D.C. Cir. 2000) ..........................................................7, 9

*NRDC v. EPA*,
   489 F.3d 1364 (D.C. Cir. 2007) ..........................................................27

*NRDC v. EPA*,
   529 F.3d 1077 (D.C. Cir. 2008) ..........................................................10

*NRDC v. EPA*,
   749 F.3d 1055 (D.C. Cir. 2014).............................................................22

*Rio Grande Pipeline Co. v. FERC*,
178 F.3d 533 (D.C. Cir. 1999) .................................................................37

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
489 F.3d 1245 (D.C. Cir. 2007) ...............................................................39

*Shays v. FEC*,
414 F.3d 76 (D.C. Cir. 2005) ...................................................................23

*Siegel v. SEC*,
592 F.3d 147 (D.C. Cir. 2010) .................................................................37

*Sierra Club v. EPA*,
479 F.3d 875 (D.C. Cir. 2007) ...................................................................9

*Sierra Club v. EPA*,
551 F.3d 1019 (D.C. Cir. 2008) .................................................................8

*Sierra Club v. Leavitt*,
368 F.3d 1300 (11th Cir. 2004)................................................................13

*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996) ...................................................................24

*\*U.S. Sugar Corp. v. EPA*,
830 F.3d 579 (D.C. Cir. 2016) ............................ 14, 24, 29, 30, 31, 33, 34, 35, 37

*U.S. Sugar Corp. v. EPA*,
113 F.4th 984 (D.C. Cir. 2024) ................................................................23

*Union Neighbors United v. Jewell*,
831 F.3d 564 (D.C. Cir. 2016) .................................................................26

*United States v. Palomar-Santiago*,
593 U.S. 321 (2021) .................................................................................26

**STATUTES**

42 U.S.C. § 7412 ................................................................................................................ 8, 27, 36

42 U.S.C. § 7412(a)(1) ..................................................................................................................8

42 U.S.C. § 7412(a)(2) ..................................................................................................................8

42 U.S.C. § 7412(a)(4) ..................................................................................................................9

42 U.S.C. § 7412(a)(10) ................................................................................................................9

42 U.S.C. § 7412(b)(1) ..................................................................................................................8

42 U.S.C. § 7412(c) ......................................................................................................................8

42 U.S.C. § 7412(d) .............................................................................................. 9, 10, 17, 18

42 U.S.C. § 7412(d)(2) ..................................................................................................................9

42 U.S.C. § 7412(d)(3) ..................................................................................................................9

42 U.S.C. § 7412(d)(6) ..................................................................................................11, 12, 16, 17

42 U.S.C. § 7412(d)(5) ..................................................................................................................9

42 U.S.C. § 7412(f) ............................................................... 10, 11, 18, 24, 25, 26, 27, 28

42 U.S.C. § 7412(f)(2) ..................................................................................................2, 11, 16, 24

*42 U.S.C. § 7412(f)(2)(A) ..................................................................................10, 11, 12

*42 U.S.C. § 7412(f)(4) ............................................................... 2, 11, 21, 24, 25, 27, 28

42 U.SC. § 7412(f)(4)(A) ..................................................................................... 11, 24, 26, 28

*42 U.S.C. § 7412(f)(4)(B) .................................................................11, 24, 26, 28

42 U.S.C. § 7412(i)(1) ....................................................................................9

42 U.S.C. § 7412(i)(3) ..................................................................................27

42 U.S.C. § 7412(i)(3)(A) ....................................................................... 10, 27

42 U.S.C. § 7412(r)(7) ............................................................................... 36

42 U.S.C. § 7607(b)(1).....................................................................................1

42 U.S.C. § 7607(d)(1)(C) ......................................................................... 23

42 U.S.C. § 7607(d)(9)(A) ............................................................................23

42 U.S.C. § 7661a .........................................................................................2

*42 U.S.C. § 7661a(a)........................................................... 13, 14, 29, 38

42 U.S.C. § 7661a(b)(6) ................................................................................13

42 U.S.C. § 7661c(c) .....................................................................................13

42 U.S.C. § 7661d(a)(1) ................................................................................13

42 U.S.C. § 7661d(b)(1) ................................................................................13

42 U.S.C. § 7661d(b)(2) ................................................................................13

## LEGISLATIVE HISTORY

S. REP. NO. 101-228 (1989) ...................................................... 8, 12, 29

## REGULATIONS

40 C.F.R. § 70.2 ...........................................................................................36

40 C.F.R. § 70.6 ......................................................................................36

**FEDERAL REGISTER NOTICES**

59 Fed. Reg. 62,585 (Dec. 6, 1994) ..........................................................16

61 Fed. Reg. 27,785 (June 3, 1996) ..........................................................16

64 Fed. Reg. 69,637 (Dec. 14, 1999) ........................................................16

66 Fed. Reg. 55,577 (Nov. 2, 2001) ................................................... 16, 19

70 Fed. Reg. 75,320 (Dec. 19, 2005) ........................................................16

71 Fed. Reg. 17,712 (Apr. 7, 2006) ..........................................................17

84 Fed. Reg. 67,889 (Dec. 12, 2019) ........................................................84

*88 Fed. Reg. 22,790 (Apr. 13, 2023) ............... 15, 17-19, 25, 29, 31, 32, 34, 36, 38

*89 Fed. Reg. 24,090 (April 5, 2024) .......................... 1, 3, 4, 6, 7, 20, 26, 30, 32-38

89 Fed. Reg. 42,932 (May 16, 2024) .........................................................28

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to DC Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| CEMS | Continuous Emissions Monitoring System |
| Earthjustice *et al*. comments | EPA-HQ-OAR-2019-0178-0634 |
| EtO | Ethylene Oxide |
| GACT | Generally Available Control Technology |
| IRIS Review of Ethylene Oxide | EPA-HQ-OAR-2019-0178-0477 |
| MACT | Maximum Achievable Control Technology |
| NESHAP | National Emission Standards for Hazardous Air Pollutants |
| Regulatory Impact Analysis | EPA-HQ-OAR-2019-0178-1557 |
| Residual Risk Assessment | EPA-HQ-OAR-2019-0178-1576 |
| Sterilizer Rule Response to Comments | EPA-HQ-OAR-2019-0178-1595 |
| Technical Support Document for Proposed Rule | EPA-HQ-OAR-2019-0178-0469 |

## PRELIMINARY STATEMENT

Medical devices are supposed to save lives, not destroy them. And yet, all across the U.S., hundreds of thousands of people face significant risks of developing cancer by breathing in ethylene oxide, a cancer-causing chemical commercial sterilization facilities use to sterilize medical equipment. The Clean Air Act requires EPA to reduce this risk to the public by setting health-protective standards to reduce emissions of ethylene oxide from these sterilization facilities. EPA's new commercial sterilizer rule falls short in two ways: first, it illegally prolongs Petitioner's exposure to ethylene oxide during the compliance period without any interim controls; second, it arbitrarily denies Petitioners access to the Clean Air Act's robust permitting processes that would provide them critical information about the sterilizer facilities in their communities. This Court should vacate EPA's illegal compliance and permitting provisions.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1) to review EPA's final agency action at 89 Fed. Reg. 24,090 (April 5, 2024) ("final rule"), JA_____. Petitioners timely filed this petition for review within the Clean Air Act's 60-day window on June 3, 2024. 42 U.S.C. § 7607(b)(1).

