# U.S. COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

California Communities Against Toxics, Clean Power
Lake County, Comité Diálogo Ambiental, Rio Grande International
Study Center, Sierra Club, and Union of Concerned Scientists.
Petitioners (No. 24-1178)

Ethylene Oxide Sterilization Association,
Petitioner (No. 24-1180)

v.

U.S. Environmental Protection Agency and Lee M. Zeldin, Administrator,
Respondents.

———————————

Petition for Review of Rule of the U.S. Environmental Protection Agency

———————————

## EPA's Final Answering Brief

———————————

<table>
<tr><td></td><td>Lisa Lynne Russell<br>Deputy Assistant Attorney General</td></tr>
<tr><td><em>Of counsel</em><br>Amy Huang Branning<br>U.S. Environmental Protection<br>Agency<br>Office of General Counsel<br>Washington, DC</td><td>Jeffrey Hammons<br>U.S. Department of Justice<br>Environment & Natural Resources Div.<br>Environmental Defense Section<br>P.O. Box 7611<br>Washington, DC 20044<br>(202) 598-6925<br>jeffrey.hammons@usdoj.gov</td></tr>
</table>

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

As required by D.C. Circuit Rule 28(a)(1), EPA certifies:

## A.    Parties and amici

All parties appearing here are listed in Petitioners' opening briefs with one exception: Lee M. Zeldin is substituted for Jane Nishida under Fed. R. App. P. 43(c)(2).

Amici for Petitioners are: American Petroleum Institute, Chamber of Commerce of the United States of America, and American Chemistry Council.

## B.    Ruling under review

Under review is EPA's Final Rule titled: National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review, 89 Fed. Reg. 24090 (Apr. 5, 2024).

## C.    Related cases

There are no related cases.


*/s/ Jeffrey Hammons*
Jeffrey Hammons
Counsel for EPA

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ................................. i

Table of Authorities ................................................................ iv

Glossary............................................................................x

Introduction ........................................................................1

Statement of Jurisdiction............................................................2

Issues Presented ....................................................................3

Statement of the Case................................................................4

I.      The Uses and Dangers of Ethylene Oxide......................................4

II.     The Sterilization Process. ...................................................6

III.    Statutory Background .......................................................10

        A.      Section 7412(d) Technology Standards and Review .........................10

        B.      Section 7412(f)(2) Risk Review............................................13

IV.     Regulating Commercial Sterilization Facilities............................14

V.      The Final Rule. ...........................................................16

        A.      Section 7412(d) Technology Review...................................17

        B.      Section 7412(f)(2) Risk Review..........................................19

Standard of Review..................................................................23

Summary of Argument................................................................25

Argument...........................................................................28

I.      The Clean Air Act Empowers EPA to Update Risk Reviews.......................28

II.     The Clean Air Act Empowers EPA to Distinguish Emission Sources Based
        on Pollutant Usage, and EPA Reasonably Did So Here.................................38

III.    EPA Need Not Publish Technology Standards and Risk-based Standards in Sequential Federal Register Notices. ................................................................. 42

IV.    The Final Rule's Emission Standards Are Reasonable. ................................ 44

    A.    The Emission Standards are Achievable for Sterilization Chamber Vents. ................................................................................................. 44

    B.    The Emission Standards are Achievable for Aeration Room Vents ... 48

        1.    Industry Petitioner Forfeited its Argument and, in any Event, Existing Performance Test Data Reflects Normal Operating Conditions. ................................................................................. 48

        2.    An Alternative Concentration Based Standard is Not Necessary or Appropriate. ..................................................................... 50

    C.    EPA Reasonably Set the Maximum Deadlines Allowable Under Section 7412. ................................................................................... 52

        1.    The Clean Air Act Places Outer Limits on EPA's Authority to Set Compliance Deadlines. ................................................... 52

        2.    EPA Complied with Section 7412(f)(4)(B). ........................... 56

    D.    EPA Reasonably Assessed the Final Rule's Costs and Benefits. ....... 56

    E.    EPA Responded to All Significant Comments on Its Use of the 2016 Cancer Risk Estimate for Ethylene Oxide. ...................................... 64

V.    The Final Rule's Continuous Emissions Monitoring System Requirements Are Reasonable. ......................................................................................... 67

VI.    EPA Reasonably Declined to Require Facilities to Obtain Title V Operating Permits. ........................................................................................................ 75

Conclusion .............................................................................................................. 80

Certificates of Compliance and Service................................................................. 81

EPA's Statutory Addendum............................................................................. ADD-i

# TABLE OF AUTHORITIES

**CASES**

*Agape Church v. FCC,*
  738 F.3d 397 (D.C. Cir. 2013)..............................................................74

*Am. Methyl Corp. v. EPA,*
  749 F.2d 826 (D.C. Cir. 1984)..............................................................32

*Catawba County v. EPA,*
  571 F.3d 20 (D.C. Cir. 2009)................................................................24

*Cement Kiln Recycling Coal. v. EPA,*
  255 F.3d 855 (D.C. Cir. 2001)..............................................................11

*Certified Color Mfrs. Ass'n v. Mathews,*
  543 F.2d 284 (D.C. Cir. 1976)..............................................................32

*Citizens for Pa.'s Future v. Wheeler,*
  469 F. Supp. 3d 920 (N.D. Cal. 2020)........................................... 33, 34

*City of Portland v. EPA,*
  507 F.3d 706 (D.C. Cir. 2007) ..............................................................62

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.,*
  628 F. Supp. 3d 189 (D.D.C. 2022) ............................................... 76, 78

*Huntsman Petrochemical LLC v. EPA,*
  114 F.4th 727 (D.C. Cir. 2024) ..................................................... 65, 66

*Ivy Sports Med., LLC v. Burwell,*
  767 F.3d 81 (D.C. Cir. 2014)................................................................30

*Jones v. Hendrix,*
  599 U.S. 465 (2023) .............................................................................36

*La. Env't Action Network ("LEAN") v. EPA,*
  955 F.3d 1088 (D.C. Cir. 2020)..................................................... 12, 35

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
  523 U.S. 26 (1998) ...............................................................................35

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) .................................................................... 23, 28, 32, 38

*Michigan v. EPA*,
    576 U.S. 743 (2015) ..............................................................................62

*Miss. Comm'n on Env't Quality v. EPA*,
    790 F.3d 138 (D.C. Cir. 2015) .............................................................24

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
    142 F.3d 449 (D.C. Cir. 1998) .............................................................48

*Nat. Res. Def. Council v. Regan*,
    67 F.4th 397 (D.C. Cir. 2023) ..............................................................30

*Nat'l Ass'n for Surface Finishing* v. *EPA*,
    795 F.3d 1 (D.C. Cir. 2015)......................................................... 13, 35

*Nat'l Lime Ass'n v. EPA*,
    233 F.3d 625 (D.C. Cir. 2000) ................................................ 25, 44, 57

*New Jersey v. EPA*,
    517 F.3d 574 (D.C. Cir. 2008) .............................................................32

*New York v. EPA*,
    413 F.3d 3 (D.C. Cir. 2005).......................................................24, 38, 47

*NextEra Energy Res., LLC v. FERC*,
    118 F.4th 361 (D.C. Cir. 2024) ...........................................................23

*NRDC v. EPA ("NRDC 2008")*,
    529 F.3d 1077 (D.C. Cir. 2008)..................................................... 13, 14

*NRDC v. EPA ("NRDC 2014")*,
    749 F.3d 1055 (D.C. Cir. 2014)..................................................... 36, 37

*NRDC v. Reilly*,
    976 F.2d 36 (D.C. Cir. 1992)........................................................ 37, 53

*NRDC v. Thomas*,
    838 F.2d 1224 (D.C. Cir. 1988)............................................................74

*Russello v. United States*,
464 U.S. 16 (1983) ...................................................................34

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981)..................................................78

*Sierra Club v. EPA*,
353 F.3d 976 (D.C. Cir. 2004)..................................................12

*Sinclair Wyo. Refin. Co. v. EPA,*
101 F.4th 871 (D.C. Cir. 2024) ................................................62

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) .................................................................24

*U.S. Sugar Corp. v. EPA*,
830 F.3d 579 (D.C. Cir. 2016)............................................ 57, 67

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) .................................................................43

**STATUTES**

5 U.S.C. § 553(e) .............................................................................30

42 U.S.C. § 7412 ..........................................................................1, 3

42 U.S.C. § 7412(a)(1).....................................................................11

42 U.S.C. § 7412(a)(2).....................................................................11

42 U.S.C. § 7412(b)(1).....................................................................10

42 U.S.C. § 7412(c)(1) ............................................................... 10, 11

42 U.S.C. § 7412(c)(3) .....................................................................11

42 U.S.C. § 7412(c)(6) .....................................................................11

42 U.S.C. § 7412(d) .........................................................................22

42 U.S.C. § 7412(d)(1)............................................... 3, 12, 15, 26, 38

42 U.S.C. § 7412(d)(1)(C) ................................................................36

42 U.S.C. § 7412(d)(2) ............................................................ 11, 38, 57

42 U.S.C. § 7412(d)(3) ........................................................ 11, 12, 38, 57

42 U.S.C. § 7412(d)(5) ......................................................................12

42 U.S.C. § 7412(d)(6) ............................................................... 12, 32

42 U.S.C. § 7412(f)(2) ........................... 22, 29, 32, 34, 37, 42, 57

42 U.S.C. § 7412(f)(2)(A) .................................................. 13, 14, 21, 30

42 U.S.C. § 7412(f)(2)(B) ................................................................ 13, 31

42 U.S.C. § 7412(f)(4)(A) ..................................................................52

42 U.S.C. § 7412(f)(4)(B) ..................................................................52

42 U.S.C. § 7412(i)(3)(A) ..................................................................54

42 U.S.C. § 7412(i)(3)(B) ..................................................................54

42 U.S.C. § 7412(i)(4) ......................................................................53

42 U.S.C. § 7412(k)(3)(B) ..................................................................11

42 U.S.C. § 7601(a)(1) ......................................................................36

42 U.S.C. § 7604(a) ..........................................................................78

42 U.S.C. § 7607(b)(1) ........................................................................2

42 U.S.C. § 7607(d)(1)(C) ..................................................................36

42 U.S.C. § 7607(d)(4)(B)(ii) ..............................................................63

42 U.S.C. § 7607(d)(7)(A) ..................................................................63

42 U.S.C. § 7607(d)(7)(B) ..................................................... 48, 69, 70

42 U.S.C. § 7607(d)(8) ......................................................................43

42 U.S.C. § 7607(d)(9)(A) ............................................................. 24, 38

42 U.S.C. § 7661a(a) ........................................................................75

Pub. L. No. 101-549, 104 Stat. 2399 (1990)............................................10

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. § 63.361 ......................................................................73

40 C.F.R. § 63.365 ......................................................................73

40 C.F.R. § 63.365(d)(3)...............................................................74

40 C.F.R. § 63.8(c)(4)(ii) ..............................................................68

**FEDERAL REGISTER**

54 Fed. Reg. 38044 (Sept. 14, 1989) ................................................31

57 Fed. Reg. 31576 (July 16, 1992) ..................................................14

59 Fed. Reg. 10591 (Mar. 7, 1994).....................................................41

59 Fed. Reg. 62585 (Dec. 6, 1994) ............................... 15, 40, 41, 74

63 Fed. Reg. 66990 (Dec. 4, 1998) .....................................................15

66 Fed. Reg. 55577 (Nov. 2, 2001)......................................................15

70 Fed. Reg. 75320 (Dec. 19, 2005) ...................................................76

71 Fed. Reg. 17352 (Apr. 6, 2006) ............................................ 14, 33

71 Fed. Reg. 17712 (Apr. 7, 2006) ......................... 14, 15, 16, 29, 33, 36

72 Fed. Reg. 25138 (May 3, 2007) ............................................. 14, 33

80 Fed. Reg. 75178 (Dec. 1, 2015).....................................................21

85 Fed. Reg. 42074 (July 13, 2020)....................................................21

85 Fed. Reg. 49084 (Aug. 12, 2020) ..................................................21

88 Fed. Reg. 22790 (April 13, 2024)............... 17, 39, 40, 61, 68, 71, 74, 76, 77, 79

89 Fed. Reg. 24090 (Apr. 5, 2024) 16, 17, 19, 20, 21, 22, 30, 34, 36, 38. 39, 40, 41, 42, 44, 45, 46, 47, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 61, 62, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79

89 Fed. Reg. 42932 (May 16, 2024) ...........................................................................21

**LEGISLATIVE HISTORY**

S. Rep. No. 101-228 (1989), 1990 U.S.C.C.A.N. 3385...........................................34

# GLOSSARY

| | |
|---|---|
| Environmental Petitioners | Petitioners California Communities Against Toxics, Clean Power Lake County, Comité Diálogo Ambiental, Rio Grande International Study Center, Sierra Club, and Union of Concerned Scientists |
| Enviro Br. | Brief of Petitioners California Communities Against Toxics, Clean Power Lake County, Comité Diálogo Ambiental, Rio Grande International Study Center, Sierra Club, and Union of Concerned Scientists. |
| EPA | U.S. Environmental Protection Agency |
| EtO Eval. | EPA's Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide, EPA-HQ-OAR-2019-0178-0477 (Dec. 2016), JA0252. |
| Final Rule | National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review, 89 Fed. Reg. 24090 (April 5, 2024), JA0080. |
| Industry Br. | Brief of Petitioner Ethylene Oxide Sterilization Association, Inc. |
| Industry Petitioner | Petitioner Ethylene Oxide Sterilization Association, Inc. |
| JA | Joint Appendix |
| MACT | Maximum achievable control technology |
| Proposal | National Emission Standards for Hazardous Air Pollutants: Ethylene Oxide Emissions Standards for Sterilization Facilities Residual Risk and Technology Review, 88 Fed. Reg. 22790 (April 13, 2024), JA0012. |

**INTRODUCTION**

This dispute arises from EPA's regulation of emissions of ethylene oxide, a human carcinogen, from commercial sterilization facilities. As required by 42 U.S.C. § 7412 ("Section 7412"), the Clean Air Act's provision governing hazardous air pollutants (known colloquially as "air toxics") like ethylene oxide, EPA reviewed the public health risks of these facilities in 2006. Ten years later, in 2016, EPA updated its cancer-risk assessment for ethylene oxide. That assessment, which this Court recently upheld, revealed that ethylene oxide's cancer risk is 60 times higher than EPA had first thought and suggested that ethylene oxide emissions from sterilization facilities likely pose much greater risks than what EPA concluded in 2006.

Because its understanding of ethylene oxide had changed so much since 2006, EPA updated its risk review of ethylene oxide emissions from commercial sterilization facilities in the Final Rule challenged here. The updated review showed that these facilities' ethylene oxide emissions posed unacceptable risk to public health and, in fact, resulted in public health risks that are significantly higher than most other source categories analyzed by EPA under Section 7412. Thus, EPA tightened regulations of those emissions. EPA's actions here are well within the authority granted by Section 7412, whose goal is to reduce emissions of

1

air toxics to, among other things, provide an ample margin of safety to protect public health.

Industry Petitioner, by contrast, would prohibit EPA from ever updating its risk reviews to consider new information about health risks or to correct a prior risk review that was based on an outdated understanding of risks. That perverse reading of the statute is not only divorced from text, but it would also undermine the statute's goal.

Besides its statutory argument, Industry Petitioner takes a kitchen-sink approach to argue that the Final Rule is arbitrary and capricious. But EPA's robust administrative record speaks for itself. EPA's Final Rule, responses to comments, and regulatory impact analysis thoroughly explained the evidence on every issue, and EPA rationally connected the available evidence to its conclusions on appropriate emission standards and monitoring requirements.

Environmental Petitioners' challenges to the Final Rule are likewise unavailing because EPA reasonably explained its decision to set the maximum compliance deadlines under the Act and to continue its exemption for commercial sterilization facilities from obtaining operating permits under Title V of the Clean Air Act.

## STATEMENT OF JURISDICTION

The Court has jurisdiction under 42 U.S.C. § 7607(b)(1).

**ISSUES PRESENTED**

The Clean Air Act directs EPA to regulate emissions of air toxics. 42 U.S.C. § 7412. In the Final Rule, EPA set standards for ethylene oxide emissions from commercial sterilization facilities. The issues presented are:

1.  Section 7412(f)(2) directs EPA to set standards to reduce lifetime cancer risk and to provide an ample margin of safety to protect public health. After recent EPA assessments revealed that ethylene oxide's cancer risk is much higher than the agency had thought during its 2006 risk review, EPA updated that review and tightened the ethylene oxide standards under Section 7412(f)(2). Did EPA act within its Section 7412(f)(2) authority?

2.  In setting emission standards in the Final Rule, EPA distinguished among certain sources based on their ethylene oxide usage because usage affects emissions and risk. Did EPA act consistently with the Clean Air Act, which allows EPA to "distinguish among classes, types, and sizes of sources" within a category? 42 U.S.C. § 7412(d)(1).

3.  Section 7412(f) requires EPA to first set standards under Section 7412(d) and then consider the public health risks of the source category using the Section 7412(d) standards as a baseline. Did EPA act consistently with the Clean Air Act by finalizing Section 7412(d) standards and Section 7412(f) standards in the same Federal Register notice?

4.    The Final Rule imposed new technology and risk-based emission standards, including a two-year deadline by when facilities must comply with those new risk-based standards, and imposed new monitoring, recordkeeping, and reporting requirements. Did EPA acknowledge the available evidence, provide a rational basis for its decision based on that evidence, and respond to substantive comments in setting those new standards, including the two-year risk-based compliance deadline, and in setting the new monitoring, recordkeeping, and reporting requirements?

5.    Continuous emission monitoring systems are a common technology to continuously measure air pollutant concentrations like ethylene oxide. Did EPA act reasonably in requiring commercial sterilization facilities to install continuous emission monitoring systems?

6.    In a prior rulemaking, under a four-factor balancing test, EPA concluded that the commercial sterilization area sources should be excluded from obtaining an operating permit under Title V of the Clean Air Act. Did EPA act reasonably in retaining that exclusion in the Final Rule?

**STATEMENT OF THE CASE**

**I.    The Uses and Dangers of Ethylene Oxide.**

Ethylene oxide, a gas at room temperature, is often used to sterilize medical equipment. EtO Eval 2-1, JA0255. But the quality that makes ethylene oxide an

effective sterilant—the ability to kill microorganisms—is also what makes it toxic. Ethylene oxide has long been known to damage chromosomes in humans. *Id.* 1-1, 3-1, JA0253, 0259. Because ethylene oxide is normally a gas, inhalation is the main exposure route, and people living nearby can breathe in the toxic gas. *Id.* 2-1, JA0255. EPA first evaluated ethylene oxide's toxicity in 1985. *Id.* 3-1, JA0259. Since then, new studies have shown the chemical to be much more toxic than EPA had originally thought. *See id.* App. A, JA0281-338.

In 2016, EPA completed its updated cancer-risk estimate for ethylene oxide. Over the preceding two decades, the science had evolved, and EPA had reviewed many new epidemiological studies of ethylene oxide's toxicity in humans. EtO Eval 3-1 to 19, JA0259-77. EPA's review found "strong evidence" that ethylene oxide exposure increases cancer risk. *Id.* 1-1, 3-6 to 13, JA0253, 0264-71. Based on the weight of the evidence, EPA concluded that ethylene oxide, when inhaled, is a human carcinogen. *See id.* 1-1, JA0253.

In the same analysis, EPA also estimated that ethylene oxide's cancer risk is about <u>60 times higher</u> than what it had used in its prior risk review, conducted in 2006. Final Rule at 24094, JA0084. EPA estimated ethylene oxide's additional lifetime cancer risk is $5.0 \times 10^{-3}$ per $\mu g/m^3$. EtO Eval. 1-7, 4-91, JA0254, 0279. This means, based on a lifetime of exposure, that 5 out of every 1,000 people

exposed to 1 microgram of ethylene oxide per cubic meter of air would be expected to develop cancer because of that exposure.

EPA first used its 2016 ethylene oxide evaluation to support updated emission standards for the Miscellaneous Organic Chemical Manufacturing source category. *Huntsman Petrochemical LLC v. EPA*, 114 F.4th 727 (D.C. Cir. 2024). This Court recently upheld EPA's use of the 2016 cancer-risk estimate in setting risk-based standards, in the face of many flawed legal and technical challenges. *Id.*

## II. The Sterilization Process.

The Final Rule regulates five sources of ethylene oxide emissions from commercial sterilization facilities. Those sources are: (1) Sterilization Chamber Vents, (2) Chamber Exhaust Vents, (3) Aeration Room Vents, (4) Group 1 Room air emissions, and (5) Group 2 Room air emissions. While there are different configurations at any given facility, the following is an illustration of a common sterilization process and the five emission sources.

**Sterilization Chamber Vent.** Products are prepped for sterilization and then transferred into a sterilization chamber. Ethylene oxide and other gases are introduced into the chamber until a certain ethylene oxide concentration is achieved. Proposal at 22797, JA0019. Once the product has sat in the specified ethylene oxide concentration for a predetermined amount of time, the ethylene oxide is evacuated out of the sterilization chamber in phases. *Id*. The ethylene

oxide and other emissions from this evacuation are sucked up by the Sterilization Chamber Vent, and these emissions are sent to a control technology to reduce ethylene oxide concentrations to meet the applicable emission standards. *Id.*

**Chamber Exhaust Vent**. Once the bulk of ethylene oxide has been evacuated, the door to the sterilization chamber is opened so that products can be transferred to an aeration room or aeration chamber. While the sterilization chamber door is open, the Chamber Exhaust Vent is activated—the vent in the back of the chamber that sucks air to evacuate any remaining ethylene oxide while products are transferred out. *Id.* These emissions are also sent to a control technology to reduce ethylene oxide concentrations to meet the applicable emission standards. *Id.*

**Aeration Room Vent**. Once the sterilized products have been transferred from the sterilization room, they are often placed in either an aeration room or aeration chamber. *Id.* Latent ethylene oxide remaining in the sterilized products off-gases and is captured by the Aeration Room Vent, which sucks air out of the aeration room or chamber to capture the off-gassed ethylene oxide and send it to a control technology to reduce ethylene oxide concentrations to meet the applicable emission standards. *Id.* Once products complete aeration, they are typically sent to an onsite storage room or warehouse to prepare for shipment offsite. *Id.*

**Group 1 Room Air Emissions.** Before, during, and right after the sterilization stage, emissions of ethylene oxide are released into the air outside the facility. These emissions originate from sources such as ethylene oxide storage and dispensing equipment, vacuum pump operations, and pre-aeration handling of sterilized materials. Final Rule at 24099, JA0089. These ethylene oxide emissions are considered part of Group 1 Room air emissions. *Id*. These emissions are different than emissions from the Sterilization Chamber Vent and Chamber Exhaust Vent.

**Group 2 Room Air Emissions.** Similarly, after the products have finished their aeration stage, there are emissions of ethylene oxide that can off-gas from products while they sit in onsite, post-aeration storage rooms and warehouses. *Id*. These emissions are different than emissions from the Aeration Room Vent.

Diagram 1 below illustrates the above-described process.

**Diagram 1 – Sterilization Process Illustration**



While not all facilities follow the above framework, it illustrates the five categories of emission sources from commercial sterilization facilities. For example, some facilities have combination chambers that act as both a sterilization chamber and, after ethylene oxide evacuation, an aeration chamber, so any emissions after opening the combined chamber are considered part of Group 2 Room air emissions. Other facilities may not have Chamber Exhaust Vents, so any emissions ordinarily sucked up by those vents are instead released upon opening the sterilization chamber's door and are considered part of Group 1 Room air emissions.

## III. Statutory Background

Section 7412 began in 1970 as a risk-based program to regulate air toxics, but the 1970 approach was ineffective because of uncertainty over which pollutants pose a health risk. *NRDC v. EPA (NRDC 2008)*, 529 F.3d 1077, 1079 (D.C. Cir. 2008). The Clean Air Act Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399 (1990), aimed to remedy Section 7412's flaws by making two major changes.[1] First, rather than wait for EPA to list new air toxics, Congress identified 191 air toxics requiring emission standards. *See* 42 U.S.C. § 7412(b)(1); *Sierra Club v. EPA*, 353 F.3d 976, 979-80 (D.C. Cir. 2004). Second, Congress supplemented the risk-based standard-setting approach with a mandate for EPA to require reductions "based on the maximum reduction in emissions which can be achieved by application of best available control technology." *Sierra Club*, 353 F.3d at 980 (citation omitted).

### A. Section 7412(d) Technology Standards and Review

Congress divided emissions sources based on their potential to emit. 42 U.S.C. § 7412(c)(1). A major source is any stationary source, or group

---

[1] Industry Petitioner claims that Congress amended Section 7412 so that EPA could consider costs in setting standards, Industry Br. 5, but that was never the reason for the 1990 amendments. *See, e.g., Sierra Club*, 353 F.3d at 979-980 (in-depth history of 1990 amendments to Section 7412, explaining that Congress acted because the prior regime proved ineffective because of uncertainty of how to measure risk and unrealistic timeframes mandated by the statute).

of stationary sources located within a contiguous area and under common control, that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any individual air toxic or 25 tons per year or more of any combination of air toxics. *Id*. § 7412(a)(1). Congress also required EPA to list and regulate area sources in specified circumstances. *Id.* § 7412(c)(1), (c)(3), (c)(6) and (k)(3)(B). An area source is any source that is not a major source. *Id*. § 7412(a)(2).

For each listed major source category or subcategory, Congress directed EPA to promulgate technology-based emission standards that are known as "maximum achievable control technology" or "MACT" standards. *Id*. § 7412(d)(2)-(3). MACT standards "require the maximum degree of reduction in [air-toxics] emissions," up to a total prohibition, that EPA "determines is achievable." *Id*. § 7412(d)(2). To assess achievability, EPA must consider "the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements." *Id.* Congress also specified a minimum stringency level ("MACT floor") for these technology standards based on the actual emission rates of the best-performing sources. *See* 42 U.S.C. § 7412(d)(3); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 861-62 (D.C. Cir. 2001). The MACT floor for existing sources cannot be less stringent than "the average emission limitation achieved by the best performing 12 percent" or "the

best performing 5 sources . . . for categories or subcategories with fewer than 30 sources." 42 U.S.C. § 7412(d)(3).

EPA establishes MACT standards using a two-step process. First, EPA calculates the category-specific MACT floor under Section 7412(d)(3). *Sierra Club*, 353 F.3d at 988; Final Rule at 24096, JA0086. Next, EPA evaluates the factors set forth in Section 7412(d)(2) to determine whether more stringent standards, commonly called "beyond-the-floor" standards, are necessary. *Sierra Club*, 353 F.3d at 988. Congress required EPA to set emission standards for all major and area source categories and subcategories. 42 U.S.C. § 7412(d)(1). For certain categories of area sources, EPA may, in lieu of MACT standards, promulgate standards that "provide for the use of generally available control technologies or management practices by such sources to reduce emissions of [air toxics]." *Id.* § 7412(d)(5).

Section 7412(d)(6) requires EPA to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under [Section 7412] no less often than every 8 years." 42 U.S.C. § 7412(d)(6). As part of this "technology" review, EPA is required to address regulatory gaps, such as missing standards for listed air toxics known to be emitted from a major source category. *La. Env't Action Network ("LEAN") v. EPA*, 955 F.3d 1088 (D.C. Cir. 2020).

## B. Section 7412(f)(2) Risk Review.

After establishing the technology standards for a source category or subcategory, EPA must conduct a risk review "within 8 years after promulgation of [technology] standards." 42 U.S.C. § 7412(f)(2)(A). EPA conducts this risk review in a two-step process, and Congress spelled out exactly how much risk triggers EPA's duty to set more standards: If a standard regulating a carcinogenic pollutant does not "reduce lifetime excess cancer risks to the individual most exposed to emissions from [a regulated source] to less than one in one million," then EPA "shall" promulgate standards. 42 U.S.C. § 7412(f)(2)(A).

Under step one, EPA considers whether the residual health risk is acceptable, considering all health information, including estimated cancer risks. EPA generally interprets as acceptable a maximum individual lifetime cancer risk of no greater than 100-in-1-million.[2] *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 7 (D.C. Cir. 2015); *see also NRDC*, 529 F.3d at 1082. If the risk is not acceptable, EPA sets a more stringent standard regardless of cost to bring the risk down to an acceptable level. 42 U.S.C. § 7412(f)(2)(A); *Surface Finishing*, 795 F.3d at 5.

---

[2] Meaning a 100-in-a-million chance of developing cancer over a lifetime's exposure to emissions from regulated sources. This presumptive threshold was set in EPA's 1989 regulation of benzene, which established how EPA conducts risk reviews under Section 7412, and Congress approved of this approach in 42 U.S.C. § 7412(f)(2)(B).

Under step two, even if risks posed by a source category are acceptable, EPA considers whether a more stringent standard is "required in order to provide an ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A). Whether such a standard is required turns on whether it is attainable, which is determined based on the agency's consideration of costs, economic impact, feasibility, and other factors. *Id.*; *NRDC*, 529 F.3d at 1083.

EPA has consistently said that it may need to update a prior risk assessment if there are changes within the affected industry or significant improvements to science that suggest the public is exposed to more risk than previously assessed. 71 Fed. Reg. 17352, 17354 (Apr. 6, 2006) (risk review for Bulk Gasoline Terminals and Pipeline Breakout Stations); 71 Fed. Reg. 17712, 17715 (Apr. 7, 2006) (risk review for commercial sterilization facilities); 72 Fed. Reg. 25138, 25147 (May 3, 2007) (risk review for Halogenated Solvent Cleaning).

## IV. Regulating Commercial Sterilization Facilities.

In 1992, EPA listed both major and area sources of commercial sterilization facilities for regulation. 57 Fed. Reg. 31576, 31591 tbl.1 (July 16, 1992). EPA listed the area source category under Section 7412(c)(3) based on its finding that ethylene oxide emissions from these facilities threaten human health and the environment, warranting regulation under Section 7412. *Id.* at 31588.

In 1994, EPA promulgated technology standards under Section 7412(d) for ethylene oxide emissions from Sterilization Chamber Vents, Aeration Room Vents, and Chamber Exhaust Vents at commercial sterilization facilities. 59 Fed. Reg. 62585 (Dec. 6, 1994). In the 1994 rule, EPA set different standards based on facilities' ethylene oxide usage amounts, except that no emission control was required for facilities using less than 1 ton per year of ethylene oxide and for Aeration Room Vents for facilities using at least 1 ton but less than 10 tons per year of ethylene oxide. *Id*. at 62593; *see also* 42 U.S.C. § 7412(d)(1) ("[t]he Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards"). The 1994 rule did not regulate Group 1 or Group 2 Room air emissions. 59 Fed. Reg. at 62593. A few years later, because of certain safety concerns with the emission standard for Chamber Exhaust Vents, EPA suspended that emission standard and later eliminated it. 63 Fed. Reg. 66990 (Dec. 4, 1998); 66 Fed. Reg. 55577 (Nov. 2, 2001).

In 2006, EPA conducted a risk review of the technology standards under Section 7412(f)(2). 71 Fed. Reg. at 17716. For that review, EPA relied on California EPA's cancer-risk estimate for ethylene oxide at the time. California's estimate, in turn was based on EPA's 1985 cancer-risk estimate. *Id*. at 17715. Noting that it was developing an updated cancer assessment for ethylene oxide,

EPA explained that it could revisit and revise any rulemaking if necessary, including where there are "significant improvements to science [suggesting that] the public is exposed to significant increases in risk as compared to the risk assessment prepared for the rulemaking." *Id*.

In the 2006 rulemaking, EPA also conducted a technology review of the technology standards for Sterilization Chamber Vents and Aeration Room Vents pursuant to Section 7412(d)(6) and concluded that revisions were unnecessary. *Id*. at 17714. EPA did not set standards for unregulated ethylene oxide emissions at that time.