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in an addendum to this brief.

## STATEMENT OF ISSUES

I.      Whether EPA violated the Clean Air Act or acted arbitrarily by failing to follow the compliance provisions of section 112(f)(4), 42 U.S.C. § 7412(f)(4), after the agency promulgated standards under section 112(f)(2).

II.     Whether EPA violated the Clean Air Act or acted arbitrarily by exempting area source sterilization facilities from compliance with Title V of the Clean Air Act, 42 U.S.C. § 7661a.

## STATEMENT OF THE CASE

### I.      Introduction

Ethylene oxide ("EtO") is a DNA-damaging gas that, as relevant here, commercial sterilizers use to sterilize medical equipment and spices. IRIS Review of Ethylene Oxide, EPA-HQ-OAR-2019-0178-0477 at 1-1, JA_____. According to the FDA, approximately 50% of medical devices in the U.S., or more than 20 billion devices, are sterilized with EtO each year. Regulatory Impact Analysis, EPA-HQ-OAR-2019-0178-1557 at 1-6, JA_____. These devices save lives. But the use of EtO to sterilize medical devices also threatens lives, because the same DNA-damaging properties that make EtO an effective sterilant also make it a potent carcinogen.

Even though multiple alternatives exist, EtO-sterilization is widely used by medical device manufacturers due to its ability to sterilize many medical devices without degrading their materials. EPA-HQ-OAR-2019-0178-0452 at 1, JA_____. A small molecule of only seven atoms, EtO works as a sterilant by damaging the enzymes, DNA, and RNA of microbes to render them nonviable. *Id.* at 2, JA_____. And because EtO's molecular structure is so small, EtO penetrates packaging, like shrink wrap and cardboard, to destroy bacteria and viruses. EPA-HQ-OAR-2019-0178-1522 at 103, JA_____. Throughout this process, EtO readily escapes to surrounding neighborhoods through inadequate control technologies and leaky doors and windows. Unlike many industrial facilities, commercial sterilizer facilities are often inconspicuous from the outside, located in office parks near residential areas, and operate 24 hours a day, seven days a week. Earthjustice et al. Comments, EPA-HQ-OAR-2019-0178-0634 at Appendix B, p. 119, JA_____; EPA-HQ-OAR-2019-0178-0541 at 3, JA_____.

For the communities that surround commercial sterilizers, and for the workers inside sterilizer facilities, the health risks posed by breathing in EtO emissions are exceptionally high. EPA's "upper bound threshold for acceptable health risks" from a pollutant-emitting facility is a lifetime cancer risk of 100-in-1 million. 89 Fed. Reg. 24,095, JA_____. But when EPA analyzed the cancer risk posed by commercial sterilizers' current allowable emissions, the agency found

that "the maximum lifetime individual cancer risk could be as high as 8,000-in-1 million," or 80 times EPA's upper bound threshold, "with EtO driving the risk." *Id.* at 24,118, JA_____. This translates to "1 excess [cancer] case in every 1.5 months." *Id*. EPA estimated that around 260,000 people in the U.S. could face unacceptable cancer risks from commercial sterilizers' permitted EtO emissions. *Id.* For workers in commercial sterilization facilities, the risk caused by breathing in EtO is even higher: without new protections, one in 17 workers at a commercial sterilization facility could develop cancer over the course of their career. EPA-HQ-OAR-2019-0178-1564, JA_____.

There are currently 88 commercial sterilization facilities in the U.S. 89 Fed. Reg. 24,091, JA_____. Through the Clean Air Act, Congress mandated that EPA reduce the public health threat posed by EtO emissions from commercial sterilizers by setting emission standards.  In 2024, EPA revised its National Emission Standards for Hazardous Air Pollutants: Commercial Sterilization Facilities ("sterilizer rule") after years of advocacy and a lawsuit brought by Petitioners.

While EPA's new sterilizer rule strengthened emission standards, it still falls short of the Clean Air Act's health-protective mandates in two ways. First, the new rule illegally waives the Clean Air Act's default 90-day compliance deadline, without requiring any interim controls during the waiver period on emissions that EPA has found to pose an unacceptable public health risk. Second, even though

EPA's proposal recognized the compliance benefits of public participation that the Clean Air Act's Title V permit program provides, EPA arbitrarily retreated from that conclusion in the final rule, without explaining the basis of that change or providing any new information to support its changed position.

## II.     The Dangers of Breathing in Ethylene Oxide

EtO's mutagenetic, or DNA-damaging, properties have been well known to scientists since the 1940s. IRIS Review of Ethylene Oxide, EPA-HQ-OAR-2019-0178-0477 at 1-1, JA_____. EPA, however, conducted its first health assessment of EtO in 1985 and concluded that EtO is "probably carcinogenic to humans."[1] But in 1998, EPA began reassessing its conclusion on EtO's carcinogenicity through its Integrated Risk Information System ("IRIS") program, a research program created to identify and characterize the health hazards of chemicals in the environment. The IRIS review of EtO would result in "an extensive, eighteen-year process that… involved rounds of public comment and peer review by EPA's Science Advisory Board…, and concluded in 2016 when EPA issued a comprehensive report on the subject." *Huntsman Petrochemical LLC v. EPA*, 114 F.4th 727, 733 (D.C. Cir. 2024); *see also* IRIS Review of Ethylene Oxide, EPA-HQ-OAR-2019-0178-0477 at 2-2, JA_____. EPA's comprehensive report reached an unambiguous

---

[1] EPA, Health Assessment Document for Ethylene Oxide (1985), at 1-7, https://iris.epa.gov/Document/&deid=41115

conclusion: "EtO <u>is</u> 'carcinogenic to humans'" because of EtO's mutagenetic actions on human and animal cells. IRIS Review of Ethylene Oxide, EPA-HQ-OAR-2019-0178-0477 at 3-1 (emphasis added), JA_____.

To reach that conclusion, EPA reviewed scores of publications analyzing the effects in animals and humans of inhaling EtO. The human exposure studies involved tremendous sample sizes, including several studies that followed a cohort of over 18,000 U.S. sterilization and hospital workers in the decades during and after their exposure to EtO. *Id.* at 3-6, JA_____. EPA found that the body of evidence, taken as a whole, showed that exposure to EtO causes "an elevated risk of lymphohematopoietic cancer that cannot be attributed to the presence of confounders." *Id.* at 3-12, JA_____. The science showed that in addition to increasing the risk of blood and bone cancers, EtO inhalation increases the risk of developing and dying from breast cancer. *Id.* at 3-11-13, JA_____-_____. EPA's literature review resulted in a cancer risk estimate for EtO that was "approximately 60 times greater" than EPA's previous risk estimate for EtO. 89 Fed. Reg. 24,094, JA_____.

Using this revised cancer risk value, EPA then analyzed the extent of the health risk posed by EtO emissions in its 2018 National Air Toxics Assessment. The Assessment found "that EtO significantly contributes to potential elevated cancer risks" in census tracts across the U.S. and that commercial sterilization

6

facilities contribute to that risk. 84 Fed. Reg. 67,889, 67,893 (Dec. 12, 2019), JA\_\_\_\_\_. Moreover, these risks are not equitably distributed. Hispanics and Latinos are disproportionately impacted by EtO sterilizers, as are African Americans, people living below the poverty line, people older than 25 without a high school diploma, and people who are linguistically isolated. 89 Fed. Reg. 24,139, JA\_\_\_\_. For communities that live around 23 of these facilities, the cancer risks posed by EtO emissions are "exceptionally high" and are "among some of the highest" that EPA has ever seen in a Clean Air Act risk assessment. *Id.* at 24,091, JA\_\_\_\_\_. In sum, it is scientifically well-established that EtO can cause cancer and that commercial sterilizers release EtO in quantities that pose significant cancer risks to surrounding communities.