## V. The Final Rule.

Three aspects of the Final Rule are at dispute here. The first is a technology review under Section 7412(d)(6) technology standards for the commercial sterilization facilities source category. The second is an updated risk review under Section 7412(f)(2) for this source category based on EPA's updated understanding of ethylene oxide's cancer risks and updated risk-based standards. EPA determined facilities have up to the statutory maximum of two years before they must demonstrate compliance with the new risk-based standards. *Supra* STATEMENT OF THE CASE § I; Final Rule at 24100, 24116-25, JA0090, JA0106-15. The third is updates to the monitoring, reporting, and recordkeeping requirements. Final Rule at 24131-34, JA0121-24.

## A.     Section 7412(d) Technology Review.

Before the Final Rule, the only emission standards for this source category were: (1) Sterilization Chamber Vent standards for facilities using at least 10 tons of ethylene oxide per year; (2) Sterilization Chamber Vent standards for facilities using at least 1 ton but less than 10 tons of ethylene oxide per year; and (3) Aeration Room Vent standards for facilities using at least 10 tons of ethylene oxide per year. Proposal at 22797 & tbl.4, JA0019.

In the Final Rule, EPA conducted "gap filling" by establishing technology standards for Sterilization Chamber Vents and Aeration Room Vents at facilities using less than 1 ton per year of ethylene oxide and for Aeration Room Vents at facilities using at least 1 ton but less than 10 tons of ethylene oxide per year. Final Rule at 24099, JA0089. For Chamber Exhaust Vent and Group 1 and Group 2 Room air emissions, EPA's gap-filling established MACT standards for major sources as required by Section 7412(d)(2) and (3); for area sources, EPA invoked its discretion under Section 7412(d)(5) and issued GACT standards based on generally available and cost-effective controls. Final Rule at 24099, 24104-17, JA0089, JA0094-107. Figure 1 below shows the results of EPA's gap-filling for previously unregulated emission sources (also including the current standards for the few previously regulated sources) for new and existing sources. *Id*. at 24118 tbl.17, JA0108.

**Figure 1 – Section 7412(d) Standards**

| Emission Source | Existing or New Source | EtO Use | Standard (emission reduction percentage) |
|---|---|---|---|
| Sterilization chamber vents | Existing and new | At least 1 tpy | 99 percent reduction |
| | | Less than 1 tpy | 99 percent reduction |
| Aeration room vents | Existing and new | At least 10 tpy | 99 percent reduction |
| | | Less than 10 tpy | 99 percent reduction |
| Chamber exhaust vents at major sources | Existing and new | All amounts | 99.94 percent reduction |
| Chamber exhaust vents at area sources | Existing and new | All amounts | 99 percent reduction |
| Group 1 room air emissions at major sources | Existing and new | All amounts | 97 percent reduction |
| Group 1 room air emissions at area sources | Existing and new | All amounts | 80 percent reduction |
| Group 2 room air emissions at major sources | Existing and new | All amounts | 86 percent reduction |
| Group 2 room air emissions at area sources | Existing | All amounts | Lower the EtO concentration within each sterilization chamber to 1 ppm before the chamber can be opened. |
| | New | All amounts | 80 percent reduction |

For the few emission sources that were previously regulated, EPA conducted the technology review required by Section 7412(d)(6). Based on developments in technology and practices, EPA determined that the preexisting standards should be updated. *Id*. at 24125-27, JA0115-17. EPA also found that many facilities are already meeting the new standards. *Id*. Figure 2 below shows the results of EPA's technology review pursuant to Section 7412(d)(6) for previously regulated emission sources. *Id*. at 24126, JA0116.

**Figure 2 – Summary of Standards Under Section 7412(d)(6)**

| Emission Source | Existing or New Source | EtO Use | Standard (emission reduction percentage) |
|---|---|---|---|
| Sterilization chamber vents | Existing and new | At least 10 tpy | 99.9 percent reduction |
| | | Less than 10 tpy but more than 1 tpy | 99.8 percent reduction |
| Aeration room vents | Existing | At least 10 tpy | 99.6 percent reduction |
| | New | At least 10 tpy | 99.9 percent reduction |

**B.    Section 7412(f)(2) Risk Review.**

Using the 2016 cancer-risk estimate, EPA calculated the maximum lifetime individual cancer risk for the commercial sterilization facilities source category in the Final Rule. EPA set its baseline risk level using actual and allowable emissions without considering the new technology standards set in the Final Rule.

For people living near regulated sources, the baseline risk from actual emissions was as high as 6,000-in-1 million—60 times higher than what EPA normally considers acceptable (100-in-1 million). Final Rule at 24117-8 & tbl.16, JA0107-08. The baseline risk from allowable emissions (or what regulated sources were allowed to emit under preexisting standards) was even higher, at 8,000-in-1 million—80 times higher than what EPA normally considers acceptable. *Id.*

After factoring in the new technology standards set in the Final Rule, the risk from allowable emissions (what regulated sources could emit under the new technology standards) are as high as 6000-in-1 million. *Id.* at 24118, JA0108; *id.* at 24118 tbl.17, JA0108 (listing the new technology standards considered in the risk assessment). After factoring in the new technology standards set in the Final Rule, the risk from actual emissions (what regulated sources are anticipated to actually emit based on the new standards), the risks are as high as 5000-in-1 million. *Id.* at 24119, JA0109 (tbl.18 n.4). So even after the new technology standards set in the Final Rule, the risk posed by this source category is still 50 to 60 times higher than what EPA normally considers acceptable.

The public health risks from this source category are significantly higher than risks from most other source categories analyzed by EPA under Section 7412. For example, for Petroleum Refineries and Integrated Iron and Steel source

categories, the baseline risks were about 60-in-1 million[3] and 70-in-1 million[4] (respectively). Focusing just on ethylene oxide as the main driver of cancer risks, for the Synthetic Organic Chemical Manufacturing Industry and Miscellaneous Organic Chemical Manufacturing source categories, the baseline risks were about 2000-in-1 million[5] and 400-in-1 million[6] (respectively).

Based on risk and other information, EPA determined that ethylene oxide emissions from the source category posed unacceptable risk. *Id.* at 24118-19, JA0108-09. Under the statute, EPA thus had to set emission standards that reduce risk to acceptable levels and provide ample margins of safety. *Id*. at 24100, JA0090; 42 U.S.C. § 7412(f)(2)(A).

To that end, EPA tightened emission standards for emissions from certain (1) Sterilization Chamber Vents, (2) Chamber Exhaust Vents, (3) Aeration Room Vents, (4) Group 1 Room air emissions, and (5) Group 2 Room air emissions. Final Rule at 24100, 24116-25, JA0090, JA0106-15. EPA found that all five emission source types contribute to unacceptable risks. *Id.* at 24119, JA0109.

---

[3] 80 Fed. Reg. 75178, 75187 (Dec. 1, 2015) (Petroleum Refineries)
[4] 85 Fed. Reg. 42074, 42082 (July 13, 2020) (Integrated Iron and Steel)
[5] 89 Fed. Reg. 42932, 42956 (May 16, 2024) (Synthetic Organic Chemical Manufacturing Industry)
[6] 85 Fed. Reg. 49084, 49095 (Aug. 12, 2020) (Miscellaneous Organic Chemical Manufacturing)

In this further narrowing of the risk-based standards, EPA used its discretion to distinguish facilities within each of the five emission sources based on annual ethylene oxide usage amounts, which reflect each source's emissions and associated risks. *Id*. at 24116-25, JA0106-15; 42 U.S.C. § 7412(d), (f)(2). EPA then identified controls that would bring risks posed by each of the five emission sources to acceptable levels and provide an ample margin of safety. The resulting standards bring risks to an acceptable level for the entire commercial sterilization facilities source category and at the same time spare many facilities from having to install the most stringent controls for all five emission sources.

Figure 3 below shows the standards set in the risk review. Final Rule at 24093 tbl.1, JA0083.

**Figure 3 – Section 7412(f)(2) Standards**

| Emission Source | Existing or New Source | EtO Use | Risk-based Standard (emission reduction percentage) |
|---|---|---|---|
| Sterilization chamber vents | Existing and New | At least 30 tpy | 99.99 percent reduction |
| | | At least 10 tpy but less than 30 tpy | 99.9 percent reduction |
| | | At least 1 tpy but less than 10 tpy | 99.8 percent reduction |
| Aeration room vents | Existing | At least 30 tpy | 99.9 percent reduction |
| | | At least 10 tpy but less than 30 tpy | 99.6 percent reduction |
| | New | At least 10 tpy | 99.9 percent reduction |

| Emission Source | Existing or New Source | EtO Use | Risk-based Standard (emission reduction percentage) |
|---|---|---|---|
| Chamber exhaust vents at area source facilities | Existing and New | At least 60 tpy | 99.9 percent reduction |
| Group 1 room air emissions at area sources | Existing and New | At least 40 tpy | 98 percent reduction |
| Group 2 room air emissions at area sources | Existing and New | At least 20 tpy | 98 percent reduction |
| | | At least 4 tpy but less than 20 tpy | 80 percent reduction |

## STANDARD OF REVIEW

To resolve the meaning of disputed statutory language, a court adopts the interpretation that it, "after applying all relevant interpretive tools, concludes is best." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). In this analysis, "courts should prefer textually permissible readings that would advance statutory or regulatory goals over ones that would frustrate them." *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 371 (D.C. Cir. 2024).

"Careful attention to the judgment of the Executive Branch may help inform that inquiry." *Loper Bright*, 603 U.S. at 412-13. EPA's interpretation and opinions, "'made in pursuance of official duty' and 'based upon . . . specialized experience,' 'constitute[d] a body of experience and informed judgment to which courts and litigants [could] properly resort for guidance,' even on legal questions." *Id.* at 388

(quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)). The weight of that judgment "'depend[s] upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Id.* (quoting *Skidmore*, 323 U.S. at 140).

This Court reviews the challenged actions under the same arbitrary-and-capricious standard as under the Administrative Procedure Act. *See* 42 U.S.C. § 7607(d)(9)(A); *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) (per curiam). The question for the Court, then, is not whether it or anyone else "[l]ooking at the same data . . . … would simply reach a different conclusion." *Id. Miss. Comm'n on Env't Quality,* 790 F.3d at 162. It is whether EPA "considered all relevant factors and articulated a rational connection between the facts found and the choice made." *Id.* at 150 (internal quotation marks omitted). In other words, EPA's action will be upheld so long as it "explained the available evidence and offered a 'rational connection between the facts found and the choice made.'" *New York v. EPA*, 413 F.3d 3, 31 (D.C. Cir. 2005). The Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Catawba County v. EPA*, 571 F.3d 20, 50 (D.C. Cir. 2009) (per curiam). An agency's factual findings that "require[] a high level of technical

expertie" receive deference. *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 635 (D.C. Cir. 2000).

## SUMMARY OF ARGUMENT

The Court should uphold the Final Rule.

I.     Section 7412(f) directs EPA to set standards that reduce lifetime cancer risks and have ample margins of safety to protect public health. EPA had reviewed risks of ethylene oxide emissions from commercial sterilization facilities in 2006, but ethylene oxide's cancer risks are now known to be about 60 times higher than EPA believed in 2006. EPA thus updated its risk review in 2024. In that updated review, EPA found that the baseline risk that these facilities pose to people living nearby is up to 8000-in-1 million (based on allowable emissions). After factoring in the new technology standards set in the Final Rule, the risks are still as high as 6000-in-1 million (based on allowable emissions). Those risks are far greater than what EPA generally normally considers acceptable (100-in-a-million). Thus, consistent with Section 7412, EPA tightened standards governing commercial sterilization facilities. The commercial sterilization source category poses public health risks that are significantly higher than risks from most other source categories analyzed by EPA, so EPA acted well within its Section 7412(f)(2) authority by updating its risk review based on a record that demonstrated that ethylene oxide was much more harmful than EPA had thought 18 years earlier.

EPA's approach here implements the "best" interpretation of Section 7412(f)(2) and is supported by the statute's text and context. Industry Petitioner's reading, by contrast, would bar EPA from ever updating risk reviews—even when those reviews become obsolete in the face of better understanding about risks to public health. That reading not only finds no support in the statute's text; it also flouts the purpose of Section 7412(f)(2).

II.     Section 7412 empowers EPA to "distinguish among classes, types, and sizes of sources within a category" when setting emission standards. 42 U.S.C. § 7412(d)(1). Industry Petitioner's argument that EPA can only distinguish facilities within a source category based on their emissions defies the statute, which places no such limit. Sources with different usage amounts can be separated into different "classes," and the record shows that there is a correlation between ethylene oxide usage and emissions. Thus, EPA complied with Section 7412, and its distinctions based on ethylene oxide usage are reasonable.

III.    Section 7412(f) requires that, before EPA considers the public health risks from regulated sources, technology standards must be established for those sources. EPA followed that sequence here. Its risk review considered the existing technology standards for the source category and the new "gap filling" technology standards set for previously unregulated emission sources. After factoring in those new technology standards, the risks posed by the source category were still as high

as 6000-in-1 million (based on allowable emissions). Industry Petitioner's insistence that EPA must set those "gap filling" technology standards in a separate, prior notice lacks merit. Nothing in Section 7412(f)(2) requires such formalistic segmentation.

IV. EPA based its new emission standards and new monitoring, reporting, and recordkeeping requirements on a robust technical record. In setting new standards for Sterilization Chamber Vents and Aeration Room Vents, EPA explained why the new standards and requirements are achievable, noting that many facilities are already complying with some of them. EPA set the maximum compliance deadlines allowed under Section 7412 for facilities that require additional controls to meet the new standards, and Industry Petitioner's argument that EPA should have set deadlines beyond the statutory maximum are meritless. For similar reasons, EPA reasonably explained why, over the objection of Environmental Petitioners' argument, that the statutory maximum is required here. EPA analyzed all costs and benefits of the Final Rule consistent with Section 7412. And, contrary to Industry Petitioner's claim, EPA responded—exhaustively, in many instances— to all significant comments.

V. The Final Rule requires all facilities using more than 100 pounds of ethylene oxide per year to monitor their emissions with well-established monitoring technology called continuous emissions monitoring systems. These systems

continuously monitor ethylene oxide concentrations to determine whether a facility is complying with its applicable emission standards. This monitoring requirement replaces the old requirement for a facility to demonstrate its compliance with monitoring parameters that were established based on a single performance test that only captures a tiny snapshot of a facility's operation. Here too, Industry Petitioner fails to rebut the many reasons and explanations EPA provided to support this requirement.

VI.    Based on comments, EPA decided to retain the exemption for area sources from the requirement to obtain an operating permit under Title V of the Clean Air Act. EPA reasonably explained that decision, and Environmental Petitioners point to no meaningful defect in EPA's explanation.

## ARGUMENT

## I.    The Clean Air Act Empowers EPA to Update Risk Reviews.

Section 7412(f)(2) authorizes EPA to update risk reviews to protect public health. That interpretation of the statute follows from plain statutory text and context and thus is the "best" interpretation of the statute. *Loper Bright*, 603 U.S. at 400. Industry Petitioner's contrary interpretation—that EPA cannot update risk reviews, no matter how obvious it is that the source category poses unacceptable risks to public health or offers no margin of safety—finds no support in the text and would also defeat Section 7412(f)(2)'s purpose.

Section 7412 requires EPA to conduct a risk review of potential public health harms after setting technology standards under Section 7412(d). 42 U.S.C.§ 7412(f)(2). If, based on that risk review, EPA determines additional standards are required to provide an ample margin of safety to protect public health, EPA must set such standards. *Id*. The Clean Air Act entrusts EPA with discretion to update risk reviews, especially when warranted by changed circumstances, such as an updated understanding of ethylene oxide's significant cancer risks. EPA has consistently interpreted Section 7412(f)(2) as providing this authority and consistently stated that a change in a pollutant's cancer-risk estimate could require revisiting a prior risk review.

EPA's 2006 risk review for the commercial sterilization source category was based on EPA's 1985 ethylene oxide health assessment. 71 Fed. Reg. at 17715-16. At that time, EPA determined no risk-based standards were required. *Id*. at 17714. But EPA also cautioned that it was updating its cancer assessment for ethylene oxide, *id*., at 17716, and that it may need to revisit the risk review should the science suggest that the public is exposed to greater risk. *Id*. at 17715.

Fast forward ten years. In 2016, EPA finalized its updated cancer-risk estimate for ethylene oxide and found ethylene oxide poses about <u>60 times higher</u> cancer risk than known in 2006. *Supra* STATEMENT OF THE CASE §§ I, IV. The 2016 cancer-risk estimate spurred EPA to update its risk review for commercial

29

sterilization facilities. Final Rule at 24094, JA0084. Based on the 2016 cancer-risk estimate and emissions from commercial sterilization facilities, EPA determined that standards were needed to provide an ample margin of safety to protect public health. Final Rule at 24116-25, JA0106-15.

Meanwhile, Section 7412(f)(2) says that EPA "shall" set risk-based standards if EPA determines "such standards [are] required in order to provide an ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A). So the question is, under Section 7412(f)(2), can EPA update its risk review to account for the current understanding of ethylene oxide's cancer risk? The answer is yes for two reasons.

First, revision and reconsideration of rules, after notice and comment, is part of the basic architecture of administrative law. *See, e.g.*, 5 U.S.C. § 553(e). When a statute authorizes an agency to decide a matter, that authority is implicitly "accompanied by the power to reconsider" that decision. *Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023); *accord Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (explaining that the "power to reconsider is inherent in the power to decide").

Second, Section 7412(f)(2) directs EPA to set standards that limit risks to public health to acceptable levels and that provide an ample margin of safety. And it does not bar EPA from updating, reconsidering, or revising prior risk reviews.

The statute incorporates a presumptive limit on maximum individual lifetime risk of 100-in-1 million.[7] If EPA has reason to think that existing standards no longer adequately protect the public—as it did here after realizing that ethylene oxide's cancer risks are much higher than it had previously understood—the agency can update its risk review.

That interpretation is the "best" and aligns with the Clean Air Act's command to protect public health from toxic air pollution. Understanding of risk evolves based on scientific advances and newly available data. So risk reviews are not, as Industry Petitioner urges, set in stone. Industry Br. 19-20. And the public is not condemned to inadequate protection based on obsolete science. What happened here is case in point: EPA concluded that ethylene oxide's cancer risk is about 60 times higher than what the 2006 risk review had contemplated. Using the revised cancer-risk estimate, EPA found that the source category's ethylene oxide emissions posed unacceptably high risk to public health—in fact, the risk is one of the highest that EPA has ever analyzed under Section 7412. Of course EPA could update its risk review and revise the standards to protect public health and provide an ample margin of safety—that is the whole purpose of Section 7412. Final Rule

---

[7] 54 Fed. Reg. 38044, 38045 (Sept. 14, 1989); 42 U.S.C. § 7412(f)(2)(B) (incorporating 54 Fed. Reg. 38044 by reference); *see also* Final Rule at 24096-97, JA0086-87 (Section 7412(f)(2)(B) "preserves the EPA's use of the two-step approach for developing standards to address any residual risk . . . in the [Benzene NESHAP] (54 FR 38044, September 14, 1989).").

at 24116-25, JA0106-15; 42 U.S.C. § 7412(f)(2); *see Certified Color Mfrs. Ass'n v. Mathews*, 543 F.2d 284, 296 (D.C. Cir. 1976) ("It is a fundamental rule of statutory construction that legislative enactments be construed in a manner designed to give effect to all parts while avoiding a result contrary to the apparent intent of the Congress.").

Industry Petitioner's contrary reading finds no support in Section 7412(d)(6). Industry Br. 20. Though that provision commands EPA to review, and revise as necessary, its *technology* standards every 8 years, 42 U.S.C. § 7412(d)(6), the absence of a similar command in Section 7412(f)(2) to update risk reviews every 8 years is not a bar on updating risk reviews should the need arise. To be sure, Congress "can limit an agency's discretion to reverse itself." *See, e.g., New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008). But where Congress has not expressly barred revisions or reconsideration or curtailed such actions, such as by providing a "mechanism capable of rectifying mistaken actions," *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 835 (D.C. Cir. 1984), an agency need not identify explicit reconsideration authority to revisit or revise a prior action. Nothing in Section 7412 or elsewhere in the Clean Air Act prohibits EPA from updating its Section 7412(f)(2) risk reviews.

EPA has consistently interpreted Section 7412(f)(2) as authorizing it to update risk-based standards. *See Loper Bright*, 603 U.S. at 386 ("[T]he

longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is." (cleaned up)). For example, in its 2006 risk review, EPA said it has "authority to revisit (and revise, if necessary) any rulemaking if there is sufficient evidence that changes within the affected industry or significant improvements to science suggests the public is exposed to significant increases in risk as compared to the risk assessment prepared for the rulemaking (e.g., CAA section 301)." 71 Fed. Reg. at 17715. And the agency has applied the same interpretation to other source categories. *See, e.g.*, 71 Fed. Reg. at 17354-35 (risk review for Bulk Gasoline Terminals and Pipeline Breakout Stations); 72 Fed. Reg. at 25147 (risk review for Halogenated Solvent Cleaning). In the Halogenated Solvent Cleaning risk review, EPA explicitly cited an ongoing assessment of the cancer-risk estimate as a reason that it might need to revisit and revise the standards. 72 Fed. Reg. at 25147; *contra* Industry Br. 18 (accusing EPA of asserting "newfound authority").

To be sure, EPA has consistently interpreted the language of Section 7412(f)(2) to not impose a *mandatory duty* to update a risk review as part of every technology review pursuant to Section 7412(d)(6). *Citizens for Pa.'s Future v. Wheeler*, 469 F. Supp. 3d 920, 931 (N.D. Cal. 2020) (finding no clearly articulated mandatory duty in Section 7412(f)(2) requiring EPA to conduct an updated risk as part of its every-8-years technology review). But that does not speak to the issue

here, which is whether EPA has *discretionary authority* to update a risk review when a compelling change in relevant data signals the need for an update. *Id*. 931 n.2 (noting one avenue for challenging "[o]ut-of-date risk-based standards" is by "a petition for rulemaking under the Clean Air Act, and EPA's action on any such petition would be subject to judicial review.").[8]

Industry Petitioner reads the word "initial" into Section 7412(f)(2) to argue that EPA is limited to only one risk review after the first time it sets technology standards. Industry Br. 23. But the word "initial" appears nowhere in the text. And though earlier drafts of this provision included "initial," the law as enacted by Congress omitted that word. *Compare* S. Rep. No. 101-228, at 522 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 3385 ("Not later than three years after the *initial* promulgation of emissions standards . . . … pursuant to subsection (d), the Administrator shall commence an evaluation of the risks to human health and the environment . . . .") (emphasis added), *with* 42 U.S.C. § 7412(f)(2). "Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23-24 (1983). Industry Petitioner's insertion

---

[8] Industry Petitioner cites EPA's sentence in the Final Rule that says, "section [74]12(f)(2) requires only a one-time risk review . . . ," … ," Industry Br. 21, but that quoted excerpt omits the end of the sentence, which says "it does not limit [EPA's] discretion or authority to conduct another risk review should we consider that such review is warranted." Final Rule at 24094, JA0084.

of the word "initial" into Section 7412(f)(2) finds no support in the text or history of the law.[9] While EPA's mandatory duty is triggered after the initial technology standards are set, that does not mean EPA is prohibited from updating a risk review, should the need arise (as it did here).

Finally, dicta in *Surface Finishing* and *Louisiana Environmental Action Network* do not support Industry Petitioner's interpretation. Industry Br. 20. Neither case concerns whether EPA can update a risk review. *See Surface Finishing*, 795 F.3d at 5; *La. Env't Action Network*, 955 F.3d at 1093. Industry Petitioner appears to suggest that if EPA wants to conduct an updated risk review, it must first submit another report to Congress under Section 7412(f)(1). Industry Br. 23. But that suggestion conflicts with Industry Petitioner's position that EPA can never update risk reviews. Besides, the one-time report, due in 1996, concerned how EPA should conduct risk reviews generally, regardless of pollutant. EPA never had to submit a report for every pollutant.

The structure of the Clean Air Act supports EPA's interpretation too. It is a "central tenet of interpretation" that "a statute is to be considered in all its parts when construing any one of them." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36 (1998). The Act's judicial review provision includes

---

[9] Industry Petitioner argues that legislative history supports its position for three reasons but never cites any legislative history in support of any of the three reasons. Industry Br. 27-28.

EPA actions to "promulgat[e] or revis[e] . . . any standard under section 7412(f)." 42 U.S.C. § 7607(d)(1)(C). If EPA could never update a risk review, then it could never "revise" a "section 7412(f)" standard, but the Act's judicial review provision envisions that EPA can revise such standards, which necessarily includes updates to risk reviews. 42 U.S.C. § 7607(d)(1)(C). The straightforward explanation for this language, and the one supported by the plain text of Section 7412(f), is that EPA has discretionary authority to update risk-based standards under the Act. *Jones v. Hendrix*, 599 U.S. 465, 480 (2023) ("[T]he best interpretation is the straightforward one.").

Another part of the Clean Air Act empowers EPA to "prescribe such regulations as are necessary to carry out [its] functions." 42 U.S.C. § 7601(a)(1). This general rulemaking authority allows EPA to fill in the details of how to implement the Act. *NRDC v. EPA ("NRDC 2014")*, 749 F.3d 1055, 1064 (D.C. Cir. 2014). While Section 7412(f)(2) provides EPA authority to update risk reviews, Section 7601(a)(1) would also allow EPA to update a risk review to use the current and correct estimate of a pollutant's cancer risk, if it has significantly changed since last review. Final Rule at 24094, JA0084 (citing 71 Fed. Reg. at 17715).

Nor do *NRDC 2014* and *NRDC v. Reilly* hold that Section 7601 bars EPA from updating risk reviews. Industry Br. 22. Both cases suggest that, when the Act

empowers EPA to act, the absence of an express limitation on that power means EPA can update its past actions. In *NRDC 2014*, the Court held that EPA cannot use its general rulemaking authority to create an affirmative defense against civil penalties under the Clean Air Act because the Act expressly authorized only federal district courts, not EPA, to impose civil penalties. 749 F.3d at 1063-64. Likewise, in *NRDC v. Reilly*, Industry Br. 22, the Court held that EPA's general rulemaking authority did not allow EPA to delay the effectiveness of a regulation beyond the Clean Air Act's deadlines for setting effective dates. 976 F.2d 36, 40-41 (D.C. Cir. 1992). By contrast, the authority to conduct risk reviews is vested in EPA alone, and no statutory provision limits EPA's authority to update prior risk reviews and risk-based standards. 42 U.S.C. § 7412(f)(2).

Industry Petitioner lastly argues that EPA's consistent interpretation of Section 7412(f)(2) somehow allows it to impermissibly bypass consideration of costs. Industry Br. 24-25. But Industry Petitioner concedes, on the same page, that at step one of a risk review, when deciding whether risk is acceptable, EPA cannot consider cost. *Id*. at 24. So if EPA can update risk reviews, then forgoing costs in step one of a risk review is not exploiting a "loophole," *id*. at 25, but a fundamental aspect of Section 7412(f)(2).[10]

---

[10] Industry Petitioner cites Section 7412(d), Industry Br. 25, but the Clean Air Act's process for setting technology standards also prohibits EPA from considering

*Cont.*

And EPA *did* consider costs in updating the risk review. *Contra* Industry Br. 25. At step two of its risk review, EPA considered cost and opted not to impose stricter limits on many classes of facilities because of those costs. *See, e.g.*, Final Rule at 24122, JA0112 (declining to impose stricter limits on certain classes of Aeration Room Vents, Chamber Exhaust Vents, and Group 2 Room air emissions).

## II. The Clean Air Act Empowers EPA to Distinguish Emission Sources Based on Pollutant Usage, and EPA Reasonably Did So Here.

Section 7412 says EPA "may distinguish among classes, types, and sizes of sources within a category or subcategory" when setting emission standards but left it to EPA to decide what bases for distinction are relevant and reasonable in a given situation. 42 U.S.C. § 7412(d)(1); *Loper Bright*, 603 U.S. at 395 (noting that some statutes "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme"); *see also* 42 U.S.C. § 7607(d)(9)(A); *New York*, 413 F.3d at 31. In the Final Rule, EPA reasonably distinguished between sources based on ethylene oxide usage because of the correlation between usage and emission and risk. Final Rule at 24103-31, JA0093-121. Industry Petitioner disagrees and argues

---

costs when setting the MACT floor. 42 U.S.C. § 7412(d)(3); *supra* STATEMENT OF THE CASE § III.A. Only when considering MACT standards more stringent than the floor does EPA have to consider costs. 42 U.S.C. § 7412(d)(2); *supra* STATEMENT OF THE CASE § III.A. So even under Section 7412(d), costs are only considered in certain parts of the process.

that EPA can only distinguish facilities based on their emissions and not on their class, size, or type. Industry Br. 29-30. But no such limitation exists in the statute.

As EPA explained in the Final Rule, the distinctions reflected emissions from commercial sterilization facilities and the associated public health risks of those emissions.[11] *Contra* Industry Br. 28-29. And the record demonstrates why ethylene oxide usage is a reasonable basis for distinction. For example, when facilities calculate their emissions of ethylene oxide, they tend to use a mass-based approach that multiplies ethylene oxide usage by the fraction of ethylene oxide going to each emissions source. *See, e.g.*, Sterigenics Section 114 Response for Atlanta Facility, EPA-HQ-OAR-2019-0178-0184 (attachment 6), JA0202; BD Section 114 Response for Utah Facility, EPA-HQ-OAR-2019-0178-0197 (attachment 5), JA0203. Both cited facilities used annual ethylene oxide usage as the input to derive estimated annual ethylene oxide emissions.

EPA used a similar mass-based approach to estimate ethylene oxide emissions of each facility for the risk review. Proposal at 22800, JA0022. As EPA explained, "emissions were estimated using a mass balance approach, beginning with annual EtO use (i.e., the previous consecutive 12-month period of EtO use)"

---

[11] Industry Petitioner twice claims EPA failed to respond to comments on its basis for distinguishing facilities based on ethylene oxide usage. Industry Br. 29-30. But EPA detailed its basis for this distinction in the rule's preamble. Final Rule at 24119-23, JA0109-13.

and then "EtO use was apportioned to the different emission process groups using emission factors." *Id*. One commenter agreed with EPA's mass-balance approach to estimating emissions, and no one objected.[12] Resp. to Comments at 251-52, JA0889-90.

The Final Rule also allows facilities to follow a similar ethylene oxide usage-based approach when calculating whether they meet the required emission reductions on a site-wide basis should they choose that option for demonstrating compliance. Final Rule at 24136-37, JA0126-27. Under this option, a facility would "[d]etermine the mass of EtO being used at the facility and apply the SCV emission reduction standard, which is the most stringent emission reduction standard that any emission stream at the facility is subject to." *Id*.

Distinguishing emission standards in this source category based on annual ethylene oxide usage is not new. In 1994, EPA distinguished emission sources based on this parameter for the following: (1) facilities using at least 10 tons per year of ethylene oxide, (2) those using at least 1 ton but less than 10 tons per year,

---

[12] Multiple commenters—including Industry Petitioner—argued that, rather than require monitoring of actual ethylene oxide amounts at the inlets, EPA should instead allow facilities to use a mass-balance calculation that uses ethylene oxide usage as the primary input to calculate compliance at Sterilization Chamber Vents. Resp. to Comments at 301, JA0939. EPA ultimately finalized this approach, which tracks how EPA has historically required emission reductions from this source to be determined. 59 Fed. Reg. at 62596. So both EPA and industry commenters recognize the importance ethylene oxide usage has in influencing emissions.

and (3) those using less than one ton per year. 59 Fed. Reg. at 62586. That rule was not challenged. In this Final Rule, EPA extended that approach and created additional distinctions when setting risk-based standards.[13]

EPA's prior rules for this source category also left regulatory gaps in the standards, which EPA needed to fill. The gaps included sources that previously were only partially regulated: Sterilization Chamber Vents at facilities using less than 1 ton of ethylene oxide per year and Aeration Room Vents at facilities using 10 tons or less of ethylene oxide per year. Final Rule at 24125-26, JA0115-16. The existence of those gaps provided EPA a reasonable basis for using those preexisting distinctions as a starting point. *Id.* EPA then further distinguished among facilities using at least 10 tons per year of ethylene oxide when setting risk-based standards.[14]

---

[13] EPA did not, as Industry Petitioner appears to believe, distinguish facilities here by relying on a presumption in the 1994 action that *all* EtO used for sterilization is eventually emitted. Industry Br. 29 (citing 59 Fed. Reg. 10591 (Mar. 7, 1994)). *See* Final Rule at 24103-31, JA0093-121.