## III. EPA's Statutory Duty to Effectively Regulate Air Toxics to Protect Public Health

### A. Emission Standards for Hazardous Air Pollutants

In 1990, Congress overhauled the Clean Air Act to ensure that EPA would effectively regulate hazardous air pollutants like EtO. The Clean Air Act originally relied on EPA to identify which pollutants are "hazardous" and then set risk-based standards for these pollutants. *See Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 857-58 (D.C. Cir. 2001). That law "worked poorly." *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 634 (D.C. Cir. 2000). In the first eighteen years after enactment, the

agency "regulated only some sources of only seven chemicals." *Id.* (quoting S. REP. NO. 101-228, at 128 (1989), *as reprinted in* 1990 U.S.C.C.A.N. at 3513). So, Congress rewrote the Clean Air Act "to require EPA to set the most stringent standards achievable" by eliminating much of the agency's discretion. *Cement Kiln Recycling Coal.*, 255 F.3d at 857; *see also Sierra Club v. EPA*, 551 F.3d 1019, 1028 (D.C. Cir. 2008) ("[T]he text, history and structure of section 112," 42 U.S.C. § 7412, show Congress intended to "[e]liminat[e] much of EPA's discretion").

Congress's overhaul of the air toxics program began with Congress itself identifying an initial list of 189 hazardous air pollutants that it wanted EPA to regulate. 42 U.S.C. § 7412(b)(1). This list includes ethylene oxide. *Id.* Congress then required EPA to list the categories of industrial sources that emit each of the listed hazardous air pollutants. *Id.* § 7412(c). And for each pollutant, Congress required EPA to list categories of large ("major") sources and small ("area") sources of the listed hazardous air pollutants.[2] *Id.* Congress required EPA then to set emission standards for each source category.

---

[2] The Clean Air Act defines a "major source" as "any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants." 42 U.S.C. § 7412(a)(1). "Area sources," also known as minor sources, are "any stationary source of hazardous air pollutants that is not a major source." *Id.* § 7412(a)(2).

Congress mandated that EPA first issue technology-based emission standards for each listed source category. *Id.* § 7412(d). For major sources, EPA is required to set what are known as "maximum achievable control technology" ("MACT") standards. *Nat'l Lime*, 233 F.3d at 629 (describing standard setting for major sources under 42 U.S.C. § 7412(d)(2)-(3)). MACT standards must require the "maximum" degree of reduction in emissions that is "achievable" considering cost and other factors, and no less than what the best performing existing sources have actually "achieved." 42 U.S.C. § 7412(d)(2)-(3); *Sierra Club v. EPA*, 479 F.3d 875, 877 (D.C. Cir. 2007). For area sources, EPA may either establish MACT standards or, instead, standards which "provide for the use of generally available control technologies or management practices" ("GACT" standards). 42 U.S.C. § 7412(d)(5).

Compliance deadlines with EPA's technology-based standards under section 112(d) depend on whether the facility is a "new source" or an "existing source."[3] In general, all new sources must comply with a technology-based emission standard by the standard's effective date. *Id.* § 7412(i)(1). In contrast, for existing sources, EPA must set a compliance date that ensures that they come into

---

[3] The Clean Air Act defines a "new source" as "a stationary source the construction or reconstruction of which is commenced after [EPA] first proposes regulations under this section establishing an emission standard applicable to such source." 42 U.S.C. § 7412(a)(4). An "existing source" is "any stationary source other than a new source." *Id.* § 7412(a)(10).

compliance with a new technology-based standard "as expeditiously as practicable," but no "later than 3 years after the effective date" of the standard. *Id.* § 7412(i)(3)(A).

Next, EPA must "review any residual health risks that [have] not been eliminated by the initial technology-based standards." *NRDC v. EPA*, 529 F.3d 1077, 1080 (D.C. Cir. 2008); *see also* 42 U.S.C. § 7412(f). These standards, promulgated under section 112(f), are often "described as 'risk-based' or 'health-based' because [section 112(f)] requires EPA to set a standard based on a medical assessment of a given pollutant's health risks (as was true of the pre-1990 statute), rather than the current state of control technology." *NRDC*, 529 F.3d at 1080. To set these residual-risk based standards, EPA must first review the technology-based standards set under section 112(d) and see if they "provide an ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A). If the technology-based standards do provide an ample margin of safety, then EPA's review is done. But if the technology-based standards do not provide an ample margin of safety to protect public health, then EPA must promulgate new residual-risk based standards that do protect public health. *Id.* According to EPA, a rule provides an ample margin of safety "if as many people as possible face[] excess lifetime cancer risks no greater than one-in-one million, and… no person face[s] a risk greater than 100-in-one million (one-in-ten thousand)." *NRDC*, 529 F.3d at 1082. Residual risk reviews

must occur "within 8 years after promulgation of [technology-based] standards for each category." 42 U.S.C. § 7412(f)(2)(A).

Unlike the compliance provisions for technology-based standards, Congress prescribed a default 90-day compliance deadline for complying with residual-risk based standards for existing sources.[4] *Id.* § 7412(f)(4)(A); *see, e.g.*, *Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 672 (D.C. Cir. 2013) (holding that section 112(f)(4) "provide[s] the governing framework for emissions standards promulgated under section 112(f).") EPA may grant "a waiver permitting such source a period of up to 2 years after the effective date" to comply with a residual-risk based emission standard if the agency makes two findings. 42 U.S.C. § 7412(f)(4)(B). First, EPA must "find[] that such period is necessary for the installation of controls." *Id.* And second, EPA must find "that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment." *Id.*

To ensure that EPA's emission standards keep up with changes in science and technology, Congress mandated that EPA review, and occasionally revise, both technology-based and residual-risk based standards for each source category on precise timetables. *Id.* § 7412(d)(6), (f)(2). Under section 112(d)(6), EPA must

_____

[4] Similar to the compliance provisions of the technology-based standards, new sources must comply with residual-risk emission standards on their effective date. 42 U.S.C. § 7412(f)(4).

"review, and revise as necessary," its emission standards, "taking into account developments in practices, processes, and control technologies," at least once every eight years. *Id.* § 7412(d)(6). And if EPA finds that the technology has developed such that it must promulgate new technology-based standards, then it must conduct another residual-risk review of the updated technology-based standards to determine whether further emission reductions are needed to protect people and the environment. *See id*. § 7412(f)(2)(A) ("[W]ithin 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d)," EPA "shall…promulgate standards for [each] category or subcategory if … required in order to provide an ample margin of safety to protect public health … or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect.").