[14] Industry Petitioner may have mistaken the Final Rule's risk-based standards as technology standards because it cites Section 7412(d)(2)–(3) and insists that the standards be "based on *emission levels actually achieved* by the application of technology." Industry Br. 29. The Final Rule includes MACT standards for previously unregulated emissions at *major* sources (Chamber Exhaust Vents and Group 1 and Group 2 Room air emissions) and did not distinguish among classes, sizes or types when setting these MACT standards. The Final Rule also established standards for previously unregulated emissions at area sources and similarly did not distinguish those standards. The only standards reflecting

*Cont.*

41

At bottom, distinguishing facilities on their ethylene oxide usage is consistent with the Act. Different "classes" or "sizes" of facilities correspond to their ethylene oxide usage, which itself relates to emissions. And, as EPA explained, these classes of facilities have different risk profiles, and thus deserve different emission standards.

## III. EPA Need Not Publish Technology Standards and Risk-based Standards in Sequential Federal Register Notices.

Under Section 7412(f)(2), EPA must conduct a risk review of emission standards after setting technology standards under Section 7412(d). 42 U.S.C. § 7412(f)(2). EPA did that here: EPA's risk assessment considered the new technology standards established in the Final Rule and the anticipated emission reductions from those new requirements. Final Rule at 24118-24119 & tbl.18, JA0108-09; *id*. at 24119-22, JA0109-12; *supra* STATEMENT OF THE CASE § V.B. After factoring in the new technology standards, the risk posed by commercial sterilization facilities was still as high as 6000-in-1 million (based on allowable emissions)—far above what EPA considered acceptable. Final Rule at 24118-19, JA0108-09.

---

distinctions among classes, sizes, or types of sources were the Section 7412(f) risk-based standards.

Industry Petitioner interprets Section 7412(f)(2) as forbidding EPA from setting technology and risk-based standards in the same Federal Register notice. Industry Br. 31.

But nothing in Section 7412 requires sequential publication of related actions under Section 7412(d) and Section 7412(f)(2). Industry Petitioner's argument urges an inefficient use of the government's resources that is not required by the statute and should be rejected. *See, e.g.*, *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978) ("Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them.").

And, in any event, even if EPA was prohibited from setting technology and risk-based standards in the same Federal Register notice, because EPA complied with the substantive requirements of the Act, any error is harmless. 42 U.S.C.§ 7607(d)(8) ("[T]he court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.").

## IV. The Final Rule's Emission Standards Are Reasonable.

### A. The Emission Standards are Achievable for Sterilization Chamber Vents.

The only standard for Sterilization Chamber Vents that Industry Petitioner contests is the 99.99 percent emission reduction standard for facilities using 30 tons or more of ethylene oxide per year.[15] Industry Br. 34. The 99.99 percent emission reduction standard is a risk-based standard that EPA set after careful consideration of highly technical information. *Nat'l Lime,* 233 F.3d at 635 (An agency's factual findings that "require[] a high level of technical expertise" receive deference). Industry Petitioner raises only one issue, which concerns some of the performance test data that EPA considered, among other factors, in setting the standard. *Id.* Industry Petitioner ignores the record.

As EPA explained, its air dispersion modeling and analysis showed that a 99.99 percent reduction standard would eliminate Sterilization Chamber Vent emissions as a contributor to unacceptable public health risks for facilities using 30 tons or more of ethylene oxide per year. Final Rule at 24120, JA0110; *see also id.* at 24121-22, JA0111-12.

---

[15] Industry Petitioner does not challenge the other two measures necessary to eliminate Sterilization Chamber Vents emissions as a contributor to unacceptable levels of risks. These were 99.9 percent emission reduction for facilities using at least 10 but less than 30 tons per year of ethylene oxide, and 99.8 percent emission reduction for facilities using at least 1 but less than 10 tons per year of ethylene oxide.

EPA based its decision on performance testing data that shows at least 15 facilities are already achieving 99.99 percent emission reductions. Final Rule at 24124-25, JA0114-15. The Final Rule provided illustrations of two of them: the first performance test occurred in November 1999, at a facility using between 10 and 30 tons per year of ethylene oxide, and the second performance test occurred in March 2020, at a facility using 229.2 tons per year of ethylene oxide. *Id*. at 24124, JA0114. Both facilities used a wet scrubber system to control emissions from their Sterilization Chamber Vents, and the March 2020 facility also used gas/solid reactors to reduce emissions. *Id*.

For background, when removing ethylene oxide from the sterilization chamber, there are multiple evacuations of ethylene oxide gas, and each evacuation is captured by the Sterilization Chamber Vent. *Id*; *supra* STATEMENT OF THE CASE § II (description of the sterilization process). The first evacuation often has the highest amount of ethylene oxide, and the last evacuation has the least. Final Rule at 24124, JA0114.

During the November 1999 performance test, both the first and last evacuation cycles were tested: During the first evacuation, the wet scrubber was able to achieve a 99.9946 percent emission reduction, and during the final evacuation, a 99.99 percent emission reduction. *Id.*; EPA-HQ-OAR-2019-0178-0297, Attachment 1 at 9, JA0213. The November 1999 facility routed its

Sterilization Chamber Vent emissions to the wet scrubber and did not comingle the emissions from other sources. Final Rule at 24124, JA0114.

During the March 2020 performance test, the average emission reduction was 99.99%. *Id*.; EPA-HQ-OAR-2019-0178-0349 at 21, JA0234. Unlike the November 1999 facility, the March 2020 performance test facility routed multiple emission streams to a single stack after multiple types of emission control technologies reduced emissions from the Sterilization Chamber Vents, Chamber Exhaust Vents, Aeration Room Vents, and all Group 1 and Group 2 Room air emissions. *Id*. at 8 (Figure 2-1), JA0221. The test consisted of three runs, each run occurred on a different day, and each run lasted about 10 hours, during which there were multiple evacuations from 10 different sterilization chambers. The March 2020 facility was able to achieve a 99.99 percent emission reduction over an average 10-hour period for all its emission source and not just the emissions from Sterilization Chamber Vents. Final Rule at 24124, JA0114; EPA-HQ-OAR-2019-0178-0349 at 21, JA0234.

Industry Petitioner claims that prior performance tests only captured the first evacuation over a short period and were thus not representative of normal operating conditions. Industry Br. 34. But Industry Petitioner ignores the two performance tests EPA cited above in the Final Rule. Final Rule at 24124, JA0114. Neither of the November 1999 or March 2020 performance test suffers from

Industry Petitioner's alleged defect, and Industry Petitioner does not grapple with these two tests or provide examples of any other test it claims are not representative of operating conditions. *See* Industry Br. 34-35. Both performance tests show that a 99.99 percent emission reduction is achievable, whether Sterilization Chamber Vent emissions are segregated and treated separately (November 1999 test) or comingled and treated along with other emission sources (March 2020 test). Final Rule at 24124, JA0114.

EPA identified other performance test data showing that at least 15 facilities using at least 30 tons per year of ethylene oxide are already achieving emission reductions greater than 99.9946 percent on the first evacuation. *Id*. As the above shows, EPA "explained the available evidence" and "offered a rational connection" to the facts to its finding that 99.99 percent emission reduction of Sterilization Chamber Vent emissions is achievable at facilities using at least 30 tons per year of ethylene oxide (and in fact is already being achieved at many facilities).[16] *New York*, 413 F.3d at 31.

---

[16] As for Industry Petitioner's argument that required emission reductions cannot exceed the level guaranteed by manufacturers of emission controls, Industry Br. 36, as shown above, EPA based its decision on performance testing data that shows at least 15 facilities are already achieving 99.99 percent emission reductions (including the November 1999 and March 2020 performance tests). Final Rule at 24124-25, JA0114-15.

**B. The Emission Standards are Achievable for Aeration Room Vents.**

    **1. Industry Petitioner Forfeited its Argument and, in any Event, Existing Performance Test Data Reflects Normal Operating Conditions.**

Industry Petitioner challenges the standards for Aeration Room Vents at facilities using at least 10 tons per year of ethylene oxide, claiming that performance testing data does not reflect normal conditions. Industry Br. 37. But this argument is forfeited because no one raised it during the rulemaking. Under Section 7607(d)(7)(B), this Court may only consider "an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment." 42 U.S.C. § 7607(d)(7)(B). The Court "enforces this provision 'strictly.'" *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998).

But even if this argument were not forfeited, to support its argument that Aeration Room Vent performance test data is not representative of normal operating conditions, Industry Petitioner refers only to its argument about the Sterilization Chamber Vents performance tests. Industry Br. 37. As explained above, Industry Petitioner's only issue with Sterilization Chamber Vents performance tests was its incorrect argument that only the initial evacuation from the sterilization chamber was tested. That issue is irrelevant for Aeration Room Vent emissions because such emissions stem from a separate process with no

48

evacuation cycles. The emissions sent to the Aeration Room Vent come from sterilized products when they are stored in an aeration chamber or room, separate from the sterilization chamber, and those products off-gas ethylene oxide that is then sucked up by the Aeration Room Vent. *Supra* STATEMENT OF THE CASE § II (description of the sterilization process). In fact, one of the comments that Industry Petitioner favorably cited elsewhere argues that Aeration Room Vents should <u>not</u> have to follow the same performance testing procedures as Sterilization Chamber Vents because the latter's emissions can be (and often are) isolated from Aeration Room Vent emissions. Sterigenics Comments (Attach. 2) at p. 15, EPA-HQ-OAR-2019-0178-0632, JA0509. So even commenters critical of EPA's action still understood that Sterilization Chamber Vents and Aeration Room Vents have their own, unique performance testing differences.

Most importantly, EPA explained that "there are available performance test data for [Aeration Room Vents] that are representative of actual operating conditions." Final Rule at 24128, JA0118. Industry Petitioner cites nothing in the record to support its contention that EPA's test data for Aeration Room Vents is not representative.

Lastly, on feasibility, EPA explained that one-third of all existing facilities using at least 30 tons of ethylene oxide per year are already achieving a 99.9 percent emission reduction of their Aeration Room Vent emissions, which is the

new risk-based standard facilities using at least 30 tons of ethylene oxide per year. Final Rule at 24120, JA0110; Resp. to Comments at 58 (Response 4-5), JA0696. And three-fourths of all existing facilities using at least 10 tons of ethylene oxide per year are already achieving a 99.6 percent emission reduction of their Aeration Room Vent emissions, Final Rule at 24127-28, JA0117-18, which is the new risk-based standard for existing facilities using at least 10 but less than 30 tons of ethylene oxide per year. *Id*. at 24122, JA0112 (99.6 percent is also the new technology standard for all Aeration Room Vents at existing facilities using at least 10 tons of ethylene oxide per year).

### 2. An Alternative Concentration Based Standard is Not Necessary or Appropriate.

Industry Petitioner contends that there should be an alternative concentration-based standard for Aeration Room Vents at facilities using at least 10 tons per year of ethylene oxide because these emissions could be low enough that demonstrating compliance would require a test to detect levels of ethylene oxide below the detection limit. Industry Br. 37-38. But this argument ignores EPA's sound reasons against an alternative concentration standard.

First, responding to Industry Petitioner's concern that facilities might be unable to demonstrate compliance with the required 99.6 percent reduction, Industry Br. 37, EPA explained that the current representative detection level is 30 parts per billion, thus requiring pre-control ethylene oxide concentrations be at

least 7.5 parts per million to meet the 99.6 percent emission reduction standard and still detectable. Final Rule at 24128, JA0118; Resp. to Comments at 58 (Response 4-5), JA0696. Existing performance test data for Aeration Room Vents show that, of 86 test runs, 81 of them (94%) had a measured pre-control concentration greater than 7.5 parts per million, which suggests a very low likelihood any facility will have trouble demonstrating compliance because of low pre-control concentration based on the current operating conditions. Final Rule at 24128, JA0118. In addition, the 99.6 percent emission reduction standard for Aeration Room Vents ultimately applies to facilities where EtO use is between 10 and 30 tons per year, and EPA explained that this emission reduction "is already being achieved by these facilities." *Id*. at 24122, JA0112.

Second, EPA decided against any concentration-based standards for this source category as a general matter because "some owners and operators may dilute the air flow of the emissions stream to meet a concentration standard, which would not result in any actual emission reductions."[17] *Id*. at 24128, JA0118; Resp.

---

[17] Here, and throughout its brief, Industry Petitioner accuses EPA of not responding to comments. Industry Br. 39. But EPA did, in fact, respond to significant comments, including those identified in Industry Petitioner's brief. Here, Industry Petitioner cites another section of EPA's preamble as EPA's alleged non-response to the issue raised in Industry Petitioner's brief. Industry Br. 39 (citing EPA's statement summarizing its proposal's equivalency analysis for 1 part per million by volume concentration and 99 percent emission reduction, Final Rule at 24104, JA0094). But as shown above, EPA did respond to the exact issue

*Cont.*

to Comments at 58 (Response 4-5), JA0696. To ensure owners or operators cannot "game" their tests, a concentration standard would also require EPA to set "an upper-bound limit on the volumetric flow rate." Final Rule at 24108, JA0098. But setting any limit on volumetric flow could result in other problems because, for example, "additional flow may be needed in order to demonstrate compliance" or "to ensure worker health and safety." *Id*.

### C. EPA Reasonably Set the Maximum Deadlines Allowable Under Section 7412.

#### 1. The Clean Air Act Places Outer Limits on EPA's Authority to Set Compliance Deadlines.

Section 7412(f) sets forth the maximum compliance deadlines for meeting risk-based standards. EPA hewed to those statutory limits and could not, as Industry Petitioner urges, set longer deadlines. Industry Br. 40-41.

Section 7412(f)(4) sets a deadline of 90 days after the effective date for existing sources to comply with risk-based standards of a rule. 42 U.S.C. § 7412(f)(4)(A). But EPA can grant a waiver of the statutory default by extending the deadline up to two years after the rule's effective date. *Id.* § 7412(f)(4)(B). To

Industry Petitioner raised. Final Rule at 24108, 24128, JA0098, 0118. EPA did not specifically address the comment disputing EPA's equivalency analysis for 1 part per million by volume concentration and 99 percent emission reduction because that issue was rendered moot by EPA's decision to not have any concentration-based standard for other reasons, as described in this subsection. While Industry Petitioner may disagree with EPA's response to comments, that does not amount to failure to respond.

grant such an extension, EPA must determine that such period is necessary for the installation of controls and that steps will be taken during the waiver period to ensure that the health of persons will be protected from imminent endangerment. *Id*. The Act also provides a Presidential exemption that applies to compliance deadlines for both technology and risk-based standards. *Id*. § 7412(i)(4). The extension of up to 2 years may be granted if the President determines that the technology to implement such standard is unavailable and that it is in the national security interests of the United States to do so. *Id*.

In response to comments, EPA set the maximum amount of time allowed under the Clean Air Act—two years—for existing sources to meet the risk-based standards. EPA's decision not to exceed statutory authority cannot, as Industry Petitioner contends, be arbitrary and capricious conduct. Industry Br. 41; *see Reilly*, 976 F.2d at 40-41 (holding that EPA cannot delay effectiveness of a regulation beyond the Clean Air Act's deadline).

Industry Petitioner errs in asserting that EPA made no finding that two years was possible, Industry Br. 40, because EPA's extensive explanation belies that assertion. Based on comments and EPA's engagement with industry stakeholders, EPA found that facilities could comply with the two-year deadline set by Section 7412(f)(4) if they commence the emission reduction efforts right after the Final Rule took effect. Final Rule at 24102, JA0092; Final Regulatory Impact Analysis

at p. 1-18 (March 2024), EPA-HQ-OAR-2019-0178-1557, JA0586. Some facilities will also need to plan and design the upgrade, procure the upgrades, submit a permit application, and then install the upgrades. Final Rule at 24102, JA0092. EPA thus set the maximum two-year deadline for risk-based standards to provide owners and operators flexibility to stagger pauses in operation to install new controls. Final Rule at 24092, 24102, JA0082, JA0092; Final Regulatory Impact Analysis at p. 1-18, JA0586; *see also* Final Regulatory Impact Analysis App. A (Sensitivity Analysis) at 5, JA0627; Resp. to Comments at 345-46 (Response 9-15), JA0983-84. Based on this record, EPA reasonably concluded that two years is necessary (and the maximum allowed under the statute) to install controls required to meet the risk-based standards and also enough time to do so. Final Rule at 24102-03, JA0092-93.

Beyond granting the statutory maximum period to comply with the section 7412(f) standards, EPA took additional steps to account for the industry's timing concerns. EPA provided the statutory maximum of three years for technology standards, in part, to provide flexibilities to facilities that also need to make upgrades to meet risk-based standards first. *Id*. at 24103, JA0093; 42 U.S.C. § 7412(i)(3)(A), (B). EPA also provided a suggested step-by-step timeframe to ensure facilities meet the deadlines. Final Rule at 24102-03, JA0092-93. Industry

Petitioner cites no support in the record for its argument that these steps are not achievable.

EPA responded in detail to comments about impacts to the medical device supply chain. *See* Resp. to Comments at 345-46 (Response 9-15), JA0983-84; *contra* Industry Br. 40. To determine the standards' impacts to the supply chain, EPA extensively engaged with industry stakeholders and the Department of Health and Human Services and the Food and Drug Administration, federal agencies with expertise and responsibility for the medical device supply chain. Final Rule at 24092, JA0082. Through that engagement, EPA found that several facilities had begun to install the required controls before EPA even finalized the standards, and there were no reports of industry capacity issues as part of these control upgrades. Resp. to Comments at 345-46 (Response 9-15), JA0983-84; Final Regulatory Impact Analysis App. A at 5, JA0627. These facilities include those that the Food and Drug Administration identified as critical to the medical device supply chain. Resp. to Comments at 345-46 (Response 9-15), JA0983-84; Final Regulatory Impact Analysis at p. 1-17, JA0585. EPA will continue to work closely with the Food and Drug Administration and industry stakeholders to address impacts to the medical supply chain. Final Rule at 24092, JA0082.

## 2. EPA Complied with Section 7412(f)(4)(B).

Environmental Petitioners conversely argue that EPA failed to comply with Section 7412(f)(4)(B) and thus could not set the maximum 2-year compliance deadline.[18] But as described above, EPA thoroughly explained why more time was necessary. *Supra* ARGUMENT § IV.C.1.

Environmental Petitioners are wrong that EPA needed to make a finding that steps would be taken to protect against imminent endangerment under Section 7412(f)(4)(B). Enviro Br. 26. EPA never made a finding on whether the risks posed by Commercial Sterilizers amount to imminent endangerment. Rather, based on EPA's risk review, EPA found the risks over a lifetime of exposure triggered the need for the Final Rule's requirements for the commercial sterilization facilities source category. Final Rule at 24091, JA0081; *id.* at 24093 n.3, JA0083. Because EPA did not make any finding on imminent endangerment, EPA was not then required to ensure that steps will be taken to ensure people are protected from an imminent endangerment before extending the compliance deadline.

## D. EPA Reasonably Assessed the Final Rule's Costs and Benefits.

In the Final Rule, EPA considered costs consistent with Section 7412, and, more generally, considered compliance costs, and economic impacts. EPA also

---

[18] Environmental Petitioners do not challenge EPA's conclusion that the default 90-day compliance deadline is insufficient. Enviro Br. 25.

considered the rule's benefits, including public health benefits and air emission reduction benefits. *Contra* Industry Br. 44-45.

When setting the MACT floor, EPA cannot consider costs. Final Rule at 24096, JA0086; 42 U.S.C. § 7412(d)(3); *Nat'l Lime,* 233 F.3d at 640. Beyond-the-floor standards, by contrast, account for costs. Final Rule at 24096, JA0086; 42 U.S.C. § 7412(d)(2); *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 594-95 (D.C. Cir. 2016) (per curiam). EPA followed that statutory instruction here. *See, e.g.*, Final Rule at 24109-10, JA0099-100(Chamber Exhaust Vent cost considerations at major and area sources); *id*. at 24111-12, JA0101-02 (Group 1 Room air emission cost considerations at major and area sources); *id*. at 14113-14, JA0103-04 (Group 2 Room air emissions cost considerations at major and area sources).

Similarly, for risk-based standards under Section 7412(f)(2), at step one—where EPA determines what emission reductions are required to bring risk down to an acceptable level—EPA cannot (and did not) consider costs. Final Rule at 24117, JA0107; 42 U.S.C. § 7412(f)(2). At step two—where EPA determines whether additional reductions are needed to provide an ample margin of safety to protect public health—EPA does (and did) consider cost (along with a few other factors). Final Rule at 24121, JA0111; 42 U.S.C. § 7412(f)(2); *see, e.g.*, Final Rule at 24121-22, JA0111-12 (declining to impose stricter risk-based standards because of

costs for certain classes of Aeration Room Vents, Chamber Exhaust Vents, and Group 2 Room air emissions).

Industry Petitioner argues that the Final Rule's health benefits are "minimal," Industry Br. 46, but this ignores the record because this source category poses some of the highest public health risks ever analyzed by EPA under Section 7412. Accordingly, EPA found significant, nonmonetized benefits from the Final Rule. For example, for baseline risks based on actual emissions, 19,000 people live within 50 kilometers of a facility with a cancer-risk estimate above 100-in-1 million. Final Rule at 24117, JA0107. But after the Final Rule's risk-based standards, that number drops to zero people. The estimated cancer incidence would be reduced from one cancer case every 1.1 years to one cancer case every five to ten years. *Id*. at 24139, JA0129. Table 3 summarizes the significant reduction in cancer risks below the baseline because of the risk-based standards in the Final Rule:

TABLE 3—SUMMARY OF CANCER RISK REDUCTIONS

| | Current cancer risks— actual emissions | Current cancer risks— allowable emissions | Cancer risks after implementation of final amendments |
|---|---|---|---|
| Maximum Individual Risk (MIR) [1] | 6,000-in-1 million | 8,000-in-1 million [3] | 100-in-1 million. |
| Number of People with Cancer Risks >100-in-1 million | 19,000 | 260,000 | 0. |
| Number of People with Cancer Risks ≥1-in-1 million | 8.5 million | 62 million | 700,000 to 1.4 million.[2] |
| Estimated Annual Cancer Incidence (cases per year) | 0.9 | 8 | 0.1 to 0.2.[2] |

[1] The MIR or maximum individual lifetime cancer risk is defined as the increase in estimated cancer risk associated with a 70-year lifetime of continuous exposure at the highest concentration of HAP where people are likely to live.
[2] Ranges in values account for if all facilities were performing at the level of the standards (high end) to considering facilities that are currently performing better than the standards (low end).

*Id.* at 24095, JA0085. As the table shows, for baseline risks based on allowable emissions, the risk-based standards cause a reduction from 260,000 people to zero people within 50 kilometers of a facility with a cancer-risk estimate above 100-in-1 million. *Id*. For baseline risks based on actual or allowable emissions, the risk-based standards reduce cancer risks greater or equal to 1-in-1 million for millions of people within 50 kilometers of commercial sterilization facilities. *Id*.

After factoring in the new technology standards set in the Final Rule, the risks posed by the commercial sterilization source category are still between 5000-to-6000-in-1 million, with up to 3,900 people (actual emissions) to 260,000 people (allowable emissions) within 50 kilometers of commercial sterilization facilities. *Id*. at 24119 & tbl.18, JA0109. After the Final Rule's risk-based standards, that number drops to zero people. *Id*.

The technology and risk-based standards will also result in positive air quality benefits by reducing total ethylene oxide emissions nationwide by 21 tons per year (based on actual emissions) and by 150 tons per year (based on allowable emissions). *Id*. at 24137, JA0127.

Industry Petitioner argues that EPA's cost estimates allegedly underestimate costs of retrofitting certain facilities to comply with the new Group 1 and Group 2 Room air emissions standards, which will require a permanent total enclosure of these two sources of emissions to capture and control such emissions (i.e., route to

a control device). Industry Br. 44-45. But EPA reasonably explained how it estimated costs of permanent total enclosure requirements. Resp. to Comments at 103-04 (Response 4-50), JA0741-42. Limited data exists on these costs, so EPA used the "sixth-tenths" rule, a common method to estimate costs based on the size and capacity of a facility. *Id*.

The sole comment that Industry Petitioner cites here, Industry Br. 42, from Advanced Medical Technology Association, included estimates from its members but gave no information on the facilities that those estimates apply to, including size, throughput, or flow rate, etc. Resp. to Comments at 103-04 (Response 4-50), JA0741-42. Without that information, EPA could not evaluate the commenter's estimates or assess them against the agency's own cost estimates. *Id*.

Beyond its specific complaint about the retrofitting costs for complying with Group 1 and Group 2 Room air emissions standards, Industry Petitioner does not challenge any of the cost estimates conducted under Section 7412(d) or Section 7412(f)(2) to support the technology and risk-based standards for Sterilization Chamber Vents, Chamber Exhaust Vents, and Aeration Room Vents.[19] The costs associated with the rule are feasible because, as EPA explained in setting both

---

[19] Industry Petitioner argues that EPA was also required to consider other costs unrelated to those required under Section 7412(d) and Section 7412(f), such as alleged financial costs to "medical providers and patients." Industry Br. 45-46. But Industry Petitioner does not base this alleged deficiency in the law or the record.

technology and risk-based standards, many facilities are already meeting the standards. Final Rule at 24120-23 (risk-based standards), 24125-27 (technology standards), JA0110-13, JA0115-17; *see also* Proposal at 22808, JA0030.

Echoing a prior argument, Industry Petitioner contends that EPA ignored the cost effects on the medical device supply chain, Industry Br. 47, but as explained above, EPA addressed supply-chain issues in detail. *Supra* ARG § IV.C; Resp. to Comments at 387 (Response 9-37), JA1025; Final Regulatory Impact Analysis at 1-12 – 1-18, JA0580-86; *id*. at 5-1 – 5-17, JA0603-19.

EPA's consideration of medical device supply chain costs includes its explanation that the Final Rule's costs will be spread across different parts of the supply chain and that these compliance costs are minor relative to the value of the U.S. healthcare industry and unlikely to result in any price impact on end-use consumers. Resp. to Comments at 387 (Response 9-37), JA1025. Although some owners or operators might exit the market, EPA noted that commenters offered no information on how to quantify that effect. *Id*. EPA also notes that it set the compliance deadline to the maximum extent allowed under the statute to provide flexibilities and further reduce any potential effect on medical device pricing. *Id*.; *see generally* Final Regulatory Impact Analysis at 5-1 – 5-17, JA0603-19.

Industry Petitioner criticizes EPA for not monetizing the air quality and public health benefits, Industry Br. 46, but just because "those benefits are not

easily monetizable does not mean they are less valuable." *Sinclair Wyo. Refin. Co.*

*v. EPA*, 101 F.4th 871, 889 (D.C. Cir. 2024). EPA also explained that it "does not

have sufficient methods to monetize benefits associated with HAP, HAP

reductions, and risk reductions for this rulemaking." Final Rule at 24139, JA0129;

Resp. to Comments at 372 (Response 9-32) ("The benefits of reducing HAP

generally cannot be quantified or monetized due to data gaps."), JA1010. In

*Sinclair*, this Court rejected the same argument against crediting non-monetized

benefits. 101 F.4th at 889-90. Here, Congress made a policy choice to secure

maximum achievable reductions in toxic air emissions, a policy that it designed to

yield the benefit of reduced exposure to air toxics.[20]

---

[20] Industry Petitioner cites *Michigan v. EPA*, Industry Br. 44, but that case concerned a regulation under a different provision of the Clean Air Act, Section 7412(n)(1)(A), applying to power plants. 576 U.S. 743, 752 (2015). Even in that context, the Court did not hold that EPA must compare monetized costs and benefits and ignore nonmonetized benefits; just the opposite: "We need not and do not hold that the law" required EPA "to conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value." *Id*. at 759.

As for *City of Portland v. EPA*, Industry Br. 49, that case concerned a rule under the Safe Drinking Water Act where that Act explicitly required EPA to conduct a cost-benefit analysis when proposing a national primary drinking water regulation. 507 F.3d 706, 710 (D.C. Cir. 2007). And this Court ultimately held that the Act prohibited EPA from using that same cost-benefit analysis in setting final standards. *Id*. at 712-13.

Nor is the interagency review documentation cited by Industry Petitioner part of the administrative record.[21] Industry Br. 40 n.8, 44, 46 n.10. Thus, the Court cannot consider it. While the Clean Air Act requires that this documentation be posted to the public rulemaking docket, 42 U.S.C. § 7607(d)(4)(B)(ii), the Act also explicitly excludes them from the administrative record on review. 42 U.S.C. § 7607(d)(7)(A).

Industry Petitioner next argues that EPA failed to assess impacts to the availability of sterilized medical devices, Industry Br. 46-48, but EPA explained that there is "limited data available and uncertainty/complexity in estimating future supply chain impacts" and therefore it "is not able to estimate impacts on medical device availability and patients." Resp. to Comments at 383 (Response 9-35), JA1021. Industry Petitioner cites nothing in the record undermining EPA's conclusion. EPA also "made several changes to the final rule to reduce the potential for medical device supply chain impacts," including amending "the compliance timeline to reflect the maximum amount of time allowable under the CAA." *Id.*; *see also supra* ARGUMENT § IV.C.1. "The longer compliance

---

[21] On top of impermissibly citing extra-record, interagency materials, Industry Petitioner's citation is selective, highlighting only the Food and Drug Administration's interagency comments on the Proposal, Industry Br. 40 n. 8, 44, but ignoring the Food and Drug Administration's supportive interagency comments on the Final Rule. FDA Letter at 1-2 (dated February 27, 2024), EPA-HQ-OAR-2019-0178-1515 (Attachment 40), JA1141-42 (concurring with EPA's conclusions in the Final Rule).

timeframe is expected to provide enough flexibility for facilities to stagger the timing of their upgrades, and thus comply without affecting EtO sterilization capacity to a degree that causes device shortages." Resp. to Comments at 383 (Response 9-35), JA1021.

Lastly, Industry Petitioner cites one comment that speculates that the Final Rule may increase prices for medical devices and argues that this will result in health insurance companies dropping coverage for certain procedures or devices. Industry Br. 47-48. But no insurance companies commented on the Proposal and there is no evidence in the record to support this speculation. As EPA explained, "[r]elative to the value of the U.S. healthcare industry, the estimated costs of this rule are minor and thus the EPA does not expect major price impacts on patients." Resp. to Comments at 387 (Response 9-37), JA1025. Furthermore, "[m]edical devices are generally not final goods but inputs into delivering health care to consumers" and therefore "any price effects transmitted to end-use consumers are likely to be small." Final Regulatory Impact Analysis at p. 5-15, JA0617.

### E. EPA Responded to All Significant Comments on Its Use of the 2016 Cancer Risk Estimate for Ethylene Oxide.

EPA's 2016 cancer-risk estimate for ethylene oxide has been the subject of comment multiple times over the years in multiple fora, and many commenters raise the same issues repeatedly. That is the case here. Industry Petitioner claims EPA failed to respond to comments on why the 2016 cancer-risk estimate is

allegedly "flawed" and why EPA must consider background levels of ethylene oxide in the air to set standards. Industry Br. 49-50. But both lack merit. EPA responded to those comments.