## B. Title V Operating Permits

In addition to reforming emission standards for hazardous air pollutants, the 1990 amendments added a new Title V to the Act, which requires that sources of hazardous air pollutants obtain operating permits. With these permits, often referred to as "Title V permits," Congress intended to enable the public to "better determine the requirements to which [a] source is subject, and whether the source is meeting those requirements." S. REP. NO. 101-228, at 347, *as reprinted in* 1990 U.S.C.C.A.N. at 3730. Congress predicted these Title V permits would yield

"[b]etter enforcement" of all air pollution requirements, "including … hazardous air pollution requirements." *Id.*

Title V achieves this goal of ensuring better compliance with air regulations by "consolidat[ing] existing air pollution requirements into a single document," *Sierra Club v. Leavitt*, 368 F.3d 1300, 1302 (11th Cir. 2004), and "set[ting] forth … monitoring … and reporting requirements to assure compliance with the permit terms and conditions." 42 U.S.C. § 7661c(c). By ensuring that all relevant provisions are in one document, a Title V permit provides "a source-specific bible for Clean Air Act compliance." *Com. of Va. v. Browner*, 80 F.3d 869, 873 (4th Cir. 1996). Under the program, "[s]ources subject to Title V may not operate in violation of, or without, a Title V permit containing all applicable requirements." *Leavitt*, 368 F.3d at 1302; 42 U.S.C. § 7661a(a).

Furthermore, the Title V program gives EPA and the public oversight tools that help ensure compliance with EPA's hazardous air pollutant regulations. For example, under the program, permitting authorities must provide for public comment and a hearing on permit proceedings. 42 U.S.C. § 7661a(b)(6). Additionally, EPA must object to deficient permits issued by state and local permitting authorities, and members of the public can petition EPA to raise objections. *Id.* §§ 7661d(a)(1), 7661d(b)(1)-(2).

While both major and area sources of hazardous air pollutants are subject to Title V by default, Congress provided that EPA may exempt some or all of an area source category from Title V if it "finds that compliance with such requirements is impracticable, infeasible, or unnecessarily burdensome." *Id.* § 7661a(a). In deciding whether to exempt area sources from Title V permitting, EPA employs a four-factor balancing test that "considers whether: (1) Title V permitting would result in significant improvements in compliance with emission standards; (2) whether Title V permitting would impose significant burdens on the area source category; (3) whether the costs are justified, taking into account potential gains; and (4) whether there are existing enforcement programs in place sufficient to ensure compliance." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 647 (D.C. Cir. 2016).

## IV. EPA's Commercial Sterilizer Regulations

While the exact process varies from facility to facility, most commercial sterilizers operate by placing medical devices within a large vacuum-sealed chamber, removing the air, replacing it with steam, and pumping the chamber with EtO. Regulatory Impact Analysis, EPA-HQ-OAR-2019-0178-1557 at 1-4-5, JA____-___; EPA-HQ-OAR-2019-0178-0456, JA_____. After the EtO has been allowed to "dwell" for a set period of time, nitrogen is used to "wash" EtO from the chamber. EPA-HQ-OAR-2019-0178-0456 at 3, JA_____. But because the sterilized products themselves are still laden with residual EtO, they must go

through an aeration process to reduce this residual amount of EtO. *Id.*; Regulatory

Impact Analysis, EPA-HQ-OAR-2019-0178-1557 at 1-4-5, JA\_\_\_\_\_-\_\_. For most

facilities, sterilization and aeration occur in separate chambers, but some facilities

conduct both processes in the same chamber. Regulatory Impact Analysis, EPA-

HQ-OAR-2019-0178-1557 at 1-4-5, JA\_\_\_\_\_-\_. Regardless of the type of facility,

EPA estimates that despite the aeration process, approximately 1% of the EtO used

is left on the material as residual EtO. *See* Residual Risk Assessment, EPA-HQ-

OAR-2019-0178-1576, Appendix 1, tbl. 2, JA\_\_\_\_\_. This residual EtO, which is

trapped in the medical device and its packaging materials, continues to off-gas EtO

emissions "even after the aeration step." 88 Fed. Reg. 22,790, 22,801 (Apr. 13,

2023) JA\_\_\_\_\_.

For over 30 years, EPA under-regulated emissions from commercial

sterilizers. In 1994, EPA issued its first set of emission standards for commercial

sterilizers. This rule assumed that 100% of EtO used at a facility could be captured

at three emission points: sterilization chamber vents,[5] chamber exhaust vents,[6] and

---

[5] Sterilization chamber vents "evacuate[] EtO from the sterilization chamber following sterilization, fumigation, and any subsequent gas washes before the chamber door is opened." 88 Fed. Reg. 22,797, JA\_\_\_\_\_.

[6] Chamber exhaust vents "evacuate[] EtO-laden air from the sterilization chamber after the chamber door is opened for product unloading following the completion of sterilization and associated gas washes." *Id.*

aeration room vents.[7] 59 Fed. Reg. 62,585 (Dec. 6, 1994), JA____; EPA-HQ-OAR-2019-0178-0480 at 1-2, JA_____. Left unregulated were any fugitive air emissions that can be released at various stages of the sterilization process, such as from EtO storage or the off-gassing of sterilized materials. Moreover, some facilities were not required to control their emissions from all three putatively regulated points. 59 Fed. Reg. 62,593, JA____. But any facility that used more than 1 ton of EtO was required to obtain a Title V operating permit. *Id*. at 62,592, JA____. EPA, however, repeatedly deferred the applicability of this requirement until 2004. *See* 61 Fed. Reg. 27,785 (June 3, 1996), JA_____; 64 Fed. Reg. 69,637 (Dec. 14, 1999), JA____.

These standards would only get weaker. In 2001, EPA removed its standards for chamber exhaust vents. 66 Fed. Reg. 55,577 (Nov. 2, 2001), JA____. Then in 2005, EPA permanently exempted area source commercial sterilization facilities from the Title V permit program. 70 Fed. Reg. 75,320 (Dec. 19, 2005), JA_____. In 2006, EPA completed its first residual-risk and technology review for commercial sterilizers under sections 112(d)(6) and (f)(2) of the Clean Air Act. After conducting both reviews, EPA concluded that "no additional control

---

[7] Aeration room vents "evacuate[] EtO-laden air from the aeration room or chamber that is used to facilitate off-gassing of the sterile product and packaging." *Id.*

requirements [were] warranted." 71 Fed. Reg. 17,712-14 (Apr. 7, 2006), JA_____-__.

Under the Clean Air Act, EPA was required to conduct its next technology review for the commercial sterilizer source category by April 2014. *See* 42 U.S.C. § 7412(d)(6) (EPA "shall review, and revise as necessary … emission standards promulgated under this section no less often than every 8 years."). In 2022, after years of advocating for a new rule, Petitioners sued EPA over the agency's failure to complete a new technology review by its statutory deadline. *California Communities Against Toxics v. EPA*, No. 1:22-CV-03724, 2022 WL 17717384 (D.D.C., Dec. 14, 2022). The following year, Petitioners settled their claims with EPA and entered into a consent decree requiring the agency to finalize a new sterilizer rulemaking.

In April 2023, EPA issued a proposed revision of its commercial sterilizer rule. Using its authority under section 112(d), EPA proposed new technology-based standards for sterilizer facilities that used less than 1 ton of EtO, reinstated the requirement to control emissions from chamber exhaust vents, and created new standards to control previously uncontrolled room air emissions from EtO storage and the post-sterilization handling of sterilized materials. *See* 88 Fed. Reg. 22,824 tbl.18, JA_____. Because the agency's understanding of the risk that EtO poses to the public health had dramatically changed, EPA also conducted a residual-risk

review under section 112(f) of its new proposed technology-based standards. *Id.* at 22,794, JA_____. EPA found that even after accounting for the new proposed technology-based standards, "the risks from the Commercial Sterilization Facilities source category… are unacceptable." *Id.* at 22,826, JA_____. As a result, under the Clean Air Act, EPA was required to propose additional standards that would "bring the risk from this source category to an acceptable level and provide [an] ample margin of safety to protect public health." *Id.* at 22,831, JA_____. For both the standards set under section 112(d) and section 112(f), EPA proposed a "compliance date of 18 months after the effective date of the final rule." *Id.* at 22,853, JA_____.