First, EPA explained why commenters were wrong that the 2016 risk estimate overestimated cancer mortalities. In an almost 6-page long response, EPA explained that, among other things, the cancer-risk estimate is consistent with the results from the main epidemiology study that EPA had relied on in the 2016 estimate. Resp. to Comments at 158, JA0796. Industry Petitioner does not acknowledge these responses nor point to any deficiency in them.[22] Industry Br. 50.

Second, EPA responded to comments claiming that the 2016 risk estimate uses a biologically implausible mode of action. Resp. to Comments at 179-181 (Response 5-21), JA0817-19. EPA explained that the cancer-risk estimate was biologically plausible because it was based on an extensive review of studies on ethylene oxide's effects on animals and humans that show a relationship between ethylene oxide and cancer. *Id*. Furthermore, this issue of whether the 2016 risk estimate is biologically plausible was raised in *Huntsman Petrochemical LLC*, and

---

[22] Though Industry Petitioner claims EPA did not respond to any comments on the 2016 cancer-risk estimate's alleged "inconsist[ency] with underlying data and other evidence," Industry Br. 50, it offers no example of what type of underlying data or other evidence exists, let alone why it thinks EPA's responses to comments ignored any such data or evidence.

the D.C. Circuit upheld EPA's explanation, which is the same as EPA's explanation here. 114 F.4th at 739-740.

Third, EPA explained that, contrary to some commenters' contention, the 2016 risk estimate accounted for any background and endogenous ethylene oxide exposures in study participants. Resp. to Comments at 202-214 (Responses 5-24, 5-25, 5-26), JA0840-52. Industry Petitioner does not acknowledge these responses nor point to any deficiency in the responses. Industry Br. 50. Like the other issues above, EPA's response on this issue was upheld in *Huntsman*. 114 F.4th at 741-742.

Lastly, EPA responded to comments about differences in cancer rates in the public compared to sterilization facility workers. Resp. to Comments at 157-163 (Response 5-16), JA0795-801. This issue is sometimes known as the "healthy worker effect"—that is, occupational workers tend to be healthier than the general population. EPA's explanation of this effect and its role in the revised cancer-risk estimate was upheld in *Huntsman Petrochemical LLC*, 114 F.4th at 740. The main epidemiology study that EPA relied on had tracked cancer rates in sterilization facility workers and created an internal control group by comparing those workers exposed to ethylene oxide and those workers not exposed to it. Resp. to Comments at 157-163 (Response 5-16), JA0795-801. The study showed higher cancer rates in exposed workers than in the internal control group. *Id*.; *see also id*. at 131-32,

(Response 5-11) (discussing elevated breast cancer rates with increased exposure to ethylene oxide), JA0769-70; *id*. at 142-143 (Response 5-13) (same), JA0780-81; *id*. at 145-152 (Response 5-14) (discussing elevated lymphoid cancer rates with increased exposure to ethylene oxide), JA0783-90. Industry Petitioner does not acknowledge EPA's responses nor point to any deficiency in the responses. Industry Br. 50.

## V.  The Final Rule's Continuous Emissions Monitoring System Requirements Are Reasonable.

The Final Rule requires a continuous emission monitoring system for facilities using at least 100 pounds per year of ethylene oxide. This system, as its name suggests, can continuously monitor ethylene oxide concentrations in emissions. EPA had originally proposed to allow facilities to use either parametric monitoring[23] or continuous emissions monitoring. But after considering comments, EPA decided to allow only continuous emissions monitoring for facilities using at least 100 pounds per year of ethylene oxide. Final Rule at 24132, JA0122.

Contrary to Industry Petitioner's belief that there is no benefit to using continuous emissions monitoring, Industry Br. 52, EPA explained that even small amounts of ethylene oxide can pose large public health risks, and parametric

---

[23] Parametric monitoring is a system that monitors other parameters of emissions, such as temperature, pressure, or oxygen content but does not directly measure the regulated pollutant itself like continuous emissions monitoring systems do. *U.S. Sugar Corp.*, 830 F.3d at 654 n.39.

monitoring alone is not sensitive enough to detect small fluctuations. *Id*. Many

facilities in this source category are also reducing their ethylene oxide emissions

by using more than one control device, each with its own parametric monitoring

requirements. *Id*. This has led to the collection and processing of multiple

parameters simultaneously, resulting in unnecessary complexity and increasing the

time needed to diagnose and correct any problems. *Id*. Continuous emissions

monitoring systems, by contrast, simplify monitoring and have been proven as a

highly effective and feasible method for demonstrating compliance. *Id*.

Industry Petitioner disagrees with EPA's decision to require continuous

emissions monitoring systems and cites a comment that facilities will have to

suspend some or all operations to install the new monitoring systems. Industry Br.

52. But as EPA explained in response, most facilities will have to do that to

comply with other requirements anyway. Final Rule at 24102, JA0092 (outlining

timeline for compliance and suggesting continuous monitoring systems be installed

at same time as new controls).

EPA reasonably set the continuous emission monitoring system's sampling

interval at 15 minutes rather than 60 minutes. *Contra* Industry Br. 52-53. EPA

explained that a 15-minute sampling interval is consistent with EPA's general

requirement that a continuous monitoring system be capable of measuring once

each 15-minutes. Proposal at 22846, JA0068 (citing 40 C.F.R. § 63.8(c)(4)(ii)).

EPA declined to deviate from this general requirement based on just the one data set Industry Petitioner cited where a 15-minute vs. a 60-minute interval had a similar ability to accurately represent emissions. Resp. to Comment at 282 (Response 8-9), JA0920. Industry Petitioner's brief does not acknowledge or respond to EPA's explanation.

Industry Petitioner argues that because sterilization is done in batches, a longer monitoring interval would provide a better picture of emissions. But that argument was not raised in comments and thus is forfeited. 42 U.S.C. § 7607(d)(7)(B). Industry Petitioner cites only a comment advocating performance tests in lieu of *any* type of continuous monitoring. Industry Br. 53 (citing AdvaMed Comments 56, EPA-HQ-OAR-2019-0178-0601, JA0375). If Industry Petitioner believes a longer monitoring period is required to account for the batching, continuous emissions monitoring provides a theoretically infinite monitoring period, so Industry Petitioner's rationale would support continuous monitoring.

The Final Rule requires facilities to account for emissions during 90 percent of their total operating time, which provides a cushion as facilities begin installing, learning, and operating their new continuous monitoring system. Final Rule at 24133, JA0123. EPA often provides this cushion for when a new source category is subject to continuous emissions monitoring requirements for the first time. *Id*.

As those other industries' familiarity with the technology increased, their minimum data availability requirements also increased. *Id*.

Industry Petitioner flips this generous allowance on its head by arguing that a 90 percent data availability requirement does not consider that monitoring system malfunctions are "common." Industry Br. 54. But this argument was also not raised in comments and is forfeited. 42 U.S.C. § 7607(d)(7)(B). Industry Petitioner only cites a comment from a company admitting it had not yet installed any continuous emissions monitoring systems (but had plans to do so at four facilities), and the commenter did not quantify the frequency of malfunctions to compare against a 90 percent data availability requirement. *See* BD Comments at 8-9, EPA-HQ-OAR-2019-0178-0635, JA0547-48. Instead, the commenter argued that EPA should not require a facility to shut down during periods of monitoring malfunctions, *id*. which EPA did not. Final Rule at 24130, 24133, JA0120, JA0123. EPA explained that the 90 percent data availability requirement is to assist facilities that are unfamiliar with the technology and to account for monitoring malfunctions. *Id*. at 24130, JA0120. EPA noted that commenter did not provide any alterative recommendation for demonstrating compliance during a monitoring malfunction. *Id*.

Next, Industry Petitioner disputes the use of backup continuous emissions monitoring systems. Industry Br. 54. Though EPA suggested that backup systems

are useful because they provide an alternative in the event the primary monitoring system malfunctions, the Final Rule does not require a backup system. Final Rule at 24198, JA0188. EPA does not have to assess the costs associated with backup systems because it did not require them.

Industry Petitioner incorrectly asserts that EPA did not provide fair notice it might require continuous monitoring at the inlets of individual emission sources. Industry Br. 55. For background, facilities have two methods of reducing various sources' emissions: combining sources' emissions or keeping them separate (i.e., non-combined). In a non-combined-source facility, each sources' emissions (e.g., Sterilization Chamber Vent, Chamber Exhaust Vent, etc.) stay separate and are sent to separate pollution control devices. Final Rule at 24136, JA0126. At a combined-source facility, multiple sources' emissions are combined and sent to a centralized pollution control device. *Id.*

For combined sources, because each source could be subject to different standards, EPA proposed that facilities can demonstrate compliance by showing that the outlet of their centralized control device meets the most stringent standard among the combined sources (referred to in the Final Rule as Option 1). Proposal at 22852, JA0074; Final Rule at 24136, JA0126. In response to a comment objecting to Option 1, the Final Rule introduced Option 2, which allows a combined-source facility to calculate the required emission reduction target by

71

apportioning each pre-combined stream's own applicable standard. Final Rule at 24136, JA0126. This option is analogous to the non-combined-source facility that does not combine its emission sources and instead treats them individually. *Id*.

Industry Petitioner argues that EPA did not provide a meaningful opportunity to comment on Option 2, which requires monitoring each emission stream's inlet before combined with other emission streams. Industry Br. 56. But as explained above, Option 2 was added after the Proposal in response to comments asking for more flexibility at combined-facilities.[24] Final Rule at 24136, JA0126 (referring to Option 2). Regardless, EPA provided notice that it might require continuous monitoring at the inlets of individual emission sources. *See, e.g.*, Approaches for Determining Compliance with Proposed Subpart O, Ethylene Oxide (EtO) Emission Standards for Sterilization Facilities at 1, EPA-HQ-OAR-2019-0178-0476, JA0249 (continuous emission monitoring can "calculate removal efficiencies when samples are obtained from control device inlets and outlets").

A non-combined facility must always know the ethylene oxide amounts entering (inlet) and exiting (outlet) control technology systems. This is common sense: the only way to determine compliance with an "emission reduction"

---

[24] Along with Option 2, in response to comments, EPA provided two more options that would allow facilities to establish and demonstrate compliance with a site-wide emission limit. Final Rule at 24136-37, JA0126-27. Industry Petitioner does not challenge these other compliance methods.

standard would be to monitor both the inlet and the outlet (otherwise, there is no way to know whether you removed enough pollutant to comply with the emission reduction standard). Industry Petitioner's own comments reveal that it knew that EPA's proposal included inlet monitoring:

> EPA proposes to require continuous emission monitoring system (CEMS) in certain circumstances, demonstrating compliance with emission reduction limitations would require real time *inlet* and outlet monitoring/calculation of emission reduction.

EOSA Comments 9, EPA-HQ-OAR-2019-0178-0618, JA0416 (emphasis added); *see also id.* 41, JA0423 ("Demonstrating compliance with emission reduction limitations would require real time inlet and outlet monitoring/calculation of emission reduction to demonstrate compliance.").

In the Final Rule, EPA added Option 2, which requires the same type of inlet and outlet measuring envisioned by Industry Petitioner's comment. Final Rule at 24136, JA0126. So Industry Petitioner cannot claim that it had no chance to comment on Option 2's inlet-based monitoring approach. In any case, continuous emissions monitoring is simply performance testing on a continuous basis.[25]

---

[25] In both the proposed and final regulatory text, a "continuous monitoring system" is defined as "the equipment necessary to continuously sample the regulated parameter specified in § 63.364 or § 63.365 of this subpart without interruption." 40 C.F.R. § 63.361; Redline/Strikeout for proposed amendments to 40 CFR 63 Subpart O: Ethylene Oxide Emissions Standards for Sterilization Facilities ("Proposed Amendments") at 15, EPA-HQ-OAR-2019-0178-0486, JA0351. The parameters specified in 40 C.F.R. § 63.365, which governs performance testing,

*Cont.*

Sampling the inlet and outlet of a control device through performance testing has been a requirement for non-combined emission sources since the 1994 rule was promulgated. *See, e.g.*, 59 Fed. Reg. at 62597 ("continuously monitor ethylene oxide concentration at the inlet and outlet of the control device" during the last evacuation of the sterilization chamber). Industry Petitioner therefore "should have anticipated" that EPA could extend that approach to facilities that do combine their emission streams. *Agape Church v. FCC*, 738 F.3d 397, 412 (D.C. Cir. 2013). Thus, EPA's Option 2 is a logical outgrowth and shows EPA addressed comments it received. *NRDC v. Thomas*, 838 F.2d 1224, 1242 (D.C. Cir. 1988) (holding that EPA's new source performance standard in the final rule was a logical outgrowth of the proposed rule because the "germ" of this standard was in the original proposal).

Lastly, Industry Petitioner is wrong that the Final Rule will require its members to purchase and install a "substantial" number of continuous monitoring systems. As EPA explained, these systems can be configured so that a single system can measure at multiple points (a concept known as "time-sharing"). Proposal at 22846, JA0068; Final Rule at 24152-53, JA0142-43 (providing

---

include sampling of ethylene oxide at the inlet and outlet of the control device. 40 C.F.R. § 63.365(d)(3); Proposed Amendments at 40, JA____ (using total mass of ethylene oxide to and from the control device to determine emission reduction or control efficiency).

requirements of time-sharing to monitor multiple measurement points with one system). That is, a facility need not to have a separate continuous emissions monitoring system for every single measurement point.

## VI. EPA Reasonably Declined to Require Facilities to Obtain Title V Operating Permits.

The Clean Air Act requires area source facilities with emission standards under Section 7412 to acquire an operating permit under Title V of the Clean Air Act. 42 U.S.C. § 7661a(a). But EPA may exempt an area source category from the operating permit requirement if "in the Administrator's discretion and consistent with the applicable provisions of this chapter" the Administrator finds that compliance with such requirements is "impracticable, infeasible, or unnecessarily burdensome on such categories." *Id*. To make this finding, EPA uses a "four-factor balancing test." Final Rule at 24136, JA0126. The four factors are:

1. Whether an operating permit would result in significant improvements to the compliance requirements, including monitoring, recordkeeping, and reporting that are proposed for the area source category.

2. Whether an operating permit would impose significant burdens on the area source category and whether the burdens would be aggravated by any difficulty in obtaining assistance from permitting authorities.

3. Whether the costs of an operating permit for area sources would be justified considering any potential gains in compliance likely to occur for such sources.

4. Whether adequate oversight by State and local permitting authorities could achieve high compliance with the Section 7412 emission standards without relying on an operating permit.

Final Rule at 24134-35, JA0124-25.

Based on these factors, EPA in 2005 exempted area sources of commercial sterilization facilities from operating permit requirements. 70 Fed. Reg. 75320 (Dec. 19, 2005). Here, EPA proposed to remove this exemption, Proposal at 22851 n.67, JA0073. But considering the comments received, EPA once again found that, on balance, the four factors did not warrant requiring Commercial Sterilizer area sources to obtain operating permits. Final Rule at 24136, JA0126.

In reaching this conclusion, EPA recognized that the comments undermined its basis for the proposed removal of the exemption and reasonably changed its mind. *See Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*, 628 F. Supp. 3d 189, 210-211 (D.D.C. 2022), *aff'd*, No. 22-5295, 2024 WL 3083338 (D.C. Cir. June 21, 2024) (changes to proposal based on comments received means the final rule is a logical outgrowth of the proposal and not an unsupported change in position). Indeed, EPA's actions here are what the public comment process is all about.

Though Environmental Petitioners argue that EPA did not explain why it changed its mind in the Final Rule on this issue, they ignore the record. Enviro Br. 31-32. At proposal, EPA found the costs of an operating permit were justified considering the "compliance benefits of additional informational, monitoring, reporting, certification, and enforcement requirements." Proposal at 22851,

JA0073. But in the Final Rule, EPA made changes that strengthened its informational, monitoring, reporting, and enforcement requirements, thus rendering operating permit requirements redundant. Final Rule at 24136, JA0126.

EPA determined that compliance costs associated with the operating permit are not justified because the Final Rule now provided many of the same safeguards. *Contra* Enviro Br. 38. For example, in the Proposal, EPA proposed that facilities could show compliance by either continuous emissions monitoring or an alternative option that combined annual performance tests with continuous parameter monitoring. Proposal at 22794, JA0016. But in the Final Rule, EPA removed the alterative option and required continuous emissions monitoring for facilities that use more than 100 pounds of ethylene oxide per year. *Supra* ARGUMENT § V. And the Final Rule requires quarterly, public reporting of the emissions data captured by mandatory continuous emissions monitoring. Final Rule at 24136, JA0126. These requirements now mean the compliance status of a facility is easier for the public to determine and an operating permit's monitoring and reporting requirements are redundant. *Id*. Thus, the original basis in the Proposal for justifying the compliance costs of an operating permit proved invalid. *Contra* Enviro Br. 38.

Contrary to Environmental Petitioner's argument, Enviro Br. 32-33, EPA explained why public participation would not be harmed by exempting area

sources from operating permit requirements. EPA received comments that challenged its initial justification in the Proposal. Final Rule at 24135, JA0125. For example, commenters noted that the only difference between the proposed requirements and the operating permit process is that the latter has a public comment requirement, but because many facilities subject to the Final Rule will also need to obtain construction permits to install their new controls, and those construction permits generally still go through public comment, requiring operating permit for that purpose is redundant and unwarranted. *Id*. at 24134-35, JA0124-25. EPA, in short, reasonably changed its mind considering comments that undermined its initial justification. *Ctr. for Biological Diversity*, 628 F. Supp. 3d at 210-211; *see also Sierra Club v. Costle*, 657 F.2d 298, 352-53 (D.C. Cir. 1981) (It "is entirely proper and often necessary for the agency to continue its deliberations and internal decisionmaking process after the close of public comment in order to assimilate those comments and arrive at a policy choice."). And as noted above, public transparency is still promoted in the Final Rule because it requires quarterly, public reporting of all data captured by the continuous emissions monitoring systems.[26]

---

[26] Concerned citizens can use this quarterly, public monitoring reports to review compliance and bring citizen suit enforcement cases if a facility is out of compliance. 42 U.S.C. § 7604(a) ("any person may commence a civil action on his own behalf against any person . . . who is alleged to have violated (if there is

*Cont.*

Similarly, contrary to Environmental Petitioner's argument, EPA received comments undermining its initial proposal that an operating permit is necessary given the complexity of emission standards. Enviro Br. 34-35. In the Proposal, EPA said that its new requirements are more complex than the prior 2006 standards, thus this source category might benefit from operating permit requirements. Proposal at 22851, JA0073. But EPA then received comments explaining that, whereas the complexity envisioned by requiring an operating permit kicks in when a facility is subject to many types of emission standards, commercial sterilizers are generally only subject to an emission standard for ethylene oxide. Final Rule at 24134, JA0124. So, in the Final Rule, EPA agreed that the key benefit of the operating permit—to clarify, in a single document, the various and complex regulations that apply to a facility—is not realized here because commercial sterilization facilities are generally subject to only one set of Section 7412 standards. *Id*. Again, EPA has a right to change its position if it receives comments that it believes undermined the initial proposal.

For those reasons, in declining to require operating permits, EPA "explained the available evidence" and offered a "rational connection" to the facts and its decision. *New York*, 413 F.3d at 31.

---

evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.").

# CONCLUSION

The Court should deny the petitions for review.

Dated February 24, 2025

Respectfully submitted,

Lisa Lynne Russell
Deputy Assistant Attorney General

/s/ Jeffrey Hammons
Jeffrey Hammons
U.S. Department of Justice
Environment & Natural Resources Div.
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 598-6925
jeffrey.hammons@usdoj.gov

*Of counsel*
Amy Huang Branning
U.S. Environmental Protection Agency
Office of General Counsel
Washington, DC

## CERTIFICATES OF COMPLIANCE AND SERVICE

I certify that this brief complies with Fed. R. App. P. 32(a)(5) and (6) because it uses 14-point Times New Roman, a proportionally spaced font.

I also certify that this brief complies with Fed. R. App. P. 32(a)(7)(B) because according to Microsoft Word's count, it has 17,888 words, excluding the parts of the brief exempted under Rule 32(f).

Finally, I certify that on February 24, 2025, I electronically filed this brief with the Court's CM/ECF system, which will serve each party.

*/s/ Jeffrey Hammons*
Jeffrey Hammons

# U.S. COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

——————————

California Communities Against Toxics, Clean Power
Lake County, Comité Diálogo Ambiental, Rio Grande International
Study Center, Sierra Club, and Union of Concerned Scientists.
Petitioners (No. 24-1178)

Ethylene Oxide Sterilization Association,
Petitioner (No. 24-1180)

v.

U.S. Environmental Protection Agency and Jane Nishida, Acting Administrator,
Respondents.

——————————

Petition for Review of Rule of the U.S. Environmental Protection Agency

——————————

## EPA'S STATUTORY ADDENDUM

——————————

Todd Kim
Assistant Attorney General

Jeffrey Hammons
U.S. Department of Justice
Environment & Natural Resources Div.
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(202) 598-6925
jeffrey.hammons@usdoj.gov

*Of counsel*
Amy Huang Branning
U.S. Environmental Protection
Agency
Office of General Counsel
Washington, DC

# TABLE OF CONTENTS

42 U.S.C. § 7412.............................................................................ADD-001

42 U.S.C. § 7607.............................................................................ADD-031


such regulations are proposed that, at a minimum, require any source subject to such revised standards to emit sulfur dioxide at a rate not greater than would have resulted from compliance by such source with the applicable standards of performance under this section [amending sections 7411 and 7479 of this title] prior to such revision.

''(c) APPLICABILITY.—The provisions of subsections (a) [amending this section] and (b) apply only so long as the provisions of section 403(e) of the Clean Air Act [42 U.S.C. 7651b(e)] remain in effect.''

### PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### Executive Documents

### TRANSFER OF FUNCTIONS

Enforcement functions of Administrator or other official in Environmental Protection Agency related to compliance with new source performance standards under this section with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for the Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, eff. July 1, 1979, §§ 102(a), 203(a), 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

### POWER SECTOR CARBON POLLUTION STANDARDS

Memorandum of President of the United States, June 25, 2013, 78 F.R. 39535, which related to carbon pollution standards for power plants, was revoked by Ex. Ord. No. 13783, § 3(a)(ii), Mar. 28, 2017, 82 F.R. 16094, formerly set out as a note under section 13201 of this title.

## § 7412. Hazardous air pollutants

### (a) Definitions

For purposes of this section, except subsection (r)—

### (1) Major source

The term ''major source'' means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. The Administrator may establish a lesser quantity, or in the case of radionuclides different criteria, for a major source than that specified in the previous sentence, on the basis of the potency of the air pollutant, persistence, potential for bioaccumulation, other characteristics of the air pollutant, or other relevant factors.

### (2) Area source

The term ''area source'' means any stationary source of hazardous air pollutants that is not a major source. For purposes of this section, the term ''area source'' shall not include motor vehicles or nonroad vehicles subject to regulation under subchapter II.

### (3) Stationary source

The term ''stationary source'' shall have the same meaning as such term has under section 7411(a) of this title.

### (4) New source

The term ''new source'' means a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source.

### (5) Modification

The term ''modification'' means any physical change in, or change in the method of operation of, a major source which increases the actual emissions of any hazardous air pollutant emitted by such source by more than a de minimis amount or which results in the emission of any hazardous air pollutant not previously emitted by more than a de minimis amount.

### (6) Hazardous air pollutant

The term ''hazardous air pollutant'' means any air pollutant listed pursuant to subsection (b).

### (7) Adverse environmental effect

The term ''adverse environmental effect'' means any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas.

### (8) Electric utility steam generating unit

The term ''electric utility steam generating unit'' means any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale. A unit that cogenerates steam and electricity and supplies more than one-third of its potential electric output capacity and more than 25

megawatts electrical output to any utility power distribution system for sale shall be considered an electric utility steam generating unit.

**(9) Owner or operator**

The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

**(10) Existing source**

The term "existing source" means any stationary source other than a new source.

**(11) Carcinogenic effect**

Unless revised, the term "carcinogenic effect" shall have the meaning provided by the Administrator under Guidelines for Carcinogenic Risk Assessment as of the date of enactment.[1] Any revisions in the existing Guidelines shall be subject to notice and opportunity for comment.

**(b) List of pollutants**

**(1) Initial list**

The Congress establishes for purposes of this section a list of hazardous air pollutants as follows:

| CAS number | Chemical name |
|---|---|
| 75070 | Acetaldehyde |
| 60355 | Acetamide |
| 75058 | Acetonitrile |
| 98862 | Acetophenone |
| 53963 | 2-Acetylaminofluorene |
| 107028 | Acrolein |
| 79061 | Acrylamide |
| 79107 | Acrylic acid |
| 107131 | Acrylonitrile |
| 107051 | Allyl chloride |
| 92671 | 4-Aminobiphenyl |
| 62533 | Aniline |
| 90040 | o-Anisidine |
| 1332214 | Asbestos |
| 71432 | Benzene (including benzene from gasoline) |
| 92875 | Benzidine |
| 98077 | Benzotrichloride |
| 100447 | Benzyl chloride |
| 92524 | Biphenyl |
| 117817 | Bis(2-ethylhexyl)phthalate (DEHP) |
| 542881 | Bis(chloromethyl)ether |
| 75252 | Bromoform |
| 106990 | 1,3-Butadiene |
| 156627 | Calcium cyanamide |
| 105602 | Caprolactam |
| 133062 | Captan |
| 63252 | Carbaryl |
| 75150 | Carbon disulfide |
| 56235 | Carbon tetrachloride |
| 463581 | Carbonyl sulfide |
| 120809 | Catechol |
| 133904 | Chloramben |
| 57749 | Chlordane |
| 7782505 | Chlorine |
| 79118 | Chloroacetic acid |
| 532274 | 2-Chloroacetophenone |
| 108907 | Chlorobenzene |
| 510156 | Chlorobenzilate |
| 67663 | Chloroform |
| 107302 | Chloromethyl methyl ether |
| 126998 | Chloroprene |
| 1319773 | Cresols/Cresylic acid (isomers and mixture) |
| 95487 | o-Cresol |

| CAS number | Chemical name |
|---|---|
| 108394 | m-Cresol |
| 106445 | p-Cresol |
| 98828 | Cumene |
| 94757 | 2,4-D, salts and esters |
| 3547044 | DDE |
| 334883 | Diazomethane |
| 132649 | Dibenzofurans |
| 96128 | 1,2-Dibromo-3-chloropropane |
| 84742 | Dibutylphthalate |
| 106467 | 1,4-Dichlorobenzene(p) |
| 91941 | 3,3-Dichlorobenzidene |
| 111444 | Dichloroethyl ether (Bis(2-chloroethyl)ether) |
| 542756 | 1,3-Dichloropropene |
| 62737 | Dichlorvos |
| 111422 | Diethanolamine |
| 121697 | N,N-Diethyl aniline (N,N-Dimethylaniline) |
| 64675 | Diethyl sulfate |
| 119904 | 3,3-Dimethoxybenzidine |
| 60117 | Dimethyl aminoazobenzene |
| 119937 | 3,3'-Dimethyl benzidine |
| 79447 | Dimethyl carbamoyl chloride |
| 68122 | Dimethyl formamide |
| 57147 | 1,1-Dimethyl hydrazine |
| 131113 | Dimethyl phthalate |
| 77781 | Dimethyl sulfate |
| 534521 | 4,6-Dinitro-o-cresol, and salts |
| 51285 | 2,4-Dinitrophenol |
| 121142 | 2,4-Dinitrotoluene |
| 123911 | 1,4-Dioxane (1,4-Diethyleneoxide) |
| 122667 | 1,2-Diphenylhydrazine |
| 106898 | Epichlorohydrin (l-Chloro-2,3-epoxypropane) |
| 106887 | 1,2-Epoxybutane |
| 140885 | Ethyl acrylate |
| 100414 | Ethyl benzene |
| 51796 | Ethyl carbamate (Urethane) |
| 75003 | Ethyl chloride (Chloroethane) |
| 106934 | Ethylene dibromide (Dibromoethane) |
| 107062 | Ethylene dichloride (1,2-Dichloroethane) |
| 107211 | Ethylene glycol |
| 151564 | Ethylene imine (Aziridine) |
| 75218 | Ethylene oxide |
| 96457 | Ethylene thiourea |
| 75343 | Ethylidene dichloride (1,1-Dichloroethane) |
| 50000 | Formaldehyde |
| 76448 | Heptachlor |
| 118741 | Hexachlorobenzene |
| 87683 | Hexachlorobutadiene |
| 77474 | Hexachlorocyclopentadiene |
| 67721 | Hexachloroethane |
| 822060 | Hexamethylene-1,6-diisocyanate |
| 680319 | Hexamethylphosphoramide |
| 110543 | Hexane |
| 302012 | Hydrazine |
| 7647010 | Hydrochloric acid |
| 7664393 | Hydrogen fluoride (Hydrofluoric acid) |
| 123319 | Hydroquinone |
| 78591 | Isophorone |
| 58899 | Lindane (all isomers) |
| 108316 | Maleic anhydride |
| 67561 | Methanol |
| 72435 | Methoxychlor |
| 74839 | Methyl bromide (Bromomethane) |
| 74873 | Methyl chloride (Chloromethane) |
| 71556 | Methyl chloroform (1,1,1-Trichloroethane) |
| 78933 | Methyl ethyl ketone (2-Butanone) |
| 60344 | Methyl hydrazine |
| 74884 | Methyl iodide (Iodomethane) |
| 108101 | Methyl isobutyl ketone (Hexone) |
| 624839 | Methyl isocyanate |
| 80626 | Methyl methacrylate |
| 1634044 | Methyl tert butyl ether |
| 101144 | 4,4-Methylene bis(2-chloroaniline) |
| 75092 | Methylene chloride (Dichloromethane) |
| 101688 | Methylene diphenyl diisocyanate (MDI) |
| 101779 | 4,4'-Methylenedianiline |
| 91203 | Naphthalene |
| 98953 | Nitrobenzene |

---

[1] See References in Text note below.

| CAS number | Chemical name |
|---|---|
| 92933 | 4-Nitrobiphenyl |
| 100027 | 4-Nitrophenol |
| 79469 | 2-Nitropropane |
| 684935 | N-Nitroso-N-methylurea |
| 62759 | N-Nitrosodimethylamine |
| 59892 | N-Nitrosomorpholine |
| 56382 | Parathion |
| 82688 | Pentachloronitrobenzene (Quintobenzene) |
| 87865 | Pentachlorophenol |
| 108952 | Phenol |
| 106503 | p-Phenylenediamine |
| 75445 | Phosgene |
| 7803512 | Phosphine |
| 7723140 | Phosphorus |
| 85449 | Phthalic anhydride |
| 1336363 | Polychlorinated biphenyls (Aroclors) |
| 1120714 | 1,3-Propane sultone |
| 57578 | beta-Propiolactone |
| 123386 | Propionaldehyde |
| 114261 | Propoxur (Baygon) |
| 78875 | Propylene dichloride (1,2-Dichloropropane) |
| 75569 | Propylene oxide |
| 75558 | 1,2-Propylenimine (2-Methyl aziridine) |
| 91225 | Quinoline |
| 106514 | Quinone |
| 100425 | Styrene |
| 96093 | Styrene oxide |
| 1746016 | 2,3,7,8-Tetrachlorodibenzo-p-dioxin |
| 79345 | 1,1,2,2-Tetrachloroethane |
| 127184 | Tetrachloroethylene (Perchloroethylene) |
| 7550450 | Titanium tetrachloride |
| 108883 | Toluene |
| 95807 | 2,4-Toluene diamine |
| 584849 | 2,4-Toluene diisocyanate |
| 95534 | o-Toluidine |
| 8001352 | Toxaphene (chlorinated camphene) |
| 120821 | 1,2,4-Trichlorobenzene |
| 79005 | 1,1,2-Trichloroethane |
| 79016 | Trichloroethylene |
| 95954 | 2,4,5-Trichlorophenol |
| 88062 | 2,4,6-Trichlorophenol |
| 121448 | Triethylamine |
| 1582098 | Trifluralin |
| 540841 | 2,2,4-Trimethylpentane |
| 108054 | Vinyl acetate |
| 593602 | Vinyl bromide |
| 75014 | Vinyl chloride |
| 75354 | Vinylidene chloride (1,1-Dichloroethylene) |
| 1330207 | Xylenes (isomers and mixture) |
| 95476 | o-Xylenes |
| 108383 | m-Xylenes |
| 106423 | p-Xylenes |
| 0 | Antimony Compounds |
| 0 | Arsenic Compounds (inorganic including arsine) |
| 0 | Beryllium Compounds |
| 0 | Cadmium Compounds |
| 0 | Chromium Compounds |
| 0 | Cobalt Compounds |
| 0 | Coke Oven Emissions |
| 0 | Cyanide Compounds [1] |
| 0 | Glycol ethers [2] |
| 0 | Lead Compounds |
| 0 | Manganese Compounds |
| 0 | Mercury Compounds |
| 0 | Fine mineral fibers [3] |
| 0 | Nickel Compounds |
| 0 | Polycyclic Organic Matter [4] |
| 0 | Radionuclides (including radon) [5] |
| 0 | Selenium Compounds |

NOTE: For all listings above which contain the word "compounds" and for glycol ethers, the following applies: Unless otherwise specified, these listings are defined as including any unique chemical substance that contains the named chemical (i.e., antimony, arsenic, etc.) as part of that chemical's infrastructure.