EPA also proposed to remove the Title V permitting exemption for area source facilities that it had promulgated in 2005. *Id.* at 22,850, JA____. According to EPA, over half of the facilities subject to this rule are "synthetic" area sources, or facilities that "otherwise ha[ve] the potential to emit [EtO] in amounts that are at or above those for major sources of [EtO], but that ha[ve] taken a restriction so that [their] potential to emit is less than the threshold amounts for major sources." 88 Fed. Reg. 22,808, JA _____; Technical Support Document for Proposed Rule, EPA-HQ-OAR-2019-0178-0469 at 52 tbl.3, JA _____. Under the exemption, these facilities were not required to get a Title V permit.

EPA noted that since the agency had updated its risk assessment for EtO and released the results of its National Air Toxics Assessment in 2018, there has been a "significant public interest in the Commercial Sterilization Facilities source category, including robust participation in public hearings and public comment on permitting actions." 88 Fed. Reg. 22,850, JA_____. EPA noted that when it originally exempted area source commercial sterilization facilities from Title V, the regulations they were required to comply with were "relatively simple in how they apply to these sources." *Id.* at 22,851, JA_____.[8] In contrast to those regulations, EPA found that the proposed "rule amendments proposed in this rule provide for a greater degree of complexity and requirements to achieve and demonstrate compliance" that did not exist at the time that EPA exempted area source categories from Title V. *Id*. Thus, EPA concluded that "[t]he additional public participation and compliance benefits of additional informational, monitoring, reporting, certification, and enforcement requirements that exist in title V should be required for these sources" and that "it is not appropriate to exempt

---

[8] For example, in 2005, most area source facilities only had to control their emissions from one emission point source: sterilization chamber vents. *See* Table 1, 66 Fed. Reg. 55,583, JA _____. For facilities that used less than 1 ton of EtO, there were no control requirements at all. *Id.* Other than monitoring and reporting requirements, the compliance requirements for commercial sterilizers was relatively small.

area source EtO commercial sterilizers from the requirement to obtain a title V permit." *Id.*

On April 5, 2024, EPA finalized its commercial sterilizer rule. As it relates to the compliance deadlines, EPA extended the original 18-month compliance waiver to two years from the Clean Air Act's 90-day default deadline for its residual-risk standards. 89 Fed. Reg. 24,102, JA_____. The Act required EPA to find that first, more time is necessary to install controls, and second, that steps will be taken to protect the public's health during that extended compliance time. But EPA only made the first finding. Sterilizer Rule Response to Comments, EPA-HQ-OAR-2019-0178-1595 at 341, JA_____. EPA failed to make the second finding and did not require any "steps" to protect the public's health during the two-year compliance period.

As it relates to the Title V exemption, EPA reversed its position and found that "title V permitting …is unnecessarily burdensome." 89 Fed. Reg. 24,136, JA_____. Furthermore, EPA stated that "one of the primary benefits of the title V," is its ability "to clarify, in a single document, the various and complex regulations that apply to a facility," and that this benefit is "not realized in this case because commercial sterilization facilities are subject to only one" hazardous air pollutant regulation. *Id.* But the agency failed to recognize the other Clean Air Act regulations sterilizers are subject to, or address the other public participation

benefits from Title V permitting, other than to note that some of the new monitoring data will be reported to the public. *Id.*

## SUMMARY OF ARGUMENT

EPA's final sterilizer rule is unlawful and arbitrary for two reasons.

**Compliance Waiver for Residual-Risk Standards.** EPA unlawfully waived the Clean Air Act's 90-day deadline for existing sources' compliance with residual-risk standards. These residual-risk standards were set to provide an "ample margin of safety" after EPA had found that its technology-based standards still posed an unacceptable public health risk. Under section 112(f)(4) of the Clean Air Act, existing sources must comply with new residual-risk standards within 90 days of the standards' effective date. EPA may waive compliance with these standards for up to two years, but only if it finds that steps will be taken during the waiver period to protect the health of the communities near facilities from "imminent endangerment." Here, EPA illegally gave facilities a two-year waiver to comply with the new rules without making a finding that any steps would be taken to protect the public from imminent endangerment.

**Title V Exemption for Area Sources.** EPA arbitrarily retreated from its proposal to withdraw area source facilities' exemption from Title V. In the proposed rule, EPA found that Title V permitting for area sources was necessary because the Title V permitting process—with its involvement of the public—was

likely to increase compliance with EPA's new complex regulation. Furthermore, the agency found that the cost of Title V permitting was relatively modest. But in the final rule, EPA arbitrarily determined that Title V would no longer provide the benefit of increased compliance and that emission monitoring reports that were already included in the proposal were sufficient for ensuring compliance with the new rule. EPA, however, failed to explain or provide any new evidence on how this conclusion is consistent with its prior view that this is a complex rule and that public participation in the Title V process would increase compliance.

## STANDING

Petitioners have standing to bring this suit on behalf of their members. *See Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 181 (2000). Petitioners' members live, work, and recreate near commercial sterilizers that emit EtO and are regulated by EPA's rule. Exposure to EtO emissions from commercial sterilizers threatens Petitioners' members' health and impairs their well-being. *See* Declarations. Because EPA extended the default 90-day compliance period for existing sources, without following the compliance provisions for residual-risk standards in the Clean Air Act, the final rule prolongs this harm. The Court may redress these injuries by ordering EPA to follow the Clean Air Act on remand. *See, e.g.*, *NRDC v. EPA*, 749 F.3d 1055, 1062 (D.C. Cir. 2014); *Ass'n of Battery Recyclers*, 716 F.3d at 672-73.

Furthermore, by failing to require Title V permits, EPA has denied Petitioners and their members important access to information about the amount of EtO pollution emitted by the sterilizer facilities where they live, work, and recreate. *See* Declarations. The denial of "information which must be publicly disclosed pursuant to a statute" is injury-in-fact. *FEC v. Akins*, 524 U.S. 11, 21 (1998); *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002); *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016). Petitioners and their members also experience a procedural injury by EPA denying them the opportunity to participate in the public process that accompanies permitting of sources under Title V. *Shays v. FEC*, 414 F.3d 76, 91-92 (D.C. Cir. 2005); *City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003).

## STANDARD OF REVIEW

At issue is whether EPA's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A); *see also id.* § 7607(d)(1)(C). This Court reviews EPA's construction of the Clean Air Act de novo. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 n.4 (2024). Under *Loper Bright*, "[i]nstead of deferring to EPA's interpretation of the Clean Air Act, [this Court] must apply what [it] regard[s] as the statute's 'best' reading." *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024).

EPA's action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In particular, EPA's decision is arbitrary and capricious if it has failed to "identif[y] and explain[] the reasoned basis for its decision." *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996). If EPA reverses course between a proposed rule and a final rule, it must explain why "the facts and characteristics it relied on for its initial assessment are no longer relevant." *U.S. Sugar Corp.*, 830 F.3d at 651.