[1] X'CN where X = H' or any other group where a formal dissociation may occur. For example KCN or Ca(CN)$_2$.

[2] Includes mono- and di- ethers of ethylene glycol, diethylene glycol, and triethylene glycol R–(OCH2CH2)$_n$–OR' where

n = 1, 2, or 3
R = alkyl or aryl groups
R' = R, H, or groups which, when removed, yield glycol ethers with the structure: R–(OCH2CH)$_n$–OH. Polymers are excluded from the glycol category.

[3] Includes mineral fiber emissions from facilities manufacturing or processing glass, rock, or slag fibers (or other mineral derived fibers) of average diameter 1 micrometer or less.

[4] Includes organic compounds with more than one benzene ring, and which have a boiling point greater than or equal to 100°C.

[5] A type of atom which spontaneously undergoes radioactive decay.

**(2) Revision of the list**

The Administrator shall periodically review the list established by this subsection and publish the results thereof and, where appropriate, revise such list by rule, adding pollutants which present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects (including, but not limited to, substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic) or adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise, but not including releases subject to regulation under subsection (r) as a result of emissions to the air. No air pollutant which is listed under section 7408(a) of this title may be added to the list under this section, except that the prohibition of this sentence shall not apply to any pollutant which independently meets the listing criteria of this paragraph and is a precursor to a pollutant which is listed under section 7408(a) of this title or to any pollutant which is in a class of pollutants listed under such section. No substance, practice, process or activity regulated under subchapter VI of this chapter shall be subject to regulation under this section solely due to its adverse effects on the environment.

**(3) Petitions to modify the list**

(A) Beginning at any time after 6 months after November 15, 1990, any person may petition the Administrator to modify the list of hazardous air pollutants under this subsection by adding or deleting a substance or, in case of listed pollutants without CAS numbers (other than coke oven emissions, mineral fibers, or polycyclic organic matter) removing certain unique substances. Within 18 months after receipt of a petition, the Administrator shall either grant or deny the petition by publishing a written explanation of the reasons for the Administrator's decision. Any such petition shall include a showing by the petitioner that there is adequate data on the health or environmental defects [2] of the pollutant or other evidence adequate to support the petition. The Administrator may not deny a petition solely

[2] So in original. Probably should be "effects".

on the basis of inadequate resources or time for review.

(B) The Administrator shall add a substance to the list upon a showing by the petitioner or on the Administrator's own determination that the substance is an air pollutant and that emissions, ambient concentrations, bioaccumulation or deposition of the substance are known to cause or may reasonably be anticipated to cause adverse effects to human health or adverse environmental effects.

(C) The Administrator shall delete a substance from the list upon a showing by the petitioner or on the Administrator's own determination that there is adequate data on the health and environmental effects of the substance to determine that emissions, ambient concentrations, bioaccumulation or deposition of the substance may not reasonably be anticipated to cause any adverse effects to the human health or adverse environmental effects.

(D) The Administrator shall delete one or more unique chemical substances that contain a listed hazardous air pollutant not having a CAS number (other than coke oven emissions, mineral fibers, or polycyclic organic matter) upon a showing by the petitioner or on the Administrator's own determination that such unique chemical substances that contain the named chemical of such listed hazardous air pollutant meet the deletion requirements of subparagraph (C). The Administrator must grant or deny a deletion petition prior to promulgating any emission standards pursuant to subsection (d) applicable to any source category or subcategory of a listed hazardous air pollutant without a CAS number listed under subsection (b) for which a deletion petition has been filed within 12 months of November 15, 1990.

**(4) Further information**

If the Administrator determines that information on the health or environmental effects of a substance is not sufficient to make a determination required by this subsection, the Administrator may use any authority available to the Administrator to acquire such information.

**(5) Test methods**

The Administrator may establish, by rule, test measures and other analytic procedures for monitoring and measuring emissions, ambient concentrations, deposition, and bioaccumulation of hazardous air pollutants.

**(6) Prevention of significant deterioration**

The provisions of part C (prevention of significant deterioration) shall not apply to pollutants listed under this section.

**(7) Lead**

The Administrator may not list elemental lead as a hazardous air pollutant under this subsection.

**(c) List of source categories**

**(1) In general**

Not later than 12 months after November 15, 1990, the Administrator shall publish, and shall from time to time, but no less often than every 8 years, revise, if appropriate, in response to public comment or new information, a list of all categories and subcategories of major sources and area sources (listed under paragraph (3)) of the air pollutants listed pursuant to subsection (b). To the extent practicable, the categories and subcategories listed under this subsection shall be consistent with the list of source categories established pursuant to section 7411 of this title and part C. Nothing in the preceding sentence limits the Administrator's authority to establish subcategories under this section, as appropriate.

**(2) Requirement for emissions standards**

For the categories and subcategories the Administrator lists, the Administrator shall establish emissions standards under subsection (d), according to the schedule in this subsection and subsection (e).

**(3) Area sources**

The Administrator shall list under this subsection each category or subcategory of area sources which the Administrator finds presents a threat of adverse effects to human health or the environment (by such sources individually or in the aggregate) warranting regulation under this section. The Administrator shall, not later than 5 years after November 15, 1990, and pursuant to subsection (k)(3)(B), list, based on actual or estimated aggregate emissions of a listed pollutant or pollutants, sufficient categories or subcategories of area sources to ensure that area sources representing 90 percent of the area source emissions of the 30 hazardous air pollutants that present the greatest threat to public health in the largest number of urban areas are subject to regulation under this section. Such regulations shall be promulgated not later than 10 years after November 15, 1990.

**(4) Previously regulated categories**

The Administrator may, in the Administrator's discretion, list any category or subcategory of sources previously regulated under this section as in effect before November 15, 1990.

**(5) Additional categories**

In addition to those categories and subcategories of sources listed for regulation pursuant to paragraphs (1) and (3), the Administrator may at any time list additional categories and subcategories of sources of hazardous air pollutants according to the same criteria for listing applicable under such paragraphs. In the case of source categories and subcategories listed after publication of the initial list required under paragraph (1) or (3), emission standards under subsection (d) for the category or subcategory shall be promulgated within 10 years after November 15, 1990, or within 2 years after the date on which such category or subcategory is listed, whichever is later.

**(6) Specific pollutants**

With respect to alkylated lead compounds, polycyclic organic matter, hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-

tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin, the Administrator shall, not later than 5 years after November 15, 1990, list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4). Such standards shall be promulgated not later than 10 years after November 15, 1990. This paragraph shall not be construed to require the Administrator to promulgate standards for such pollutants emitted by electric utility steam generating units.

**(7) Research facilities**

The Administrator shall establish a separate category covering research or laboratory facilities, as necessary to assure the equitable treatment of such facilities. For purposes of this section, ''research or laboratory facility'' means any stationary source whose primary purpose is to conduct research and development into new processes and products, where such source is operated under the close supervision of technically trained personnel and is not engaged in the manufacture of products for commercial sale in commerce, except in a de minimis manner.

**(8) Boat manufacturing**

When establishing emissions standards for styrene, the Administrator shall list boat manufacturing as a separate subcategory unless the Administrator finds that such listing would be inconsistent with the goals and requirements of this chapter.

**(9) Deletions from the list**

(A) Where the sole reason for the inclusion of a source category on the list required under this subsection is the emission of a unique chemical substance, the Administrator shall delete the source category from the list if it is appropriate because of action taken under either subparagraphs (C) or (D) of subsection (b)(3).

(B) The Administrator may delete any source category from the list under this subsection, on petition of any person or on the Administrator's own motion, whenever the Administrator makes the following determination or determinations, as applicable:

(i) In the case of hazardous air pollutants emitted by sources in the category that may result in cancer in humans, a determination that no source in the category (or group of sources in the case of area sources) emits such hazardous air pollutants in quantities which may cause a lifetime risk of cancer greater than one in one million to the individual in the population who is most exposed to emissions of such pollutants from the source (or group of sources in the case of area sources).

(ii) In the case of hazardous air pollutants that may result in adverse health effects in humans other than cancer or adverse environmental effects, a determination that emissions from no source in the category or subcategory concerned (or group of sources in the case of area sources) exceed a level

which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source (or from a group of sources in the case of area sources).

The Administrator shall grant or deny a petition under this paragraph within 1 year after the petition is filed.

**(d) Emission standards**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation pursuant to subsection (c) in accordance with the schedules provided in subsections (c) and (e). The Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards except that, there shall be no delay in the compliance date for any standard applicable to any source under subsection (i) as the result of the authority provided by this sentence.

**(2) Standards and methods**

Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which—

(A) reduce the volume of, or eliminate emissions of, such pollutants through process changes, substitution of materials or other modifications,

(B) enclose systems or processes to eliminate emissions,

(C) collect, capture or treat such pollutants when released from a process, stack, storage or fugitive emissions point,

(D) are design, equipment, work practice, or operational standards (including requirements for operator training or certification) as provided in subsection (h), or

(E) are a combination of the above.

None of the measures described in subparagraphs (A) through (D) shall, consistent with the provisions of section 7414(c) of this title, in any way compromise any United States patent or United States trademark right, or any confidential business information, or any trade secret or any other intellectual property right.

**(3) New and existing sources**

The maximum degree of reduction in emissions that is deemed achievable for new sources in a category or subcategory shall not

be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator. Emission standards promulgated under this subsection for existing sources in a category or subcategory may be less stringent than standards for new sources in the same category or subcategory but shall not be less stringent, and may be more stringent than—

(A) the average emission limitation achieved by the best performing 12 percent of the existing sources (for which the Administrator has emissions information), excluding those sources that have, within 18 months before the emission standard is proposed or within 30 months before such standard is promulgated, whichever is later, first achieved a level of emission rate or emission reduction which complies, or would comply if the source is not subject to such standard, with the lowest achievable emission rate (as defined by section 7501 of this title) applicable to the source category and prevailing at the time, in the category or subcategory for categories and subcategories with 30 or more sources, or

(B) the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information) in the category or subcategory for categories or subcategories with fewer than 30 sources.

**(4) Health threshold**

With respect to pollutants for which a health threshold has been established, the Administrator may consider such threshold level, with an ample margin of safety, when establishing emission standards under this subsection.

**(5) Alternative standard for area sources**

With respect only to categories and subcategories of area sources listed pursuant to subsection (c), the Administrator may, in lieu of the authorities provided in paragraph (2) and subsection (f), elect to promulgate standards or requirements applicable to sources in such categories or subcategories which provide for the use of generally available control technologies or management practices by such sources to reduce emissions of hazardous air pollutants.

**(6) Review and revision**

The Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

**(7) Other requirements preserved**

No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D, or other authority of this chapter or a standard issued under State authority.

**(8) Coke ovens**

(A) Not later than December 31, 1992, the Administrator shall promulgate regulations establishing emission standards under paragraphs (2) and (3) of this subsection for coke oven batteries. In establishing such standards, the Administrator shall evaluate—

(i) the use of sodium silicate (or equivalent) luting compounds to prevent door leaks, and other operating practices and technologies for their effectiveness in reducing coke oven emissions, and their suitability for use on new and existing coke oven batteries, taking into account costs and reasonable commercial door warranties; and

(ii) as a basis for emission standards under this subsection for new coke oven batteries that begin construction after the date of proposal of such standards, the Jewell design Thompson non-recovery coke oven batteries and other non-recovery coke oven technologies, and other appropriate emission control and coke production technologies, as to their effectiveness in reducing coke oven emissions and their capability for production of steel quality coke.

Such regulations shall require at a minimum that coke oven batteries will not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing oven doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries shall be December 31, 1995.

(B) The Administrator shall promulgate work practice regulations under this subsection for coke oven batteries requiring, as appropriate—

(i) the use of sodium silicate (or equivalent) luting compounds, if the Administrator determines that use of sodium silicate is an effective means of emissions control and is achievable, taking into account costs and reasonable commercial warranties for doors and related equipment; and

(ii) door and jam cleaning practices.

Notwithstanding subsection (i), the compliance date for such work practice regulations for coke oven batteries shall be not later than the date 3 years after November 15, 1990.

(C) For coke oven batteries electing to qualify for an extension of the compliance date for standards promulgated under subsection (f) in accordance with subsection (i)(8), the emission standards under this subsection for coke oven batteries shall require that coke oven batteries not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries seeking an extension shall be not later than the date 3 years after November 15, 1990.

### (9) Sources licensed by the Nuclear Regulatory Commission

No standard for radionuclide emissions from any category or subcategory of facilities licensed by the Nuclear Regulatory Commission (or an Agreement State) is required to be promulgated under this section if the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission pursuant to the Atomic Energy Act [42 U.S.C. 2011 et seq.] for such category or subcategory provides an ample margin of safety to protect the public health. Nothing in this subsection shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce any standard or limitation respecting emissions of radionuclides which is more stringent than the standard or limitation in effect under section 7411 of this title or this section.

### (10) Effective date

Emission standards or other regulations promulgated under this subsection shall be effective upon promulgation.

## (e) Schedule for standards and review

### (1) In general

The Administrator shall promulgate regulations establishing emission standards for categories and subcategories of sources initially listed for regulation pursuant to subsection (c)(1) as expeditiously as practicable, assuring that—

(A) emission standards for not less than 40 categories and subcategories (not counting coke oven batteries) shall be promulgated not later than 2 years after November 15, 1990;

(B) emission standards for coke oven batteries shall be promulgated not later than December 31, 1992;

(C) emission standards for 25 per centum of the listed categories and subcategories shall be promulgated not later than 4 years after November 15, 1990;

(D) emission standards for an additional 25 per centum of the listed categories and subcategories shall be promulgated not later than 7 years after November 15, 1990; and

(E) emission standards for all categories and subcategories shall be promulgated not later than 10 years after November 15, 1990.

### (2) Priorities

In determining priorities for promulgating standards under subsection (d), the Administrator shall consider—

(A) the known or anticipated adverse effects of such pollutants on public health and the environment;

(B) the quantity and location of emissions or reasonably anticipated emissions of hazardous air pollutants that each category or subcategory will emit; and

(C) the efficiency of grouping categories or subcategories according to the pollutants emitted, or the processes or technologies used.

### (3) Published schedule

Not later than 24 months after November 15, 1990, and after opportunity for comment, the Administrator shall publish a schedule establishing a date for the promulgation of emission standards for each category and subcategory of sources listed pursuant to subsection (c)(1) and (3) which shall be consistent with the requirements of paragraphs (1) and (2). The determination of priorities for the promulgation of standards pursuant to this paragraph is not a rulemaking and shall not be subject to judicial review, except that, failure to promulgate any standard pursuant to the schedule established by this paragraph shall be subject to review under section 7604 of this title.

### (4) Judicial review

Notwithstanding section 7607 of this title, no action of the Administrator adding a pollutant to the list under subsection (b) or listing a source category or subcategory under subsection (c) shall be a final agency action subject to judicial review, except that any such action may be reviewed under such section 7607 of this title when the Administrator issues emission standards for such pollutant or category.

### (5) Publicly owned treatment works

The Administrator shall promulgate standards pursuant to subsection (d) applicable to publicly owned treatment works (as defined in title II of the Federal Water Pollution Control Act [33 U.S.C. 1281 et seq.]) not later than 5 years after November 15, 1990.

## (f) Standard to protect health and environment

### (1) Report

Not later than 6 years after November 15, 1990, the Administrator shall investigate and report, after consultation with the Surgeon General and after opportunity for public comment, to Congress on—

(A) methods of calculating the risk to public health remaining, or likely to remain, from sources subject to regulation under this section after the application of standards under subsection (d);

(B) the public health significance of such estimated remaining risk and the technologically and commercially available methods and costs of reducing such risks;

(C) the actual health effects with respect to persons living in the vicinity of sources, any available epidemiological or other health studies, risks presented by background concentrations of hazardous air pollutants, any uncertainties in risk assessment methodology or other health assessment technique, and any negative health or environmental consequences to the community of efforts to reduce such risks; and

(D) recommendations as to legislation regarding such remaining risk.

### (2) Emission standards

(A) If Congress does not act on any recommendation submitted under paragraph (1), the Administrator shall, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d), promulgate standards for such category or subcategory if promulgation of such

standards is required in order to provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) unless the Administrator determines that a more stringent standard is necessary to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. If standards promulgated pursuant to subsection (d) and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, the Administrator shall promulgate standards under this subsection for such source category.

(B) Nothing in subparagraph (A) or in any other provision of this section shall be construed as affecting, or applying to the Administrator's interpretation of this section, as in effect before November 15, 1990, and set forth in the Federal Register of September 14, 1989 (54 Federal Register 38044).

(C) The Administrator shall determine whether or not to promulgate such standards and, if the Administrator decides to promulgate such standards, shall promulgate the standards 8 years after promulgation of the standards under subsection (d) for each source category or subcategory concerned. In the case of categories or subcategories for which standards under subsection (d) are required to be promulgated within 2 years after November 15, 1990, the Administrator shall have 9 years after promulgation of the standards under subsection (d) to make the determination under the preceding sentence and, if required, to promulgate the standards under this paragraph.

**(3) Effective date**

Any emission standard established pursuant to this subsection shall become effective upon promulgation.

**(4) Prohibition**

No air pollutant to which a standard under this subsection applies may be emitted from any stationary source in violation of such standard, except that in the case of an existing source—

(A) such standard shall not apply until 90 days after its effective date, and

(B) the Administrator may grant a waiver permitting such source a period of up to 2 years after the effective date of a standard to comply with the standard if the Administrator finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment.

**(5) Area sources**

The Administrator shall not be required to conduct any review under this subsection or promulgate emission limitations under this subsection for any category or subcategory of area sources that is listed pursuant to subsection (c)(3) and for which an emission standard is promulgated pursuant to subsection (d)(5).

**(6) Unique chemical substances**

In establishing standards for the control of unique chemical substances of listed pollutants without CAS numbers under this subsection, the Administrator shall establish such standards with respect to the health and environmental effects of the substances actually emitted by sources and direct transformation byproducts of such emissions in the categories and subcategories.

**(g) Modifications**

**(1) Offsets**

(A) A physical change in, or change in the method of operation of, a major source which results in a greater than de minimis increase in actual emissions of a hazardous air pollutant shall not be considered a modification, if such increase in the quantity of actual emissions of any hazardous air pollutant from such source will be offset by an equal or greater decrease in the quantity of emissions of another hazardous air pollutant (or pollutants) from such source which is deemed more hazardous, pursuant to guidance issued by the Administrator under subparagraph (B). The owner or operator of such source shall submit a showing to the Administrator (or the State) that such increase has been offset under the preceding sentence.

(B) The Administrator shall, after notice and opportunity for comment and not later than 18 months after November 15, 1990, publish guidance with respect to implementation of this subsection. Such guidance shall include an identification, to the extent practicable, of the relative hazard to human health resulting from emissions to the ambient air of each of the pollutants listed under subsection (b) sufficient to facilitate the offset showing authorized by subparagraph (A). Such guidance shall not authorize offsets between pollutants where the increased pollutant (or more than one pollutant in a stream of pollutants) causes adverse effects to human health for which no safety threshold for exposure can be determined unless there are corresponding decreases in such types of pollutant(s).

**(2) Construction, reconstruction and modifications**

(A) After the effective date of a permit program under subchapter V in any State, no person may modify a major source of hazardous air pollutants in such State, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for existing sources will be met. Such determination shall be made on a case-by-case basis where no applicable emissions limitations have been established by the Administrator.

(B) After the effective date of a permit program under subchapter V in any State, no person may construct or reconstruct any major source of hazardous air pollutants, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met. Such determination shall be made on a case-by-case basis where no applicable emission limitations have been established by the Administrator.

**(3) Procedures for modifications**

The Administrator (or the State) shall establish reasonable procedures for assuring that the requirements applying to modifications under this section are reflected in the permit.

**(h) Work practice standards and other requirements**

**(1) In general**

For purposes of this section, if it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, the Administrator may, in lieu thereof, promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in the Administrator's judgment is consistent with the provisions of subsection (d) or (f). In the event the Administrator promulgates a design or equipment standard under this subsection, the Administrator shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(2) Definition**

For the purpose of this subsection, the phrase "not feasible to prescribe or enforce an emission standard" means any situation in which the Administrator determines that—

(A) a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State or local law, or

(B) the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations.

**(3) Alternative standard**

If after notice and opportunity for comment, the owner or operator of any source establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

**(4) Numerical standard required**

Any standard promulgated under paragraph (1) shall be promulgated in terms of an emission standard whenever it is feasible to promulgate and enforce a standard in such terms.

**(i) Schedule for compliance**

**(1) Preconstruction and operating requirements**

After the effective date of any emission standard, limitation, or regulation under subsection (d), (f) or (h), no person may construct any new major source or reconstruct any existing major source subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V) determines that such source, if properly constructed, reconstructed and operated, will comply with the standard, regulation or limitation.

**(2) Special rule**

Notwithstanding the requirements of paragraph (1), a new source which commences construction or reconstruction after a standard, limitation or regulation applicable to such source is proposed and before such standard, limitation or regulation is promulgated shall not be required to comply with such promulgated standard until the date 3 years after the date of promulgation if—

(A) the promulgated standard, limitation or regulation is more stringent than the standard, limitation or regulation proposed; and

(B) the source complies with the standard, limitation, or regulation as proposed during the 3-year period immediately after promulgation.

**(3) Compliance schedule for existing sources**

(A) After the effective date of any emissions standard, limitation or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation or regulation except, in the case of an existing source, the Administrator shall establish a compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard, except as provided in subparagraph (B) and paragraphs (4) through (8).

(B) The Administrator (or a State with a program approved under subchapter V) may issue a permit that grants an extension permitting an existing source up to 1 additional year to comply with standards under subsection (d) if such additional period is necessary for the installation of controls. An additional extension of up to 3 years may be added for mining waste operations, if the 4-year compliance time is insufficient to dry and cover mining waste in order to reduce emissions of any pollutant listed under subsection (b).

**(4) Presidential exemption**

The President may exempt any stationary source from compliance with any standard or limitation under this section for a period of not more than 2 years if the President deter-

mines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years. The President shall report to Congress with respect to each exemption (or extension thereof) made under this paragraph.

**(5) Early reduction**

(A) The Administrator (or a State acting pursuant to a permit program approved under subchapter V) shall issue a permit allowing an existing source, for which the owner or operator demonstrates that the source has achieved a reduction of 90 per centum or more in emissions of hazardous air pollutants (95 per centum in the case of hazardous air pollutants which are particulates) from the source, to meet an alternative emission limitation reflecting such reduction in lieu of an emission limitation promulgated under subsection (d) for a period of 6 years from the compliance date for the otherwise applicable standard, provided that such reduction is achieved before the otherwise applicable standard under subsection (d) is first proposed. Nothing in this paragraph shall preclude a State from requiring reductions in excess of those specified in this subparagraph as a condition of granting the extension authorized by the previous sentence.

(B) An existing source which achieves the reduction referred to in subparagraph (A) after the proposal of an applicable standard but before January 1, 1994, may qualify under subparagraph (A), if the source makes an enforceable commitment to achieve such reduction before the proposal of the standard. Such commitment shall be enforceable to the same extent as a regulation under this section.

(C) The reduction shall be determined with respect to verifiable and actual emissions in a base year not earlier than calendar year 1987, provided that, there is no evidence that emissions in the base year are artificially or substantially greater than emissions in other years prior to implementation of emissions reduction measures. The Administrator may allow a source to use a baseline year of 1985 or 1986 provided that the source can demonstrate to the satisfaction of the Administrator that emissions data for the source reflects verifiable data based on information for such source, received by the Administrator prior to November 15, 1990, pursuant to an information request issued under section 7414 of this title.

(D) For each source granted an alternative emission limitation under this paragraph there shall be established by a permit issued pursuant to subchapter V an enforceable emission limitation for hazardous air pollutants reflecting the reduction which qualifies the source for an alternative emission limitation under this paragraph. An alternative emission limitation under this paragraph shall not be available with respect to standards or requirements promulgated pursuant to subsection (f) and the Administrator shall, for the purpose of determining whether a standard under sub-

section (f) is necessary, review emissions from sources granted an alternative emission limitation under this paragraph at the same time that other sources in the category or subcategory are reviewed.

(E) With respect to pollutants for which high risks of adverse public health effects may be associated with exposure to small quantities including, but not limited to, chlorinated dioxins and furans, the Administrator shall by regulation limit the use of offsetting reductions in emissions of other hazardous air pollutants from the source as counting toward the 90 per centum reduction in such high-risk pollutants qualifying for an alternative emissions limitation under this paragraph.

**(6) Other reductions**

Notwithstanding the requirements of this section, no existing source that has installed—

(A) best available control technology (as defined in section 7479(3) of this title), or

(B) technology required to meet a lowest achievable emission rate (as defined in section 7501 of this title),

prior to the promulgation of a standard under this section applicable to such source and the same pollutant (or stream of pollutants) controlled pursuant to an action described in subparagraph (A) or (B) shall be required to comply with such standard under this section until the date 5 years after the date on which such installation or reduction has been achieved, as determined by the Administrator. The Administrator may issue such rules and guidance as are necessary to implement this paragraph.

**(7) Extension for new sources**

A source for which construction or reconstruction is commenced after the date an emission standard applicable to such source is proposed pursuant to subsection (d) but before the date an emission standard applicable to such source is proposed pursuant to subsection (f) shall not be required to comply with the emission standard under subsection (f) until the date 10 years after the date construction or reconstruction is commenced.

**(8) Coke ovens**

(A) Any coke oven battery that complies with the emission limitations established under subsection (d)(8)(C), subparagraph (B), and subparagraph (C), and complies with the provisions of subparagraph (E), shall not be required to achieve emission limitations promulgated under subsection (f) until January 1, 2020.

(B)(i) Not later than December 31, 1992, the Administrator shall promulgate emission limitations for coke oven emissions from coke oven batteries. Notwithstanding paragraph (3) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 1998. Such emission limitations shall reflect the lowest achievable emission rate as defined in section 7501 of this title for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than—

(I) 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

(II) 1 per centum leaking lids;

(III) 4 per centum leaking offtakes; and

(IV) 16 seconds visible emissions per charge,

with an exclusion for emissions during the period after the closing of self-sealing oven doors (or the total mass emissions equivalent). The rulemaking in which such emission limitations are promulgated shall also establish an appropriate measurement methodology for determining compliance with such emission limitations, and shall establish such emission limitations in terms of an equivalent level of mass emissions reduction from a coke oven battery, unless the Administrator finds that such a mass emissions standard would not be practicable or enforceable. Such measurement methodology, to the extent it measures leaking doors, shall take into consideration alternative test methods that reflect the best technology and practices actually applied in the affected industries, and shall assure that the final test methods are consistent with the performance of such best technology and practices.

(ii) If the Administrator fails to promulgate such emission limitations under this subparagraph prior to the effective date of such emission limitations, the emission limitations applicable to coke oven batteries under this subparagraph shall be—

(I) 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

(II) 1 per centum leaking lids;

(III) 4 per centum leaking offtakes; and

(IV) 16 seconds visible emissions per charge,

or the total mass emissions equivalent (if the total mass emissions equivalent is determined to be practicable and enforceable), with no exclusion for emissions during the period after the closing of self-sealing oven doors.

(C) Not later than January 1, 2007, the Administrator shall review the emission limitations promulgated under subparagraph (B) and revise, as necessary, such emission limitations to reflect the lowest achievable emission rate as defined in section 7501 of this title at the time for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than the emission limitation promulgated under subparagraph (B). Notwithstanding paragraph (2) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 2010.

(D) At any time prior to January 1, 1998, the owner or operator of any coke oven battery may elect to comply with emission limitations promulgated under subsection (f) by the date such emission limitations would otherwise apply to such coke oven battery, in lieu of the emission limitations and the compliance dates provided under subparagraphs (B) and (C) of this paragraph. Any such owner or operator shall be legally bound to comply with such emission limitations promulgated under sub-

section (f) with respect to such coke oven battery as of January 1, 2003. If no such emission limitations have been promulgated for such coke oven battery, the Administrator shall promulgate such emission limitations in accordance with subsection (f) for such coke oven battery.

(E) Coke oven batteries qualifying for an extension under subparagraph (A) shall make available not later than January 1, 2000, to the surrounding communities the results of any risk assessment performed by the Administrator to determine the appropriate level of any emission standard established by the Administrator pursuant to subsection (f).

(F) Notwithstanding the provisions of this section, reconstruction of any source of coke oven emissions qualifying for an extension under this paragraph shall not subject such source to emission limitations under subsection (f) more stringent than those established under subparagraphs (B) and (C) until January 1, 2020. For the purposes of this subparagraph, the term "reconstruction" includes the replacement of existing coke oven battery capacity with new coke oven batteries of comparable or lower capacity and lower potential emissions.

## (j) Equivalent emission limitation by permit

### (1) Effective date

The requirements of this subsection shall apply in each State beginning on the effective date of a permit program established pursuant to subchapter V in such State, but not prior to the date 42 months after November 15, 1990.

### (2) Failure to promulgate a standard

In the event that the Administrator fails to promulgate a standard for a category or subcategory of major sources by the date established pursuant to subsection (e)(1) and (3), and beginning 18 months after such date (but not prior to the effective date of a permit program under subchapter V), the owner or operator of any major source in such category or subcategory shall submit a permit application under paragraph (3) and such owner or operator shall also comply with paragraphs (5) and (6).

### (3) Applications

By the date established by paragraph (2), the owner or operator of a major source subject to this subsection shall file an application for a permit. If the owner or operator of a source has submitted a timely and complete application for a permit required by this subsection, any failure to have a permit shall not be a violation of paragraph (2), unless the delay in final action is due to the failure of the applicant to timely submit information required or requested to process the application. The Administrator shall not later than 18 months after November 15, 1990, and after notice and opportunity for comment, establish requirements for applications under this subsection including a standard application form and criteria for determining in a timely manner the completeness of applications.

### (4) Review and approval

Permit applications submitted under this subsection shall be reviewed and approved or

disapproved according to the provisions of section 7661d of this title. In the event that the Administrator (or the State) disapproves a permit application submitted under this subsection or determines that the application is incomplete, the applicant shall have up to 6 months to revise the application to meet the objections of the Administrator (or the State).