## ARGUMENT

### I. EPA VIOLATED THE CLEAN AIR ACT AND ACTED ARBITRARILY BY FAILING TO FOLLOW THE COMPLIANCE PROVISIONS FOR 112(F)(2) EMISSION STANDARDS.

For existing sources, the default compliance deadline for residual-risk standards under section 112(f) of the Clean Air Act is 90 days. 42 U.S.C. § 7412(f)(4)(A). EPA, however, may grant "a waiver permitting such source a period of up to 2 years" if the agency makes two findings. *Id.* § 7412(f)(4)(B); *see Ass'n of Battery Recyclers*, 716 F.3d at 672 (Section 112(f)(4) "provide[s] the governing framework for emissions standards promulgated under section 112(f)"). First, EPA must "find[] that such period is necessary for the installation of controls." 42 U.S.C. § 7412(f)(4)(B). Second, EPA must find "that steps will be

taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment." *Id.* Here, EPA granted existing sources a two-year waiver to comply with its residual-risk standards. The agency completed the first finding, but it did not complete the second finding. As a result, EPA's waiver is illegal.

The text of 112(f)(4) is clear and EPA cannot ignore its statutory mandate to ensure that the health of communities living near sterilization facilities is protected from EtO emissions while necessary controls are installed. *See Fin. Plan. Ass'n v. SEC*, 482 F.3d 481, 492 (D.C. Cir. 2007) ("[W]e assume that in drafting ... legislation, Congress said what it meant."). Because residual-risk standards are designed to provide an "ample margin of safety," after EPA makes a finding that technology-based standards pose an unacceptable risk to public health, section 112(f)(4) requires immediate compliance with residual risk-based standards. *See* 42 U.S.C. § 7412(f)(4). This structure makes sense, where, like here, EPA finds that its new technology-based standards leave an unacceptable risk to public health. *See* 88 Fed. Reg. 22,826, JA_____. Section 112(f)(4), however, carefully carves out an exception for existing sources, which itself contains another precisely limited exception, which is at issue here.

For existing sources, standards promulgated under section 112(f) "shall not apply until 90 days after [the standards'] effective date." 42 U.S.C.

25

§ 7412(f)(4)(A). At issue here is subparagraph (B), which creates an exception to the Clean Air Act's 90-day default compliance deadline. Under subparagraph (B), EPA may grant a source up to 2 years to comply with section 112(f) standards, but only "if [EPA] <u>finds</u> that such period is necessary for the installation of controls <u>and</u> that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment." *Id.* § 7412(f)(4)(B) (emphasis added). Because the statute uses the conjunctive "and," EPA must make both findings to issue a waiver of the 90-day compliance deadline for existing sources. *See, e.g.*, *United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021) (when a statute lists requirements that "are connected by the conjunctive 'and,'" a party "must meet all" parts of the requirements); *Union Neighbors United v. Jewell*, 831 F.3d 564, 582 (D.C. Cir. 2016) (statute's use of the conjunctive "and" means "that the terms should be read together, not as a sequence.").

Nowhere in the record did EPA make the second finding. *See* 89 Fed. Reg 24,102, JA_____; Sterilizer Rule Response to Comments, EPA-HQ-OAR-2019-0178-1595 at 341, JA_____. EPA's waiver was therefore unlawful and arbitrary.

EPA's attempts to evade its statutory obligation are unavailing. In its response to comments, EPA erroneously frames section 112(f)(4)(A) as merely establishing 90 days as "the earliest compliance date" for existing sources "for section 112(f) standards." Sterilizer Rule Response to Comments, EPA-HQ-OAR-

2019-0178-1595 at 341, JA _____. EPA's reading is wrong because it ignores that Congress opted to establish a date-certain default deadline and to severely restrict EPA's discretion in setting compliance deadlines for section 112(f) standards, rather than establish an earliest and latest possible compliance date.

Just compare the two compliance provisions in section 112, one for technology-based standards—section 112(i)(3)—and the other for residual-risk based standards—section 112(f)(4). For the technology-based standards, section 112(i)(3) provides that EPA must "establish a compliance date" for existing sources that is "no…later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A). This compliance date must "provide for compliance as expeditiously as practicable." *Id.*; *see also NRDC v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007) ("Congress stated it wanted 'expeditious' compliance.") (cleaned up). In comparison, Section 112(f)(4) sets the compliance date to 90 days after the effective date of the rule. *See, e.g.*, *Monsanto Co. v. EPA*, 19 F.3d 1201, 1203 (7th Cir. 1994) (finding that regulations under 112(f)'s predecessor version "did not apply to existing sources… until 90 days after its effective date."). EPA can only set a different deadline if it complies with the waiver provision of subparagraph (B) of section 112(f)(4).

EPA itself confirms its interpretation here is unlawful because in a parallel rulemaking for neoprene facilities the agency correctly interpreted section

112(f)(4). In that rulemaking, EPA stated that existing sources "may seek the EPA's approval of a waiver from the 90-day compliance deadline and obtain a compliance date of up to July 15, 2026 if they demonstrate to the Administrator's satisfaction that 'such period is necessary for the installation of controls' and that steps will be taken during the waiver period to assure that the public health of persons will be protected from any imminent endangerment." 89 Fed. Reg., 42,932 42,955 (May 16, 2024), JA _____. And in stay briefing in this Court over EPA's interpretation of section 112(f)(4), EPA correctly outlined the elements of section 112(f)(4)'s compliance provisions for existing sources:

> Existing sources generally must comply with section 7412(f) residual risk standards within ninety days after their effective date. 42 U.S.C. § 7412(f)(4)(A). Congress authorized EPA to grant a longer compliance period of up to two years after the effective date of section 7412(f) standards. *Id.* § 7412(f)(4)(B); *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 672 (D.C. Cir. 2013). EPA may grant such an extension upon finding that (1) it is necessary for the installation of controls and (2) steps will be taken during the extension period to ensure that the health of persons will be protected from imminent endangerment. 42 U.S.C. § 7412(f)(4)(B).

Respondents' Opposition to Motion to Stay Final Rule at 4, D.C. Cir. No. 24-1135, Doc. No. 2059123 (June 11, 2024). But for commercial sterilizers, EPA interpreted the same statutory provision as only requiring the agency to make the first finding, but not the second. EPA had it right for neoprene facilities, and wrong here.

As this Court has found, "when [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not

absurd—is to enforce it according to its terms." *In re England*, 375 F.3d 1169, 1177 (D.C. Cir. 2004) (cleaned up).