**(5) Emission limitation**

The permit shall be issued pursuant to subchapter V and shall contain emission limitations for the hazardous air pollutants subject to regulation under this section and emitted by the source that the Administrator (or the State) determines, on a case-by-case basis, to be equivalent to the limitation that would apply to such source if an emission standard had been promulgated in a timely manner under subsection (d). In the alternative, if the applicable criteria are met, the permit may contain an emissions limitation established according to the provisions of subsection (i)(5). For purposes of the preceding sentence, the reduction required by subsection (i)(5)(A) shall be achieved by the date on which the relevant standard should have been promulgated under subsection (d). No such pollutant may be emitted in amounts exceeding an emission limitation contained in a permit immediately for new sources and, as expeditiously as practicable, but not later than the date 3 years after the permit is issued for existing sources or such other compliance date as would apply under subsection (i).

**(6) Applicability of subsequent standards**

If the Administrator promulgates an emission standard that is applicable to the major source prior to the date on which a permit application is approved, the emission limitation in the permit shall reflect the promulgated standard rather than the emission limitation determined pursuant to paragraph (5), provided that the source shall have the compliance period provided under subsection (i). If the Administrator promulgates a standard under subsection (d) that would be applicable to the source in lieu of the emission limitation established by permit under this subsection after the date on which the permit has been issued, the Administrator (or the State) shall revise such permit upon the next renewal to reflect the standard promulgated by the Administrator providing such source a reasonable time to comply, but no longer than 8 years after such standard is promulgated or 8 years after the date on which the source is first required to comply with the emissions limitation established by paragraph (5), whichever is earlier.

**(k) Area source program**

**(1) Findings and purpose**

The Congress finds that emissions of hazardous air pollutants from area sources may individually, or in the aggregate, present significant risks to public health in urban areas. Considering the large number of persons exposed and the risks of carcinogenic and other adverse health effects from hazardous air pollutants, ambient concentrations characteristic of large urban areas should be reduced to levels substantially below those currently experienced. It is the purpose of this subsection to achieve a substantial reduction in emissions of hazardous air pollutants from area sources and an equivalent reduction in the public health risks associated with such sources including a reduction of not less than 75 per centum in the incidence of cancer attributable to emissions from such sources.

**(2) Research program**

The Administrator shall, after consultation with State and local air pollution control officials, conduct a program of research with respect to sources of hazardous air pollutants in urban areas and shall include within such program—

(A) ambient monitoring for a broad range of hazardous air pollutants (including, but not limited to, volatile organic compounds, metals, pesticides and products of incomplete combustion) in a representative number of urban locations;

(B) analysis to characterize the sources of such pollution with a focus on area sources and the contribution that such sources make to public health risks from hazardous air pollutants; and

(C) consideration of atmospheric transformation and other factors which can elevate public health risks from such pollutants.

Health effects considered under this program shall include, but not be limited to, carcinogenicity, mutagenicity, teratogenicity, neurotoxicity, reproductive dysfunction and other acute and chronic effects including the role of such pollutants as precursors of ozone or acid aerosol formation. The Administrator shall report the preliminary results of such research not later than 3 years after November 15, 1990.

**(3) National strategy**

(A) Considering information collected pursuant to the monitoring program authorized by paragraph (2), the Administrator shall, not later than 5 years after November 15, 1990, and after notice and opportunity for public comment, prepare and transmit to the Congress a comprehensive strategy to control emissions of hazardous air pollutants from area sources in urban areas.

(B) The strategy shall—

(i) identify not less than 30 hazardous air pollutants which, as the result of emissions from area sources, present the greatest threat to public health in the largest number of urban areas and that are or will be listed pursuant to subsection (b), and

(ii) identify the source categories or subcategories emitting such pollutants that are or will be listed pursuant to subsection (c). When identifying categories and subcategories of sources under this subparagraph, the Administrator shall assure that sources accounting for 90 per centum or more of the aggregate emissions of each of the 30 identified hazardous air pollutants are subject to standards pursuant to subsection (d).

(C) The strategy shall include a schedule of specific actions to substantially reduce the public health risks posed by the release of hazardous air pollutants from area sources that will be implemented by the Administrator under the authority of this or other laws (including, but not limited to, the Toxic Substances Control Act [15 U.S.C. 2601 et seq.], the Federal Insecticide, Fungicide and Rodenticide Act [7 U.S.C. 136 et seq.] and the Resource Conservation and Recovery Act [42 U.S.C. 6901 et seq.]) or by the States. The strategy shall achieve a reduction in the incidence of cancer attributable to exposure to hazardous air pollutants emitted by stationary sources of not less than 75 per centum, considering control of emissions of hazardous air pollutants from all stationary sources and resulting from measures implemented by the Administrator or by the States under this or other laws.

(D) The strategy may also identify research needs in monitoring, analytical methodology, modeling or pollution control techniques and recommendations for changes in law that would further the goals and objectives of this subsection.

(E) Nothing in this subsection shall be interpreted to preclude or delay implementation of actions with respect to area sources of hazardous air pollutants under consideration pursuant to this or any other law and that may be promulgated before the strategy is prepared.

(F) The Administrator shall implement the strategy as expeditiously as practicable assuring that all sources are in compliance with all requirements not later than 9 years after November 15, 1990.

(G) As part of such strategy the Administrator shall provide for ambient monitoring and emissions modeling in urban areas as appropriate to demonstrate that the goals and objectives of the strategy are being met.

**(4) Areawide activities**

In addition to the national urban air toxics strategy authorized by paragraph (3), the Administrator shall also encourage and support areawide strategies developed by State or local air pollution control agencies that are intended to reduce risks from emissions by area sources within a particular urban area. From the funds available for grants under this section, the Administrator shall set aside not less than 10 per centum to support areawide strategies addressing hazardous air pollutants emitted by area sources and shall award such funds on a demonstration basis to those States with innovative and effective strategies. At the request of State or local air pollution control officials, the Administrator shall prepare guidelines for control technologies or management practices which may be applicable to various categories or subcategories of area sources.

**(5) Report**

The Administrator shall report to the Congress at intervals not later than 8 and 12 years after November 15, 1990, on actions taken under this subsection and other parts of this chapter to reduce the risk to public health posed by the release of hazardous air pollutants from area sources. The reports shall also identify specific metropolitan areas that continue to experience high risks to public health as the result of emissions from area sources.

**(l) State programs**

**(1) In general**

Each State may develop and submit to the Administrator for approval a program for the implementation and enforcement (including a review of enforcement delegations previously granted) of emission standards and other requirements for air pollutants subject to this section or requirements for the prevention and mitigation of accidental releases pursuant to subsection (r). A program submitted by a State under this subsection may provide for partial or complete delegation of the Administrator's authorities and responsibilities to implement and enforce emissions standards and prevention requirements but shall not include authority to set standards less stringent than those promulgated by the Administrator under this chapter.

**(2) Guidance**

Not later than 12 months after November 15, 1990, the Administrator shall publish guidance that would be useful to the States in developing programs for submittal under this subsection. The guidance shall also provide for the registration of all facilities producing, processing, handling or storing any substance listed pursuant to subsection (r) in amounts greater than the threshold quantity. The Administrator shall include as an element in such guidance an optional program begun in 1986 for the review of high-risk point sources of air pollutants including, but not limited to, hazardous air pollutants listed pursuant to subsection (b).

**(3) Technical assistance**

The Administrator shall establish and maintain an air toxics clearinghouse and center to provide technical information and assistance to State and local agencies and, on a cost recovery basis, to others on control technology, health and ecological risk assessment, risk analysis, ambient monitoring and modeling, and emissions measurement and monitoring. The Administrator shall use the authority of section 7403 of this title to examine methods for preventing, measuring, and controlling emissions and evaluating associated health and ecological risks. Where appropriate, such activity shall be conducted with not-for-profit organizations. The Administrator may conduct research on methods for preventing, measuring and controlling emissions and evaluating associated health and environment risks. All information collected under this paragraph shall be available to the public.

**(4) Grants**

Upon application of a State, the Administrator may make grants, subject to such terms and conditions as the Administrator deems appropriate, to such State for the purpose of assisting the State in developing and implementing a program for submittal and approval

under this subsection. Programs assisted under this paragraph may include program elements addressing air pollutants or extremely hazardous substances other than those specifically subject to this section. Grants under this paragraph may include support for high-risk point source review as provided in paragraph (2) and support for the development and implementation of areawide area source programs pursuant to subsection (k).

**(5) Approval or disapproval**

Not later than 180 days after receiving a program submitted by a State, and after notice and opportunity for public comment, the Administrator shall either approve or disapprove such program. The Administrator shall disapprove any program submitted by a State, if the Administrator determines that—

(A) the authorities contained in the program are not adequate to assure compliance by all sources within the State with each applicable standard, regulation or requirement established by the Administrator under this section;

(B) adequate authority does not exist, or adequate resources are not available, to implement the program;

(C) the schedule for implementing the program and assuring compliance by affected sources is not sufficiently expeditious; or

(D) the program is otherwise not in compliance with the guidance issued by the Administrator under paragraph (2) or is not likely to satisfy, in whole or in part, the objectives of this chapter.

If the Administrator disapproves a State program, the Administrator shall notify the State of any revisions or modifications necessary to obtain approval. The State may revise and resubmit the proposed program for review and approval pursuant to the provisions of this subsection.

**(6) Withdrawal**

Whenever the Administrator determines, after public hearing, that a State is not administering and enforcing a program approved pursuant to this subsection in accordance with the guidance published pursuant to paragraph (2) or the requirements of paragraph (5), the Administrator shall so notify the State and, if action which will assure prompt compliance is not taken within 90 days, the Administrator shall withdraw approval of the program. The Administrator shall not withdraw approval of any program unless the State shall have been notified and the reasons for withdrawal shall have been stated in writing and made public.

**(7) Authority to enforce**

Nothing in this subsection shall prohibit the Administrator from enforcing any applicable emission standard or requirement under this section.

**(8) Local program**

The Administrator may, after notice and opportunity for public comment, approve a program developed and submitted by a local air pollution control agency (after consultation with the State) pursuant to this subsection and any such agency implementing an approved program may take any action authorized to be taken by a State under this section.

**(9) Permit authority**

Nothing in this subsection shall affect the authorities and obligations of the Administrator or the State under subchapter V.

**(m) Atmospheric deposition to Great Lakes and coastal waters**

**(1) Deposition assessment**

The Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall conduct a program to identify and assess the extent of atmospheric deposition of hazardous air pollutants (and in the discretion of the Administrator, other air pollutants) to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters. As part of such program, the Administrator shall—

(A) monitor the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters, including monitoring of the Great Lakes through the monitoring network established pursuant to paragraph (2) of this subsection and designing and deploying an atmospheric monitoring network for coastal waters pursuant to paragraph (4);

(B) investigate the sources and deposition rates of atmospheric deposition of air pollutants (and their atmospheric transformation precursors);

(C) conduct research to develop and improve monitoring methods and to determine the relative contribution of atmospheric pollutants to total pollution loadings to the Great Lakes, the Chesapeake Bay, Lake Champlain, and coastal waters;

(D) evaluate any adverse effects to public health or the environment caused by such deposition (including effects resulting from indirect exposure pathways) and assess the contribution of such deposition to violations of water quality standards established pursuant to the Federal Water Pollution Control Act [33 U.S.C. 1251 et seq.] and drinking water standards established pursuant to the Safe Drinking Water Act [42 U.S.C. 300f et seq.]; and

(E) sample for such pollutants in biota, fish, and wildlife of the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters and characterize the sources of such pollutants.

**(2) Great Lakes monitoring network**

The Administrator shall oversee, in accordance with Annex 15 of the Great Lakes Water Quality Agreement, the establishment and operation of a Great Lakes atmospheric deposition network to monitor atmospheric deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) to the Great Lakes.

(A) As part of the network provided for in this paragraph, and not later than December 31, 1991, the Administrator shall establish in each of the 5 Great Lakes at least 1 facility capable of monitoring the atmospheric depo-

sition of hazardous air pollutants in both dry and wet conditions.

(B) The Administrator shall use the data provided by the network to identify and track the movement of hazardous air pollutants through the Great Lakes, to determine the portion of water pollution loadings attributable to atmospheric deposition of such pollutants, and to support development of remedial action plans and other management plans as required by the Great Lakes Water Quality Agreement.

(C) The Administrator shall assure that the data collected by the Great Lakes atmospheric deposition monitoring network is in a format compatible with databases sponsored by the International Joint Commission, Canada, and the several States of the Great Lakes region.

**(3) Monitoring for the Chesapeake Bay and Lake Champlain**

The Administrator shall establish at the Chesapeake Bay and Lake Champlain atmospheric deposition stations to monitor deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) within the Chesapeake Bay and Lake Champlain watersheds. The Administrator shall determine the role of air deposition in the pollutant loadings of the Chesapeake Bay and Lake Champlain, investigate the sources of air pollutants deposited in the watersheds, evaluate the health and environmental effects of such pollutant loadings, and shall sample such pollutants in biota, fish and wildlife within the watersheds, as necessary to characterize such effects.

**(4) Monitoring for coastal waters**

The Administrator shall design and deploy atmospheric deposition monitoring networks for coastal waters and their watersheds and shall make any information collected through such networks available to the public. As part of this effort, the Administrator shall conduct research to develop and improve deposition monitoring methods, and to determine the relative contribution of atmospheric pollutants to pollutant loadings. For purposes of this subsection, "coastal waters" shall mean estuaries selected pursuant to section 320(a)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C. 1330(a)(2)(A)] or listed pursuant to section 320(a)(2)(B) of such Act [33 U.S.C. 1330(a)(2)(B)] or estuarine research reserves designated pursuant to section 1461 of title 16.

**(5) Report**

Within 3 years of November 15, 1990, and biennially thereafter, the Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall submit to the Congress a report on the results of any monitoring, studies, and investigations conducted pursuant to this subsection. Such report shall include, at a minimum, an assessment of—

(A) the contribution of atmospheric deposition to pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

(B) the environmental and public health effects of any pollution which is attributable to atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

(C) the source or sources of any pollution to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters which is attributable to atmospheric deposition;

(D) whether pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain or coastal waters cause or contribute to exceedances of drinking water standards pursuant to the Safe Drinking Water Act [42 U.S.C. 300f et seq.] or water quality standards pursuant to the Federal Water Pollution Control Act [33 U.S.C. 1251 et seq.] or, with respect to the Great Lakes, exceedances of the specific objectives of the Great Lakes Water Quality Agreement; and

(E) a description of any revisions of the requirements, standards, and limitations pursuant to this chapter and other applicable Federal laws as are necessary to assure protection of human health and the environment.

**(6) Additional regulation**

As part of the report to Congress, the Administrator shall determine whether the other provisions of this section are adequate to prevent serious adverse effects to public health and serious or widespread environmental effects, including such effects resulting from indirect exposure pathways, associated with atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters of hazardous air pollutants (and their atmospheric transformation products). The Administrator shall take into consideration the tendency of such pollutants to bioaccumulate. Within 5 years after November 15, 1990, the Administrator shall, based on such report and determination, promulgate, in accordance with this section, such further emission standards or control measures as may be necessary and appropriate to prevent such effects, including effects due to bioaccumulation and indirect exposure pathways. Any requirements promulgated pursuant to this paragraph with respect to coastal waters shall only apply to the coastal waters of the States which are subject to section 7627(a) of this title.

**(n) Other provisions**

**(1) Electric utility steam generating units**

(A) The Administrator shall perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by electric utility steam generating units of pollutants listed under subsection (b) after imposition of the requirements of this chapter. The Administrator shall report the results of this study to the Congress within 3 years after November 15, 1990. The Administrator shall develop and describe in the Administrator's report to Congress alternative control strategies for emissions which may warrant regulation under this section. The Administrator shall regulate electric utility steam generating units under this section, if the Administrator

finds such regulation is appropriate and necessary after considering the results of the study required by this subparagraph.

(B) The Administrator shall conduct, and transmit to the Congress not later than 4 years after November 15, 1990, a study of mercury emissions from electric utility steam generating units, municipal waste combustion units, and other sources, including area sources. Such study shall consider the rate and mass of such emissions, the health and environmental effects of such emissions, technologies which are available to control such emissions, and the costs of such technologies.

(C) The National Institute of Environmental Health Sciences shall conduct, and transmit to the Congress not later than 3 years after November 15, 1990, a study to determine the threshold level of mercury exposure below which adverse human health effects are not expected to occur. Such study shall include a threshold for mercury concentrations in the tissue of fish which may be consumed (including consumption by sensitive populations) without adverse effects to public health.

**(2) Coke oven production technology study**

(A) The Secretary of the Department of Energy and the Administrator shall jointly undertake a 6-year study to assess coke oven production emission control technologies and to assist in the development and commercialization of technically practicable and economically viable control technologies which have the potential to significantly reduce emissions of hazardous air pollutants from coke oven production facilities. In identifying control technologies, the Secretary and the Administrator shall consider the range of existing coke oven operations and battery design and the availability of sources of materials for such coke ovens as well as alternatives to existing coke oven production design.

(B) The Secretary and the Administrator are authorized to enter into agreements with persons who propose to develop, install and operate coke production emission control technologies which have the potential for significant emissions reductions of hazardous air pollutants provided that Federal funds shall not exceed 50 per centum of the cost of any project assisted pursuant to this paragraph.

(C) On completion of the study, the Secretary shall submit to Congress a report on the results of the study and shall make recommendations to the Administrator identifying practicable and economically viable control technologies for coke oven production facilities to reduce residual risks remaining after implementation of the standard under subsection (d).

(D) There are authorized to be appropriated $5,000,000 for each of the fiscal years 1992 through 1997 to carry out the program authorized by this paragraph.

**(3) Publicly owned treatment works**

The Administrator may conduct, in cooperation with the owners and operators of publicly owned treatment works, studies to characterize emissions of hazardous air pollutants emitted by such facilities, to identify industrial, commercial and residential discharges that contribute to such emissions and to demonstrate control measures for such emissions. When promulgating any standard under this section applicable to publicly owned treatment works, the Administrator may provide for control measures that include pretreatment of discharges causing emissions of hazardous air pollutants and process or product substitutions or limitations that may be effective in reducing such emissions. The Administrator may prescribe uniform sampling, modeling and risk assessment methods for use in implementing this subsection.

**(4) Oil and gas wells; pipeline facilities**

(A) Notwithstanding the provisions of subsection (a), emissions from any oil or gas exploration or production well (with its associated equipment) and emissions from any pipeline compressor or pump station shall not be aggregated with emissions from other similar units, whether or not such units are in a contiguous area or under common control, to determine whether such units or stations are major sources, and in the case of any oil or gas exploration or production well (with its associated equipment), such emissions shall not be aggregated for any purpose under this section.

(B) The Administrator shall not list oil and gas production wells (with its associated equipment) as an area source category under subsection (c), except that the Administrator may establish an area source category for oil and gas production wells located in any metropolitan statistical area or consolidated metropolitan statistical area with a population in excess of 1 million, if the Administrator determines that emissions of hazardous air pollutants from such wells present more than a negligible risk of adverse effects to public health.

**(5) Hydrogen sulfide**

The Administrator is directed to assess the hazards to public health and the environment resulting from the emission of hydrogen sulfide associated with the extraction of oil and natural gas resources. To the extent practicable, the assessment shall build upon and not duplicate work conducted for an assessment pursuant to section 8002(m) of the Solid Waste Disposal Act [42 U.S.C. 6982(m)] and shall reflect consultation with the States. The assessment shall include a review of existing State and industry control standards, techniques and enforcement. The Administrator shall report to the Congress within 24 months after November 15, 1990, with the findings of such assessment, together with any recommendations, and shall, as appropriate, develop and implement a control strategy for emissions of hydrogen sulfide to protect human health and the environment, based on the findings of such assessment, using authorities under this chapter including sections [3] 7411 of this title and this section.

**(6) Hydrofluoric acid**

Not later than 2 years after November 15, 1990, the Administrator shall, for those regions

---

[3] So in original. Probably should be "section".

of the country which do not have comprehensive health and safety regulations with respect to hydrofluoric acid, complete a study of the potential hazards of hydrofluoric acid and the uses of hydrofluoric acid in industrial and commercial applications to public health and the environment considering a range of events including worst-case accidental releases and shall make recommendations to the Congress for the reduction of such hazards, if appropriate.

**(7) RCRA facilities**

In the case of any category or subcategory of sources the air emissions of which are regulated under subtitle C of the Solid Waste Disposal Act [42 U.S.C. 6921 et seq.], the Administrator shall take into account any regulations of such emissions which are promulgated under such subtitle and shall, to the maximum extent practicable and consistent with the provisions of this section, ensure that the requirements of such subtitle and this section are consistent.

**(o) National Academy of Sciences study**

**(1) Request of the Academy**

Within 3 months of November 15, 1990, the Administrator shall enter into appropriate arrangements with the National Academy of Sciences to conduct a review of—

(A) risk assessment methodology used by the Environmental Protection Agency to determine the carcinogenic risk associated with exposure to hazardous air pollutants from source categories and subcategories subject to the requirements of this section; and

(B) improvements in such methodology.

**(2) Elements to be studied**

In conducting such review, the National Academy of Sciences should consider, but not be limited to, the following—

(A) the techniques used for estimating and describing the carcinogenic potency to humans of hazardous air pollutants; and

(B) the techniques used for estimating exposure to hazardous air pollutants (for hypothetical and actual maximally exposed individuals as well as other exposed individuals).

**(3) Other health effects of concern**

To the extent practicable, the Academy shall evaluate and report on the methodology for assessing the risk of adverse human health effects other than cancer for which safe thresholds of exposure may not exist, including, but not limited to, inheritable genetic mutations, birth defects, and reproductive dysfunctions.

**(4) Report**

A report on the results of such review shall be submitted to the Senate Committee on Environment and Public Works, the House Committee on Energy and Commerce, the Risk Assessment and Management Commission established by section 303 of the Clean Air Act Amendments of 1990 and the Administrator not later than 30 months after November 15, 1990.

**(5) Assistance**

The Administrator shall assist the Academy in gathering any information the Academy deems necessary to carry out this subsection. The Administrator may use any authority under this chapter to obtain information from any person, and to require any person to conduct tests, keep and produce records, and make reports respecting research or other activities conducted by such person as necessary to carry out this subsection.

**(6) Authorization**

Of the funds authorized to be appropriated to the Administrator by this chapter, such amounts as are required shall be available to carry out this subsection.

**(7) Guidelines for carcinogenic risk assessment**

The Administrator shall consider, but need not adopt, the recommendations contained in the report of the National Academy of Sciences prepared pursuant to this subsection and the views of the Science Advisory Board, with respect to such report. Prior to the promulgation of any standard under subsection (f), and after notice and opportunity for comment, the Administrator shall publish revised Guidelines for Carcinogenic Risk Assessment or a detailed explanation of the reasons that any recommendations contained in the report of the National Academy of Sciences will not be implemented. The publication of such revised Guidelines shall be a final Agency action for purposes of section 7607 of this title.

**(p) Mickey Leland National Urban Air Toxics Research Center**

**(1) Establishment**

The Administrator shall oversee the establishment of a National Urban Air Toxics Research Center, to be located at a university, a hospital, or other facility capable of undertaking and maintaining similar research capabilities in the areas of epidemiology, oncology, toxicology, pulmonary medicine, pathology, and biostatistics. The center shall be known as the Mickey Leland National Urban Air Toxics Research Center. The geographic site of the National Urban Air Toxics Research Center should be further directed to Harris County, Texas, in order to take full advantage of the well developed scientific community presence on-site at the Texas Medical Center as well as the extensive data previously compiled for the comprehensive monitoring system currently in place.

**(2) Board of Directors**

The National Urban Air Toxics Research Center shall be governed by a Board of Directors to be comprised of 9 members, the appointment of which shall be allocated pro rata among the Speaker of the House, the Majority Leader of the Senate and the President. The members of the Board of Directors shall be selected based on their respective academic and professional backgrounds and expertise in matters relating to public health, environmental pollution and industrial hygiene. The duties of the Board of Directors shall be to determine policy and research guidelines, submit

views from center sponsors and the public and issue periodic reports of center findings and activities.

**(3) Scientific Advisory Panel**

The Board of Directors shall be advised by a Scientific Advisory Panel, the 13 members of which shall be appointed by the Board, and to include eminent members of the scientific and medical communities. The Panel membership may include scientists with relevant experience from the National Institute of Environmental Health Sciences, the Center for Disease Control, the Environmental Protection Agency, the National Cancer Institute, and others, and the Panel shall conduct peer review and evaluate research results. The Panel shall assist the Board in developing the research agenda, reviewing proposals and applications, and advise on the awarding of research grants.

**(4) Funding**

The center shall be established and funded with both Federal and private source funds.

**(q) Savings provision**

**(1) Standards previously promulgated**

Any standard under this section in effect before the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990] shall remain in force and effect after such date unless modified as provided in this section before the date of enactment of such Amendments or under such Amendments. Except as provided in paragraph (4), any standard under this section which has been promulgated, but has not taken effect, before such date shall not be affected by such Amendments unless modified as provided in this section before such date or under such Amendments. Each such standard shall be reviewed and, if appropriate, revised, to comply with the requirements of subsection (d) within 10 years after the date of enactment of the Clean Air Act Amendments of 1990. If a timely petition for review of any such standard under section 7607 of this title is pending on such date of enactment, the standard shall be upheld if it complies with this section as in effect before that date. If any such standard is remanded to the Administrator, the Administrator may in the Administrator's discretion apply either the requirements of this section, or those of this section as in effect before the date of enactment of the Clean Air Act Amendments of 1990.

**(2) Special rule**

Notwithstanding paragraph (1), no standard shall be established under this section, as amended by the Clean Air Act Amendments of 1990, for radionuclide emissions from (A) elemental phosphorous plants, (B) grate calcination elemental phosphorous plants, (C) phosphogypsum stacks, or (D) any subcategory of the foregoing. This section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990], shall remain in effect for radionuclide emissions from such plants and stacks.

**(3) Other categories**

Notwithstanding paragraph (1), this section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990], shall remain in effect for radionuclide emissions from non-Department of Energy Federal facilities that are not licensed by the Nuclear Regulatory Commission, coal-fired utility and industrial boilers, underground uranium mines, surface uranium mines, and disposal of uranium mill tailings piles, unless the Administrator, in the Administrator's discretion, applies the requirements of this section as modified by the Clean Air Act Amendments of 1990 to such sources of radionuclides.

**(4) Medical facilities**

Notwithstanding paragraph (1), no standard promulgated under this section prior to November 15, 1990, with respect to medical research or treatment facilities shall take effect for two years following November 15, 1990, unless the Administrator makes a determination pursuant to a rulemaking under subsection (d)(9). If the Administrator determines that the regulatory program established by the Nuclear Regulatory Commission for such facilities does not provide an ample margin of safety to protect public health, the requirements of this section shall fully apply to such facilities. If the Administrator determines that such regulatory program does provide an ample margin of safety to protect the public health, the Administrator is not required to promulgate a standard under this section for such facilities, as provided in subsection (d)(9).

**(r) Prevention of accidental releases**

**(1) Purpose and general duty**

It shall be the objective of the regulations and programs authorized under this subsection to prevent the accidental release and to minimize the consequences of any such release of any substance listed pursuant to paragraph (3) or any other extremely hazardous substance. The owners and operators of stationary sources producing, processing, handling or storing such substances have a general duty in the same manner and to the same extent as section 654 of title 29 to identify hazards which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur. For purposes of this paragraph, the provisions of section 7604 of this title shall not be available to any person or otherwise be construed to be applicable to this paragraph. Nothing in this section shall be interpreted, construed, implied or applied to create any liability or basis for suit for compensation for bodily injury or any other injury or property damages to any person which may result from accidental releases of such substances.

**(2) Definitions**

(A) The term "accidental release" means an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

(B) The term "regulated substance" means a substance listed under paragraph (3).

(C) The term "stationary source" means any buildings, structures, equipment, installations or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons under common control), and (iv) from which an accidental release may occur.

(D) The term "retail facility" means a stationary source at which more than one-half of the income is obtained from direct sales to end users or at which more than one-half of the fuel sold, by volume, is sold through a cylinder exchange program.

**(3) List of substances**

The Administrator shall promulgate not later than 24 months after November 15, 1990, an initial list of 100 substances which, in the case of an accidental release, are known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment. For purposes of promulgating such list, the Administrator shall use, but is not limited to, the list of extremely hazardous substances published under the Emergency Planning and Community Right-to-Know[4] Act of 1986 [42 U.S.C. 11001 et seq.], with such modifications as the Administrator deems appropriate. The initial list shall include chlorine, anhydrous ammonia, methyl chloride, ethylene oxide, vinyl chloride, methyl isocyanate, hydrogen cyanide, ammonia, hydrogen sulfide, toluene diisocyanate, phosgene, bromine, anhydrous hydrogen chloride, hydrogen fluoride, anhydrous sulfur dioxide, and sulfur trioxide. The initial list shall include at least 100 substances which pose the greatest risk of causing death, injury, or serious adverse effects to human health or the environment from accidental releases. Regulations establishing the list shall include an explanation of the basis for establishing the list. The list may be revised from time to time by the Administrator on the Administrator's own motion or by petition and shall be reviewed at least every 5 years. No air pollutant for which a national primary ambient air quality standard has been established shall be included on any such list. No substance, practice, process, or activity regulated under subchapter VI shall be subject to regulations under this subsection. The Administrator shall establish procedures for the addition and deletion of substances from the list established under this paragraph consistent with those applicable to the list in subsection (b).

**(4) Factors to be considered**

In listing substances under paragraph (3), the Administrator—

(A) shall consider—
(i) the severity of any acute adverse health effects associated with accidental releases of the substance;
(ii) the likelihood of accidental releases of the substance; and

(iii) the potential magnitude of human exposure to accidental releases of the substance; and

(B) shall not list a flammable substance when used as a fuel or held for sale as a fuel at a retail facility under this subsection solely because of the explosive or flammable properties of the substance, unless a fire or explosion caused by the substance will result in acute adverse health effects from human exposure to the substance, including the unburned fuel or its combustion byproducts, other than those caused by the heat of the fire or impact of the explosion.

**(5) Threshold quantity**

At the time any substance is listed pursuant to paragraph (3), the Administrator shall establish by rule, a threshold quantity for the substance, taking into account the toxicity, reactivity, volatility, dispersibility, combustibility, or flammability of the substance and the amount of the substance which, as a result of an accidental release, is known to cause or may reasonably be anticipated to cause death, injury or serious adverse effects to human health for which the substance was listed. The Administrator is authorized to establish a greater threshold quantity for, or to exempt entirely, any substance that is a nutrient used in agriculture when held by a farmer.

**(6) Chemical Safety Board**

(A) There is hereby established an independent safety board to be known as the Chemical Safety and Hazard Investigation Board.

(B) The Board shall consist of 5 members, including a Chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate. Members of the Board shall be appointed on the basis of technical qualification, professional standing, and demonstrated knowledge in the fields of accident reconstruction, safety engineering, human factors, toxicology, or air pollution regulation. The terms of office of members of the Board shall be 5 years. Any member of the Board, including the Chairperson, may be removed for inefficiency, neglect of duty, or malfeasance in office. The Chairperson shall be the Chief Executive Officer of the Board and shall exercise the executive and administrative functions of the Board.