## II.    EPA'S DECISION NOT TO REQUIRE TITLE V PERMITS WAS ARBITRARY AND CAPRICIOUS.

As noted above, as part of the Clean Air Act Amendments, Congress created the Title V permitting program "so that the public might 'better determine the requirements to which [a] source is subject, and whether the source is meeting those requirements.'" *U.S. Sugar Corp.*, 830 F.3d at 597 (citing S. REP. NO. 101-228, at 347). EPA may, however, exempt some or all of an area source category from Title V if it "finds that compliance with such requirements is impracticable, infeasible, or unnecessarily burdensome." 42 U.S.C. § 7661a(a). In deciding whether to exempt area sources from Title V permitting, EPA employs a four-factor balancing test: "(1) Whether title V would result in significant improvements to the compliance requirements…; (2) whether title V permitting would impose significant burdens on the area source category…; (3) whether the costs of title V permitting for area sources would be justified taking into consideration any potential gains in compliance likely to occur for such sources; and (4) whether adequate oversight by state and local permitting authorities could achieve high compliance with the NESHAP." 88 Fed. Reg. 22,850, JA_____. EPA must also consider whether the exemption is consistent with the Clean Air Act's legislative

history, which "suggests that EPA should not grant exemptions where doing so would adversely affect public health, welfare, or the environment." *Id.*

In the proposed rule, EPA reasoned that commercial sterilizers should obtain Title V permits because the new standards are more complex and stringent, so public health, compliance, and transparency benefits will be served by requiring Title V permits. *Id.* at 22,851, JA____. EPA reversed course in the final rule, stating that Title V is "unnecessarily burdensome" and that the benefits are not outweighed by the concerns. 89 Fed. Reg. 24,136, JA____. But EPA failed to provide any additional information and evidence for why the agency was reversing its position.

EPA's final-rule determination fundamentally rests on two arbitrary decisions. First, EPA arbitrarily changed its position on exempting sources from Title V without adequately explaining why its reasoning changed between the proposal and final rule. Second, EPA's final decision on the burden of Title V permits was arbitrary because it was not supported by the evidence in the record.

## A.    EPA arbitrarily changed its position without adequately explaining its change in reasoning.

This Court has held that EPA acts arbitrarily when it fails to rationally justify its final-rule exemption of sources from Title V permitting after proposing to require Title V permits. *U.S. Sugar Corp.*, 830 F.3d at 647-52. Like in *U.S. Sugar*,

EPA's exemption of commercial sterilizers in this final rule was arbitrary because EPA's proffered reasons directly contradicted its earlier reasons for requiring Title V permitting. 830 F.3d at 651 ("EPA's analysis fails to explain why several of the facts and characteristics it relied on for its initial assessment are no longer relevant—creating several glaring inconsistencies in the rulemaking record."). EPA cannot rely on the same information to arrive at the opposite conclusion without "adding new evidence [or] explaining why the old evidence support[s] the new conclusion." *Allegheny Power v. FERC*, 437 F.3d 1215, 1224 (D.C. Cir. 2006). Once again, EPA did neither for core aspects of its decision making.

### 1. EPA arbitrarily changed its position on the value of the Title V permit process in increasing compliance at sterilizer facilities.

In the proposed rule, EPA found that the public participation process of Title V would increase compliance with the new rule to the benefit of communities that face significant risks of EtO emissions. *See* 88 Fed. Reg. at 22,851 n.67, JA _____ ("EPA believes that more involvement from local permitting authorities and the public will result in requirements that properly address the health needs and concerns of individual communities. A benefit in a Title V permit is increased transparency and public participation…."); *id. at* 22,850-51, JA _____-__ ("Since [EPA's exemption decision in 2005], the EPA has gained a better understanding of the risks associated with EtO emissions…. Related to these risk findings, there has

been significant public interest in the Commercial Sterilization Facilities source category, including robust participation in public hearings and public comment on permitting actions."). But in the final rule, EPA reversed its position and instead concluded that Title V permitting is not warranted because publicly available continuous emissions monitoring system ("CEMS") data will "ensure transparency around the emissions from these facilities." 89 Fed. Reg. 24,136, JA____. EPA's reversal is arbitrary because EPA failed to explain why the public participation benefits of Title V were no longer justified for ensuring compliance with the rule and failed to explain how CEMS reports serve as an adequate replacement for the transparency benefits EPA identified in the proposed rule.

In the proposal, EPA explained that Title V permits will provide "expected benefits to public health and compliance" and "increase[] transparency" by making it possible for "members of affected communities [to] know where sources are, what they are emitting, and the standards they are subject to, as well as having an opportunity to participate in the process." 88 Fed. Reg. 22,851 n.67, JA____. EPA stated that Title V's "additional public participation" requirements are "important to ensure that these sources are maintaining compliance with the requirements of this rule." *Id.* at 22,851, JA_____. When EPA rescinded the Title V requirement in the final rule, the agency was silent on the loss of public participation opportunities and did not explain why these benefits were no longer "important." 89 Fed. Reg.

24,136, JA____; *U.S. Sugar Corp.*, 830 F.3d at 651 ("EPA never explains why these additional benefits [of 'additional public involvement and compliance assurance'] were considered 'important' before but are now 'not important'…"). EPA's reversal on Title V is arbitrary because the agency failed to "reasonably consider[] the relevant issues and reasonably explain[] the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

In the final rule, EPA did not disavow its statement on the importance of public participation and transparency in ensuring compliance with the new standards. Instead, EPA claimed that the rule's requirement to submit quarterly CEMS monitoring reports will "ensure transparency around the emissions from these facilities". 89 Fed. Reg. 24,136, JA_____. But CEMS reports serve only to allow the public to know that emission control devices are working properly. *See Id.* at 24,132 (discussing EPA's shift to CEMS over parametric monitoring), JA_____. Publicly available CEMS reports do not allow the public to know what additional standards sterilizers must meet (see section 2 below), nor do they provide community members opportunities to participate in permitting processes that could result in greater compliance. *See* EPA-HQ-OAR-2019-0178-1594, JA_____.[9] Even though EPA found that Title V, and its public participation

---

[9] Furthermore, EPA's reliance on CEMS reports to justify rescinding the Title V requirement is undercut by the fact that EPA weakened its CEMS reporting

process, was important in ensuring transparency, in the final rule, EPA arbitrarily

relied on publicly available CEMS reports to fill the role Title V permitting plays.

*See U.S. Sugar Corp.*, 830 F.3d at 651 (finding that EPA's observation that while

area sources "have a legal duty to use control equipment," this does "not speak to

the need for public oversight…."); *see also Burlington Truck Lines v. United

States*, 371 U.S. 156, 168 (1962) (EPA must articulate a "rational connection

between the facts found and the choice made").

Thus, EPA acted arbitrarily by failing to explain or justify why the benefits

brought to light under the Title V program are sufficiently replaced by EPA's

CEMS reporting requirements.

**2.     EPA arbitrarily changed its position on the complexity of the
sterilizer rule.**

In the proposed rule, EPA reasoned that "[i]n contrast to the [sterilizer rule's

previous requirements], the rule amendments proposed in this rule provide for a

greater degree of complexity and requirements to achieve and demonstrate

compliance." 88 Fed. Reg. 22,851, JA _____. Thus, it did not matter that "the

majority of area source EtO sterilizers are subject only to a single NESHAP, the

---

requirements between the proposal and the final. In the proposal, EPA required
facilities to report their CEMS data "daily so that results can be shared with the
public on a daily basis." 88 Fed. Reg. 22,847, JA _____. In the final rule, EPA
weakened this requirement to only require quarterly reporting of CEMS data with a
minimum data availability of 90 percent. 89 Fed. Reg. 24,133, JA_____.

compliance benefits of title V are greater today than in 2005." *Id.* In the final rule, EPA disregarded that reasoning without explanation, stating only that Title V's benefit of clarifying regulatory obligations in a single document is "not realized in this case" because commercial sterilizers are only subject to one NESHAP. 89 Fed. Reg. 24,136, JA____. But sterilizers were subject to one NESHAP when EPA issued the proposal, so EPA merely citing this same fact as the sole basis for reaching the opposite conclusion in the final rule was irrational and arbitrary. *See U.S. Sugar Corp.*, 830 F.3d at 651 (finding EPA's decision to exempt some area sources from Title V in a final rule was arbitrary because these "sources retain the attributes which first motivated the EPA to subject them to Title V permitting," and EPA did not explain why these facts were "no longer relevant.").