(C) The Board shall—
(i) investigate (or cause to be investigated), determine and report to the public in writing the facts, conditions, and circumstances and the cause or probable cause of any accidental release resulting in a fatality, serious injury or substantial property damages;

(ii) issue periodic reports to the Congress, Federal, State and local agencies, including the Environmental Protection Agency and the Occupational Safety and Health Administration, concerned with the safety of chemical production, processing, handling and storage, and other interested persons recommending measures to reduce the likelihood or the consequences of accidental re-

---

[4] So in original. Probably should be "Right-To-Know".

leases and proposing corrective steps to make chemical production, processing, handling and storage as safe and free from risk of injury as is possible and may include in such reports proposed rules or orders which should be issued by the Administrator under the authority of this section or the Secretary of Labor under the Occupational Safety and Health Act [29 U.S.C. 651 et seq.] to prevent or minimize the consequences of any release of substances that may cause death, injury or other serious adverse effects on human health or substantial property damage as the result of an accidental release; and

(iii) establish by regulation requirements binding on persons for reporting accidental releases into the ambient air subject to the Board's investigatory jurisdiction. Reporting releases to the National Response Center, in lieu of the Board directly, shall satisfy such regulations. The National Response Center shall promptly notify the Board of any releases which are within the Board's jurisdiction.

(D) The Board may utilize the expertise and experience of other agencies.

(E) The Board shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety. The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of releases which are transportation related. The Board shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate. The Board shall enter into a memorandum of understanding with the Occupational Safety and Health Administration so as to limit duplication of activities. In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.

(F) The Board is authorized to conduct research and studies with respect to the potential for accidental releases, whether or not an accidental release has occurred, where there is evidence which indicates the presence of a potential hazard or hazards. To the extent practicable, the Board shall conduct such studies in cooperation with other Federal agencies having emergency response authorities, State and local governmental agencies and associations and organizations from the industrial, commercial, and nonprofit sectors.

(G) No part of the conclusions, findings, or recommendations of the Board relating to any accidental release or the investigation thereof shall be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report.

(H) Not later than 18 months after November 15, 1990, the Board shall publish a report ac-

companied by recommendations to the Administrator on the use of hazard assessments in preventing the occurrence and minimizing the consequences of accidental releases of extremely hazardous substances. The recommendations shall include a list of extremely hazardous substances which are not regulated substances (including threshold quantities for such substances) and categories of stationary sources for which hazard assessments would be an appropriate measure to aid in the prevention of accidental releases and to minimize the consequences of those releases that do occur. The recommendations shall also include a description of the information and analysis which would be appropriate to include in any hazard assessment. The Board shall also make recommendations with respect to the role of risk management plans as required by paragraph (8)(B)[5] in preventing accidental releases. The Board may from time to time review and revise its recommendations under this subparagraph.

(I) Whenever the Board submits a recommendation with respect to accidental releases to the Administrator, the Administrator shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator shall indicate whether the Administrator will—

(i) initiate a rulemaking or issue such orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation;[6]

(ii) decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Administrator not to implement a recommendation of the Board or to implement a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Administrator setting forth the reasons for such determination.

(J) The Board may make recommendations with respect to accidental releases to the Secretary of Labor. Whenever the Board submits such recommendation, the Secretary shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator[7] shall indicate whether the Secretary will—

(i) initiate a rulemaking or issue such orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation;[6]

(ii) decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Secretary not to implement a recommendation or to implement

---

[5] So in original. Probably should be paragraph ''(7)(B)''.

[6] So in original. The word ''or'' probably should appear.

[7] So in original. The word ''Administrator'' probably should be ''Secretary''.

a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Secretary setting forth the reasons for such determination.

(K) Within 2 years after November 15, 1990, the Board shall issue a report to the Administrator of the Environmental Protection Agency and to the Administrator of the Occupational Safety and Health Administration recommending the adoption of regulations for the preparation of risk management plans and general requirements for the prevention of accidental releases of regulated substances into the ambient air (including recommendations for listing substances under paragraph (3)) and for the mitigation of the potential adverse effect on human health or the environment as a result of accidental releases which should be applicable to any stationary source handling any regulated substance in more than threshold amounts. The Board may include proposed rules or orders which should be issued by the Administrator under authority of this subsection or by the Secretary of Labor under the Occupational Safety and Health Act [29 U.S.C. 651 et seq.]. Any such recommendations shall be specific and shall identify the regulated substance or class of regulated substances (or other substances) to which the recommendations apply. The Administrator shall consider such recommendations before promulgating regulations required by paragraph (7)(B).

(L) The Board, or upon authority of the Board, any member thereof, any administrative law judge employed by or assigned to the Board, or any officer or employee duly designated by the Board, may for the purpose of carrying out duties authorized by subparagraph (C)—

(i) hold such hearings, sit and act at such times and places, administer such oaths, and require by subpoena or otherwise attendance and testimony of such witnesses and the production of evidence and may require by order that any person engaged in the production, processing, handling, or storage of extremely hazardous substances submit written reports and responses to requests and questions within such time and in such form as the Board may require; and

(ii) upon presenting appropriate credentials and a written notice of inspection authority, enter any property where an accidental release causing a fatality, serious injury or substantial property damage has occurred and do all things therein necessary for a proper investigation pursuant to subparagraph (C) and inspect at reasonable times records, files, papers, processes, controls, and facilities and take such samples as are relevant to such investigation.

Whenever the Administrator or the Board conducts an inspection of a facility pursuant to this subsection, employees and their representatives shall have the same rights to participate in such inspections as provided in the Occupational Safety and Health Act [29 U.S.C. 651 et seq.].

(M) In addition to that described in subparagraph (L), the Board may use any information

gathering authority of the Administrator under this chapter, including the subpoena power provided in section 7607(a)(1) of this title.

(N) The Board is authorized to establish such procedural and administrative rules as are necessary to the exercise of its functions and duties. The Board is authorized without regard to section 6101 of title 41 to enter into contracts, leases, cooperative agreements or other transactions as may be necessary in the conduct of the duties and functions of the Board with any other agency, institution, or person.

(O) After the effective date of any reporting requirement promulgated pursuant to subparagraph (C)(iii) it shall be unlawful for any person to fail to report any release of any extremely hazardous substance as required by such subparagraph. The Administrator is authorized to enforce any regulation or requirements established by the Board pursuant to subparagraph (C)(iii) using the authorities of sections 7413 and 7414 of this title. Any request for information from the owner or operator of a stationary source made by the Board or by the Administrator under this section shall be treated, for purposes of sections 7413, 7414, 7416, 7420, 7603, 7604 and 7607 of this title and any other enforcement provisions of this chapter, as a request made by the Administrator under section 7414 of this title and may be enforced by the Chairperson of the Board or by the Administrator as provided in such section.

(P) The Administrator shall provide to the Board such support and facilities as may be necessary for operation of the Board.

(Q) Consistent with subsection [8] (G) and section 7414(c) of this title any records, reports or information obtained by the Board shall be available to the Administrator, the Secretary of Labor, the Congress and the public, except that upon a showing satisfactory to the Board by any person that records, reports, or information, or particular part thereof (other than release or emissions data) to which the Board has access, if made public, is likely to cause substantial harm to the person's competitive position, the Board shall consider such record, report, or information or particular portion thereof confidential in accordance with section 1905 of title 18, except that such record, report, or information may be disclosed to other officers, employees, and authorized representatives of the United States concerned with carrying out this chapter or when relevant under any proceeding under this chapter. This subparagraph does not constitute authority to withhold records, reports, or information from the Congress.

(R) Whenever the Board submits or transmits any budget estimate, budget request, supplemental budget request, or other budget information, legislative recommendation, prepared testimony for congressional hearings, recommendation or study to the President, the Secretary of Labor, the Administrator, or the Director of the Office of Management and Budget, it shall concurrently transmit a copy thereof to the Congress. No report of the

---

[8] So in original. Probably should be "subparagraph".

Board shall be subject to review by the Administrator or any Federal agency or to judicial review in any court. No officer or agency of the United States shall have authority to require the Board to submit its budget requests or estimates, legislative recommendations, prepared testimony, comments, recommendations or reports to any officer or agency of the United States for approval or review prior to the submission of such recommendations, testimony, comments or reports to the Congress. In the performance of their functions as established by this chapter, the members, officers and employees of the Board shall not be responsible to or subject to supervision or direction, in carrying out any duties under this subsection, of any officer or employee or agent of the Environmental Protection Agency, the Department of Labor or any other agency of the United States except that the President may remove any member, officer or employee of the Board for inefficiency, neglect of duty or malfeasance in office. Nothing in this section shall affect the application of title 5 to officers or employees of the Board.

(S) The Board shall submit an annual report to the President and to the Congress which shall include, but not be limited to, information on accidental releases which have been investigated by or reported to the Board during the previous year, recommendations for legislative or administrative action which the Board has made, the actions which have been taken by the Administrator or the Secretary of Labor or the heads of other agencies to implement such recommendations, an identification of priorities for study and investigation in the succeeding year, progress in the development of risk-reduction technologies and the response to and implementation of significant research findings on chemical safety in the public and private sector.

**(7) Accident prevention**

(A) In order to prevent accidental releases of regulated substances, the Administrator is authorized to promulgate release prevention, detection, and correction requirements which may include monitoring, record-keeping, reporting, training, vapor recovery, secondary containment, and other design, equipment, work practice, and operational requirements. Regulations promulgated under this paragraph may make distinctions between various types, classes, and kinds of facilities, devices and systems taking into consideration factors including, but not limited to, the size, location, process, process controls, quantity of substances handled, potency of substances, and response capabilities present at any stationary source. Regulations promulgated pursuant to this subparagraph shall have an effective date, as determined by the Administrator, assuring compliance as expeditiously as practicable.

(B)(i) Within 3 years after November 15, 1990, the Administrator shall promulgate reasonable regulations and appropriate guidance to provide, to the greatest extent practicable, for the prevention and detection of accidental releases of regulated substances and for response

to such releases by the owners or operators of the sources of such releases. The Administrator shall utilize the expertise of the Secretaries of Transportation and Labor in promulgating such regulations. As appropriate, such regulations shall cover the use, operation, repair, replacement, and maintenance of equipment to monitor, detect, inspect, and control such releases, including training of persons in the use and maintenance of such equipment and in the conduct of periodic inspections. The regulations shall include procedures and measures for emergency response after an accidental release of a regulated substance in order to protect human health and the environment. The regulations shall cover storage, as well as operations. The regulations shall, as appropriate, recognize differences in size, operations, processes, class and categories of sources and the voluntary actions of such sources to prevent such releases and respond to such releases. The regulations shall be applicable to a stationary source 3 years after the date of promulgation, or 3 years after the date on which a regulated substance present at the source in more than threshold amounts is first listed under paragraph (3), whichever is later.

(ii) The regulations under this subparagraph shall require the owner or operator of stationary sources at which a regulated substance is present in more than a threshold quantity to prepare and implement a risk management plan to detect and prevent or minimize accidental releases of such substances from the stationary source, and to provide a prompt emergency response to any such releases in order to protect human health and the environment. Such plan shall provide for compliance with the requirements of this subsection and shall also include each of the following:

(I) a hazard assessment to assess the potential effects of an accidental release of any regulated substance. This assessment shall include an estimate of potential release quantities and a determination of downwind effects, including potential exposures to affected populations. Such assessment shall include a previous release history of the past 5 years, including the size, concentration, and duration of releases, and shall include an evaluation of worst case accidental releases;

(II) a program for preventing accidental releases of regulated substances, including safety precautions and maintenance, monitoring and employee training measures to be used at the source; and

(III) a response program providing for specific actions to be taken in response to an accidental release of a regulated substance so as to protect human health and the environment, including procedures for informing the public and local agencies responsible for responding to accidental releases, emergency health care, and employee training measures.

At the time regulations are promulgated under this subparagraph, the Administrator shall promulgate guidelines to assist sta-

tionary sources in the preparation of risk management plans. The guidelines shall, to the extent practicable, include model risk management plans.

(iii) The owner or operator of each stationary source covered by clause (ii) shall register a risk management plan prepared under this subparagraph with the Administrator before the effective date of regulations under clause (i) in such form and manner as the Administrator shall, by rule, require. Plans prepared pursuant to this subparagraph shall also be submitted to the Chemical Safety and Hazard Investigation Board, to the State in which the stationary source is located, and to any local agency or entity having responsibility for planning for or responding to accidental releases which may occur at such source, and shall be available to the public under section 7414(c) of this title. The Administrator shall establish, by rule, an auditing system to regularly review and, if necessary, require revision in risk management plans to assure that the plans comply with this subparagraph. Each such plan shall be updated periodically as required by the Administrator, by rule.

(C) Any regulations promulgated pursuant to this subsection shall to the maximum extent practicable, consistent with this subsection, be consistent with the recommendations and standards established by the American Society of Mechanical Engineers (ASME), the American National Standards Institute (ANSI) or the American Society of Testing Materials (ASTM). The Administrator shall take into consideration the concerns of small business in promulgating regulations under this subsection.

(D) In carrying out the authority of this paragraph, the Administrator shall consult with the Secretary of Labor and the Secretary of Transportation and shall coordinate any requirements under this paragraph with any requirements established for comparable purposes by the Occupational Safety and Health Administration or the Department of Transportation. Nothing in this subsection shall be interpreted, construed or applied to impose requirements affecting, or to grant the Administrator, the Chemical Safety and Hazard Investigation Board, or any other agency any authority to regulate (including requirements for hazard assessment), the accidental release of radionuclides arising from the construction and operation of facilities licensed by the Nuclear Regulatory Commission.

(E) After the effective date of any regulation or requirement imposed under this subsection, it shall be unlawful for any person to operate any stationary source subject to such regulation or requirement in violation of such regulation or requirement. Each regulation or requirement under this subsection shall for purposes of sections 7413, 7414, 7416, 7420, 7604, and 7607 of this title and other enforcement provisions of this chapter, be treated as a standard in effect under subsection (d).

(F) Notwithstanding the provisions of subchapter V or this section, no stationary source shall be required to apply for, or operate pursuant to, a permit issued under such subchapter solely because such source is subject to regulations or requirements under this subsection.

(G) In exercising any authority under this subsection, the Administrator shall not, for purposes of section 653(b)(1) of title 29, be deemed to be exercising statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health.

(H) PUBLIC ACCESS TO OFF-SITE CONSEQUENCE ANALYSIS INFORMATION.—

(i) DEFINITIONS.—In this subparagraph:

(I) COVERED PERSON.—The term "covered person" means—

(aa) an officer or employee of the United States;

(bb) an officer or employee of an agent or contractor of the Federal Government;

(cc) an officer or employee of a State or local government;

(dd) an officer or employee of an agent or contractor of a State or local government;

(ee) an individual affiliated with an entity that has been given, by a State or local government, responsibility for preventing, planning for, or responding to accidental releases;

(ff) an officer or employee or an agent or contractor of an entity described in item (ee); and

(gg) a qualified researcher under clause (vii).

(II) OFFICIAL USE.—The term "official use" means an action of a Federal, State, or local government agency or an entity referred to in subclause (I)(ee) intended to carry out a function relevant to preventing, planning for, or responding to accidental releases.

(III) OFF-SITE CONSEQUENCE ANALYSIS INFORMATION.—The term "off-site consequence analysis information" means those portions of a risk management plan, excluding the executive summary of the plan, consisting of an evaluation of 1 or more worst-case release scenarios or alternative release scenarios, and any electronic data base created by the Administrator from those portions.

(IV) RISK MANAGEMENT PLAN.—The term "risk management plan" means a risk management plan submitted to the Administrator by an owner or operator of a stationary source under subparagraph (B)(iii).

(ii) REGULATIONS.—Not later than 1 year after August 5, 1999, the President shall—

(I) assess—

(aa) the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet; and

(bb) the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

(II) based on the assessment under subclause (I), promulgate regulations gov-

erning the distribution of off-site consequence analysis information in a manner that, in the opinion of the President, minimizes the likelihood of accidental releases and the risk described in subclause (I)(aa) and the likelihood of harm to public health and welfare, and—

(aa) allows access by any member of the public to paper copies of off-site consequence analysis information for a limited number of stationary sources located anywhere in the United States, without any geographical restriction;

(bb) allows other public access to off-site consequence analysis information as appropriate;

(cc) allows access for official use by a covered person described in any of items (cc) through (ff) of clause (i)(I) (referred to in this subclause as a ''State or local covered person'') to off-site consequence analysis information relating to stationary sources located in the person's State;

(dd) allows a State or local covered person to provide, for official use, off-site consequence analysis information relating to stationary sources located in the person's State to a State or local covered person in a contiguous State; and

(ee) allows a State or local covered person to obtain for official use, by request to the Administrator, off-site consequence analysis information that is not available to the person under item (cc).

(iii) AVAILABILITY UNDER FREEDOM OF INFORMATION ACT.—

(I) FIRST YEAR.—Off-site consequence analysis information, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of title 5 during the 1-year period beginning on August 5, 1999.

(II) AFTER FIRST YEAR.—If the regulations under clause (ii) are promulgated on or before the end of the period described in subclause (I), off-site consequence analysis information covered by the regulations, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of title 5 after the end of that period.

(III) APPLICABILITY.—Subclauses (I) and (II) apply to off-site consequence analysis information submitted to the Administrator before, on, or after August 5, 1999.

(iv) AVAILABILITY OF INFORMATION DURING TRANSITION PERIOD.—The Administrator shall make off-site consequence analysis information available to covered persons for official use in a manner that meets the requirements of items (cc) through (ee) of clause (i)(II), and to the public in a form that does not make available any information concerning the identity or location of stationary sources, during the period—

(I) beginning on August 5, 1999; and

(II) ending on the earlier of the date of promulgation of the regulations under clause (ii) or the date that is 1 year after August 5, 1999.

(v) PROHIBITION ON UNAUTHORIZED DISCLOSURE OF INFORMATION BY COVERED PERSONS.—

(I) IN GENERAL.—Beginning on August 5, 1999, a covered person shall not disclose to the public off-site consequence analysis information in any form, or any statewide or national ranking of identified stationary sources derived from such information, except as authorized by this subparagraph (including the regulations promulgated under clause (ii)). After the end of the 1-year period beginning on August 5, 1999, if regulations have not been promulgated under clause (ii), the preceding sentence shall not apply.

(II) CRIMINAL PENALTIES.—Notwithstanding section 7413 of this title, a covered person that willfully violates a restriction or prohibition established by this subparagraph (including the regulations promulgated under clause (ii)) shall, upon conviction, be fined for an infraction under section 3571 of title 18 (but shall not be subject to imprisonment) for each unauthorized disclosure of off-site consequence analysis information, except that subsection (d) of such section 3571 shall not apply to a case in which the offense results in pecuniary loss unless the defendant knew that such loss would occur. The disclosure of off-site consequence analysis information for each specific stationary source shall be considered a separate offense. The total of all penalties that may be imposed on a single person or organization under this item shall not exceed $1,000,000 for violations committed during any 1 calendar year.

(III) APPLICABILITY.—If the owner or operator of a stationary source makes off-site consequence analysis information relating to that stationary source available to the public without restriction—

(aa) subclauses (I) and (II) shall not apply with respect to the information; and

(bb) the owner or operator shall notify the Administrator of the public availability of the information.

(IV) LIST.—The Administrator shall maintain and make publicly available a list of all stationary sources that have provided notification under subclause (III)(bb).

(vi) NOTICE.—The Administrator shall provide notice of the definition of official use as provided in clause (i)(III)[9] and examples of actions that would and would not meet that definition, and notice of the restrictions on further dissemination and the penalties established by this chapter to each covered person who receives off-site consequence analysis information under clause (iv) and each covered person who receives off-site consequence analysis information for an of-

---

[9] So in original. Probably should be ''(i)(II)''.

ficial use under the regulations promulgated under clause (ii).

(vii) QUALIFIED RESEARCHERS.—

(I) IN GENERAL.—Not later than 180 days after August 5, 1999, the Administrator, in consultation with the Attorney General, shall develop and implement a system for providing off-site consequence analysis information, including facility identification, to any qualified researcher, including a qualified researcher from industry or any public interest group.

(II) LIMITATION ON DISSEMINATION.—The system shall not allow the researcher to disseminate, or make available on the Internet, the off-site consequence analysis information, or any portion of the off-site consequence analysis information, received under this clause.

(viii) READ-ONLY INFORMATION TECHNOLOGY SYSTEM.—In consultation with the Attorney General and the heads of other appropriate Federal agencies, the Administrator shall establish an information technology system that provides for the availability to the public of off-site consequence analysis information by means of a central data base under the control of the Federal Government that contains information that users may read, but that provides no means by which an electronic or mechanical copy of the information may be made.

(ix) VOLUNTARY INDUSTRY ACCIDENT PREVENTION STANDARDS.—The Environmental Protection Agency, the Department of Justice, and other appropriate agencies may provide technical assistance to owners and operators of stationary sources and participate in the development of voluntary industry standards that will help achieve the objectives set forth in paragraph (1).

(x) EFFECT ON STATE OR LOCAL LAW.—

(I) IN GENERAL.—Subject to subclause (II), this subparagraph (including the regulations promulgated under this subparagraph) shall supersede any provision of State or local law that is inconsistent with this subparagraph (including the regulations).

(II) AVAILABILITY OF INFORMATION UNDER STATE LAW.—Nothing in this subparagraph precludes a State from making available data on the off-site consequences of chemical releases collected in accordance with State law.

(xi) REPORT.—

(I) IN GENERAL.—Not later than 3 years after August 5, 1999, the Attorney General, in consultation with appropriate State, local, and Federal Government agencies, affected industry, and the public, shall submit to Congress a report that describes the extent to which regulations promulgated under this paragraph have resulted in actions, including the design and maintenance of safe facilities, that are effective in detecting, preventing, and minimizing the consequences of releases of regulated substances that may be caused by criminal activity. As part of this report, the Attor-

ney General, using available data to the extent possible, and a sampling of covered stationary sources selected at the discretion of the Attorney General, and in consultation with appropriate State, local, and Federal governmental agencies, affected industry, and the public, shall review the vulnerability of covered stationary sources to criminal and terrorist activity, current industry practices regarding site security, and security of transportation of regulated substances. The Attorney General shall submit this report, containing the results of the review, together with recommendations, if any, for reducing vulnerability of covered stationary sources to criminal and terrorist activity, to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate and other relevant committees of Congress.

(II) INTERIM REPORT.—Not later than 12 months after August 5, 1999, the Attorney General shall submit to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate, and other relevant committees of Congress, an interim report that includes, at a minimum—

(aa) the preliminary findings under subclause (I);

(bb) the methods used to develop the findings; and

(cc) an explanation of the activities expected to occur that could cause the findings of the report under subclause (I) to be different than the preliminary findings.

(III) AVAILABILITY OF INFORMATION.—Information that is developed by the Attorney General or requested by the Attorney General and received from a covered stationary source for the purpose of conducting the review under subclauses (I) and (II) shall be exempt from disclosure under section 552 of title 5 if such information would pose a threat to national security.

(xii) SCOPE.—This subparagraph—

(I) applies only to covered persons; and

(II) does not restrict the dissemination of off-site consequence analysis information by any covered person in any manner or form except in the form of a risk management plan or an electronic data base created by the Administrator from off-site consequence analysis information.

(xiii) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to the Administrator and the Attorney General such sums as are necessary to carry out this subparagraph (including the regulations promulgated under clause (ii)), to remain available until expended.

**(8) Research on hazard assessments**

The Administrator may collect and publish information on accident scenarios and con-

sequences covering a range of possible events for substances listed under paragraph (3). The Administrator shall establish a program of long-term research to develop and disseminate information on methods and techniques for hazard assessment which may be useful in improving and validating the procedures employed in the preparation of hazard assessments under this subsection.

**(9) Order authority**

(A) In addition to any other action taken, when the Administrator determines that there may be an imminent and substantial endangerment to the human health or welfare or the environment because of an actual or threatened accidental release of a regulated substance, the Administrator may secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The Administrator may also, after notice to the State in which the stationary source is located, take other action under this paragraph including, but not limited to, issuing such orders as may be necessary to protect human health. The Administrator shall take action under section 7603 of this title rather than this paragraph whenever the authority of such section is adequate to protect human health and the environment.

(B) Orders issued pursuant to this paragraph may be enforced in an action brought in the appropriate United States district court as if the order were issued under section 7603 of this title.

(C) Within 180 days after November 15, 1990, the Administrator shall publish guidance for using the order authorities established by this paragraph. Such guidance shall provide for the coordinated use of the authorities of this paragraph with other emergency powers authorized by section 9606 of this title, sections 311(c), 308, 309 and 504(a) of the Federal Water Pollution Control Act [33 U.S.C. 1321(c), 1318, 1319, 1364(a)], sections 3007, 3008, 3013, and 7003 of the Solid Waste Disposal Act [42 U.S.C. 6927, 6928, 6934, 6973], sections 1445 and 1431 of the Safe Drinking Water Act [42 U.S.C. 300j–4, 300i], sections 5 and 7 of the Toxic Substances Control Act [15 U.S.C. 2604, 2606], and sections 7413, 7414, and 7603 of this title.

**(10) Presidential review**

The President shall conduct a review of release prevention, mitigation and response authorities of the various Federal agencies and shall clarify and coordinate agency responsibilities to assure the most effective and efficient implementation of such authorities and to identify any deficiencies in authority or resources which may exist. The President may utilize the resources and solicit the recommendations of the Chemical Safety and Hazard Investigation Board in conducting such review. At the conclusion of such review, but not later than 24 months after November 15, 1990, the President shall transmit a message to the Congress on the release prevention, mitigation and response activities of the Federal Government making such recommendations for change in law as the President may deem appropriate. Nothing in this paragraph shall be interpreted, construed or applied to authorize the President to modify or reassign release prevention, mitigation or response authorities otherwise established by law.

**(11) State authority**

Nothing in this subsection shall preclude, deny or limit any right of a State or political subdivision thereof to adopt or enforce any regulation, requirement, limitation or standard (including any procedural requirement) that is more stringent than a regulation, requirement, limitation or standard in effect under this subsection or that applies to a substance not subject to this subsection.

**(s) Periodic report**

Not later than January 15, 1993 and every 3 years thereafter, the Administrator shall prepare and transmit to the Congress a comprehensive report on the measures taken by the Agency and by the States to implement the provisions of this section. The Administrator shall maintain a database on pollutants and sources subject to the provisions of this section and shall include aggregate information from the database in each annual report. The report shall include, but not be limited to—

(1) a status report on standard-setting under subsections (d) and (f);

(2) information with respect to compliance with such standards including the costs of compliance experienced by sources in various categories and subcategories;

(3) development and implementation of the national urban air toxics program; and

(4) recommendations of the Chemical Safety and Hazard Investigation Board with respect to the prevention and mitigation of accidental releases.

(July 14, 1955, ch. 360, title I, §112, as added Pub. L. 91–604, §4(a), Dec. 31, 1970, 84 Stat. 1685; amended Pub. L. 95–95, title I, §§109(d)(2), 110, title IV, §401(c), Aug. 7, 1977, 91 Stat. 701, 703, 791; Pub. L. 95–623, §13(b), Nov. 9, 1978, 92 Stat. 3458; Pub. L. 101–549, title III, §301, Nov. 15, 1990, 104 Stat. 2531; Pub. L. 102–187, Dec. 4, 1991, 105 Stat. 1285; Pub. L. 105–362, title IV, §402(b), Nov. 10, 1998, 112 Stat. 3283; Pub. L. 106–40, §§2, 3(a), Aug. 5, 1999, 113 Stat. 207, 208.)

### Editorial Notes

#### References in Text

The date of enactment, referred to in subsec. (a)(11), probably means the date of enactment of Pub. L. 101–549, which amended this section generally and was approved Nov. 15, 1990.

The Atomic Energy Act, referred to in subsec. (d)(9), probably means the Atomic Energy Act of 1954, act Aug. 1, 1946, ch. 724, as added by act Aug. 30, 1954, ch. 1073, §1, 68 Stat. 919, which is classified principally to chapter 23 (§2011 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2011 of this title and Tables.

The Federal Water Pollution Control Act, referred to in subsecs. (e)(5) and (m)(1)(D), (5)(D), is act June 30, 1948, ch. 758, as amended generally by Pub. L. 92–500, §2, Oct. 18, 1972, 86 Stat. 816, which is classified generally

to chapter 26 (§1251 et seq.) of Title 33, Navigation and Navigable Waters. Title II of the Act is classified generally to subchapter II (§1281 et seq.) of chapter 26 of Title 33. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

The Toxic Substances Control Act, referred to in subsec. (k)(3)(C), is Pub. L. 94–469, Oct. 11, 1976, 90 Stat. 2003, which is classified generally to chapter 53 (§2601 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 2601 of Title 15 and Tables.

The Federal Insecticide, Fungicide and Rodenticide Act, referred to in subsec. (k)(3)(C), probably means the Federal Insecticide, Fungicide, and Rodenticide Act, act June 25, 1947, ch. 125, as amended generally by Pub. L. 92–516, Oct. 21, 1972, 86 Stat. 973, which is classified generally to subchapter II (§136 et seq.) of chapter 6 of Title 7, Agriculture. For complete classification of this Act to the Code, see Short Title note set out under section 136 of Title 7 and Tables.

The Resource Conservation and Recovery Act, referred to in subsec. (k)(3)(C), probably means the Resource Conservation and Recovery Act of 1976, Pub. L. 94–580, Oct. 21, 1976, 90 Stat. 2796, as amended, which is classified generally to chapter 82 (§6901 et seq.) of this title. For complete classification of this Act to the Code, see Short Title of 1976 Amendment note set out under section 6901 of this title and Tables.

The Safe Drinking Water Act, referred to in subsec. (m)(1)(D), (5)(D), is title XIV of act July 1, 1944, as added Dec. 16, 1974, Pub. L. 93–523, §2(a), 88 Stat. 1660, which is classified generally to subchapter XII (§300f et seq.) of chapter 6A of this title. For complete classification of this Act to the Code, see Short Title note set out under section 201 of this title and Tables.

The Solid Waste Disposal Act, referred to in subsec. (n)(7), is title II of Pub. L. 89–272, Oct. 20, 1965, 79 Stat. 997, as amended generally by Pub. L. 94–580, §2, Oct. 21, 1976, 90 Stat. 2795. Subtitle C of the Act is classified generally to subchapter III (§6921 et seq.) of chapter 82 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6901 of this title and Tables.

Section 303 of the Clean Air Act Amendments of 1990, referred to in subsec. (o)(4), probably means section 303 of Pub. L. 101–549, which is set out below.

The Clean Air Act Amendments of 1990, referred to in subsec. (q)(1)–(3), probably means Pub. L. 101–549, Nov. 15, 1990, 104 Stat. 2399. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of this title and Tables.

The Emergency Planning and Community Right-To-Know Act of 1986, referred to in subsec. (r)(3), is title III of Pub. L. 99–499, Oct. 17, 1986, 100 Stat. 1728, which is classified generally to chapter 116 (§11001 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 11001 of this title and Tables.

The Occupational Safety and Health Act, referred to in subsec. (r)(6)(C)(ii), (K), (L), probably means the Occupational Safety and Health Act of 1970, Pub. L. 91–596, Dec. 29, 1970, 84 Stat. 1590, as amended, which is classified principally to chapter 15 (§651 et seq.) of Title 29, Labor. For complete classification of this Act to the Code, see Short Title note set out under section 651 of Title 29 and Tables.

#### CODIFICATION

In subsec. (r)(6)(N), "section 6101 of title 41" substituted for "section 5 of title 41 of the United States Code" on authority of Pub. L. 111–350, §6(c), Jan. 4, 2011, 124 Stat. 3854, which Act enacted Title 41, Public Contracts.

Section was formerly classified to section 1857c–7 of this title.

#### AMENDMENTS

1999—Subsec. (r)(2)(D). Pub. L. 106–40, §2(5), added subpar. (D).

Subsec. (r)(4). Pub. L. 106–40, §2, substituted "Administrator—

"(A) shall consider—"

for "Administrator shall consider each of the following criteria—" in introductory provisions, redesignated subpars. (A) to (C) as cls. (i) to (iii), respectively, of subpar. (A) and added subpar. (B).

Subsec. (r)(7)(H). Pub. L. 106–40, §3(a), added subpar. (H).