Furthermore, EPA's conclusion that title V's benefit of "clarify[ing], in a single document, the various complex regulations that apply to a facility in order to improve compliance…is not realized in this case because commercial sterilization facilities are subject to only one NESHAP" is not supported by the facts. 89 Fed. Reg. 24,136, JA____. While commercial sterilization facilities are generally only subject to one NESHAP, many of these same facilities are also subject to other Clean Air Act requirements, such as EPA's Risk Management Plan rule under

section 112(r) of the Clean Air Act.[10] Information about a sterilizer facility's Risk Management Plan would be included in their title V permit if they were required to obtain one. *See* 40 C.F.R. § 70.6 (requiring each permit to include "emission limitations and standards…that assure compliance with all applicable requirements."); *id.* § 70.2 (definition for applicable requirement includes "Any standard or other requirement under section 112 of the Act, including any requirement concerning accident prevention under section 112(r)(7) of the Act").

EPA also failed to explain why the regulatory complexity that warranted Title V permitting in the proposed rule no longer warranted Title V permitting in the final rule. In its proposal, EPA found that Title V permitting was warranted because the new standards "provide for a greater degree of complexity and requirements to achieve and demonstrate compliance" compared to the previous standard. 88 Fed. Reg. 22,851, JA____. The emissions control and monitoring requirements in the final rule are even more demanding than those in the proposed rule. *Compare* 89 Fed. Reg. 24,098 tbl.6, JA____, *with* 89 Fed. Reg. 24,093 tbl.1, JA____ (for example, control standards for existing and new sterilization chamber vents at facilities using at least 30 tons per year of EtO increased from 99.94% to 99.99% between the proposed and final rules). They are also more complex, as

---

[10] At least 10 sterilization facilities are subject to section 112(r) of the Clean Air Act and are required to submit a Risk Management Plan to EPA. *See* EPA's Risk Management Plan portal, https://cdxapps.epa.gov/olem-rmp-pds/.

EPA's residual-risk review pushed the agency to create new area source subcategories in the final rule to control emissions from chamber exhaust vents and room air emissions. *Compare* 89 Fed. Reg. 24,098 tbl.6, JA____, *with* 89 Fed. Reg. 24,093 tbl.1, JA____ (for example, between the proposal and final, EPA created a new area source subcategory to control chamber exhaust vent emissions from facilities that use at least 400 tons per year of EtO). But EPA has not explained why stricter requirements in the updated standards no longer justified the agency requiring these facilities to seek Title V permits. EPA acted arbitrarily because the same fact that led EPA to require Title V permits in the proposal—the complexity of the new sterilizer rule—exists in the final rule, and EPA has not logically explained why this fact now warrants a different conclusion. EPA must explain why "the facts and characteristics it relied on for its initial assessment are no longer relevant." *U.S. Sugar Corp.*, 830 F.3d at 651; *see also Siegel v. SEC*, 592 F.3d 147, 161 (D.C. Cir. 2010) (agency decision "must be logical and rational"); *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 543 (D.C. Cir. 1999) (vacating agency orders that "defy good reason").

**B.    EPA's finding that Title V compliance would be overly burdensome runs counter to the record evidence.**

EPA may only exempt commercial sterilizers from Title V if the agency finds that compliance is "impracticable, infeasible, or unnecessarily burdensome."

42 U.S.C. § 7661a(a). EPA made a conclusory statement in the final rule that Title V is "unnecessarily burdensome," but the record does not show that obtaining Title V permits would be particularly costly or onerous for commercial sterilizers. 89 Fed. Reg. 24,136, JA____. EPA's conclusion is thus arbitrary because it "runs counter to the evidence before the agency." *State Farm*, 463 U.S. 29, 43.

The record indicates that the cost of obtaining Title V permits is modest. In the proposed rule, EPA estimated the cost of Title V permitting to be 391 labor hours and $67,211 in total costs for the first year of compliance, and 43 labor hours and $6,287 in total cost for the second and third years of compliance. 88 Fed. Reg. 22,851, JA____. The agency also noted that because the labor hours estimate is an average for all sources that would be subject to Title V, it is likely an overestimate of the burden for area sources and represents a "small portion of the anticipated costs" of the rule. *Id.* Overall, the cost of initial Title V permitting would constitute less than 1% of the cost of compliance over the next twenty years.[11]

EPA's finding that obtaining Title V permits would be "unnecessarily burdensome" is further undercut by the fact that most businesses making up the

---

[11] In the proposal, EPA estimated a one-time annual cost for reading the rule, developing record systems, and initial Title V permitting to be approximately $6.5 million. 88 Fed. Reg. 22,794 tbl.1, JA____. In the final rule, EPA estimated the present value of estimated compliance costs from 2025 to 2044 to be $773 million in 2021 dollars. 89 Fed. Reg. 24,137, JA____. $6.5 million is 0.8% of $773 million.

commercial sterilizer source category are well-positioned to absorb the cost. Almost two-thirds of the facilities and a majority of the parent companies in the commercial source category would not qualify as small businesses as defined by the Small Business Association. Regulatory Impact Analysis, EPA-HQ-OAR-2019-0178-1557 at 5-5 tbl.5-3, JA____. Absent additional evidence that the cost of Title V permitting would be unreasonably burdensome for these facilities, EPA's exemption of all commercial sterilizers from Title V is arbitrary and runs counter to the evidence on the record. *State Farm*, 463 U.S. 29, 43.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court partially vacate the final sterilizer rule as to EPA's waiver of the residual-risk standards compliance deadline and EPA's Title V exemption for area sources. *See, e.g.*, *S. Coast Air Quality Mgmt. Dist. v. EPA*, 489 F.3d 1245, 1248 (D.C. Cir. 2007) ("complete vacatur of a partially valid rule would only serve to stall progress where it is most needed.").


DATED: October 18, 2024          */s/ Marvin C. Brown IV*
Marvin C. Brown IV
Lillian Zhou
Seth L. Johnson
Earthjustice
1001 G Street, NW
Suite 1000
Washington, DC 20001

(202) 667-4500
mcbrown@earthjustice.org
lzhou@earthjustice.org
sjohnson@earthjustice.org

*Counsel for California Communities
Against Toxics, Clean Power Lake County,
Comité Diálogo Ambiental, Rio Grande
International Study Center, Sierra Club,
and Union of Concerned Scientists*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Counsel hereby certifies, in accordance with Federal Rules of Appellate Procedure 32(a)(7)(B) that the foregoing **Proof Opening Brief of Petitioners California Communities Against Toxics, Clean Power Lake County, Comité Diálogo Ambiental, Rio Grande International Study Center, Sierra Club, and Union of Concerned Scientists** contains 9,026 words, as counted by counsel's word processing system, and thus, in conjunction with the opening brief in the consolidated case, complies with the *per curiam* order dated September 4, 2024, "up to two, briefs not to exceed 22,000 words in the aggregate."

Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) & (a)(6) because this document has been prepared in a proportionally spaced typeface using **Microsoft Word for Microsoft 365** using **size 14 Times New Roman** font.

DATED: October 18, 2024

*/s/ Marvin C. Brown IV*
Marvin C. Brown IV