1998—Subsec. (n)(2)(C). Pub. L. 105–362 substituted "On completion of the study, the Secretary shall submit to Congress a report on the results of the study and" for "The Secretary shall prepare annual reports to Congress on the status of the research program and at the completion of the study".

1991—Subsec. (b)(1). Pub. L. 102–187 struck out "7783064 Hydrogen sulfide" from list of pollutants.

1990—Pub. L. 101–549 amended section generally, substituting present provisions for provisions which related to: in subsec. (a), definitions; in subsec. (b), list of hazardous air pollutants, emission standards, and pollution control techniques; in subsec. (c), prohibited acts and exemption; in subsec. (d), State implementation and enforcement; and in subsec. (e), design, equipment, work practice, and operational standards.

1978—Subsec. (e)(5). Pub. L. 95–623 added par. (5).

1977—Subsec. (a)(1). Pub. L. 95–95, §401(c), substituted "causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness" for "may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness".

Subsec. (d)(1). Pub. L. 95–95, §109(d)(2), struck out "(except with respect to stationary sources owned or operated by the United States)" after "implement and enforce such standards".

Subsec. (e). Pub. L. 95–95, §110, added subsec. (e).

#### Statutory Notes and Related Subsidiaries

##### CHANGE OF NAME

Committee on Energy and Commerce of House of Representatives treated as referring to Committee on Commerce of House of Representatives by section 1(a) of Pub. L. 104–14, set out as a note preceding section 21 of Title 2, The Congress. Committee on Commerce of House of Representatives changed to Committee on Energy and Commerce of House of Representatives, and jurisdiction over matters relating to securities and exchanges and insurance generally transferred to Committee on Financial Services of House of Representatives by House Resolution No. 5, One Hundred Seventh Congress, Jan. 3, 2001.

##### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

##### TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions of law requiring submittal to Congress of any annual, semiannual, or other regular periodic report listed in House Document No. 103–7 (in which reports required under subsecs. (m)(5), (r)(6)(C)(ii), and (s) of this section are listed, respectively, as the 8th item on page 162, the 9th item on page 198, and the 9th item on page 162), see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance.

##### PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in

effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

REPORTS

Pub. L. 106–40, § 3(b), Aug. 5, 1999, 113 Stat. 213, provided that:

"(1) DEFINITION OF ACCIDENTAL RELEASE.—In this subsection, the term 'accidental release' has the meaning given the term in section 112(r)(2) of the Clean Air Act [42 U.S.C. 7412(r)(2)].

"(2) REPORT ON STATUS OF CERTAIN AMENDMENTS.—Not later than 2 years after the date of enactment of this Act [Aug. 5, 1999], the Comptroller General of the United States shall submit to Congress a report on the status of the development of amendments to the National Fire Protection Association Code for Liquefied Petroleum Gas that will result in the provision of information to local emergency response personnel concerning the off-site effects of accidental releases of substances exempted from listing under section 112(r)(4)(B) of the Clean Air Act (as added by section 3).

"(3) REPORT ON COMPLIANCE WITH CERTAIN INFORMATION SUBMISSION REQUIREMENTS.—Not later than 3 years after the date of enactment of this Act, the Comptroller General of the United States shall submit to Congress a report that—

"(A) describes the level of compliance with Federal and State requirements relating to the submission to local emergency response personnel of information intended to help the local emergency response personnel respond to chemical accidents or related environmental or public health threats; and

"(B) contains an analysis of the adequacy of the information required to be submitted and the efficacy of the methods for delivering the information to local emergency response personnel."

REEVALUATION OF REGULATIONS

Pub. L. 106–40, § 3(c), Aug. 5, 1999, 113 Stat. 213, provided that: "The President shall reevaluate the regulations promulgated under this section within 6 years after the enactment of this Act [Aug. 5, 1999]. If the President determines not to modify such regulations, the President shall publish a notice in the Federal Register stating that such reevaluation has been completed and that a determination has been made not to modify the regulations. Such notice shall include an explanation of the basis of such decision."

PUBLIC MEETING DURING MORATORIUM PERIOD

Pub. L. 106–40, § 4, Aug. 5, 1999, 113 Stat. 214, provided that:

"(a) IN GENERAL.—Not later than 180 days after the date of enactment of this Act [Aug. 5, 1999], each owner or operator of a stationary source covered by section 112(r)(7)(B)(ii) of the Clean Air Act [42 U.S.C. 7412(r)(7)(B)(ii)] shall convene a public meeting, after reasonable public notice, in order to describe and discuss the local implications of the risk management plan submitted by the stationary source pursuant to

section 112(r)(7)(B)(iii) of the Clean Air Act, including a summary of the off-site consequence analysis portion of the plan. Two or more stationary sources may conduct a joint meeting. In lieu of conducting such a meeting, small business stationary sources as defined in section 507(c)(1) of the Clean Air Act [42 U.S.C. 7661f(c)(1)] may comply with this section by publicly posting a summary of the off-site consequence analysis information for their facility not later than 180 days after the enactment of this Act. Not later than 10 months after the date of enactment of this Act, each such owner or operator shall send a certification to the director of the Federal Bureau of Investigation stating that such meeting has been held, or that such summary has been posted, within 1 year prior to, or within 6 months after, the date of the enactment of this Act. This section shall not apply to sources that employ only Program 1 processes within the meaning of regulations promulgated under section 112(r)(7)(B)(i) of the Clean Air Act.

"(b) ENFORCEMENT.—The Administrator of the Environmental Protection Agency may bring an action in the appropriate United States district court against any person who fails or refuses to comply with the requirements of this section, and such court may issue such orders, and take such other actions, as may be necessary to require compliance with such requirements."

RISK ASSESSMENT AND MANAGEMENT COMMISSION

Pub. L. 101–549, title III, § 303, Nov. 15, 1990, 104 Stat. 2574, provided that:

"(a) ESTABLISHMENT.—There is hereby established a Risk Assessment and Management Commission (hereafter referred to in this section as the 'Commission'), which shall commence proceedings not later than 18 months after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990] and which shall make a full investigation of the policy implications and appropriate uses of risk assessment and risk management in regulatory programs under various Federal laws to prevent cancer and other chronic human health effects which may result from exposure to hazardous substances.

"(b) CHARGE.—The Commission shall consider—

"(1) the report of the National Academy of Sciences authorized by section 112(o) of the Clean Air Act [42 U.S.C. 7412(o)], the use and limitations of risk assessment in establishing emission or effluent standards, ambient standards, exposure standards, acceptable concentration levels, tolerances or other environmental criteria for hazardous substances that present a risk of carcinogenic effects or other chronic health effects and the suitability of risk assessment for such purposes;

"(2) the most appropriate methods for measuring and describing cancer risks or risks of other chronic health effects from exposure to hazardous substances considering such alternative approaches as the lifetime risk of cancer or other effects to the individual or individuals most exposed to emissions from a source or sources on both an actual and worst case basis, the range of such risks, the total number of health effects avoided by exposure reductions, effluent standards, ambient standards, exposures standards, acceptable concentration levels, tolerances and other environmental criteria, reductions in the number of persons exposed at various levels of risk, the incidence of cancer, and other public health factors;

"(3) methods to reflect uncertainties in measurement and estimation techniques, the existence of synergistic or antagonistic effects among hazardous substances, the accuracy of extrapolating human health risks from animal exposure data, and the existence of unquantified direct or indirect effects on human health in risk assessment studies;

"(4) risk management policy issues including the use of lifetime cancer risks to individuals most exposed, incidence of cancer, the cost and technical feasibility of exposure reduction measures and the use of site-specific actual exposure information in setting

emissions standards and other limitations applicable to sources of exposure to hazardous substances; and

''(5) and comment on the degree to which it is possible or desirable to develop a consistent risk assessment methodology, or a consistent standard of acceptable risk, among various Federal programs.

''(c) MEMBERSHIP.—Such Commission shall be composed of ten members who shall have knowledge or experience in fields of risk assessment or risk management, including three members to be appointed by the President, two members to be appointed by the Speaker of the House of Representatives, one member to be appointed by the Minority Leader of the House of Representatives, two members to be appointed by the Majority Leader of the Senate, one member to be appointed by the Minority Leader of the Senate, and one member to be appointed by the President of the National Academy of Sciences. Appointments shall be made not later than 18 months after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

''(d) ASSISTANCE FROM AGENCIES.—The Administrator of the Environmental Protection Agency and the heads of all other departments, agencies, and instrumentalities of the executive branch of the Federal Government shall, to the maximum extent practicable, assist the Commission in gathering such information as the Commission deems necessary to carry out this section subject to other provisions of law.

''(e) STAFF AND CONTRACTS.—

''(1) In the conduct of the study required by this section, the Commission is authorized to contract (in accordance with Federal contract law) with non-governmental entities that are competent to perform research or investigations within the Commission's mandate, and to hold public hearings, forums, and workshops to enable full public participation.

''(2) The Commission may appoint and fix the pay of such staff as it deems necessary in accordance with the provisions of title 5, United States Code. The Commission may request the temporary assignment of personnel from the Environmental Protection Agency or other Federal agencies.

''(3) The members of the Commission who are not officers or employees of the United States, while attending conferences or meetings of the Commission or while otherwise serving at the request of the Chair, shall be entitled to receive compensation at a rate not in excess of the maximum rate of pay for Grade GS-18, as provided in the General Schedule under section 5332 of title 5 of the United States Code, including travel time, and while away from their homes or regular places of business they may be allowed travel expenses, including per diem in lieu of subsistence as authorized by law for persons in the Government service employed intermittently.

''(f) REPORT.—A report containing the results of all Commission studies and investigations under this section, together with any appropriate legislative recommendations or administrative recommendations, shall be made available to the public for comment not later than 42 months after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990] and shall be submitted to the President and to the Congress not later than 48 months after such date of enactment. In the report, the Commission shall make recommendations with respect to the appropriate use of risk assessment and risk management in Federal regulatory programs to prevent cancer or other chronic health effects which may result from exposure to hazardous substances. The Commission shall cease to exist upon the date determined by the Commission, but not later than 9 months after the submission of such report.

''(g) AUTHORIZATION.—There are authorized to be appropriated such sums as are necessary to carry out the activities of the Commission established by this section.''

[References in laws to the rates of pay for GS-16, 17, or 18, or to maximum rates of pay under the General Schedule, to be considered references to rates payable under specified sections of Title 5, Government Organization and Employees, see section 529 [title I, § 101(c)(1)] of Pub. L. 101-509, set out in a note under section 5376 of Title 5.]

**Executive Documents**

DELEGATION OF AUTHORITY

Memorandum of President of the United States, Aug. 19, 1993, 58 F.R. 52397, provided:

Memorandum for the Administrator of the Environmental Protection Agency

WHEREAS, the Environmental Protection Agency, the agencies and departments that are members of the National Response Team (authorized under Executive Order No. 12580, 52 Fed. Reg. 2923 (1987) [42 U.S.C. 9615 note]), and other Federal agencies and departments undertake emergency release prevention, mitigation, and response activities pursuant to various authorities;

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 112(r)(10) of the Clean Air Act (the ''Act'') (section 7412(r)(10) of title 42 of the United States Code) and section 301 of title 3 of the United States Code, and in order to provide for the delegation of certain functions under the Act [42 U.S.C. 7401 et seq.], I hereby:

(1) Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to conduct a review of release prevention, mitigation, and response authorities of Federal agencies in order to assure the most effective and efficient implementation of such authorities and to identify any deficiencies in authority or resources that may exist, to the extent such review is required by section 112(r)(10) of the Act; and

(2) Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to prepare and transmit a message to the Congress concerning the release prevention, mitigation, and response activities of the Federal Government with such recommendations for change in law as you deem appropriate, to the extent such message is required by section 112(r)(10) of the Act.

The authority delegated by this memorandum may be further redelegated within the Environmental Protection Agency.

You are hereby authorized and directed to publish this memorandum in the Federal Register.

WILLIAM J. CLINTON.

Memorandum of President of the United States, Jan. 27, 2000, 65 F.R. 8631, provided:

Memorandum for the Attorney General[, ] the Administrator of the Environmental Protection Agency[, and] the Director of the Office of Management and Budget

By the authority vested in me as President by the Constitution and laws of the United States of America, including section 112(r)(7)(H) of the Clean Air Act (''Act'') (42 U.S.C. 7412(r)(7)(H)), as added by section 3 of the Chemical Safety Information, Site Security and Fuels Regulatory Relief Act (Public Law 106-40), and section 301 of title 3, United States Code, I hereby delegate to:

(1) the Attorney General the authority vested in the President under section 112(r)(7)(H)(ii)(I)(aa) of the Act to assess the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet;

(2) the Administrator of the Environmental Protection Agency (EPA) the authority vested in the President under section 112(r)(7)(H)(ii)(I)(bb) of the Act to assess the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

(3) the Attorney General and the Administrator of EPA, jointly, the authority vested in the President under section 112(r)(7)(H)(ii)(II) of the Act to promul-

gate regulations, based on these assessments, governing the distribution of off-site consequence analysis information. These regulations, in proposed and final form, shall be subject to review and approval by the Director of the Office of Management and Budget.

The Administrator of EPA is authorized and directed to publish this memorandum in the Federal Register.

WILLIAM J. CLINTON.

FLEXIBLE IMPLEMENTATION OF THE MERCURY AND AIR TOXICS STANDARDS RULE

Memorandum of President of the United States, Dec. 21, 2011, 76 F.R. 80727, provided:

Memorandum for the Administrator of the Environmental Protection Agency

Today's issuance, by the Environmental Protection Agency (EPA), of the final Mercury and Air Toxics Standards rule for power plants (the ''MATS Rule'') represents a major step forward in my Administration's efforts to protect public health and the environment.

This rule, issued after careful consideration of public comments, prescribes standards under section 112 of the Clean Air Act to control emissions of mercury and other toxic air pollutants from power plants, which collectively are among the largest sources of such pollution in the United States. The EPA estimates that by substantially reducing emissions of pollutants that contribute to neurological damage, cancer, respiratory illnesses, and other health risks, the MATS Rule will produce major health benefits for millions of Americans—including children, older Americans, and other vulnerable populations. Consistent with Executive Order 13563 (Improving Regulation and Regulatory Review), the estimated benefits of the MATS Rule far exceed the estimated costs.

The MATS Rule can be implemented through the use of demonstrated, existing pollution control technologies. The United States is a global market leader in the design and manufacture of these technologies, and it is anticipated that U.S. firms and workers will provide much of the equipment and labor needed to meet the substantial investments in pollution control that the standards are expected to spur.

These new standards will promote the transition to a cleaner and more efficient U.S. electric power system. This system as a whole is critical infrastructure that plays a key role in the functioning of all facets of the U.S. economy, and maintaining its stability and reliability is of critical importance. It is therefore crucial that implementation of the MATS Rule proceed in a cost-effective manner that ensures electric reliability.

Analyses conducted by the EPA and the Department of Energy (DOE) indicate that the MATS Rule is not anticipated to compromise electric generating resource adequacy in any region of the country. The Clean Air Act offers a number of implementation flexibilities, and the EPA has a long and successful history of using those flexibilities to ensure a smooth transition to cleaner technologies.

The Clean Air Act provides 3 years from the effective date of the MATS Rule for sources to comply with its requirements. In addition, section 112(i)(3)(B) of the Act allows the issuance of a permit granting a source up to one additional year where necessary for the installation of controls. As you stated in the preamble to the MATS Rule, this additional fourth year should be broadly available to sources, consistent with the requirements of the law.

The EPA has concluded that 4 years should generally be sufficient to install the necessary emission control equipment, and DOE has issued analysis consistent with that conclusion. While more time is generally not expected to be needed, the Clean Air Act offers other important flexibilities as well. For example, section 113(a) of the Act provides the EPA with flexibility to bring sources into compliance over the course of an additional year, should unusual circumstances arise that warrant such flexibility.

To address any concerns with respect to electric reliability while assuring MATS' public health benefits, I direct you to take the following actions:

1. Building on the information and guidance that you have provided to the public, relevant stakeholders, and permitting authorities in the preamble of the MATS Rule, work with State and local permitting authorities to make the additional year for compliance with the MATS Rule provided under section 112(i)(3)(B) of the Clean Air Act broadly available to sources, consistent with law, and to invoke this flexibility expeditiously where justified.

2. Promote early, coordinated, and orderly planning and execution of the measures needed to implement the MATS Rule while maintaining the reliability of the electric power system. Consistent with Executive Order 13563, this process should be designed to ''promote predictability and reduce uncertainty,'' and should include engagement and coordination with DOE, the Federal Energy Regulatory Commission, State utility regulators, Regional Transmission Organizations, the North American Electric Reliability Corporation and regional electric reliability organizations, other grid planning authorities, electric utilities, and other stakeholders, as appropriate.

3. Make available to the public, including relevant stakeholders, information concerning any anticipated use of authorities: (a) under section 112(i)(3)(B) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary for the installation of technology; and (b) under section 113(a) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary to address a specific and documented electric reliability issue. This information should describe the process for working with entities with relevant expertise to identify circumstances where electric reliability concerns might justify allowing additional time to comply.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

You are hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA.

## § 7413. Federal enforcement

### (a) In general

#### (1) Order to comply with SIP

Whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit, the Administrator shall notify the person and the State in which the plan applies of such finding. At any time after the expiration of 30 days following the date on which such notice of a violation is issued, the Administrator may, without regard to the period of violation (subject to section 2462 of title 28)—

(A) issue an order requiring such person to comply with the requirements or prohibitions of such plan or permit,

(B) issue an administrative penalty order in accordance with subsection (d), or

(C) bring a civil action in accordance with subsection (b).

#### (2) State failure to enforce SIP or permit program

Whenever, on the basis of information available to the Administrator, the Administrator finds that violations of an applicable implementation plan or an approved permit program under subchapter V are so widespread


those facilities, together with the names and addresses of the persons who have been convicted of such offenses. Whenever the Administrator determines that the condition which gave rise to a conviction has been corrected, he shall promptly remove the facility and the name and address of the person concerned from the list.

SEC. 3. *Contracts, Grants, or Loans.* (a) Except as provided in section 8 of this Order, no Federal agency shall enter into any contract for the procurement of goods, materials, or services which is to be performed in whole or in part in a facility then designated by the Administrator pursuant to section 2.

(b) Except as provided in section 8 of this Order, no Federal agency authorized to extend Federal assistance by way of grant, loan, or contract shall extend such assistance in any case in which it is to be used to support any activity or program involving the use of a facility then designated by the Administrator pursuant to section 2.

SEC. 4. *Procurement, Grant, and Loan Regulations.* The Federal Procurement Regulations, the Armed Services Procurement Regulations, and to the extent necessary, any supplemental or comparable regulations issued by any agency of the Executive Branch shall, following consultation with the Administrator, be amended to require, as a condition of entering into, renewing, or extending any contract for the procurement of goods, materials, or services or extending any assistance by way of grant, loan, or contract, inclusion of a provision requiring compliance with the Air Act, the Water Act, and standards issued pursuant thereto in the facilities in which the contract is to be performed, or which are involved in the activity or program to receive assistance.

SEC. 5. *Rules and Regulations.* The Administrator shall issue such rules, regulations, standards, and guidelines as he may deem necessary or appropriate to carry out the purposes of this Order.

SEC. 6. *Cooperation and Assistance.* The head of each Federal agency shall take such steps as may be necessary to insure that all officers and employees of this agency whose duties entail compliance or comparable functions with respect to contracts, grants, and loans are familiar with the provisions of this Order. In addition to any other appropriate action, such officers and employees shall report promptly any condition in a facility which may involve noncompliance with the Air Act or the Water Act or any rules, regulations, standards, or guidelines issued pursuant to this Order to the head of the agency, who shall transmit such reports to the Administrator.

SEC. 7. *Enforcement.* The Administrator may recommend to the Department of Justice or other appropriate agency that legal proceedings be brought or other appropriate action be taken whenever he becomes aware of a breach of any provision required, under the amendments issued pursuant to section 4 of this Order, to be included in a contract or other agreement.

SEC. 8. *Exemptions—Reports to Congress.* (a) Upon a determination that the paramount interest of the United States so requires—

(1) The head of a Federal agency may exempt any contract, grant, or loan, and, following consultation with the Administrator, any class of contracts, grants or loans from the provisions of this Order. In any such case, the head of the Federal agency granting such exemption shall (A) promptly notify the Administrator of such exemption and the justification therefor; (B) review the necessity for each such exemption annually; and (C) report to the Administrator annually all such exemptions in effect. Exemptions granted pursuant to this section shall be for a period not to exceed one year. Additional exemptions may be granted for periods not to exceed one year upon the making of a new determination by the head of the Federal agency concerned.

(2) The Administrator may, by rule or regulation, exempt any or all Federal agencies from any or all of the provisions of this Order with respect to any class or classes of contracts, grants, or loans, which (A) involve less than specified dollar amounts, or (B) have a minimal potential impact upon the environment, or (C) involve persons who are not prime contractors or direct recipients of Federal assistance by way of contracts, grants, or loans.

(b) Federal agencies shall reconsider any exemption granted under subsection (a) whenever requested to do so by the Administrator.

(c) The Administrator shall annually notify the President and the Congress of all exemptions granted, or in effect, under this Order during the preceding year.

SEC. 9. *Related Actions.* The imposition of any sanction or penalty under or pursuant to this Order shall not relieve any person of any legal duty to comply with any provisions of the Air Act or the Water Act.

SEC. 10. *Applicability.* This Order shall not apply to contracts, grants, or loans involving the use of facilities located outside the United States.

SEC. 11. *Uniformity.* Rules, regulations, standards, and guidelines issued pursuant to this order and section 508 of the Water Act [33 U.S.C. 1368] shall, to the maximum extent feasible, be uniform with regulations issued pursuant to this order, Executive Order No. 11602 of June 29, 1971 [formerly set out above], and section 306 of the Air Act [this section].

SEC. 12. *Order Superseded.* Executive Order No. 11602 of June 29, 1971, is hereby superseded.

RICHARD NIXON.

## § 7607. Administrative proceedings and judicial review

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under

---

[1] See References in Text note below.
[2] So in original. Probably should be "this".
[3] So in original.

this subparagraph,[4] the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(b) Judicial review**

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to[5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F)[6] of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV–A (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter or-

---

[4] So in original. Probably should be "subsection,".

[5] So in original. The word "to" probably should not appear.

[6] So in original. There are no subpars. (D) and (F) of section 7412(g)(1) of this title.

ders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV–A (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a ''rule''). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the ''comment period''). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of—

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

(4)(A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

(B)(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

(ii) The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

(5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

(6)(A) The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

(B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

(C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

(7)(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b)). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b)) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section [7] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

(July 14, 1955, ch. 360, title III, §307, as added Pub. L. 91–604, §12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 92–157, title III, §302(a), Nov. 18,

---

[7] So in original. Probably should be "sections".

1971, 85 Stat. 464; Pub. L. 93–319, §6(c), June 22, 1974, 88 Stat. 259; Pub. L. 95–95, title III, §§303(d), 305(a), (c), (f)–(h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub. L. 95–190, §14(a)(79), (80), Nov. 16, 1977, 91 Stat. 1404; Pub. L. 101–549, title I, §§108(p), 110(5), title III, §302(g), (h), title VII, §§702(c), 703, 706, 707(h), 710(b), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681–2684.)

## Editorial Notes

### REFERENCES IN TEXT

Section 7521(b)(4) of this title, referred to in subsec. (a), was repealed by Pub. L. 101–549, title II, §230(2), Nov. 15, 1990, 104 Stat. 2529.

Section 7521(b)(5) of this title, referred to in subsec. (b)(1), was repealed by Pub. L. 101–549, title II, §230(3), Nov. 15, 1990, 104 Stat. 2529.

Section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977), referred to in subsec. (b)(1), was in the original "section 119(c)(2)(A), (B), or (C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977)", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, §3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to subsec. (d)(5) of section 7413 of this title. Section 7413(d) of this title was subsequently amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, no longer relates to final compliance orders. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

Part C of subchapter I, referred to in subsec. (d)(1)(J), was in the original "subtitle C of title I", and was translated as reading "part C of title I" to reflect the probable intent of Congress, because title I does not contain subtitles.

### CODIFICATION

In subsec. (h), "subchapter II of chapter 5 of title 5" was substituted for "the Administrative Procedures Act" on authority of Pub. L. 89–554, §7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

Section was formerly classified to section 1857h–5 of this title.

### PRIOR PROVISIONS

A prior section 307 of act July 14, 1955, was renumbered section 314 by Pub. L. 91–604 and is classified to section 7614 of this title.

Another prior section 307 of act July 14, 1955, ch. 360, title III, formerly §14, as added Dec. 17, 1963, Pub. L. 88–206, §1, 77 Stat. 401, was renumbered section 307 by Pub. L. 89–272, renumbered section 310 by Pub. L. 90–148, and renumbered section 317 by Pub. L. 91–604, and is set out as a Short Title note under section 7401 of this title.

### AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, §703, struck out par. (1) designation at beginning, inserted provisions authorizing issuance of subpoenas and administration of oaths for purposes of investigations, monitoring, reporting requirements, entries, compliance inspections, or administrative enforcement proceedings under this chapter, and struck out "or section 7521(b)(5)" after "section 7410(f)".

Subsec. (b)(1). Pub. L. 101–549, §706(2), which directed amendment of second sentence by striking "under sec-

tion 7413(d) of this title" immediately before "under section 7419 of this title", was executed by striking "under section 7413(d) of this title," before "under section 7419 of this title", to reflect the probable intent of Congress.

Pub. L. 101–549, §706(1), inserted at end: "The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action."

Pub. L. 101–549, §702(c), inserted "or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title," before "or any other final action of the Administrator".

Pub. L. 101–549, §302(g), substituted "section 7412" for "section 7412(c)".

Subsec. (b)(2). Pub. L. 101–549, §707(h), inserted sentence at end authorizing challenge to deferrals of performance of nondiscretionary statutory actions.

Subsec. (d)(1)(C). Pub. L. 101–549, §110(5)(A), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: "the promulgation or revision of any standard of performance under section 7411 of this title or emission standard under section 7412 of this title".

Subsec. (d)(1)(D), (E). Pub. L. 101–549, §302(h), added subpar. (D) and redesignated former subpar. (D) as (E). Former subpar. (E) redesignated (F).

Subsec. (d)(1)(F). Pub. L. 101–549, §302(h), redesignated subpar. (E) as (F). Former subpar. (F) redesignated (G).

Pub. L. 101–549, §110(5)(B), amended subpar. (F) generally. Prior to amendment, subpar. (F) read as follows: "promulgation or revision of regulations pertaining to orders for coal conversion under section 7413(d)(5) of this title (but not including orders granting or denying any such orders),".

Subsec. (d)(1)(G), (H). Pub. L. 101–549, §302(h), redesignated subpars. (F) and (G) as (G) and (H), respectively. Former subpar. (H) redesignated (I).

Subsec. (d)(1)(I). Pub. L. 101–549, §710(b), which directed that subpar. (H) be amended by substituting "subchapter VI" for "part B of subchapter I", was executed by making the substitution in subpar. (I), to reflect the probable intent of Congress and the intervening redesignation of subpar. (H) as (I) by Pub. L. 101–549, §302(h), see below.

Pub. L. 101–549, §302(h), redesignated subpar. (H) as (I). Former subpar. (I) redesignated (J).

Subsec. (d)(1)(J) to (M). Pub. L. 101–549, §302(h), redesignated subpars. (I) to (L) as (J) to (M), respectively. Former subpar. (M) redesignated (N).

Subsec. (d)(1)(N). Pub. L. 101–549, §302(h), redesignated subpar. (M) as (N). Former subpar. (N) redesignated (O).

Pub. L. 101–549, §110(5)(C), added subpar. (N) and redesignated former subpar. (N) as (U).

Subsec. (d)(1)(O) to (T). Pub. L. 101–549, §302(h), redesignated subpars. (N) to (S) as (O) to (T), respectively. Former subpar. (T) redesignated (U).

Pub. L. 101–549, §110(5)(C), redesignated subpars. (O) to (T).

Subsec. (d)(1)(U). Pub. L. 101–549, §302(h), redesignated subpar. (T) as (U). Former subpar. (U) redesignated (V).

Pub. L. 101–549, §110(5)(C), redesignated former subpar. (N) as (U).

Subsec. (d)(1)(V). Pub. L. 101–549, §302(h), redesignated subpar. (U) as (V).

Subsec. (h). Pub. L. 101–549, §108(p), added subsec. (h).

1977—Subsec. (b)(1). Pub. L. 95–190 in text relating to filing of petitions for review in the United States Court of Appeals for the District of Columbia inserted provision respecting requirements under sections 7411 and 7412 of this title, and substituted provisions authorizing review of any rule issued under section 7413, 7419, or 7420 of this title, for provisions authorizing review of any rule or order issued under section 7420 of this title, relating to noncompliance penalties, and in text relating to filing of petitions for review in the United States Court of Appeals for the appropriate circuit inserted

provision respecting review under section 7411(j), 7412(c), 7413(d), or 7419 of this title, provision authorizing review under section 1857c–10(c)(2)(A), (B), or (C) to the period prior to Aug. 7, 1977, and provisions authorizing review of denials or disapprovals by the Administrator under subchapter I of this chapter.

Pub. L. 95–95, §305(c), (h), inserted rules or orders issued under section 7420 of this title (relating to noncompliance penalties) and any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter to the enumeration of actions of the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the District of Columbia, added the approval or promulgation by the Administrator of orders under section 7420 of this title, or any other final action of the Administrator under this chapter which is locally or regionally applicable to the enumeration of actions by the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the appropriate circuit, inserted provision that petitions otherwise capable of being filed in the Court of Appeals for the appropriate circuit may be filed only in the Court of Appeals for the District of Columbia if the action is based on a determination of nationwide scope, and increased from 30 days to 60 days the period during which the petition must be filed.

Subsec. (d). Pub. L. 95–95, §305(a), added subsec. (d).

Subsec. (e). Pub. L. 95–95, §303(d), added subsec. (e).

Subsec. (f). Pub. L. 95–95, §305(f), added subsec. (f).

Subsec. (g). Pub. L. 95–95, §305(g), added subsec. (g).

1974—Subsec. (b)(1). Pub. L. 93–319 inserted reference to the Administrator's action under section 1857c–10(c)(2)(A), (B), or (C) of this title or under regulations thereunder and substituted reference to the filing of a petition within 30 days from the date of promulgation, approval, or action for reference to the filing of a petition within 30 days from the date of promulgation or approval.

1971—Subsec. (a)(1). Pub. L. 92–157 substituted reference to section ''7545(c)(3)'' for ''7545(c)(4)'' of this title.

### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 1013 of Title 5, Government Organization and Employees.

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L.

95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7608. Mandatory licensing

Whenever the Attorney General determines, upon application of the Administrator—

(1) that—

(A) in the implementation of the requirements of section 7411, 7412, or 7521 of this title, a right under any United States letters patent, which is being used or intended for public or commercial use and not otherwise reasonably available, is necessary to enable any person required to comply with such limitation to so comply, and

(B) there are no reasonable alternative methods to accomplish such purpose, and

(2) that the unavailability of such right may result in a substantial lessening of competition or tendency to create a monopoly in any line of commerce in any section of the country,

the Attorney General may so certify to a district court of the United States, which may issue an order requiring the person who owns such patent to license it on such reasonable terms and conditions as the court, after hearing, may determine. Such certification may be made to the district court for the district in which the person owning the patent resides, does business, or is found.

(July 14, 1955, ch. 360, title III, §308, as added Pub. L. 91–604, §12(a), Dec. 31, 1970, 84 Stat. 1708.)

### Editorial Notes

CODIFICATION

Section was formerly classified to section 1857h–6 of this title.

PRIOR PROVISIONS

A prior section 308 of act July 14, 1955, was renumbered section 315 by Pub. L. 91–604 and is classified to section 7615 of this title.

### Statutory Notes and Related Subsidiaries

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect